**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x
                                              )
In re                                         )
                                              )    Chapter 11
AMERICAN SAFETY                               )
RAZOR COMPANY, LLC, et al.,[1]                )    Case No. 10-_____ (___)
                                              )
                              Debtors.        )    Joint Administration Pending
                                              )
---------------------------------------------------------x

**AFFIDAVIT OF J. ANDREW BOLT, EXECUTIVE VICE PRESIDENT AND CHIEF
FINANCIAL OFFICER OF AMERICAN SAFETY RAZOR COMPANY, LLC AND
BLADE ACQUISITION COMPANY, AND VICE PRESIDENT AND AUTHORIZED
OFFICER OF THE OTHER DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS**

STATE OF NEW JERSEY          )
                             )    ss:
COUNTY OF MORRIS             )

         J. Andrew Bolt, being duly sworn, deposes and says:

         1.       I am the Executive Vice President and Chief Financial Officer of

American Safety Razor Company, LLC ("ASR"), a limited liability company organized under

the laws of Delaware, and Blade Acquisition Company ("BAC"), a corporation organized under

the laws of Delaware.  I am also Vice President or Authorized Officer of each of ASR's and

BAC's subsidiaries and affiliates that are debtors and debtors in possession (together with ASR

---

[1]       The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax
identification number, are: American Safety Razor Company, LLC (0207), American Safety Razor
Corporation (5475), ASR Holdings, Inc. (6509), Blade Acquisition Company (2053), Industrias
Manufactureras ASR de Puerto Rico, Inc. (4894), Megas Beauty Care, Inc. (0321), Megas de Puerto Rico,
Inc. (3065), Personna International de Puerto Rico, Inc. (0814), RSA Holdings Corp. of Delaware (3029),
RSA Soap Company, Inc. (7635), and Valley Park Realty, Inc. (3691). The following entities are non-
debtor foreign affiliates of the Debtors: American Safety Razor Australia Pty Limited; American Safety
Razor do Brasil Ltda.; American Safety Razor of Canada Limited; ASR Exportacao, Importacao, Comercio
e Industria de Produtos de Barbear Ltda; Personna International CZ s.r.o.; Personna International de
Mexico, S.A. de C.V.; Personna International Israel Ltd.; Personna International Limited; Personna
International UK Limited; Personna International UK Ltd; and Wolco Holland BV (collectively, the "Non-
Debtor Foreign Affiliates", and together with the Debtors, the "Company"). The corporate address of
American Safety Razor Company, LLC is 240 Cedar Knolls Road, Cedar Knolls, NJ 07927.

and BAC, and as set forth in footnote 1 hereto, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>").

   2.  I submit this affidavit in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "<u>First Day Motions</u>").[2]  The relief sought by the Debtors in the First Day Motions seeks to minimize the

---

[2]  The First Day Motions include:

  (1) Debtors' Motion for an Order Directing the Joint Administration of Their Chapter 11 Cases;

  (2) Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Continue Use of Existing Bank Accounts and Business Forms; (II) Open New Debtor in Possession Accounts; and (III) Continue Conducting Ordinary Course Intercompany Transactions;

  (3) Debtors' Motion for an Order Authorizing the Payment of Prepetition Employee Wages, Benefits, Business Expenses and Related Items;

  (4) Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Honor Certain Prepetition Obligations under Customer Programs, and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Payment Requests Made Relating to the Foregoing;

  (5) Debtors' Motion for Entry of an Order (A) Authorizing, But Not Requiring, the Debtors to Remit and Pay Sales, Use, and Franchise Taxes and Certain Other Government Charges; and (B) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing;

  (6) Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services;

  (7) Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing;

  (8) Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Continue Prepetition Insurance Coverage and Enter into New Insurance Policies and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests Relating Thereto;

  (9) Debtors' Application for Entry of Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent *Nunc Pro Tunc* to the Petition Date, Pursuant to Section 156(c) of the Judicial Code and Rule 2002-1(f) of the Local Bankruptcy Rules;

  (10) Debtors' Motion, Pursuant to Sections 105(a), 362 and 541 of the Bankruptcy Code, for Entry of an Order Establishing Notice and Hearing Procedures for Trading in Equity Interests in the Debtors;

  (11) Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing and Directing Financial Institution to Honor All Related Check and Electronic Payment Requests; and

  (12) Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay or Honor Prepetition Obligations to Certain Common Carriers and Other Lien Claimants and (B)

adverse effects of the commencement of these Chapter 11 Cases on their businesses and maximize the value of these estates.

3.      I am authorized by each of the Debtors to submit this affidavit.  In my capacities as Executive Vice President and Chief Financial Officer of ASR and BAC and Vice President and Authorized Officer of each of the nine other Debtors, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.  Except as otherwise indicated, all facts set forth in this affidavit are based upon personal knowledge, my review of relevant documents, information I have acquired in the ordinary course of performing the function of Chief Financial Officer of ASR and BAC, and/or my experience and knowledge concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this affidavit.

4.      Part I of this affidavit provides an overview of the Debtors' businesses, the circumstances affecting the Debtors and the events leading to the Debtors' chapter 11 filing.  Part II sets forth relevant facts in support of the Debtors' First Day Motions.

## PART I
### Nature Of Debtors' Business And Statement Of Circumstances Leading To Debtors' Chapter 11 Filing

**A.      The Chapter 11 Filings**

5.      On July 28, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession.  To enable the Debtors to operate efficiently following the chapter 11 filings, the

---

Authorizing and Directing Financial Institutions to Honor All Related Check And Electronic Payment Requests.

Debtors are requesting various types of relief in "first-day" applications and motions filed with this Court.

6.      These Chapter 11 Cases do not involve ASR's non-U.S. affiliates.  These Non-Debtor Foreign Affiliates (as defined in footnote 1 above) are not chapter 11 debtors or the subject of foreign insolvency proceedings.  The Non-Debtor Foreign Affiliates will continue their ordinary course business operations and are self-funding entities.

**B.      Corporate Structure**

7.      London-based private equity firm Lion Capital LLP ("Lion Capital") and certain other investors own 100 percent of the equity of Lion/Blade Luxembourg S.a.r.l ("Lux1"), which owns 100 percent of the equity of Lion/Blade Luxembourg 2 S.a.r.l. ("Lux2"). Neither Lux1 nor Lux2 is a debtor in these Chapter 11 Cases or any domestic or foreign insolvency proceedings, to my knowledge.  Lux2 owns 95.8 percent of the equity of BAC,[3] which owns 100 percent of the equity of RSA Holdings Corp. of Delaware ("Holdings").  Each of BAC and Holdings are Debtors in these Chapter 11 Cases and Holdings is the direct parent of ASR.  A summary chart depicting the Debtors' corporate organization and debt structure (described below) is annexed hereto as Exhibit A.

**C.      Background And Current Business Operations**

*Company Background*

8.      The Company (as defined in footnote 1) is currently the fourth largest manufacturer and distributor of wet shaving razors and blades and competes against the significantly larger companies that manufacture and distribute products under the brand names Gillette, Schick, Wilkinson Sword and Bic.  The Company also competes against several other

---

[3]      4.2 percent of BAC is owned by the Company's management.

manufacturers. In addition, the Company manufactures and distributes blades, bladed hand tools and specialty industrial and medical blades.

9.     The Company was founded in 1875 by the Kampfe brothers with the introduction of the "Star," the first safety razor manufactured in the United States. In 1906, several businesses begun by the Kampfes and their employees were consolidated as "American Safety Razor Company." After a series of sales of the business between 1928 and 1989, the Company went public in 1993 with a $60 million initial public offering. The Company went private in 1999 in an acquisition by private equity firm J.W. Childs Associates, L.P. Thereafter, in 2006, the Company was acquired by Lion Capital through a combination of $215 million in equity contributions and $443 million in borrowings under three loan facilities (defined and described further below) to fund the acquisition and refinance the Company's then-existing debt.

10.     Throughout the Company's history, it has been an innovator in the production of blade products. In 1935, the Company expanded its product lines from wet shave razors to include industrial and surgical blades. In 1963, the Company was the first maker of stainless steel blades. In 1969, the Company introduced "Face Guard," the first guarded blade ever marketed in the U.S. In 1971, the Company introduced the world's first disposable razor made exclusively for women. More recently, the Company has continued to develop and launch new products that deliver ever closer and more comfortable shaving experiences.

11.     The Company's: (a) net sales in 2008 were approximately $351 million, with EBITDA of approximately $74 million, and (b) net sales in 2009 were approximately $330 million, with EBITDA of approximately $76 million. In 2009, approximately 86% of the Company's sales and approximately 97% of EBITDA were generated by the wet shave unit of the business. However, as discussed in greater detail below, due to the replacement by another

manufacturer of a significant portion of products sold to the Company's largest customer, and growing competitive threats from other manufacturers, the Company is forecasting a significant drop in profitability in the coming years. The Company's primary sources of liquidity are cash flow from operations and borrowings under its first lien revolving credit facility (discussed further below).

### Divisions of the Company

12.     The Company's operations are broken down into three primary business lines: (i) consumer "wet" shaving products; (ii) blades and bladed hand tools; and (iii) specialty industrial and medical blades and tools. The Company is headquartered in Cedar Knolls, New Jersey and has manufacturing, packaging and distribution operations in North America and abroad.

13.     <u>Wet Shaving Products</u>. The Company manufactures and sells wet shaving razors and blades that provide consumers with a value-priced alternative to more heavily advertised premium priced brands, while providing retailers with attractive profit margins. The Company's wet shaving razor and blade products are primarily sold under a retailer's store brand and/or under the Company's value brand names such as Personna®, Matrix®, Magnum™, Mystique®, Solara® and GEM®. The Company markets complete razor and blade systems, replacement razor cartridges and disposable razors.

14.     <u>Blades and Bladed Hand Tools</u>. The Company's premium and value-priced blades and bladed hand tools are sold primarily under the Personna® and American Line™ brand names. This line of the Company's business capitalizes on its shaving blade technology and includes such items as single-edge blades, utility blades, carpet blades and complementary bladed hand tools. The Company's blades and bladed hand tools are sold to

6

consumers and professionals through retail paint chains, hardware stores and home-improvement centers/do-it-yourself retailers such as Home Depot and Lowes, and through wholesalers and distributors. This unit of the Company's business is directly tied to the general housing market and is heavily influenced by general economic factors.

15. <u>Specialty Industrial and Medical Blades and Tools</u>. The Company's industrial blades are used in manufacturing processes employed by a variety of industries, including food-processing, fiber cutting and automotive. The Company also manufactures carbon and stainless steel medical and surgical blades and surgical prep blades for the North American health care markets.

*Facilities and Manufacturing Operations*

16. The Company operates two U.S. manufacturing and distribution facilities in Verona, Virginia (the "<u>Verona Facility</u>"), and Knoxville, Tennessee (the "<u>Knoxville Facility</u>"), three third-party owned U.S. distribution facilities in Phoenix, Arizona, Lebanon, Tennessee, and Dallas, Texas, and one U.S. packaging and distribution facility in Rio Grande, Puerto Rico. Outside the U.S., the Company operates one manufacturing and distribution facility in Nazareth Illit, Israel (the "<u>Israel Facility</u>"), three manufacturing and packaging facilities, two in Obregon, Sonora, Mexico (the "<u>Obregon Facilities</u>"), and one in Teplice, Czech Republic (the "<u>Czech Facility</u>"), one packaging and distribution facility in Mexico City, Mexico, one third-party owned packaging and distribution facility in Toronto, Canada, three European distribution facilities in Amsterdam, Holland, Madrid, Spain, and Mansfield, United Kingdom, three other distribution facilities in Sydney, Australia, Dubai, U.A.E., and Sao Paolo, Brazil, and one packaging facility in Santa Catarina, Brazil (the "<u>Santa Catarina Facility</u>"). The Company's non-U.S. facilities serve both the U.S. and international markets.

17.     The Company operates as an integrated manufacturer.  Blades are manufactured in the Verona Facility, Knoxville Facility and Israel Facility.  Completed blades are assembled with other component parts primarily in the Obregon Facilities, Verona Facility, Israel Facility and Czech Facility.  Thereafter, finished goods are packaged primarily in the Obregon Facilities, Czech Facility and Santa Catarina Facility, as well as in Mexico City and Toronto, from which the finished goods are sent to the Company's distribution centers.

18.     Proprietary and highly technical manufacturing processes allow the Company to produce a wide variety of products of different quantities, sizes and packaging while maintaining a high level of quality.  The Company works continually to improve blade quality and performance and manufacturing productivity by adding new technologies and manufacturing processes.  The Company's business is capital-intensive and technology-driven, and relies heavily on its proprietary technology and know-how and its highly experienced research and development team.  The Company is the owner of approximately 100 patents for its blade technology.

*The Company's Workforce*

19.     As of the Petition Date, the Debtors employed approximately 440 employees (the "Employees") worldwide.  In addition to these Employees, pursuant to a third-party agreement, the Debtors utilize the services of nearly 1,200 individuals in the Obregon Facilities (the "Obregon Employees").  ASR also uses the services of 50 brokers (the "Brokers") who provide sale functions to the Debtors, but are not employees of the Debtors.  Approximately 120 of the Debtors' Hourly Employees (as defined below) are covered by a collective bargaining agreement between ASR and the IUE Industrial Division of the CWA, AFL-CIO (as amended,

the "CBA," with such Hourly Employees subject to the CBA referred to herein as the

"Bargaining Employees").  The Debtors currently do not intend to reject or modify the CBA.

        20.     The Debtors have a defined benefit pension plan for Salaried Employees

(as defined below), which was frozen on July 15, 2005 for certain Employees and on July 15,

2008 for other Employees, and a defined benefit plan for Bargaining Employees, which was

frozen on December 1, 2006 (together, the "Defined Benefit Pension Plans").  The Defined

Benefit Pension Plans are underfunded by approximately $94,888,000 as of December 31, 2009.

The Debtors are not seeking to make any prepetition payments on account of the Defined Benefit

Pension Plans in any of the First Day Motions.  Under the terms of the APA (defined below), the

First Lien Lenders (defined below) have agreed to assume the Debtors' obligations under the

Defined Benefit Pension Plans.[4]

**D.**      **The Debtors' Debt Structure**

        21.     The Company has operated with a highly-leveraged capital structure.  The

Company's three prepetition credit facilities, each dated as of July 31, 2006, are as follows:

    (i)    a first lien credit agreement (the "First Lien Credit Agreement"), under which the Debtors that are party to the First Lien Credit Agreement had revolving loans of approximately $34.0 million and term loans of approximately $210.4 million outstanding as of the Petition Date;

    (ii)    a second lien credit agreement (the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, the "First and Second Lien Credit Agreements"), under which the Debtors that are party to the Second Lien Credit Agreement  had second lien term loans of approximately $178.1 million outstanding as of the Petition Date; and

    (iii)    a payable in kind or "PIK" interest mezzanine credit agreement (the "Mezzanine Credit Agreement"), under which Holdings had

---

[4]      All of the other proposals the Debtors have received have provided for the assumption of the Debtors' obligations under the Defined Benefit Pension Plans.

mezzanine term loans of approximately $60.0 million outstanding as of the Petition Date.[5]

22.    The obligations under the First and Second Lien Credit Agreements are secured by blanket liens on substantially all of the domestic personal and real property of the Debtors, including pledges of all capital stock, which pledges include 100% of the capital stock of the Debtors' first-tier foreign subsidiaries.  The administrative agents under the First and Second Lien Credit Agreements are parties to an intercreditor agreement, which governs the relative rights of the parties (including with respect to lien priorities and enforcement of remedies) relating to the collateral of the Debtors securing the obligations under the First and Second Lien Credit Agreements and which also bars the Second Lien Lenders from objecting to certain motions and applications in these Chapter 11 Cases that bear on the collateral.  Pursuant to the terms of the intercreditor agreement, the liens on the Debtors' collateral securing the Second Lien Credit Agreement obligations are junior and subordinate to the liens on the collateral securing the First Lien Credit Agreement obligations.  The obligations under the Mezzanine Credit Agreement are unsecured and structurally subordinated to the obligations of the First and Second Lien Credit Agreements.

## E.    Events Leading To The Chapter 11 Filing

### *A Changing Competitive Landscape*

23.    As discussed above, the Company is the fourth largest producer of "wet" shaving razors and has the third largest share in the core markets of the U.S. and Europe.  Wet shaving sales represent approximately 86% of the Company's revenues.  The two largest

---

[5]    ASR is the Borrower under the First and Second Lien Credit Agreements.  Holdings is the Borrower under the Mezzanine Credit Agreement.  The following Debtors are guarantors of ASR's obligations under the First and Second Lien Credit Agreements: Holdings, American Safety Razor Corp., RSA Soap Company, Inc., Personna International de Puerto Rico, Inc., ASR Holdings, Inc. and Megas Beauty Care, Inc.  There are no guarantors of Holdings' obligations under the Mezzanine Credit Agreement.

companies in this industry are Gillette, a subsidiary of Procter & Gamble and Schick, a subsidiary of Energizer Holdings.  In addition, the Company faces regional and global competition from a variety of smaller manufacturers.

24.     Since 2008, the Company has faced significant earnings pressures due to, among other things, the impact of the slowing economy on the Company's industrial business and a poor start-up of the Czech Facility, followed by low 2009 growth in the European market. Additionally, competition in the wet shaving category has been increasing.  During the recent economic recession, the Company faced significant challenges from competitors and retailers who discounted their prices to attract the business of the cash-strapped consumer.  The accumulation of these factors had a major impact on the Company's 2009 earnings and put significant pressure on the Company's ability to stay compliant with its leverage covenants under the First and Second Lien Credit Agreements.  Further, it has become evident that competitors will increase their focus on competing with the Company in the value segment of the wet shaving market.

25.     In the summer of 2009, the Company retained Lazard Middle Market LLC ("Lazard") to help the Company engage in a process with the then-administrative agent and certain lenders under the First and Second Lien Credit Agreements to amend its financial covenants.  However, as that process got underway, the Company learned from its largest customer, which represented more than 15% of the Company's 2009 revenue, that the Company was at risk of losing such customer's business starting in 2010.  The Company suspended its amendment discussions and focused its efforts on engaging in discussions with the customer to assure the customer's future business.

26.    Notwithstanding the Company's efforts, in the beginning of 2010, the Company was informed of this customer's final decision to discontinue carrying the majority of the Company's product line.  Further, the Company also learned that this customer was replacing most of the Company's products and adding competing products from a branded competitor that had determined to compete in the value segment, squeezing shelf space and creating potential pricing pressures.  The impact of both the loss of a significant volume and the likelihood of a new competitor in the value segment immediately led the Company to reevaluate its long term strategy and revise its business plan accordingly.  The Company has since learned that, in addition to the potential new focus of the branded competitor on value-oriented products, at least two other manufacturers are expected to expand their manufacturing and/or marketing efforts on wet shaving value products for U.S. and European consumers.

27.    As a result of the changing competitive landscape, the Company refocused on significantly lowering its costs while protecting its excellence in service and quality, accelerating product development and preparing to meet customers' changing expectations for value products.  To support these efforts, in September 2009, the Company engaged AlixPartners LLP ("AlixPartners") to assist in an operational restructuring and cost reduction program.  These cost initiatives have been largely implemented over the past several months.  During 2009, the Company embarked on a plan to develop its next generation shaving platform—"Gen-Y."  The new platform will feature new cartridge architecture, and new blade coating and geometry to improve the comfort and consistency of the shave performance.  The Company accelerated development efforts to allow multiple new product launches under the Gen-Y technology in 2011.

28.    During this time period, the Company informed its lenders that as of December 31, 2009, the Company was not in compliance with the leverage ratio covenants under the First and Second Lien Credit Agreements, which resulted in an event of default under such credit agreements.  On April 21, 2010, the Company entered into separate waiver agreements (the "Initial Waivers"), effective as of April 1, 2010, with the lenders under the First Lien Credit Agreement (the "First Lien Lenders") and the lenders under the Second Lien Credit Agreement (the "Second Lien Lenders"), under which such lenders agreed to grant a temporary waiver of, and not exercise their rights and remedies with respect to, certain defaults and events of default (including non-compliance with the leverage ratio covenant).  The Waiver period was intended to allow the Company to formulate a restructuring proposal based on an updated long term business plan.  The Initial Waivers expired on June 29, 2010.

29.    As part of the Waiver process, each of the First Lien Lenders and Second Lien Lenders retained legal and financial advisors.  Paul, Hastings, Janofsky & Walker LLP and Houlihan Lokey were retained by the First Lien Lenders as advisors (the "First Lien Advisors").  Brown Rudnick LLP and Chanin Capital Partners were retained by the Second Lien Lenders as advisors (the "Second Lien Advisors").  As of the Petition Date, the First Lien Advisors and Second Lien Advisors have been paid approximately $1,699,000 and $1,814,000, respectively, by the Company to conduct due diligence in connection with the Company's restructuring.

*The Business Plan and Restructuring Proposal*

30.    Pursuant to the terms of the Initial Waivers, the Company was required to deliver a business plan to the administrative agents for the First Lien Lenders and the Second Lien Lenders by May 20, 2010.[6]  In light of the foregoing, with AlixPartners' assistance, the

---

[6]    The business plan was delivered to the administrative agents for the First Lien Lenders and the Second Lien Lenders on May 20, 2010.

Company began a process to review and revise its long term business plan.  The process

involved reviewing YTD performance for all major customers and preparing the latest estimates

for 2010.  Major assumptions used for 2011 through 2013 also were reviewed and challenged.

The business plan development process also involved revising assumptions related to external

factors that impact financial performance, namely foreign exchange assumptions.  Upon

completion of the business plan it became clear that the Company's current capital structure no

longer was compatible with its business outlook and the highly competitive marketplace in

which it will be operating.

31.    Pursuant to the terms of the Initial Waivers, the Company also was

required to deliver a "restructuring proposal" to the administrative agents for the First Lien

Lenders and the Second Lien Lenders by June 9, 2010.  To that end, the Company and its

advisors spent a considerable amount of time discussing potential restructuring options with the

First Lien Lenders and Second Lien Lenders and their advisors, and encouraged each group to

provide the Debtors with a proposal.

32.    On June 9, 2010, the Company delivered the restructuring proposal

required by the Initial Waivers to the administrative agents for the First Lien Lenders and the

Second Lien Lenders, which outlined the sale of the Company's assets pursuant to a section 363

sale process subject to a competitive auction process while retaining complete flexibility to

entertain alternative restructuring proposals including refinancings, recapitalizations and plans of

reorganization.

### *Working With Key Constituencies*

33.    Since February 2010, the Company has expended extensive efforts to

provide the First Lien Lenders and the Second Lien Lenders with due diligence and access to

management.[7]  Over the course of that time, the Company and its advisors provided the lenders

with: (a) two formal business plan presentations (one in February 2010 and one in May 2010);

(b) follow up in-person meetings with the Company's senior management and advisors to

discuss each business plan presentation; (c) access to the Company's data room, which has

approximately 900 documents (or approximately 17,000 pages of documents); (d) site tours of

each of the Knoxville Facility, Verona Facility and Obregon Facilities; (e) several diligence

meetings for the First Lien Advisors with members of senior management and AlixPartners; (f)

several diligence meetings for the Second Lien Advisors with members of senior management

and AlixPartners; (g) weekly calls with the First Lien Advisors and the Second Lien Advisors on

the Company's cash flow projections; and (h) near daily communications between the advisors

to the Company and those for the First and Second Lien Lenders.

### Restructuring/Sale Process

34.    In March 2010, two of the largest holders of the Second Lien debt

submitted a non-binding term sheet to the Company for a restructuring of the Company's capital

structure.  However, shortly thereafter, the Company was informed by the Second Lien Lenders'

steering committee that it did not support the proposed transaction. Notwithstanding the Second

Lien Lenders' lack of support for this proposal, the Debtors and their advisors continued to work

with the Second Lien Lenders and their advisors towards reaching a deal.[8]

---

[7]    The lender under the Mezzanine Credit Agreement (the "Mezzanine Lender") received all of the documentation noted in the text and has also had its own advisors and opportunity for similar diligence.

[8]    In connection with the Debtors' efforts to work with the Second Lien Lenders on a potential restructuring proposal, Lazard contacted nine financial institutions to see if they were interested in providing financing for such a proposal.  Of the nine contacted, seven executed confidentiality agreements and received the Company's business plan and related management presentation.  Moreover, certain of these financial institutions spoke with either the Debtors or AlixPartners regarding various diligence items.  Ultimately, Lazard put a number of these financial institutions in touch with the Second Lien Lenders' advisors.

35.     Thereafter, during May 2010, the administrative agent under the First Lien Credit Agreement advised the Company that First Lien Lenders holding a majority in amount of the debt under the First Lien Credit Agreement proposed to cause the First Lien Lenders to purchase the assets of the Company, assume substantially all operating liabilities (including the Company's pension, trade and wage obligations), and fund the orderly and expeditious wind down of these Chapter 11 Cases (the "First Lien Proposal").  The Company immediately engaged in substantive negotiations (and the continued provision of access and information) with the First Lien Lenders over the terms of such a sale.  The culmination of those negotiations was an asset purchase agreement between the Company and the First Lien Lenders (the "APA"), which was executed on July 27, 2010.

36.     Also in May 2010, a consortium of Second Lien Lenders holding more than 50% of the outstanding Second Lien debt informed the Company of a competing proposal. Over the next few weeks, the proposal was distilled into a written presentation, which supposedly has broad support among the Second Lien Lenders.  It contemplated that (i) the First Lien Credit Agreement would be refinanced with the proceeds of first and second lien debtor in possession financing facilities which, subject to satisfaction of certain conditions, would convert to exit financing facilities upon the Debtors' emergence from Chapter 11, and (ii) the prepetition claims of the Second Lien Lenders would be equitized (subject to dilution on account of the exercise of warrants to be distributed under a plan to the second lien DIP lenders), all as part of a pre-packaged or pre-arranged chapter 11 plan process (the "Second Lien Proposal").  Late in June 2010, the proponents of the Second Lien Proposal engaged Goldman Sachs Lending Partners LLC ("Goldman Sachs") to assist with the senior financing component of the Second Lien Proposal.  The Company subsequently engaged in substantive negotiations with (and the

16

continued provision of access and information to) the Second Lien Lenders over the terms of the

Second Lien Proposal.

37.    Based on the apparently increased prospects for success of the refinancing

efforts, the Company entered into an agreement with Goldman Sachs to cooperate with Goldman

Sachs' syndication efforts and sought and obtained an extension of the Initial Waivers from June

29, 2010 to July 29, 2010 (the "Second Waivers") to allow for additional time for the Second

Lien Proposal to become a binding deal.  To support the syndication efforts, the Company (a)

provided Goldman Sachs with a $425,000 expense reimbursement deposit; (b) worked closely

with Goldman Sachs and the proponents of the Second Lien Proposal to prepare syndication

materials; (c) made a lender presentation to over 85 financial institutions; (d) conducted one-on-

one meetings with potential investors in support of the syndication; (e) provided extensive due

diligence materials; and (f) entered into negotiations with Goldman Sachs and other Second Lien

Lenders' advisors regarding the material agreements required to implement the Second Lien

Proposal.  Goldman Sachs informed the Company that, in addition to existing parties in the

Company's capital structure, Goldman Sachs solicited 19 private equity or hedge funds to raise

the junior capital needed to fund the Second Lien Proposal.  Despite the Company's exhaustive

efforts to support the syndication effort, unfortunately, the commitments submitted to Goldman

Sachs to date are insufficient to fund the Second Lien Proposal.

38.    The Second Lien Proposal ultimately may become the basis of the

Company's reorganization.  At this time, however, the Company determined to initiate these

Chapter 11 Cases, in part because of (a) the inability to raise sufficient funds to finance the

Second Lien Proposal; (b) the instability a protracted and uncertain process would cause to

relationships with key customers, suppliers and employees, and the resulting degradation in

value; and (c) the expiration of the Second Waivers.  The Company is in a highly competitive industry.  As noted above, the Company is facing increasing competition including new competition in the value segment from a larger competitor.

39.     The primary selling season in the largest markets for the Company's new Gen-Y products and its existing products occurs from August to October.  The Company cannot remain in its current vulnerable situation without significant losses.  Without a stable and serviceable capital structure, the Company's ability to launch its next generation product line and sustain customer relationships into 2011 is severely jeopardized.  In addition, at the time of the expiration of the original Waivers, due to prior leaks concerning the expiration deadline, the Company received a worrisome number of inquiries from major and critical vendors and customers in which these key constituencies expressed serious concern about the uncertainty of the Company's future and indicated that such uncertainty might affect their business dealings with the Company in the near term. The Company concluded that it cannot afford to delay any longer the process of resolving its capital structure, although it will continue to work to procure the highest and best outcome for its stakeholders.

40.     The Company believes that the competitive auction process is perfectly suited to protect the interests of all parties in interest.  The Company anticipates that its postpetition marketing effort will build on and will be able to proceed more rapidly because of the prepetition efforts of Goldman Sachs, which already canvassed certain key private equity firms.  The proposed marketing and auction process embodied in the APA will give the Second Lien Lenders and others over seven weeks to make the Second Lien Proposal (or any other competing bid) a higher and better bid with certainty of closure.  In addition, the APA does not impose any impediments such as a breakup fee or no-shop provision. The Company believes that

the value of the estate is protected by entering into chapter 11 with a fully executed "stalking horse" asset purchase agreement, and that the back-end remarketing and sale process it is proposing will allow the proponents of the Second Lien Proposal (and other potential bidders) an ample opportunity to submit higher and better offers in the form of either a 363 sale or funding of a chapter 11 plan.

**F.      Restructuring Goals**

41.      Upon the conclusion of the chapter 11 process, the Debtors expect to have restructured their debt obligations and capital structure, and hopefully have obtained the highest recovery possible for creditor constituencies through the proposed 363 sale process or a chapter 11 plan process, as the auction process may develop.  In the meantime, the Debtors will marshal all of their resources to continue to deliver value and quality products to their customers. Additionally, the Debtors will preserve and continue the strategic growth of their operations and maintain their prominence as leading designers, manufacturers and marketers of high-quality razors and blades.

**PART II**
**Summary Of First Day Applications And Motions**

42.      An important and, in some cases, critical element in the Debtors' successful reorganization is approval of each of the First Day Motions submitted concurrently herewith.  In furtherance of the objective of successful reorganization, the Debtors request that "first-day" orders of the types mentioned below be entered.  Factual information in support of the First Day Motions is provided below.

**Debtors' Motion for an Order Directing the Joint Administration of Their Chapter 11 Cases**

43.      As reflected in the corporate organization chart attached hereto as Exhibit A, BAC is the direct or indirect parent of all of the other Debtors.  The Debtors seek entry of an

19

order directing joint administration of their Chapter 11 Cases and the consolidation thereof for procedural purposes only.  These cases involve thousands of potential creditors and will be administered more efficiently by the entry of an order of joint administration.

**Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Continue Use of Existing Bank Accounts and Business Forms; (II) Open New Debtor in Possession Accounts; and (III) Continue Conducting Ordinary Course Intercompany Transactions (the "Cash Management Motion")**

**A.        Description of the Debtors' Cash Management Systems and Bank Accounts**

44.        In the ordinary course of business, the Debtors maintain an integrated cash management system that provides mechanisms for collection, concentration, management and disbursement of funds used for their operations (collectively, the "Cash Management System"). The Cash Management System consists of numerous bank accounts (collectively, the "Bank Accounts") and is used by the Debtors to receive incoming payments and make disbursements in the ordinary course of the Debtors' business.[9]  Each Bank Account maintained by the Debtors (with the name of the corresponding bank (collectively, the "Cash Management Banks")) is listed on Exhibit B to the Cash Management Motion and a diagram detailing the flow of cash through the Cash Management System is annexed to the Cash Management Motion as Exhibit C.

45.        JPMorgan Concentration Account.  American Safety Razor Company, LLC ("ASR LLC"), a Debtor in these cases, maintains a concentration account at JPMorgan Chase Bank, N.A. (the "JPMorgan Concentration Account," Account #1).[10]

46.        Wachovia and SunTrust Disbursement Accounts.  ASR LLC maintains two master disbursement accounts, one at Wachovia Bank (the "Wachovia Disbursement

---

[9]        The Debtors believe that all of the Bank Accounts are maintained in financially stable banking institutions with FDIC or FSLIC insurance (up to the applicable limit on the account).

[10]        For the convenience of the Court, account reference numbers correspond to the applicable account on the Cash Management System diagram annexed to the Cash Management Motion as Exhibit C.

Account," Account #2) and one at SunTrust Bank (the "SunTrust Disbursement Account,"

Account #3).  The JPMorgan Concentration Account provides funding solely to the Wachovia

Disbursement Account.  The SunTrust Disbursement Account is funded by the Wachovia

Disbursement Account.  Both the Wachovia Disbursement Account and SunTrust Disbursement

Account fund various other accounts used by the Debtors and other disbursements as described

further below.

      47.    Lockbox Accounts.  ASR LLC maintains two zero-balance lockbox

accounts at JPMorgan Chase Bank, N.A. (collectively, the "JPMorgan Lockbox ZBAs,"

Accounts ##4, 5) into which the majority of the Debtors' customer collections and other cash

receipts are deposited.[11]  These funds are swept daily into the JPMorgan Concentration Account.

Flow of Funds from the Wachovia Disbursement Account.

      48.    VEBA Trust Account and Health Benefits Account.  ASR LLC maintains

a voluntary Employees' beneficiary association or "VEBA" trust account at Wachovia Bank (the

"VEBA Trust Account," Account #6), which is funded by the Wachovia Disbursement Account.

ASR LLC also maintains a zero-balance health benefits account (the "Health Benefits Account,"

Account #7) at Wachovia Bank, which is funded as needed by the VEBA Trust Account.  The

purpose of these accounts is to permit the Debtors' third party health benefits administrator to

effect reimbursement in respect of Employees' health insurance claims.

      49.    Other Disbursements from the Wachovia Disbursement Account.  The

Wachovia Disbursement Account is also used as a master disbursement account, making

disbursements for many of the Debtors' daily operational needs, including purchases, freight

---

[11]    Certain customer collections and other cash receipts and payments from foreign affiliates are deposited
directly into the Wachovia Disbursement Account.

costs, payments to consultants and other professionals, payroll taxes, 401(k) contributions,

insurance payments, intercompany payments, income taxes and financing obligations.

Flow of Funds from the SunTrust Disbursement Account.

        50.    Payroll Accounts.  ASR LLC maintains two zero-balance accounts at

SunTrust Bank that it used through June 2010 to process payroll for the Debtors' employees

(Accounts ##8, 9).  These accounts were funded by the SunTrust Disbursement Account.[12]

        51.    Flexible Spending Account.  ASR LLC maintains a zero-balance account

at SunTrust Bank that it uses to fund the FSA Programs (as defined below) for Employee

healthcare expenses (Account #10).  This account is funded by the SunTrust Disbursement

Account.

        52.    Workers' Compensation Accounts.  Although the vast majority of the

Debtors' W/C Claims (as defined below) are covered by insurance (the "Workers' Compensation

Policy"), Megas Beauty Care, Inc. ("MBC"), a Debtor in these cases, maintains two zero-balance

accounts at SunTrust Bank, which are used to self-fund certain workers' compensation payments

for MBC's Missouri and Ohio Employees (Accounts ##11, 12) and RSA Soap Company, Inc.

("RSA"),[13] also a Debtor in these cases, maintains a zero-balance account at SunTrust Bank,

which is used to self-fund certain workers' compensation payments for RSA Employees

(Account # 13).  All three of these accounts are funded by the SunTrust Disbursement Account.

        53.    Puerto Rican Operations Accounts.  Personna International de Puerto

Rico, Inc. ("PIPR") and Industrias Manufactureras ASR de Puerto Rico, Inc. ("Industrias"), each

---

[12]      Payroll administration and payment is now performed on behalf of the Debtors by third-party payroll services provider Ceridian Corporation ("Ceridian").  Additional detail regarding payroll services work performed by Ceridian for the Debtors is set forth in the Employee Wages Motion (defined below).

[13]      RSA formerly was known as Hewitt Soap Company.

a Debtor in these cases, maintain two operations accounts at Banco Popular de Puerto Rico in San Juan, Puerto Rico (the "PR Operations Accounts," Accounts ##14, 15). PIPR's and Industrias' collections and cash receipts related to customers and suppliers domiciled primarily in Puerto Rico and the Caribbean are deposited into the PR Operations Accounts. PIPR and Industrias also use these accounts to fund operations, including payroll.

54.      Blade Acquisition Account. BAC, a Debtor in these cases, maintains an inactive standalone capital funding account at Wachovia Bank (the "BAC Account," Account # 16), which was set up in 2006 for investment related to the acquisition of the Company by Lion Capital LLP. BAC keeps a *de minimis* amount of cash in this legacy account.

55.      Flow of Funds. Funds flow into and out of the Bank Accounts through three means: (a) written checks; (b) wire transfers; and (c) automatic clearing house payments ("ACH Payments").[14] As of the Petition Date, the Debtors have approximately $19.0 million in their various accounts with the Cash Management Banks.

**B.      The Debtors' Existing Business Forms**

56.      As part of the Cash Management System, in the ordinary course of business, the Debtors use a variety of business forms. If the Debtors can continue to use their existing forms, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

**C.      Intercompany Claims and Intercompany Transactions**

57.      The Debtors and the Non-Debtor Foreign Affiliates maintain business relationships with each other (the "Intercompany Transactions") resulting in intercompany

---

[14]      ACH Payments are electronic funds transfers through a system run by a third-party administrator, the National Automated Clearing House Association, and generally are used as a substitute for checks and to make electronic payments of a repetitive nature at a reduced cost as compared to wire transfers.

receivables and payables in the ordinary course of business (the "Intercompany Claims").  In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and the Non-Debtor Foreign Affiliates, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and a Non-Debtor Foreign Affiliate.

58.     Many of the Non-Debtor Foreign Affiliates purchase materials, components and finished products from the Debtors in the ordinary course of business, resulting in Intercompany Claims against such Non-Debtor Foreign Affiliates by the Debtors and repayments of such claims by the Non-Debtor Foreign Affiliates.  In the ordinary course of business, to accommodate the needs of the Debtors' and Non-Debtor Foreign Affiliates' customers, the Debtors also collect accounts receivable on behalf of certain Non-Debtor Foreign Affiliates, resulting in Intercompany Claims against the Debtors by such Non-Debtor Foreign Affiliates and subsequent repayment of such claims by the Debtors.

59.     Personna International U.K. Limited ("U.K. Limited"), a Non-Debtor Foreign Affiliate, is party to a spot and forward foreign exchange facility with Barclays Bank (the "Foreign Exchange Facility").  In the ordinary course of business, pursuant to the Foreign Exchange Facility, U.K. Limited, on behalf of ASR, enters into foreign exchange contracts, which ASR uses to hedge against exchange rate fluctuations.  At expiration, these foreign exchange contracts settle in cash.  At such time, ASR purchases Euros from cash on hand in the Wachovia Disbursement Account and transfers such Euros to U.K. Limited in exchange for the U.S. dollars required pursuant to the foreign exchange contract.  Such intercompany transfers occur three to four times per month and aggregate approximately $3.5 million to $5 million per month.

60.     The Debtors track all fund transfers in their accounting system and can ascertain, trace and account for all Intercompany Transactions.  In the ordinary course of business, substantially all Intercompany Claims, including claims of the Debtors against the Non-Debtor Foreign Affiliates and claims of Non-Debtor Foreign Affiliates against the Debtors, are satisfied monthly in cash.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors and their creditors.

**Debtors' Motion for an Order Authorizing the Payment of Prepetition Employee Wages, Benefits, Business Expenses and Related Items ("Employee Wages Motion")**

61.     As of the Petition Date, the Debtors employed approximately 440 Employees world-wide.[15]  All of the Employees other than the approximately 21 individuals working in Puerto Rico are employed by ASR.  The Employees that work in Puerto Rico are employed by either PIPR or Industrias (collectively, the "PR Debtors").  Of the Employees, as of the Petition Date, approximately 420 are full-time Employees, 10 are part-time Employees[16] and 20 are independent contractors (the "Independent Contractors").[17]

---

[15]     In addition, the Non-Debtor Foreign Affiliates employ approximately 800 employees.  Such employees who are paid by the Non-Debtor Foreign Affiliates are not included in the scope of the relief sought in the Employee Wages Motion.

[16]     Interns are included in the count of part-time Employees.

[17]     The Independent Contractors provide the Debtors with engineering and other temporary services.  Certain of the Independent Contractors are employed through temporary service agencies (the "Agencies"), including Hamilton Personnel Services, Express Services, Inc., ResourceMFG, and M Force Staffing, Inc. If the Independent Contractor is hired through an Agency, the Debtors are invoiced by the Agencies and the Agencies pay the Independent Contractors directly.  By the Employee Wages Motion, the Debtors seek authority to make the ordinary course payments to the Independent Contractors.  In the aggregate, the Debtors estimate that the prepetition accrued costs associated with the Independent Contractors are approximately $85,000.  Pursuant to applicable law, the inclusion of Independent Contractors within the definition of Employees shall not be deemed to create an employer-employee relationship between the applicable parties.

25

62.     As described above, in addition to the Employees, pursuant to a third-party agreement, the Debtors utilize the services of nearly 1,200 individuals in the Obregon Facilities.   ASR also uses the services of approximately 60 Brokers who provide sales services to the Debtors, but are not Employees of the Debtors.[18]

63.     Approximately 230 of the Employees are hourly wage earners ("Hourly Employees") and approximately 210 are salaried personnel ("Salaried Employees").  Of the Salaried Employees, approximately 15 Employees are eligible to receive commission payments, which are discussed in more detail below.

64.     As described above, approximately 120 of the Hourly Employees' employment relationship is governed by the CBA, dated September 28, 2003.  The Debtors currently do not intend to reject or modify the CBA.

65.     The Employees and Independent Contractors primarily operate out of four facilities: (i) the Verona Facility, (ii) the Knoxville Facility, (iii) a facility located in Cedar Knolls, New Jersey (the "Cedar Knolls Facility"), and (iv) a facility located in Rio Grande, Puerto Rico (the "Rio Grande Facility").  Employees in the Cedar Knolls Facility primarily handle general corporate matters, including treasury, financial, legal, and sales and marketing functions.  Employees in the Knoxville Facility are involved with manufacturing, and research and development functions.  Employees in the Verona Facility manage supply chain and administrative functions including finance, treasury, human resources, purchasing and logistics, as well as manufacturing, information technology, and research and development functions. Employees in the Rio Grande Facility participate in sales and merchandising activities.

---

[18]     Brokers include both individuals and agencies with personnel resources.

66.     The Debtors also maintain the Obregon Facilities for manufacturing functions.  Pursuant to the terms of the Maquila Shelter Agreement between Collectron International Management Inc. ("Collectron") and ASR, dated July 5, 1999 (as amended, the "Collectron Agreement"), Collectron employs approximately 1,200 Obregon Employees. Collectron also provides a personnel department responsible for employee administration, which, among other things, includes recruiting, training, safety, and negotiating with unions.  Collectron pays the Obregon Employees and invoices ASR in arrears for all amounts owed to Collectron (the "Collectron Employment Expenses").  The Collectron Employment Expenses are approximately $2,000,000 a month.[19]  As of the Petition Date, the Debtors estimate the prepetition Collectron Employment Expenses to be less than $500,000.

67.     To supplement their sales force, the Debtors utilize the Brokers. Specifically, the Brokers either have a strong purchasing relationship with a specific customer or supplement the Debtors' sales force geographically or in a specific market segment.  The Brokers are each compensated entirely based on sales volume (the "Broker Expenses").  During 2009, the Debtors paid approximately $1,600,000 in Broker Expenses.  As of the Petition Date, the Debtors estimate the prepetition Broker Expenses to be approximately $400,000.

68.     ASR also reimburses U.K. Limited for wages of two (2) international employees who conduct sales activities for the benefit of the Debtors (together with the Collectron Employment Expenses, the "Third-Party Employee Expenses").

---

[19]     Approximately $400,000 of the monthly Collectron Employment Expenses cover non-employment related obligations, such as facility lease payments and utilities; such non-employment related obligations are included in the calculation of prepetition Collectron Employment Expenses.  Also, in order to cover employee transfer and termination costs that may result under Mexican law, ASR maintains letters of credit and surety bonds, including without limitation: (i) a $900,000 surety bond with the Travelers Casualty and Surety Company of America backed by a $900,000 cash deposit pursuant to a Control Agreement; (ii) a $525,000 letter of credit with UBS AG Stamford Branch in favor of Collectron; and (iii) a $500,000 surety bond with the Safeco Insurance Company of America.

69.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors paid or honored employee wages and salaries as well as other forms of compensation.  The Debtors seek authority to pay all such accrued but unpaid wages, salaries, payroll service providers, paid time off, incentive payments, and other compensation claims (collectively, the "Employee Wage Claims"), Third-Party Employee Expenses, Broker Expenses, and other forms of compensation, through the Bank Accounts.

70.     Employee Wage Claims.  In the ordinary course, Salaried Employees are paid on the 15th and the last business day of each month for all wages owed through such date, except for PR Employees who are paid biweekly.  Salaried Employees (except for the PR Employees) were last paid on July 28, 2010 for wages through July 31, 2010.  Generally, PR Employees are paid biweekly.  The last pay date for PR Employees was on July 22, 2010, which covered the 2 weeks of service ended July 24, 2010.  The Debtors' current monthly payroll for the Salaried Employees is approximately $1,400,000, or $700,000 per pay period.  The Debtors estimate that prepetition outstanding Employee Wage Claims for Salaried Employees are $17,000 (the vast majority of which is on account of the PR Employees) plus any previously issued checks that Salaried Employees have not yet cashed.

71.     In the ordinary course, Hourly Employees typically are paid weekly, one week in arrears.[20]  Hourly Employees were last paid on July 28, 2010 for wages through July 25, 2010.  The Debtors' current payroll for the Hourly Employees is approximately $800,000 per month, or $200,000 per pay period.  The Debtors estimate that approximately $120,000 in Employee Wage Claims for Hourly Employees are outstanding as of the Petition Date in addition to any previously issued checks that Hourly Employees have not yet cashed.

---

[20]     Bargaining Employees are paid on Thursdays and payment covers wages through the previous Sunday.  Other Hourly Employees are paid on Friday and payment covers wages through the previous Sunday.

72.     The Debtors' payroll (other than for the PR Debtors) is administered by Ceridian.[21] For such services, Ceridian charges the Debtors a processing fee of approximately $8,000 per month.  As of the Petition Date, the Debtors owe approximately $14,000 to Ceridian for payroll processing fees.  The PR Debtors' payroll is administered by Accounting Virtual Solutions ("Virtual", and together with Ceridian, the "Payroll Service Providers").  Virtual charges the PR Debtors a processing fee of approximately $500 per month.  As of the Petition Date the Debtors owe approximately $500 to Virtual for payroll processing fees.  The Debtors seek authority to pay such Payroll Service Provider amounts owing and continue to pay such future amounts in the ordinary course.  Without the ability to pay any outstanding prepetition amounts to the Payroll Service Providers, or to continue paying the Payroll Service Providers in the ordinary course, the Payroll Service Providers may refuse to process the Debtors' payroll, thereby jeopardizing the ultimate receipt of wages by the Employees.

73.     As of the Petition Date, the Debtors estimate that $500,000 of the Third-Party Employee Expenses are outstanding and $400,000 of the Broker Expenses are outstanding. Without payment of these expenses, the Debtors will suffer material harm as they will lose critical functions in their manufacturing process, thereby adversely impacting their ability to sell products to their customers.

74.     In the aggregate, the Debtors estimate that there is approximately $1,136,500 of outstanding prepetition amounts owed for Employee Wage Claims, inclusive of amounts owed to the Payroll Service Providers and Withheld Funds (as defined below) related thereto, the Third-Party Employee Expenses, and Broker Expenses.

---

[21]     The Debtors transfer funds covering wages, payroll-related withholdings and payroll-related taxes to Ceridian's bank accounts in advance of pay dates.  On pay dates, Employees receive either funds wired from or checks drawn by Ceridian.

75.     The Debtors offer their Employees other forms of compensation, including vacation time ("Vacation Time"), paid holidays ("Holidays"), bereavement, jury duty and military leave, and other earned time off (together with Vacation Time and Holidays, "PTO").[22] These forms of compensation are usual, customary and necessary, if the Debtors are to retain qualified employees to operate their businesses.

76.     All Employees are eligible to accrue paid Vacation Time.  Vacation Time is accrued based on an Employee's years of service with the Debtors.  Specifically, Salaried Employees and all Employees in the Knoxville Facility accrue Vacation Time per pay period based on the following lengths of service:

| Years of Service | Vacation Time[23] |
| --- | --- |
| At least 6 months of service by calendar year end | 1 week |
| 1 year of service | 2 weeks |
| 5 years of service | 3 weeks |
| 15 years of service | 4 weeks[24] |
| 30 years of service | 5 weeks |

Bargaining Employees accrue Vacation Time per pay period based on the following lengths of service:

| Years of Service | Vacation Time[25] |
| --- | --- |
| At least 6 months, but less than a year | 40 hours |
| 1 year of service | 80 hours |
| 7 years of service | 120 hours |
| 15 years of service | 160 hours |

---

[22]    Salaried Employees and Knoxville Facility Employees are also allowed time off for sick days before receiving any STDI (as defined below); however, the Debtors do not have a formal sick time policy.

[23]    Salaried Employees may carry over 1 week of vacation time into the calendar year following the accrual calendar year upon supervisor approval if the Employee uses such time before March 31.  Only upon termination or retirement do Salaried Employees receive payouts for unused vacation time.

[24]    Hourly Employees in the Knoxville Facility are capped at 4 weeks of vacation time annually.

[25]    Bargaining Employees may not carry any vacation over, but do receive pay-outs for unused vacation time.

77.      Employees are entitled to 13 Holidays annually.

78.      It is difficult to quantify the cost of accrued PTO because, at any given point in time, it continually is accruing and Employees may be using PTO.  Nevertheless, the Debtors estimate that as of the Petition Date, the Employees have accrued approximately $350,000 in aggregate PTO.

79.      The Debtors seek authority to honor, in the ordinary course of business, all PTO obligations to their Employees, subject to any ordinary course restrictions implemented by the Debtors.  The Debtors have determined that director and officer liability may result from the Debtors' failure to pay PTO upon termination under the laws of each state where the Debtors have Employees.[26]

80.      Five sales Employees compete for a quarterly volume-based rewards incentive program through which merchandise can be redeemed based on a bonus point system administered by Online-Rewards (the "Rewards Incentive Payments").  The Debtors purchase the awarded points from Online-Rewards.  As of the Petition Date, the Debtors estimate that approximately $8,000 of prepetition obligations related to the Rewards Incentive Payments remain outstanding and owing to the participating Employees or Online-Rewards.

81.      The Debtors also have a *de minimis* incentive program that recognizes the long-term commitment of Employees upon each fifth anniversary of an Employee's employment with the Company (the "Long Term Recognition Payments").  The Debtors spend approximately $50,000 annually on the Long Term Recognition Payments.  As of the Petition Date, the Debtors estimate that approximately $10,000 in Long Term Recognition Payments are outstanding.

---

[26]      The Debtors also believe that there is a potential for D&O liability under Federal law pursuant to the Fair Labor Standards Act.

82.     Fifteen sales Employees of the PR Debtors receive commission payments if such Employees meet certain sales thresholds (the "PR Commission Payments" and together with the Rewards Incentive Payments and the Long Term Recognition Payments, the "Incentive Payments").  The Debtors expended approximately $120,000 for PR Commission Payments in 2010 prior to the Petition Date.  As of the Petition Date, the Debtors estimate that approximately $20,000 of PR Commission Payments remain outstanding and owing to such Employees.[27]

83.     Employee Expense Obligations.  The Debtors routinely reimburse Employees for expenses incurred within the scope of their employment (whether through the use of the Amex Program (as defined below) or otherwise), including, without limitation, expenses for travel, lodging, professional seminars and conventions, approved professional and business organization dues, ground transportation, meals, supplies, credit card costs, cellular telephone and Blackberry services, and other miscellaneous expenses (collectively, inclusive of the programs described in the next paragraph and the Company Car Lease Payments (as defined below), the "Employee Expense Obligations").[28]

84.     In addition, certain Employees are reimbursed pursuant to:

- an automobile allowance program, which has a current monthly run-rate of approximately $8,000, for 10 Employees, with *de minimis* amounts outstanding as of the Petition Date;[29]

- a relocation reimbursement program, pursuant to which the Debtors have outstanding prepetition obligations to 6 Employees

---

[27]    In the aggregate, approximately 65 Employees participate in one or more of the following programs: management incentive program, the Competitive Improvement Program incentive plan and the sales incentive plan.  The Debtors are not seeking approval at this time of any such programs and reserve the right to seek approval from this Court by a subsequent motion.

[28]    The Debtors also reimburse certain *de minimis* travel expenses of one employee of American Safety Razor of Canada Limited, a Foreign Affiliate, when such employee travels in the United States on behalf of the Debtors.

[29]    Only certain Employees are eligible for the automobile allowance.  Qualifying Employees are either executives or are required to travel as part of their job responsibilities.

of approximately $500,000, including related payroll tax obligations; and

- a tuition reimbursement program, in which 10 Employees currently receive tuition reimbursement and with an aggregate prepetition amount of approximately $200,000 outstanding.

85.     Additionally, the Debtors lease 16 company cars for use by certain senior executive and sales Employees in connection with their job functions.[30]  The Debtors enter into car leases and pay monthly installments (the "Company Car Lease Payments").  The Company Car Lease Payments are approximately $140,000 annually.  As of the Petition Date, the Debtors believe that any outstanding prepetition liabilities related to the Company Car Lease Payments are *de minimis*.  However, in order to continue their company car program, the Debtors seek authorization to continue making Company Car Lease Payments in the ordinary course of business.

86.     Certain Employees have not yet been reimbursed for Employee Expense Obligations previously incurred.  On average, the Debtors pay approximately $200,000 (exclusive of Company Car Lease Payments) each month to Employees and third-parties with respect to Employee Expense Obligations.  Although the Debtors cannot fully estimate the amount of Employee Expense Obligations outstanding as of the Petition Date because not all employees will have submitted expense reports as of the Petition Date, the Debtors expect the amount to be at or below the monthly average.

87.     The Debtors provide approximately 20 Employees who travel frequently with a corporate credit card pursuant to a Corporate Services Commercial Account Agreement with American Express Travel Related Services Company, Inc. ("Amex").  Amex directly bills each of the Employees and the Debtors thereafter reimburse the Employees upon their request

---

[30]     The Debtors do not restrict eligible Employees from using the company cars for personal use.

for reimbursement.  Both the Employees and Debtors are liable for the Amex bills.  In addition

to paying any Employee Expense Obligations pursuant to Employees' use of their corporate

cards in the ordinary course of business, the Debtors also seek approval to pay any Amex bills on

account of Employees' use of their corporate cards (incurred in accordance with the Debtors'

policies) and any related administrative fees (the "Amex Program") directly to Amex.

88.     Employee Benefit Obligations.  The Debtors maintain various employee

benefit plans and policies that provide eligible Employees[31] with medical, dental, vision, life and

accident insurance, disability, flexible spending accounts, employee assistance and 401(k) plans.

The Debtors also provide workers' compensation benefits to eligible Employees.

89.     The Debtors provide participating Salaried Employees, Non-Bargaining

Employees in the Knoxville Facility and their dependents with coverage under the "KeyCare

Plus" medical plan and vision plan (the "Non-Bargaining Medical Plan") administered by

Anthem Plans of Virginia, Inc. ("Anthem").  As part of the Non-Bargaining Medical Plan,

participants receive prescription drug benefits administered by WellPoint NextRx.  As of the

Petition Date approximately 300 Employee participants and approximately 450 dependents were

covered under the Non-Bargaining Medical Plan.  Additionally, there are 11 participants and 11

dependents receiving Non-Bargaining Medical Plan benefits through a COBRA program

processed by Ceridian COBRAServ.

90.     The Debtors provide participating Bargaining Employees and their

dependents with coverage under the "KeyCare 15" medical and vision plan administered by

Anthem (the "Bargaining Medical Plan").  In addition, the participating Bargaining Employees

receive prescription drug benefits as administered by WellPoint NextRx.  As of the Petition Date,

---

[31]     Only full-time Employees are entitled to participate in all Employee benefit programs; part-time Employees
         may only participate in the 401(k) Plans (as defined below).

approximately 120 Employee participants and approximately 125 dependents were covered

under the Bargaining Medical Plan.  Additionally, there is 1 participant receiving Bargaining

Medical Plan benefits through a COBRA program processed by Ceridian COBRAServ.[32]

91.    For Employees employed by the PR Debtors, such Employees are

provided with medical benefits through a plan administered by Triple-S (the "PR Medical Plan").

As of the Petition Date, approximately 20 Employees were receiving medical benefits pursuant

to the PR Medical Plan.

92.    The Debtors also offer medical benefits through plans administered by

Anthem (the "Retiree Medical Plans," and together with the Salaried Medical Plan, the

Bargaining Medical Plan and the PR Medical Plan, the "Medical Plans") to certain qualifying

retirees (the "Retirees") and eligible dependents.[33]  As of the Petition Date, approximately 180

Retirees and 75 dependents were receiving benefits pursuant to the Retiree Medical Plans, at an

aggregate annual cost of approximately $750,000.[34]

93.    The costs associated with the Medical Plans are funded through

contributions by participating Employee, Retirees, and the Debtors.  The cost is borne primarily

by the Debtors, but Employees contribute through payroll deductions from their paychecks to

pay for each month's coverage.  Retirees contribute through pension deductions, except for some

Retirees who receive quarterly invoices from the Debtors.  The Medical Plans are self-insured

plans up to $150,000 per participant with stop loss insurance above $150,000 per participant.

---

[32]    Ceridian COBRAServ charges approximately $400 monthly to process the payments of COBRA
participants.  As of the Petition Date, the Debtors owe approximately $1,000 to Ceridian on account of the
COBRA program.

[33]    Qualifying Retirees receive vision benefits, but are not entitled to any dental benefits.

[34]    This figure is inclusive of payments due under the Dental Plans (as defined herein) and Vision Plans (as
defined herein).

The Debtors pay $30,000 in monthly premiums, in arrears, to Anthem for stop-loss insurance and $50,000 monthly, in arrears, for the administration of the Medical Plans.

94.    Certain Retirees of RSA Soap Company, Inc. are entitled to medical benefits, but have a choice to opt-out of such medical benefits ("Opt-out Payments," and together with the Retiree Medical Plans, the "Retiree Benefits").  There are approximately 90 Retirees receiving Opt-out Payments averaging $120 per participating Retiree each month.

95.    On average, in 2009, the Debtors paid approximately $400,000 in the aggregate each month in arrears for Employees and their dependents in connection with the Medical Plans (inclusive of the Opt-out Payments).  As of the Petition Date, the Debtors' estimated unpaid prepetition premiums and expenses under the Medical Plans are approximately $600,000 in the aggregate.

96.    The Debtors offer Employees dental benefit plans through Anthem (the "Anthem Dental Plans").  The Anthem Dental Plans are funded partially by the Debtors and partially by the participating Employees through payroll deductions.  Approximately 400 Employees participate in the Anthem Dental Plans.  The Debtors' portion of the funding of the Anthem Dental Plans is included in the aggregate unpaid prepetition premiums and expenses under the Medical Plans above in the preceding paragraph.

97.    The Debtors also offer a Dental Plan, administered by Delta Dental, to the Employees of the PR Debtors (the "PR Dental Plan," and together with the Anthem Dental Plans, the "Dental Plans").  Approximately 20 Employees participate in the PR Dental Plan.  The Debtors' portion of the funding of the PR Dental Plans is approximately $500 per month.  As of the Petition Date, the Debtors owe approximately $1,000 on account of the PR Dental Plan.

98.     The Debtors offer their Employees the use of flexible spending accounts for various health care (the "Health Care FSA") and dependent care (the "Dependent Care FSA," and together with the Health Care FSA, the "FSA Programs") costs not otherwise covered by the Medical Plans.  Individual expenses are limited to $3,000 per year under the Health Care FSAs and $5,000 per year under Dependent Care FSAs.  The flexible spending benefits are administered by Ceridian, which charges the Debtors a monthly administrative fee of approximately $7 per participating Employee.  There are approximately 80 Employees participating in the Health Care FSA and 10 Employees participating in the Dependent FSA, leading to fees of approximately $700 per month in the aggregate.  As of the Petition Date, the Debtors estimate that their total prepetition liability under the FSA Programs is $700.

99.     The Debtors provide Employees (and family members) in the Knoxville Facility with an Employee Assistance Program (the "EAP Program").  The Debtors pay CorpHealth, Inc. d/b/a Life Synch on a monthly basis for confidential assessments, counseling and referrals, as needed.  As of the Petition Date, the Debtors estimate that they owe $1,500 on account of the EAP Program.

100.    The Debtors provide Salaried Employees with group life ("Group Life Insurance") and accidental death and dismemberment insurance ("AD&D Insurance").  The Debtors offer Salaried Employees at the Cedar Knolls Facility and Verona Facility Group Life Insurance and AD&D Insurance at twice an Employee's base salary after 30 days of employment.  The Debtors offer Employees at the Knoxville Facility Group Life Insurance and AD&D Insurance at twice an Employee's base salary after 90 days of employment.  The Debtors also provide Bargaining Employees with Group Life Insurance and AD&D Insurance in the amount of $35,000 upon death or incident, after 90 days of employment.  The Group Life and

AD&D Insurance programs are administered by the Metropolitan Life Insurance Company and the cost is borne by the Debtors. On average, the Debtors pay $30,000 per month on account of the programs. As of the Petition Date, the Debtors estimate that they owe $30,000 on account of the obligations incurred pursuant to the Group Life Insurance and AD&D Insurance.

101.     The Debtors offer supplemental life insurance (the "Supplemental Life Insurance") to Employees. Supplemental Life Insurance is available to Salaried Employees and Employees in the Knoxville Facility for up to two times an Employee's base salary and $10,000 for spouses and $5,000 for each child. Supplemental Life Insurance also is available to Bargaining Employees for up to two times their current Group Life Insurance pay-out ($35,000 or $70,000) and $10,000 for spouses and $5,000 for each child. Participating Employees are responsible for all Supplemental Life Insurance premiums, which are paid through deductions from their paychecks. The Metropolitan Life Insurance Company underwrites the Supplemental Life Insurance policy. Approximately 120 Employees, approximately 85 of which have dependent coverage, participate in the Supplemental Life Insurance program.

102.     The Debtors also provide Employees with short-term disability insurance ("STDI") and long-term disability insurance ("LTDI," and together with STDI, the "Disability Insurance"). STDI is fully funded by the Debtors. Salaried Employees at the Cedar Knolls Facility and Verona Facility are eligible to participate in self-insured Disability Insurance programs after 30 days of employment. STDI pays such Employees 100% of their base pay for up to 26 weeks at a maximum of $2,000 weekly. Knoxville Facility Employees are eligible to participate in self-insured Disability Insurance programs after 90 days of employment. STDI pays Knoxville Facility Employees 60% of their base pay for the first 26 weeks at a maximum of $2,000 weekly. Thereafter, LTDI would continue at 50% of their base pay at a maximum of

38

$10,000, before reduction by deductible income.  Bargaining Employees are eligible to participate in the Disability Insurance programs through the Aetna Life Insurance Company after 90 days of employment.  STDI pays Bargaining Employees 60% of regular earnings per week after the first day for injury and after the seventh day for illness, up to a maximum of $300 per week for the first 26 weeks.  Thereafter, LTDI would continue at 50% of base pay, not to exceed $1,300 a month.  The Debtors currently have 6 Employees receiving benefits pursuant to the STDI program and 6 Employees receiving benefits pursuant to the LTDI program.  The Debtors estimate that they owe $6,000 related to STDI and $5,000 related to LTDI as of the Petition Date.

103.    The PR Debtors also maintain 2 insurance policies for their Employees. For approximately 20 Employees who are not office personnel or managers, the Debtors pay for the Puerto Rico Government Chauffer Social Security Insurance (the "Chauffer Insurance"). The Chauffer Insurance is wholly paid by the Debtors and costs the Debtors approximately $1,000 annually.  For 7 office personnel and manager Employees, the Debtors pay for private disability insurance through Mapfre Life Insurance Company (the "Mapfre Insurance" and together with the Chauffer Insurance, the "PR Employee Insurance").  The Mapfre Insurance is wholly paid by the Debtors and costs the Debtors approximately $10,000 annually.  As of the Petition Date, the Debtors owe $5,000 on account of the PR Employee Insurance.  Through the Employee Wages Motion, the Debtors are seeking authority to pay prepetition amounts relating to the PR Employee Insurance in addition to any postpetition payments in the ordinary course of business.[35]

---

[35]    The Debtors also have a business travel accident insurance program with the Life Insurance Company of North America (the "Employee Travel Insurance"), which covers Employees who travel as part of the Debtors' business, for up to 5 times an Employee's annual salary.  The Debtors pay a premium of

104.    Salaried Employees may contribute up to 50% of their 401(k) eligible compensation through payroll deductions to the Debtors' 401(k) Plan (the "Salaried 401(k) Plan"). The Salaried 401(k) Plan is managed by Diversified Investment Advisors, Inc. ("Diversified"), which collects an administrative fee from the managed contributions. The Debtors contribute to the 401(k) Plan in two ways. First, the Debtors match an Employee's 401(k) contribution ("Matching Contributions") dollar for dollar for the first 4% of Employee contributions. In addition to the Matching Contributions, the Debtors make automatic contributions of 2% of a participating Employee's 401(k) plan eligible compensation ("Core Contributions," and together with the Matching Contributions, "401(k) Contributions"). Employees at the Knoxville Facility receive benefits under the Salaried 401(k) Plan, but do not receive Core Contributions; however, the Debtors make a Matching Contribution of fifty cents on the dollar for the first 6% of Employee contributions.

105.    Bargaining Employees may contribute up to 50% of their 401(k) eligible income (the "Bargaining 401(k) Plan," and together with the Salaried 401(k) Plan, the "401(k) Plans") through payroll deductions. The Bargaining 401(k) Plan also is managed by Diversified, which collects an administrative fee from the managed contributions. On account of Bargaining Employees, the Debtors make a Matching Contribution of fifty cents on the dollar for the first 4% of Employee contributions and in addition to the Matching Contributions, the Debtors make Core Contributions of 2% of a participating Employee's 401(k) plan eligible compensation.

106.    The Debtors withhold from Employees' paychecks approximately $150,000 per month for 401(k) purposes. As of the Petition Date, the Debtors believe that any outstanding prepetition amounts related to 401(k) Plans are *de minimis*; however, in an

---

approximately $10,000 every 3 years with the Debtors making the last payment in 2009. There currently are no amounts owing pursuant to the Employee Travel Insurance.

abundance of caution, the Debtors seek authority to make all such payments in the normal course of business.

107.    <u>Withheld Funds</u>.  The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholdings include federal and state income taxes, social security, Medicare, garnishments and premiums for medical, dental and life insurance and 401(k) Contributions (collectively, the "<u>Withheld Funds</u>").  The Debtors believe that such Withheld Funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' estates.

108.    I believe the Debtors' creditors and these estates will be better off as a whole, and clearly will be no worse off, if the Debtors are permitted to honor Prepetition Employee Obligations in the ordinary course.  The Debtors' businesses and prospects for reorganization will be seriously undermined if Employees are not paid and if they, as a consequence, leave the Debtors' employ at this critical juncture.  Without payment to the Debtors' Employees, the damage to the Debtors' prospects for rehabilitation and hence, the costs to creditors as a whole, would be immediate and irreparable.

**Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Honor Certain Prepetition Obligations under Customer Programs, and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Payment Requests Made Relating to the Foregoing**

109.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors engaged in certain business practices to develop and maintain a positive reputation with their customers and in the marketplace for their products.  Such practices include, among others, volume-based rebates, promotions and incentives, early payment discounts and consumer merchandise replacements and credits, each of which is described in greater detail below.

41

Generally, these Customer Programs are designed to meet the competitive pressures of the marketplace, ensure customer satisfaction, and generate goodwill for the Debtors, thereby enabling the Debtors to retain and attract customers and enhance revenue and profitability.

110.   The Debtors estimate that the aggregate amount of outstanding prepetition obligations arising under their Customer Programs does not exceed $8.22 million, although the Debtors reasonably expect their liability under these programs to be closer to $3.85 million.   The Debtors expend nearly no cash to fund the Customer Programs; rather, these are credits against future sales and help build continued goodwill with customers.   The Debtors seek authority to continue the existing Customer Programs and to develop and implement new Customer Programs in the ordinary course of business during the course of these Chapter 11 Cases, in their sole discretion and without the need for further Court approval.

111.   <u>Volume-Based Rebates, Promotions and Incentive</u>.   The Debtors use various volume-based rebates, promotions and incentives (collectively, the "<u>Rebates</u>" and the "<u>Rebate Programs</u>") as sales incentives as well as a negotiating tool to achieve more favorable contractual terms with certain customers.   Customers (primarily retailers and distributors) earn Rebates for, among other things, high volume purchases, favorable product placement in stores, trade-show visibility, and promotional and marketing efforts.[36]   The Rebate Programs rarely result in cash outlays; rather, customers apply Rebates to reduce the costs of future purchases.[37] The amount of the Rebates is a relatively small percentage of the overall price of the products

---

[36]    The Rebates also include coupons offered directly to consumers that are redeemed at the retail level and "passed through" by a clearinghouse to the Debtors.  The Debtors estimate that their pre-petition liability on account of these coupons (including pass-through charges payable directly to the clearinghouse) is approximately $150,000.

[37]    In limited circumstances, the Rebates are satisfied in the form of cash payments to certain customers.  The Debtors estimate that they have no more than $40,000 of outstanding prepetition obligations on account thereof.

and is within the normal range for such rebates in the consumer products industry.  The

importance of the Rebate Programs to the Debtors' market competitiveness makes it critical that

the Debtors be authorized to both honor their prepetition obligations under such Rebate

Programs, and to continue to offer Rebate Programs going forward in connection with sales.  The

Debtors estimate that the maximum outstanding prepetition obligations under the Rebate

Programs are $7.56 million; however, assuming a steady "redemption rate" consistent with

results in 2009, the Debtors estimate their liability under these programs to be closer to $3.19

million.

      112.   Early Payment Discounts.  The Debtors offer certain customers incentives

to pay their invoices in advance of the date specified in the applicable trade terms (the "Early

Payment Discounts").  Early Payment Discounts do not result in cash outlays but simply allow

customers to reduce the costs of future product orders.  The amount of the discounts is a

relatively small percentage of the overall price of the products and is also within the normal

range for such discounts in the consumer products industry.  The importance of the Early

Payment Discounts to the Debtors' market competitiveness makes it critical that the Debtors be

authorized to continue to offer Early Payment Discounts going forward in connection with sales.

During 2009, the Debtors' customers' Early Payment Discounts aggregated approximately $3.6

million.  Although Early Payment Discounts are subject to the payment patterns of their

customers, the Debtors estimate that a maximum of approximately $0.6 million of Early

Payment Discounts may be outstanding as of the Petition Date.

      113.   Consumer Merchandise Replacements and Credits.  The Debtors' products

contain an implicit satisfaction guarantee that such products are manufactured in accordance with

good manufacturing practices, conform to applicable specifications and are free of defects of

workmanship (the "Guarantee Program").  In the event a customer reports a problem with a purchased product, the Debtors either may replace such product or issue a credit for a future purchase, neither of which results in a cash outlay.  The importance of the Guarantee Program to the Debtors' market competitiveness makes it critical that the Debtors be authorized to honor their prepetition obligations under such guarantees, and to continue to offer the Guarantee Program going forward in connection with sales.  In the ordinary course of business, the Debtors maintain a reserve of approximately $60,000 to satisfy their obligations under the Guarantee Program although, similar to the other Customer Programs, no cash outlay is required.  The Debtors estimate, given historic "run-rates," that their obligations under the Guarantee Program do not exceed the $60,000 currently held in reserve.

114.    The Debtors maintenance of the Customer Programs are necessary to preserve their critical business relationships with customers and to promote goodwill among customers.  Furthermore, the Customer Programs are standard practice in the Debtors' industry.  Thus, I believe that, absent these programs, the Debtors will lose their ability to compete in a competitive and commoditized marketplace.  If the Debtors are precluded from honoring their Customer Programs, the Debtors' relationships with existing customers will be seriously jeopardized, and they effectively will lose the ability to attract new customers in the future.

**Debtors' Motion for Entry of an Order (A) Authorizing, But Not Requiring, the Debtors to Remit and Pay Sales, Use, and Franchise Taxes and Certain Other Government Charges; and (B) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Prepetition Taxes Motion")**

115.    In the ordinary course of business, the Debtors: (a) collect sales taxes from certain customers and incur taxes including, but not limited to, sales and use taxes, franchise taxes and certain other similar taxes and fees necessary to operate their businesses on behalf of

various federal, state and local taxing authorities, licensors or other government authorities (collectively, the "Authorities").[38]  The Debtors pay such taxes and fees monthly, quarterly, or annually to the respective Authorities, in each case as required by applicable laws and regulations.  The Debtors estimate that the total amount of Prepetition Tax Obligations (as defined below) owing to the various Authorities will not exceed $73,000 for periods prior to and through the Petition Date.[39]

116.    Sales and Use Taxes. The Debtors collect from certain customers and remit an assortment of state and local sales and gross receipts taxes (collectively, the "Sales Taxes") to various Authorities.  On a periodic basis, the Debtors remit to the Authorities the Sales Taxes collected during the previous term.

117.    The Debtors also may be responsible for the payment of use taxes (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes") when they purchase certain non-exempt goods or services from suppliers.  Use Taxes arise when the Debtors purchase taxable goods or services from a supplier for use in a state in which the supplier has no business operations.  Without such nexus, the supplier is not obligated to collect or remit sales taxes.  Nevertheless, the Debtors as the purchasers may be obligated to self-assess and pay the Use Taxes to the states or local taxing jurisdictions wherein the personal property is used or the services rendered.  The Debtors' obligations to self-assess and pay Use Taxes also may arise in a number of states in which the Debtors received authorization to self-assess and remit Use Taxes. The Debtors generally remit the Use Taxes to Authorities on a monthly, quarterly, or annual

---

[38]    The Debtors have a taxable presence in Arizona, Arkansas, California, Delaware, Florida, Louisiana, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Virginia and Washington.

[39]    This estimate does not include any potential prepetition tax liability that may later come due as the result of an audit. The Debtors, therefore, request authority to make any payment for Prepetition Tax Obligations (as defined below) that arises as a result of any audit of prepetition taxes.

basis. Accordingly, the Debtors estimate that they owe up to $10,000 in Sales and Use Taxes to certain of the Authorities for periods prior to and through the Petition Date.

118.    Franchise Taxes.  The Debtors pay franchise taxes and *de minimis* registration fees (collectively, the "Franchise Taxes") to certain of the Authorities, thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction. Some states assess a flat Franchise Tax on all businesses, while other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth, or other measure of value. Certain states impose personal liability on the directors, officers, and employees of a corporation if that corporation fails to pay Franchise Taxes.  Additionally, the Debtors' failure to pay Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction.  Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process.  The Debtors estimate that they owe up to $48,000 in Franchise Taxes to certain of the Authorities for periods prior to and through the Petition Date.

119.    Business License Fees.  Certain municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees (collectively, the "Business License Fees" and together with the Sales and Use Taxes and the Franchise Taxes, the "Prepetition Tax Obligations").  The criteria that require a company to obtain a business license and the manner in which the Business License Fees are computed vary greatly according to local tax laws.  Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction, and others upon gross receipts.  The Debtors estimate that any outstanding balance is *de minimis* but, in an abundance of caution, request authority to expend up to $15,000 in Business License Fees and other similar

taxes to certain of the Authorities for amounts owed relating to periods prior to and through the Petition Date.

120.    The Debtors seek the relief requested in the Prepetition Taxes Motion in the event and to the extent that any Prepetition Tax Obligation accrued prepetition has not been paid prior to the Petition Date, or was paid in an amount that was less than is actually owed, or in the event that any payment made prepetition was rejected, lost, or otherwise not received in full by any Authorities.

121.    In all cases, the Debtors' failure to pay the Prepetition Tax Obligations could have a material adverse impact on their ability to operate in the ordinary course of business.  The Debtors operate a transactional business and any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

**Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

122.    In the ordinary course of their business, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, phone, high-speed internet, cable, and natural gas services provided by their utility providers (collectively, the "Utility Providers").  The non-exclusive list of the Utility Providers is annexed as Exhibit A to the Utilities Motion and incorporated by reference therein.[40]

123.    Prior to the Petition Date, Debtors used utility services provided by the Utility Providers at the Cedar Knolls Facility, the Knoxville Facility, the Puerto Rico Facility and

---

[40]    Although the Debtors believe that the list of Utility Providers includes all of their Utility Providers, the Debtors reserve the right, without the need for further order of the Court, to supplement the list if any Utility Provider has been omitted.  Additionally, the inclusion of an entity on Exhibit A of the Utilities Motion is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

the Verona Facility.[41]  Ordinarily, the Debtors pay each Utility Provider directly upon receipt of

a monthly invoice for services provided during the immediately preceding month.  On average,

the Debtors spend approximately $269,000 per month on utility costs.  As of the Petition Date,

the Debtors had aggregate deposits with their Utility Providers of approximately $150,000.  Prior

to the Petition Date, the Debtors had a history of timely payment of utility costs.  Due to the

timing of the Petition Date in relationship to the Utility Providers' respective billing cycles, the

Debtors believe certain utility costs have been invoiced but have not been paid because payment

is not yet due.  Further, certain utility costs for services provided since the end of the last billing

cycle have not been invoiced to the Debtors yet.

124.    The Debtors fully intend to pay all postpetition obligations owed to the

Utility Providers in a timely manner.  The Debtors expect that the cash on hand, cash available

under the DIP Facility (as defined below) and expected cash flow from ongoing operations will

be more than sufficient to pay all postpetition utility obligations.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (I) Authorizing Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing (the "DIP Financing Motion")**

125.    As set forth in Part I above, the Debtors have commenced these Chapter

11 Cases in the midst of significant changes in the competitive landscape for the Debtors'

business.  Without immediate access to working capital, the Debtors cannot be assured of their

ability to continue to fund their day-to-day operations and ensure the continued support of their

trade vendors and other stakeholders, each of which is needed to continue their business.  The

---

[41]    At this time, the Debtors are not seeking relief pursuant to section 366 of the Bankruptcy Code with respect to the utility services provided pursuant to the Collectron Agreement without prejudice to seek such relief at a future time.

Debtors require a postpetition financing commitment to preserve the estate's going concern value.

126.    To that end, the Debtors are seeking authorization in the DIP Financing Motion to obtain postpetition financing in an aggregate amount not to exceed $25 million (the "DIP Facility").  The Debtors are seeking access to $10 million of the DIP Facility on an interim basis.

127.    The Debtors' reorganization depends in large part on preserving vendor, customer and Employee confidence and maintaining the operation of their business as they restructure.  The Debtors have an immediate need to access the DIP Facility and to use Prepetition Collateral (as defined in the DIP Financing Motion), including any Cash Collateral (as defined in the DIP Financing Motion), in order to, among other things, permit the orderly operation of their business by securing goods and paying Employees, preserve the going concern value of their estates by restoring confidence and ultimately maximize the value of the Debtors' estates.  Without access to such financing and Cash Collateral, the Debtors will not be able to stabilize operations and their efforts to reorganize and restore profitability will be irreparably harmed.

<u>Investigation of Restructuring Alternatives</u>

128.    As discussed in Part I above, in connection with the Debtors' efforts to work with the Second Lien Lenders on a potential restructuring proposal, Lazard contacted nine financial institutions to determine whether they were interested in providing financing for the Second Lien Lenders' proposal.  Of those nine contacted, seven executed confidentiality agreements and received the Company's business plan and related management presentation.

Moreover, certain of these financial institutions spoke with either the Debtors or the Debtors' financial advisors regarding various diligence items.

129.    Thus, when it came time to solicit proposals for debtor in possession financing, the Debtors' restructuring advisors contacted five of the financial institutions they had previously contacted regarding financing a Second Lien Lender-led restructuring.  The Debtors' advisors contacted these institutions because such institutions already were familiar with the Debtors' business and finances, knew the Company's current situation with its First Lien Lenders and Second Lien Lenders, and were common providers of DIP financing.  None of these lenders were willing to provide the Debtors with DIP financing, citing, among other reasons, that such proposed financing likely would lead to a "priming" fight with the First Lien Lenders and likely would accompany the First Lien Lenders' credit bid.

130.    As set forth in the First Day Affidavit, the Debtors have been negotiating with the Second Lien Lenders for alternative debtor in possession financing facilities (the "Proposed Alternative DIP Facilities") that would repay the obligations under the First Lien Credit Facility in full, provide the Debtors with liquidity for these chapter 11 cases and convert to exit facilities on consummation of a plan of reorganization.  To date, the Alternative DIP Facilities have not been fully subscribed.  A summary of the current terms of the Proposed Alternative DIP Facilities is annexed to the DIP Financing Motion as Exhibit D.  The Debtors reserve the right in the DIP Financing Motion to substitute the Proposed Alternative DIP Facilities for the DIP Facility at the final hearing on the DIP Financing Motion.

131.    The Debtors and Lazard also considered seeking DIP or other financing from other commercial banks and hedge funds that historically have loaned money to or invested in distressed companies.  However, the First Lien Lender and Second Lien Lender groups are

comprised of nearly 40 commercial banks and hedge funds, including most of the major institutions or entities that have experience providing distressed financing. Accordingly, the Debtors and Lazard determined that, in effect, the Debtors had sufficiently and appropriately canvassed the commercial bank and hedge fund marketplace for available financing by simply engaging in discussions with, and requesting additional financing from, the First Lien Lenders and Second Lien Lenders. Additional efforts to obtain financing from any other banks or funds outside the First Lien Lender and Second Lien Lender groups would not have been successful.

132.     The Debtors, with the assistance of their advisors, including Lazard, also solicited the Mezzanine Lender with respect to providing or participating in a potential DIP facility.

133.     The Debtors and their restructuring advisors negotiated the terms of the DIP Facility through good-faith, extensive, arms-length negotiations, which culminated in an agreement with the DIP Administrative Agent to provide postpetition financing on the terms and subject to the conditions set forth in the DIP Credit Agreement and the related proposed Interim and Final Orders. The Debtors concluded, in consultation with their restructuring advisors, that the DIP Facility offered by the DIP Administrative Agent is competitive, addresses the Debtors' working capital and liquidity needs, presents the best option available, and will enable the Debtors to preserve their value as a going concern.

134.     Given the magnitude of the financing required, the complexity of the Debtors' businesses, the immediacy of the Debtors' financing needs, the liens attaching to the Debtors' prepetition assets and the constraints imposed by the Intercreditor Agreement, the DIP Facility provided the most advantageous financing available as of the Petition Date to meet the Debtors' needs. After careful consideration of the Debtors' circumstances, the Debtors and their

restructuring advisors determined that the DIP Facility met the Debtors' critical needs and that

the DIP Facility's terms were acceptable.  Moreover, UBS AG, Stamford Branch ("UBS"), the

administrative agent under the proposed DIP Facility, is the administrative agent and one of the

lenders under the First Lien Credit Agreement.  UBS therefore has a substantial base of

knowledge with respect to the Debtors' business, its capital structure, and the prepetition

collateral, all of which would enable UBS, as the primary DIP lender, to act with the speed

necessitated by the Debtors' liquidity requirements.

　　　　　　135.　　Based on these negotiations, and for the reasons set forth above, the

Debtors ultimately decided that as of the Petition Date the proposal for debtor in possession

financing advanced by the DIP Lenders was the best available under the circumstances, could be

documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable

working capital needs, while maintaining the going concern value of the Debtors' business.

Further, the various fees and charges required by the DIP Lenders under the DIP Facility are

reasonable and appropriate under the circumstances.  For the foregoing reasons, entry into the

DIP Credit Agreement is in the best interests of Debtors' estates, creditors and other parties in

interest.

Need for Debtor in Possession Financing.

　　　　　　136.　　If the DIP Financing Motion is not approved and the Debtors do not obtain

authorization to borrow under the DIP Credit Agreement, the Debtors will suffer immediate and

irreparable harm.  Without the funds available under the DIP Facility, the Debtors face the

significant risk that they will not have the continued support of their trade vendors, which would

materially and adversely affect the Debtors' liquidity and the value of their business as a going

concern.  While the Debtors do not expect to draw on the DIP Facility immediately, immediate

access to credit will provide important assurances to customers, trade vendors, Employees and other key stakeholders.  The Debtors do not have access to their prepetition credit facilities since the chapter 11 filing.  The Debtors have no unencumbered cash.  The Debtors need funds to demonstrate they have sufficient credit.  Otherwise trade terms may contract, making it very difficult for the Debtors to make payroll, vendor payments, and other expenditures that are critical to their continued viability and ability to reorganize.

137.    Absent the DIP Facility, if trade terms contract, the Debtors have no other access to capital and may have to curtail or even terminate their business operations to the material detriment of creditors, Employees and other parties in interest, and it is likely the Debtors' restructuring would be delayed or even entirely disrupted.  Thus, the Debtors need to ensure that working capital is available in the next four weeks and throughout the pendency of these Chapter 11 Cases.  The Debtors believe that the DIP Facility will demonstrate immediately to their customers, suppliers and vendors that they have sufficient capital to ensure ongoing operations in the ordinary course.

**Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Continue Prepetition Insurance Coverage and Enter into New Insurance Policies and (b) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests Relating Thereto (the "Insurance Programs Motion")**

138.    In the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, workers' compensation and employer's liability, general commercial and products liability, property damage, business interruption, excess liability, automotive liability, ocean cargo damage, fiduciary and criminal liability, directors' and officers' liability (for their domestic and foreign operations, collectively, the "Insurance Policies").  A non-exclusive schedule of the current Insurance Policies, coverage

amounts, terms and coverage dates is annexed to the Insurance Programs Motion as Exhibit B (the "Policy Schedule").[42]

139.    The Debtors also request in the Insurance Programs Motion that financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that the Cash Management Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the Insurance Programs Motion.

140.    The total annual premiums for the Insurance Policies in 2010 is anticipated to be approximately $1,272,000, inclusive of broker fees, taxes and miscellaneous charges (collectively, the "Insurance Premiums").  With the exception of the Debtors' general liability and products liability policy (the "General/Products Liability Policy"), the commercial automobile policy (the "Business Auto Policy"), the ocean cargo liability policy (the "Ocean Cargo Policy"), and the Workers' Compensation Policy, all of the Debtors' insurance premiums for 2010 were paid in full prior to the Petition Date.

141.    The Debtors currently are paying the premium on the General/Products Policy, the Business Auto Policy and the Ocean Cargo Policy in monthly installments of approximately $7,000 for the General/Products Policy; $2,000 for the Business Auto Policy and $5,000 for the Ocean Cargo Policy.  As of the Petition Date, the Debtors estimate that pre-

---

[42]    The Policy Schedule includes Insurance Policies that are maintained for the benefit of non-debtor foreign affiliates (the "Foreign Subsidiary Policies").  The Debtors pay the premiums on certain of the Foreign Subsidiary Policies and bill the relevant non-debtor foreign affiliate in the normal course of intercompany activity.

petition obligations of approximately $28,000 for General/Products Policy; $8,000 for the Business Auto Policy; and $40,000 for the Ocean Cargo Policy remain outstanding.

142.    The Workers' Compensation Policy expires on July 31, 2010 and the Debtors have just renewed the Workers' Compensation Policy through July 31, 2011.  The expected cost of the renewed Workers' Compensation Policy is approximately $302,000 in total, with an initial payment of approximately $77,000 due on August 10, 2010 and the balance in 9 monthly installments of approximately $25,000.

143.    The Debtors request authority to pay any prepetition Insurance Premiums owing and to continue paying Insurance Premiums postpetition, and to renew Insurance Policies in the ordinary course of business.

144.    The Workers' Compensation Policy covers all current Employees up to $1,000,000.  Previously, the Debtors maintained a self-insured workers' compensation program and are still liable for certain legacy claims of MBC and RSA thereunder.  On account of two such claims (the "Missouri W/C Claims"), the Debtors maintain a deposit of approximately $200,000 with the Missouri Department of Labor and Industrial Relations, Division of Workers' Compensation (the "Department of Labor") of which the excess will be returned to the Debtors once the Department of Labor administrator certifies payment of the Missouri W/C Claims. With respect to certain additional legacy claims in Ohio (together with the Missouri W/C Claims, the "W/C Claims"), in 2009, the Debtors paid less than $5,000 on account of such claims and currently there are no accrued obligations.

145.    The Debtors utilize Lockton Companies, LLC ("Lockton") as a broker for and manager of their comprehensive insurance needs.  To compensate Lockton, the Debtors pay

Lockton a quarterly administrative fee of approximately $10,000 (the "Insurance Administrative Fees").  As of the Petition Date, the Debtors owe Lockton approximately $20,000 for such fees.

146.     Certain non-debtor foreign affiliates maintain additional insurance policies as required by applicable local jurisdictions (the "Local Policies," and together with the Insurance Premiums, the Insurance Administrative Fees and the W/C Claims, the "Insurance Costs") not listed on the Policy Schedule.  The Local Policies are paid out of the operating funds of the non-debtor foreign affiliates.  While I do not believe that any Debtor has outstanding prepetition liabilities related to the Local Polices, in an abundance of caution, the Debtors request authority to pay up to $25,000 on account of any prepetition Local Policies.

**Debtors' Application for Entry of Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC ("KCC") as Notice, Claims and Solicitation Agent *Nunc Pro Tunc* to the Petition Date, Pursuant to Section 156(c) of the Judicial Code and Rule 2002-1(f) of the Local Bankruptcy Rules**

147.     The Debtors estimate that there are potentially in excess of several thousand creditors and other parties-in-interest involved in the Debtors' cases, many of whom are expected to file proofs of claim and to whom certain notices, including notice of the commencement of these Chapter 11 Cases, must be sent.  The noticing that will be required in these Chapter 11 Cases as well as the receiving, docketing and maintenance of proofs of claim would be unduly time consuming and burdensome for the office of the clerk of this Court.

148.     Accordingly, the Debtors propose to engage KCC to act as the Debtors' notice, claims and solicitation agent.  This retention is the most effective and efficient manner of noticing the thousands of creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In that capacity, KCC will transmit, receive, docket and maintain proofs of claim filed in connection with the Chapter 11 Cases.

**Debtors' Motion, Pursuant to Sections 105(a), 362 and 541 of the Bankruptcy Code, for Entry of an Order Establishing Notice and Hearing Procedures for Trading in Equity Interests in the Debtors**

149.    The Debtors' net operating loss carryforwards ("NOLs" or "Tax Attributes") are valuable assets of the estate.  The Debtors estimate that they currently have NOL carryforwards of approximately $31.8 million.

150.    I am informed that applicable law generally permits a corporation to carry forward NOLs to offset future income, thereby reducing federal income tax liability on such future income.  Based on a federal income tax rate of 35%, because the expectation is that all of the NOLs will be used in connection with a sale of substantially all of their assets, the Tax Attributes are expected to translate into federal income tax savings of approximately $11.1 million.  I am further informed that the ability of the Debtors to use their Tax Attributes is subject to certain statutory limitations, including limitations on corporations that undergo a change of ownership.

151.    Therefore, I believe that unfettered trading in equity interests in the Debtors, with no advance warning of such trades, jeopardizes these assets and, thus, a source of value to the Debtors' stakeholders.  Thus, the Debtors request that the Court enter an order establishing notice and hearing procedures which must be complied with before certain transfers of equity interests, or any beneficial interest therein, are deemed effective.  The NOL Preservation Procedures will provide the Debtors with the flexibility, to the fullest extent possible, to craft a sale of substantially all of their assets and/or a chapter 11 plan that maximizes the use of their Tax Attributes and, consequently, the value of their estates.

**Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing and Directing Financial Institution to Honor All Related Check and Electronic Payment Requests (the "Critical Vendors Motion")**

152.    I believe that the payment of prepetition fixed, liquidated and undisputed claims (the "Critical Vendor Claims") of certain critical suppliers of materials, parts, goods and services, with whom the Debtors intend to continue to do business and whose materials, parts, goods and services are essential to the Debtors' operations (the "Critical Vendors") is necessary to continue their operations, minimize disruption to the supply of razors and blades to the Debtors' customers, preserve enterprise value and emerge successfully from chapter 11.  As set forth below and in the Critical Vendors Motion, the Debtors estimate that the maximum aggregate amount of Critical Vendor Claims that may be paid pursuant to the Critical Vendors Motion inclusive of Section 503(b)(9) Claims (defined below) is approximately $3 million on an interim basis and $6 million on a final basis.

153.    The Debtors rely on certain vendors to provide critical raw materials and supplies to enable the Debtors to produce and update their products for sale in the market.  To minimize inventory costs and maximize the Debtors' ability to meet changing customer demand, the Debtors have negotiated beneficial supply arrangements with many suppliers.  Ensuring an uninterrupted flow of materials is critical to the Debtors ability to continue producing products without interruption.  Many of the Debtors' vendors have raw materials or other goods that meet highly technical standards, are essentially customized for the Debtors' business needs, or have been specifically contracted for by the Debtors' customers.  Therefore, in many cases, the only way to ensure a continuous supply of materials and goods from these vendors would be to pay their prepetition claims.  It is essential that the Debtors have the flexibility to pay the claims of Critical Vendors in order to ensure an uninterrupted supply of raw materials and components because the Debtors maintain limited inventory levels, effectively operating on a "just-in-time" delivery system, which cannot withstand any delay or interruption in the supply of parts.

154.    The Debtors have certain steel, resin and components providers whose relationships with the Debtors are also essential.  The Debtors' steel vendors provide steel parts with custom chemical properties and dimensions.  The Debtors' ability to obtain conforming steel is critical to their ability to manufacture blades.  All of the Debtors' steel vendors must be qualified by the Debtors through a process that can take up to 6 months.  Furthermore, many of the suppliers are located abroad and, therefore, have long shipping times.  Accordingly, finding and transitioning to an alternative supplier could take months and have a materially detrimental impact on the Debtors' business.

155.    Similarly, the Debtors' petro-chemical vendors provide custom materials necessary to assemble the Debtors' razors and blades.  Certain of the Debtors' Critical Vendors are the sole source of resins with the requisite chemical compositions.  Alternative vendors would have to go to through the arduous qualification process referred to in the paragraph above.  Critical Vendors supplying resins and petro-chemicals also typically have long shipping lead times and finding an alternative supplier may add up to 6 weeks until the Debtors' receipt of materials.

156.    Moreover, certain of the Debtors' Critical Vendors provide components, without which the Debtors' business would suffer significant interruptions.   Such components include: razor handles molded to the Debtors' specifications, sole-sourced lubricating strips, electrical components that conform to the Debtors' manufacturing lines, and custom wires designed to attach the Debtors' blades to their handles.  Additionally, the Debtors' customers may request brand-specific packaging from certain Critical Vendors in order that the packaging takes a specific shape, fits the customers' shelving, or meets a certain price-point.  Further, the majority of the Debtors' packaging film, cards and bags carry individual customer names

produced from printing plates unique to each customer.  Replacing these printing plates to facilitate changing vendors would be a multi-million dollar investment and would cause a delay in receiving printed packaging components of up to fifteen weeks. Consequently, having to find alternative vendors for the Debtors' packaging may directly jeopardize the Debtors' relationship with their customers.

157.    In addition to parts and raw materials, certain Critical Vendors provide services to the Debtors that are essential to facilitating the Debtors' operation and management of their businesses, including the supervision of the Debtors' graphic-design needs and quality control.

158.    For these reasons, it is imperative that the Debtors continue to receive raw materials, components and services from multiple vendors, even in the situations where two or more vendors supply a similar part or service.  To minimize dependence on specific vendors, the Debtors previously have investigated alternative vendors and have found that switching vendors, if even possible, may take months.  The materials, parts and services to be provided by the Critical Vendors during these Chapter 11 Cases will be utilized in the Debtors' manufacturing and assembly of razors and blades and, thus, are integrally intertwined with the products and services that the Debtors, in turn, assemble, sell and provide to their customers.  Absent the ability to pay the Critical Vendors' prepetition claims as provided in the Critical Vendors Motion, such Critical Vendors may cease doing business with the Debtors which would damage, perhaps beyond repair, the Debtors' business operations.

159.    <u>Identification of Critical Vendors.</u>  To identify Critical Vendors, the Debtors and their advisors spent a significant amount of time carefully reviewing the Debtors' accounts payable and prepetition vendor lists, and consulting with facility management and

purchasing management to identify those creditors most essential to the Debtors' operations.  In addition, the Debtors' analysis included: (a) whether a particular vendor is a "sole source" supplier; (b) if a vendor, while not a sole source supplier or a supplier of customer-specified parts, supplies materials or parts that the Debtors require to continue manufacture and assembly operations and the cost or time associated with finding a replacement vendor would result in greater losses to the estate than paying such vendor's prepetition claim; (c) whether a vendor is financially dependent on the Debtors; and (d) whether a vendor meeting any of the above criteria is likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not paid.

160.    In some cases, the Debtors anticipate that, among other things, Critical Vendors (i) may refuse to deliver materials, parts, goods and services without payment of their prepetition claims, or (ii) may refuse to deliver materials, parts, goods and services on reasonable credit terms absent payment of their prepetition claims, thereby effectively refusing to do business with the Debtors.  It is in cases like these—where non-payment of Critical Vendors' claims would lead to the interruption of the delivery of necessary materials, parts, goods and/or services—that the Debtors seek to exercise their discretion to pay Critical Vendor Claims.  It is essential that the Debtors have the flexibility to pay the claims of Critical Vendors in order to ensure an uninterrupted supply of parts.  The Debtors employ "just-in-time" materials delivery, keeping as little inventory on-hand as possible.  Thus any supplier delivery delay likely will result in a production stoppage.

161.    Based on their books and records, the Debtors estimate that they have relationships with approximately 2,000 vendors, who hold approximately $16 million of aggregate prepetition claims, in the aggregate.  Of this amount, the Debtors estimate that

approximately 40 vendors who hold approximately $6 million in outstanding prepetition claims constitute Critical Vendors.

162.    The Debtors seek authority in the Critical Vendors Motion to pay, in their discretion, up to $3 million (the "Interim Critical Vendor Cap") of the Critical Vendor Claims on an interim basis and $6 million, inclusive of the Interim Critical Vendor Cap (the "Final Critical Vendor Cap") of the Critical Vendor Claims on a final basis.[43]

163.    Overlap of Section 503(b)(9) Claims    All of the Critical Vendors delivered goods in the ordinary course of business within the 20-day period prior to the Petition Date.  More specifically, the Debtors estimate that of the $6 million of Critical Vendor Claims, approximately $2.8 million (approximately 47%) of the Critical Vendor Claims likely are claims entitled to section 503(b)(9) status (collectively, the "Section 503(b)(9) Claims").[44]  Because of the priority status accorded to the Section 503(b)(9) Claims, they would have been paid upon confirmation of a chapter 11 plan of reorganization, absent payment as a Critical Vendor.  As a result, for this large subset of the Critical Vendor Claims, the relief sought will affect only the timing, but not the amount, of payment.

164.    The Debtors' failure to pay Critical Vendor Claims pursuant to the terms and conditions set forth in the Critical Vendors Motion plainly would result in immediate and irreparable harm.  The refusal of any one of the Critical Vendors to continue transacting with the Debtors could halt the Debtors' manufacture and assembly of razors and prevent the Debtors

---

[43]    These caps are based on the Debtors' latest accounts payable records as of July 26, 2010.  Certain adjustments and reconciliations will be necessary to account for invoices issued but not yet received by the Debtors as of the date of the Critical Vendors Motion.  Accordingly, the Debtors reserve their right to request an increase in the Final Critical Vendor Cap (subject to the amounts set forth in the DIP Budget (as defined in the DIP Facility)) prior to the final hearing on the Critical Vendors Motion.

[44]    There is an additional approximately $1.9 million in Section 503(b)(9) claims held by vendors that are not Critical Vendors.  The Debtors do not propose to pay these claims pursuant to the Critical Vendors Motion; rather, such claims will separately be treated in accordance with section 503(b)(9) of the Bankruptcy Code.

from meeting their delivery schedules. As a result, the Debtors would fail to meet customer demand, and they would surely lose market share. Thus, failure to pay the Critical Vendor Claims clearly will jeopardize the value of the estates.

165. The Debtors will negotiate individually with each Critical Vendor to ensure that the Critical Vendors agree to Customary Trade Terms, and that the Debtors do not pay any larger portion of a Critical Vendor's prepetition claim than is absolutely necessary to induce such Critical Vendor to continue shipping goods to the Debtors postpetition. The Debtors have devised a protocol for approving payment of Critical Vendor Claims, whereby senior level management approval (up to the CFO level) will be required in order to pay all or a portion of the claims of Critical Vendors which are owed approximately $6 million as of the Petition Date.

**Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay or Honor Prepetition Obligations to Certain Common Carriers and Other Lien Claimants and (B) Authorizing and Directing Financial Institutions to Honor All Related Check And Electronic Payment Requests (the "Common Carriers Motion")**

166. The Debtors maintain a complex manufacturing and distribution infrastructure to produce and sell their products worldwide. Throughout the manufacturing and distribution process, the Debtors routinely interact with third-party common carriers (collectively, the "Common Carriers") and third-party warehousemen and contractors (collectively, the "Lien Claimants") who, at certain points, have custody over the Debtors' assets. On account of the Debtors' unpaid prepetition financial obligations to Common Carriers and Lien Claimants for their respective services, such parties may seek to assert liens upon, or otherwise retain custody of the Debtor's finished or unfinished products, including customized manufacturing equipment, and manufacturing tools and supplies, under applicable law or contractual agreements. As described in more detail below, I believe that any such lien or possession would be greatly disruptive to the Debtors' manufacturing and distribution processes

and adversely impact their current and future business operations.  Accordingly, the Debtors

request limited authority in the Common Carriers Motion to make up to $2,1229,000 of

payments to certain Common Carriers and Lien Claimants on account of prepetition obligations

on an interim basis and prior to the entry of a final order, and an aggregate of $5,256,000 of

prepetition obligations once a final order is entered.

167.    <u>Common Carrier Claims</u>.  The Debtors estimate that, as of the Petition

Date, there are approximately 20 Common Carriers with outstanding prepetition claims in the

aggregate amount of approximately $1,872,000 for goods delivered to the Debtors or the

Debtors' customers prior to the Petition Date (the "<u>Common Carrier Claims</u>").

168.    <u>Lien Claims</u>.  The Debtors estimate that, as of the Petition Date, there are

approximately 68 Lien Claimants (excluding Common Carriers) with an outstanding prepetition

claims in the aggregate amount of approximately $3,384,000 that has given or could give rise to

a Lien against the Debtors or their property, regardless of whether such Lien Claimant has

already perfected its interest (the "<u>Lien Claims</u>").

169.    The Debtors have determined to use the chapter 11 process to market and

sell substantially all of their assets for the benefit of their creditors.  In order to do so

successfully, the Debtors must continue to operate their businesses as normal during these

Chapter 11 Cases, with minimal disruptions and distractions.

170.    The Debtors' business operations are largely dependent on their

relationships with their suppliers and customers.  Payment of the Common Carrier Claims and

Lien Claims is essential to the Debtors' day-to-day operations, which thrive on the timely

delivery and storage of raw materials, freight, machines, manufactured products to the Debtors'

facilities and finished products their customers.  Many of the Debtors' customers operate on a

"just-in-time" basis, such that even slight delay in delivery could have an immediate detrimental effect on customer relations. Furthermore, the refusal of any one of the Common Carriers to continue servicing the Debtors could halt the Debtors' manufacturing operations, prevent the Debtors from meeting their delivery schedules and, thus, cripple the Debtors' business. Moreover, any delay in the receipt of key customized manufacturing equipment and related supplies and tooling would cause enormous operational disruption, loss of revenue, and goodwill.

171.    Finally, the services of certain Lien Claimants are critical to the development and completion of the necessary tooling and infrastructure for Gen-Y. Without access to such Lien Claimants' services, and the assets in which they now have custody, the Debtors' ability to realize the future benefits of Gen-Y – the core component of the Debtors' current business plan – will be adversely affected. If a Lien Claimant, asserting a lien on the Debtors' assets, refuses to turn over property of the estate without adequate protection, the Debtors' businesses will suffer, thus jeopardizing the value of the estates.

## <u>CONCLUSION</u>

To preserve the value of their business to the fullest extent possible, the Debtors'
immediate objective is to maintain "business as usual" following the commencement of these
Chapter 11 Cases by minimizing any adverse impact of the chapter 11 filings on the Debtors'
operations.  For the reasons described herein and in the First Day Motions, I believe that the
prospect for achieving these objectives for the benefit of creditors and other stakeholders will be
substantially enhanced if this Court grants the relief requested in each of the First Day Motions.


/s/  J. Andrew Bolt
J. Andrew Bolt
Executive Vice President, Chief Financial Officer,
Vice President and Authorized Officer


Sworn to and subscribed before
me this 27th day of July, 2010.

/s/  Sara E. Johnson
Sara E. Johnson
Notary Public of New Jersey
My Commission Expires: August 31, 2011

## <u>EXHIBIT A</u>

**Corporate Organization/Debt Structure Chart**

**ASR Corporate Organization Chart**

