**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------x
                                   )

In re                        )

                            )    Chapter 11

AMERICAN SAFETY        )

RAZOR COMPANY, LLC, et al.,[1]   )    Case No. 10-_____ (___)

                            )

               Debtors.    )    Joint Administration Pending

                            )
-----------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") file this motion seeking entry of an interim (the "Interim Order"), substantially in the

form annexed hereto as Exhibit A, and a final order (the "Final Order" and, together with the

Interim Order, the "Orders"), authorizing the Debtors to (a) enter into a financing arrangement

(the "DIP Facility") as provided for in the $25,000,000 Senior Secured, Super-Priority Debtor in

Possession Credit Agreement (as amended, modified and in effect from time to time, and

together with any and all other related documents and agreements entered into in connection with

---

[1]     The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: American Safety Razor Company, LLC (0207), American Safety Razor Corporation (5475), ASR Holdings, Inc. (6509), Blade Acquisition Company (2053), Industrias Manufactureras ASR de Puerto Rico, Inc. (4894), Megas Beauty Care, Inc. (0321), Megas de Puerto Rico, Inc. (3065), Personna International de Puerto Rico, Inc. (0814), RSA Holdings Corp. of Delaware (3029), RSA Soap Company, Inc. (7635), and Valley Park Realty, Inc. (3691). The following entities are non-debtor foreign affiliates of the Debtors: American Safety Razor Australia Pty Limited; American Safety Razor do Brasil Ltda.; American Safety Razor of Canada Limited; ASR Exportacao, Importacao, Comercio e Industria de Produtos de Barbear Ltda; Personna International CZ s.r.o.; Personna International de Mexico, S.A. de C.V.; Personna International Israel Ltd.; Personna International Limited; Personna International UK Limited; Personna International UK Ltd; and Wolco Holland BV (collectively, the "Non-Debtor Foreign Affiliates"). The corporate address of American Safety Razor Company, LLC is 240 Cedar Knolls Road, Cedar Knolls, NJ 07927.

or related to the DIP Facility, including, without limitation, any fee letters, the "DIP Credit Agreement") substantially in the form attached hereto as Exhibit B, (b) use Cash Collateral (as defined below), (c) grant liens and providing super-priority administrative expense status, (d) grant "adequate protection" to the First Lien Lenders and the Second Lien Lenders (each as defined below), and (e) prescribe the form and manner of notice and scheduling hearings with respect to the relief requested herein (the "Motion").  In support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek, *inter alia*:

(a)      pursuant to sections 364(c), (d) and (e) of the Bankruptcy Code, authority to obtain senior secured postpetition financing, consisting of a term loan facility from UBS AG, Stamford Branch ("UBS") and the other lenders from time to time party to the DIP Credit Agreement (collectively, the "DIP Lenders"), with funds thereunder available for use in accordance with the 13-Week Budget (as defined in the DIP Credit Agreement) and the other terms set forth in the DIP Credit Agreement, the Interim Order, and the Final Order;

(b)      pursuant to section 364(d) of the Bankruptcy Code, authority, upon entry of the Final Order, to deem outstanding amounts in letters of credit issued pursuant to the First Lien Credit Agreement (as defined below) to have been issued under the DIP Credit Agreement;

(c)      pursuant to section 364(c)(1) of the Bankruptcy Code, and subject to the Carve-Out[2], the Wind Down Amount (as defined in the Asset Purchase Agreement[3]) and certain other administrative

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement.  To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

[3]      Defined as that certain Asset Purchase Agreement, by and among RZR Acquisition Company LLC, a Delaware limited liability company, as Purchaser, RZR Holding Corporation, a Delaware corporation, as Parent, the Borrower, as Seller and UBS AG, Stamford Branch, in its capacity as administrative agent under the Existing First Lien Credit Agreement, for certain limited provisions thereof, dated as of July 28, 2010.

claims, the grant of super-priority claim status to the claims of the DIP Lenders under the DIP Credit Agreement;

(d)     pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Credit Agreement, authority to grant to UBS, as administrative agent for the DIP Lenders under the DIP Credit Agreement (in such capacity, the "DIP Administrative Agent"), security interests in and liens upon the Collateral, subject to the Carve-Out, the Wind Down Amount and other priority liens;

(e)     pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authority to use the Prepetition Collateral (as defined in the Interim Order), including the Cash Collateral, and to provide certain protections with respect to any diminution in the value of the First Lien Lenders' interest in the Prepetition Collateral resulting from the implementation of the DIP Facility, the liens and security interests sought herein to secure the DIP Facility, the use, sale or lease of the Prepetition Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(f)     pursuant to sections 363 and 364 of the Bankruptcy Code, authority to use the proceeds of the DIP Facility to fund general corporate working capital and capital expenditure needs of the Borrower in accordance with the 13-Week Budget, including, without limitation, payment of interest and fees under the DIP Facility, the Interim Order, and the Final Order;

(g)     pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the DIP Credit Agreement;

(h)     pursuant to Bankruptcy Rule 4001, the scheduling of a preliminary hearing on this Motion and authority, from the entry of the Interim Order until the final hearing (the "Final Hearing"), to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(i)     pursuant to Bankruptcy Rule 4001, the scheduling of a Final Hearing on this Motion and the establishment of notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Facility on a final basis.

## BACKGROUND

2.      The Debtors, together with the Non-Debtor Foreign Affiliates (collectively, the "Company") are the fourth largest manufacturer and distributor of wet shaving razors and blades in the world.  The Company also produces bladed hand tools and medical and industrial blades.  A discussion of the Debtors' business operations and the reasons for commencing these chapter 11 cases are set forth in the *Affidavit of J. Andrew Bolt, Executive Vice President and Chief Financial Officer of American Safety Razor Company, LLC and Blade Acquisition Company, and Vice President and Authorized Officer of the Other Debtors, in Support of the First Day Motions* (the "First Day Affidavit"), filed contemporaneously with this Motion.

3.      As set forth in the First Day Affidavit, the Debtors have commenced these chapter 11 cases in the midst of significant changes in the competitive landscape for the Debtors' business.  Without immediate access to working capital, the Debtors cannot be assured of their ability to continue to fund their day-to-day operations and ensure the continued support of their trade vendors and other stakeholders, each of which is needed to continue their business.  The Debtors require a postpetition financing commitment to preserve the estate's going concern value.

4.      To that end, the Debtors are seeking authorization to obtain postpetition financing in an aggregate amount not to exceed $25 million.  The Debtors are seeking access to $10 million of the DIP Facility on an interim basis.

The Debtors' Prepetition Capital Structure

5.      As set forth in the First Day Affidavit, as of the Petition Date (defined below), the Debtors had $482.5 million of borrowings under three credit agreements, described below.  The Company's three prepetition credit facilities, each dated as of July 31, 2006 are as follows:

> (i) a first lien credit agreement (the "First Lien Credit Agreement"), under which the Debtors that are party to the First Lien Credit Agreement (the "First Lien Obligors") had revolving loans of approximately $34.0

million and term loans of approximately $210.4 million outstanding as of the Petition Date (the lenders party to the First Lien Credit Agreement, the "First Lien Lenders");

(ii) a second lien credit agreement (the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, the "First and Second Lien Credit Agreements"), under which the Debtors that are party to the Second Lien Credit Agreement (the "Second Lien Obligors") had second lien term loans of approximately $178.1 million outstanding as of the Petition Date (the lenders party to the Second Lien Credit Agreement, the "Second Lien Lenders"); and

(iii) a payable in kind or "PIK" interest mezzanine credit agreement (the "Mezzanine Credit Agreement"), under which RSA Holdings Corp. of Delaware ("Holdings"), a Debtor in these chapter 11 cases, had mezzanine term loans of approximately $60.0 million outstanding as of the Petition Date (the lender party to the Mezzanine Credit Agreement, the "Mezzanine Lender").[4]

6.     The obligations under the First and Second Lien Credit Agreements are secured by blanket liens on substantially all of the domestic personal and real property of the Debtors, including pledges of all capital stock, which pledges include 100% of the capital stock of the Debtors' first-tier foreign subsidiaries. The administrative agents under the First and Second Lien Credit Agreements are parties to an intercreditor agreement (the "Intercreditor Agreement", annexed hereto as Exhibit C), which governs the relative rights of the parties (including with respect to lien priorities and enforcement of remedies) relating to the collateral of the First and Second Lien Obligors securing the obligations under the First and Second Lien Credit Agreements and also bars the Second Lien Lenders from objecting to certain motions and applications in these chapter 11 cases that bear on such collateral. Pursuant to the terms of the Intercreditor Agreement, the liens on the First and Second Lien Obligors' collateral securing the

---

[4]     ASR is the Borrower under the First and Second Lien Credit Agreements. Holdings is the Borrower under the Mezzanine Credit Agreement. The following Debtors are guarantors of ASR's obligations under the First and Second Lien Credit Agreements: Holdings, American Safety Razor Corp., RSA Soap Company, Inc., Personna International de Puerto Rico, Inc., ASR Holdings, Inc. and Megas Beauty Care, Inc. There are no guarantors of Holdings' obligations under the Mezzanine Credit Agreement.

Second Lien Credit Agreement obligations are junior and subordinate to the liens on the collateral securing the First Lien Credit Agreement obligations.[5] The obligations under the Mezzanine Credit Agreement are unsecured and structurally subordinated to the obligations of the First and Second Lien Credit Agreements.

The Debtors' Challenges

7.      As discussed more fully in the First Day Affidavit, the Company faces significant competition in the wet shaving category from its two largest competitors, Gillette, a subsidiary of Procter & Gamble and Schick, a subsidiary of Energizer Holdings.  In addition, the Company faces regional and global competition from a variety of smaller manufacturers.

8.      During the recent economic recession, the Company faced significant challenges from competitors and retailers.  Customers discounted their prices to attract the business of the cash-strapped consumer.  The accumulation of these and other factors had a major impact on the Company's 2009 earnings and put significant pressure on the Company's ability to stay compliant with its leverage covenants under the First and Second Lien Credit Agreements.

9.      On April 21, 2010, the Company entered into separate waiver agreements, effective as of April 1, 2010, with the First Lien Lenders and the Second Lien Lenders, under which such lenders agreed to grant a temporary waiver of, and not exercise their rights and remedies with respect to, certain defaults and events of default (including non-compliance with the leverage ratio covenant).  The waivers, which expired on June 29, 2010, were extended for an additional 30 days to July 29, 2010.

---

[5]      Further, under the Intercreditor Agreement, the administrative agent under the Second Lien Credit Agreement and the Second Lien Lenders are deemed to consent to the financing under the DIP Facility and, upon approval of the DIP Facility, the liens under the DIP Facility shall have first priority in the Collateral (as defined in the Interim Order), the Prepetition First Liens (as defined in the Interim Order) shall have second priority in the Collateral, and the Prepetition Second Liens (as defined in the Interim Order) shall have third priority in the Collateral.

10.     The Debtors' reorganization depends in large part on preserving vendor, customer and employee confidence and maintaining the operation of their business as they restructure. The Debtors have an immediate need to access the DIP Facility and to use Prepetition Collateral, including any Cash Collateral, in order to, among other things, permit the orderly operation of their business by securing goods and paying employees, preserve the going concern value of their estates by restoring confidence and ultimately maximize the value of the Debtors' estates. Without access to such financing and Cash Collateral, the Debtors will not be able to stabilize operations and their efforts to reorganize and restore profitability will be irreparably harmed.

Investigation of Restructuring Alternatives

11.     As discussed in the First Day Affidavit, in connection with the Debtors' efforts to work with the Second Lien Lenders on a potential restructuring proposal, the Debtors' investment banker, Lazard Middle Market LLC ("Lazard"), contacted nine financial institutions to determine whether they were interested in providing financing for the Second Lien Lenders' proposal.  Of those nine contacted, seven executed confidentiality agreements and received the Company's business plan and related management presentation.  Moreover, certain of these financial institutions spoke with either the Debtors or the Debtors' financial advisors regarding various diligence items.

12.     Thus, when it came time to solicit proposals for debtor in possession financing, the Debtors' restructuring advisors contacted five of the financial institutions they had previously contacted regarding financing a Second Lien Lender-led restructuring.  The Debtors' advisors contacted these institutions because such institutions already were familiar with the Debtors' business and finances, knew the Company's current situation with its First Lien Lenders and Second Lien Lenders, and were common providers of DIP financing.  None of these lenders

were willing to provide the Debtors with DIP financing, citing, among other reasons, that such proposed financing likely would lead to a "priming" fight with the First Lien Lenders and likely would accompany the First Lien Lenders' credit bid.

13.     As set forth in the First Day Affidavit, the Debtors have been negotiating with the Second Lien Lenders for alternative debtor in possession financing facilities (the "<u>Proposed Alternative DIP Facilities</u>") that would repay the obligations under the First Lien Credit Facility in full, provide the Debtors with liquidity for these chapter 11 cases and convert to exit facilities on consummation of a plan of reorganization.  To date, the Alternative DIP Facilities have not been fully subscribed.  A summary of the current terms of the Proposed Alternative DIP Facilities is annexed hereto as Exhibit D.  The Debtors reserve the right to substitute the Proposed Alternative DIP Facilities for the DIP Facility at the Final Hearing.

14.     The Debtors and Lazard also considered seeking DIP or other financing from other commercial banks and hedge funds that historically have loaned money to or invested in distressed companies.  However, the First Lien Lender and Second Lien Lender groups are comprised of nearly 40 commercial banks and hedge funds, including most of the major institutions or entities that have experience providing distressed financing.  Accordingly, the Debtors and Lazard determined that, in effect, the Debtors had sufficiently and appropriately canvassed the commercial bank and hedge fund marketplace for available financing by simply engaging in discussions with, and requesting additional financing from, the First Lien Lenders and Second Lien Lenders.  Additional efforts to obtain financing from any other banks or funds outside the First Lien Lender and Second Lien Lender groups would not have been successful.

15.     The Debtors, with the assistance of their advisors, including Lazard, also solicited the Mezzanine Lender with respect to providing or participating in a potential DIP facility.

16.     The Debtors and their restructuring advisors negotiated the terms of the DIP

Facility through good-faith, extensive, arms-length negotiations, which culminated in an

agreement with the DIP Administrative Agent to provide postpetition financing on the terms and

subject to the conditions set forth in the DIP Credit Agreement and the related proposed Interim

and Final Orders.  The Debtors concluded, in consultation with their restructuring advisors, that

the DIP Facility offered by the DIP Administrative Agent is competitive, addresses the Debtors'

working capital and liquidity needs, presents the best option available, and will enable the

Debtors to preserve their value as a going concern.

17.     Given the magnitude of the financing required, the complexity of the Debtors'

businesses, the immediacy of the Debtors' financing needs, the liens attaching to the Debtors'

prepetition assets and the constraints imposed by the Intercreditor Agreement, the DIP Facility

provided the most advantageous financing available as of the Petition Date to meet the Debtors'

needs.  After careful consideration of the Debtors' circumstances, the Debtors and their

restructuring advisors determined that the DIP Facility met the Debtors' critical needs and that

the DIP Facility's terms were acceptable.  Moreover, UBS is the administrative agent and one of

the lenders under the Debtors' prepetition First Lien Credit Agreement.  UBS therefore has a

substantial base of knowledge with respect to the Debtors' business, its capital structure, and the

prepetition collateral, all of which would enable UBS, as the primary DIP lender, to act with the

speed necessitated by the Debtors' liquidity requirements.

18.     Based on these negotiations, and for the reasons set forth above, the Debtors

ultimately decided that as of the Petition Date the proposal for debtor in possession financing

advanced by the DIP Lenders was the best available under the circumstances, could be

documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable

working capital needs, while maintaining the going concern value of the Debtors' business. Further, the various fees and charges required by the DIP Lenders under the DIP Facility are reasonable and appropriate under the circumstances. For the foregoing reasons, entry into the DIP Credit Agreement is in the best interests of Debtors' estates, creditors and other parties in interest.

Need for Debtor in Possession Financing

19.     If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, the Debtors will suffer immediate and irreparable harm. Without the funds available under the DIP Facility, the Debtors face the significant risk that they will not have the continued support of their trade vendors, which would materially and adversely affect the Debtors' liquidity and the value of their business as a going concern. While the Debtors do not expect to draw on the DIP Facility immediately, immediate access to credit will provide important assurances to customers, trade vendors, foreign creditors, employees and other key stakeholders. The Debtors do not have access to their prepetition credit facilities since the chapter 11 filing. The Debtors have no unencumbered cash. The Debtors need funds to demonstrate they have sufficient credit. Otherwise trade terms may contract, making it very difficult for the Debtors to make payroll, vendor payments, and other expenditures that are critical to their continued viability and ability to reorganize.

20.     Absent the DIP Facility, if trade terms contract, the Debtors have no other access to capital and may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest and it is likely the Debtors' restructuring would be delayed or even entirely disrupted. Thus, the Debtors need to ensure that working capital is available in the next four weeks and throughout the pendency of these chapter 11 cases. The Debtors believe that the DIP Facility will demonstrate immediately to their

customers, suppliers and vendors that they have sufficient capital to ensure ongoing operations in the ordinary course.

## SUMMARY OF TERMS OF THE DIP FACILITY

21.     The principal terms of the DIP Facility are as follows:[6]

| | |
|---|---|
| Borrower: | American Safety Razor Company, LLC, a Delaware limited liability company ("ASR" or the "Borrower"). |
| Guarantors: | The DIP Facility will be fully and unconditionally guaranteed by (i) RSA Holdings Corp. of Delaware, a Delaware corporation ("Holdings"), and a guarantor under the First Lien Credit Agreement, and (ii) the direct and indirect domestic subsidiaries of the Borrower (collectively, the "Subsidiary Guarantors" and, together with Holdings, collectively, the "Guarantors" and, together with the Borrower, collectively, the "Loan Parties"). |
| Administrative Agent: | UBS AG, Stamford Branch as Administrative Agent. |
| Arranger: | UBS Securities LLC (the "Arranger"). |
| Collateral Agent: | General Electric Capital Corporation ("GECC"). |
| Syndication Agent: | GECC |
| Documentation Agent: | Aladdin Credit Partners I, LP |
| DIP Facility: | A first priority senior secured multiple draw term loan credit facility (the "DIP Facility") in an aggregate principal amount of $25,000,000 of "new money" liquidity, with a $7,500,000 sublimit for letters of credit as set forth below (the "Commitment"). |
| | Upon entry of this Interim Order, Borrower shall be permitted to borrow the lesser of (x) $10,000,000 and (y) the amount necessary to fund working capital and other needs set forth on the 13-Week Budget. |
| | Upon entry of the Final Order, outstanding amounts in letters of credit issued pursuant to the First Lien Credit Agreement will be deemed to have been issued under the DIP Facility. |
| Use of Proceeds: | The proceeds of the loans under the DIP Credit Facility shall be used by the Borrower to (a) to fund general corporate working capital and capital expenditure needs of the Borrower in accordance with the 13-Week Budget (as defined below) including, without limitation, payment of interest and fees under the DIP Credit Facility, and (b) to pay allowed and approved administrative expenses of the bankruptcy cases and, subject to the consent of the "Required Lenders" under the DIP Credit |

---

[6]     This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.  In addition, the Interim Order remains subject to continuing negotiations among parties in interest. The Debtors reserve all rights in connection with the Interim Order.  Unless otherwise specified, terms have the same definitions as those in the DIP Credit Agreement.

Facility (such consent not to be unreasonably withheld), reasonable fees and expenses of professionals. Notwithstanding the foregoing, at the closing of the Asset Purchase Agreement (as defined in this Motion) the Borrower may borrow an amount sufficient, and shall use the proceeds of the loans so borrowed, to fund the Wind Down Amount (as defined in the Asset Purchase Agreement) which shall be deposited and distributed as provided in Section 7.18 of the Asset Purchase Agreement.

Maturity Date: January 30, 2011 (the "<u>Original Maturity Date</u>"); provided, that, so long as no Default or Event of Default has occurred and is continuing on the Original Maturity Date, the Borrower shall have the right to request that such date be extended for an additional three (3) months to April 30, 2011 (the "<u>First Extension Date</u>") for a fee of 1.00% of the DIP Loan Commitment outstanding as of the Original Maturity Date (the "<u>First Extension Fee</u>"); provided, further, that, so long as no Event or Default has occurred and is continuing on the First Extension Date, the Borrower shall have the right to extend such date for an additional three (3) months to July 30, 2011 (the "<u>Second Extension Date</u>") for a fee of 2.00% of the DIP Loan Commitment outstanding as of the First Extension Date (the "<u>Second Extension Fee</u>"). The First Extension Fee and the Second Extension Fee actually paid shall be paid to the Administrative Agent for the pro rata benefit of the DIP Lenders.

Carve-Out The "<u>Carve-Out</u>" is defined as: (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed professional fees and expenses of the Debtors and any official committee of unsecured creditors (the "<u>Committee</u>") appointed in the Cases (but excluding any transaction, restructuring, completion, success or similar fees) (the "<u>Professional Fees</u>") incurred to the extent consistent with the 13-Week Budget, but unpaid, prior to delivery of a notice of an Event of Default (such Professional Fees, the "<u>Accrued Claims</u>" and such notice, the "<u>Carve-Out Notice</u>"); and (iii) Professional Fees incurred subsequent to delivery of the Carve-Out Notice to the extent consistent with the 13-Week Budget in an aggregate amount not to exceed $4,000,000.

The amount of $50,000 shall be permitted to be used by professionals of the Committee, if appointed, to investigate the liens, claims and interests of the First Lien Secured Parties.

Availability: Upon satisfaction or waiver by the Required Lenders of conditions precedent to drawing specified in the definitive DIP Facility documentation, up to the lesser of: (i) $25,000,000 <u>less</u> Loan Exposure <u>less</u> the Carve-Out Reserve, and (ii) the amount necessary to fund general corporate needs, including working capital needs, as set forth on the 13-Week Budget.

LIBOR Floor: 2.50%

Base Rate Floor: 3.50%

| | |
|---|---|
| Pricing: | LIBOR plus 5.50%; Base Rate plus 4.50%. |
| Default Interest: | 2.00% per annum plus the rate otherwise applicable. |
| Fees: | 1. Initial Fee – 2.10% of the DIP Loan Commitment to Administrative Agent, for the pro rata benefit of the DIP Lenders, in accordance with the principal amount of the DIP Loan Commitment held by each such DIP Lender on the closing date of the DIP Credit Facility. |
| | 2. All fees shall be fully earned on the closing date and shall be non-refundable once paid. |
| Unused Fee: | 1.00% per annum. |
| Letter of Credit Fees: | (i) Fronting fee equal to 0.375% per annum on the average aggregate face amount of the outstanding letters of credit under the DIP Facility, (ii) letter of credit participation fees equal to the applicable margin for Eurodollar Loans under the DIP Facility times the average aggregate face amount of the outstanding letters of credit under the DIP Facility, and (iii) customary fees and expenses with respect to the issuance or administration of such letters of credit. |
| Security: | The DIP Facility will be secured by first priority liens, subject to certain exceptions, on all assets of Borrower and Guarantors (collectively, the "Collateral") and shall "prime" the liens and security interests under the First Lien Credit Agreement. |
| Financial Reports: | (1) Commencing by 5:00 p.m. (Eastern Daylight Time) on August 26, 2010 and on each fourth Thursday thereafter until the Maturity Date, the Borrower shall provide: |

(a) An updated 13-week cash flow forecast for Holdings and its Subsidiaries on a consolidated basis in the form attached hereto as Exhibit A (the "13-Week Budget"); and

(b) a report of net aggregate unfavorable variances of Net Operating Cash Flow (as defined in the 13-Week Budget) evidencing net unfavorable variances of no more than $4,000,000 for the prior four (4) week period as set forth in the prior 13-Week Budget.

(2) Commencing by 5:00 p.m. (Eastern Daylight Time) on August 5, 2010 and on each Thursday thereafter until the Maturity Date, the Borrower shall provide:

(a) A comparison of actual to budgeted weekly results of operation for each prior four (4) week period, as applicable;

(b) a report of weekly net aggregate unfavorable variances of Net Operating Cash Flow; and

(c) a report containing a summary of accrued, but unpaid, professional fees and expenses of the Borrower and the Guarantors incurred in the Chapter 11 Cases as of such date.

Financial Covenant(s):   Compliance with the 13-Week Budget within the Permitted Variances.

Events of Default:   (a) default in payment of principal;

(b) default in payment of any interest on any Loan or any Fee or any other amount (other than a default in payment of principal) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five (5) Business Days;

(c) any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any, certificate, or other document furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d) default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in Section 5.02, 5.03(a), 5.08, or in Article VI of the DIP Credit Agreement;

(e) default shall be made in the observance or performance by any Company of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after written notice thereof from the Administrative Agent or any Lender to the Borrower;

(f) any Company shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations) incurred or entered into after the Petition Date, when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness entered into after the Petition Date if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity; *provided* that, it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds $5,000,000 at any one time (*provided* that, the "principal amount" in respect of any Hedging Obligations of any Loan Party at any time shall be the maximum aggregate amount (giving effect to any

netting agreements) that such Loan Party would be required to pay if the related Hedging Agreement were terminated at such time);

(g) one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $5,000,000 (exclusive of amounts covered by insurance for which coverage is not denied) in respect of obligations arising after the Petition Date shall be rendered against any Company or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Company to enforce any such judgment;

(h) one or more ERISA Events arising after the Petition Date shall have occurred (other than any ERISA Event that arises out of (i) any Company's seeking of a funding waiver under Code Section 412(c), (ii) failing to satisfy the minimum funding standard prior to or during the pendency of any funding waiver request or (iii) attempting to terminate any of the pension plans listed on Schedule 3.17, each such event arising out of (i)-(iii), hereinafter called an "Excluded ERISA Event") that, when taken together with all other such ERISA Events that have occurred after the Petition Date (other than an Excluded ERISA Event), could reasonably be expected to result in liability for any Company and its ERISA Affiliates or the imposition of a Lien on any properties of any Company, in either event in an amount which could reasonably be expected to exceed $5,000,000;

(i) any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Administrative Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents or the Financing Orders (including a perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in such Security Document or the Financing Orders)) in favor of the Administrative Agent, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, such Security Document or the Financing Orders) security interest in or Lien on the Collateral covered thereby;

(j) any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the payment of Obligations;

(k) the Loan Parties shall fail to achieve the milestones set forth on Schedule M by the dates specified therein (or such later date as may be agreed to by the Administrative Agent in its sole discretion);

(l) a termination of the Asset Purchase Agreement shall have occurred; or

(m) the occurrence of any of the following in the Chapter 11 Cases:

(i) the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations due under this Agreement and the Pre-Petition Credit Agreement with the termination of all related lending commitments thereunder; (x) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of the Administrative Agent (unless the granting of such Lien is simultaneous with a refinancing to pay in full in cash all Obligations due under this Agreement and the Pre-Petition Credit Agreement); or (y) except as provided in the Financing Orders, to use cash collateral of Administrative Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent;

(ii) the filing of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party (y) which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement, or (b) if such plan does not propose payment in full in cash of all Obligations under this Agreement, in each case to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iii) the entry of an order in the Chapter 11 Cases confirming a Reorganization Plan that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement, to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iv) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order (except with respect to ministerial changes) without the written consent of the Administrative Agent or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

(v) the Final Order is not entered on or before the date that is thirty-five (35) days after the Petition Date (which date, at the request of the Borrower and with the consent of the Administrative Agent, may be

extended for another five (5) Business Days), or prior to or immediately following the expiration of the Interim Order;

(vi) the entry of an order allowing any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, the Issuing Bank, any Lender or any of the Collateral;

(vii) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, the reorganization of such Loan Party (or any Loan Party seeks or acquiesces in such relief);

(viii) the sale without the Administrative Agent's and the Required Lenders' consent, of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code, through a confirmed Reorganization Plan in the Chapter 11 Cases, or otherwise (or any Loan Party seeks or acquiesces in such relief) that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitments (or conversion of such Obligations and Commitment to an exit facility);

(ix) the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code (except as consented to by the Administrative Agent and the Required Lenders) or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code, conversion of the Chapter 11 Cases or otherwise;

(x) other than pursuant to the First Day Orders or the Financing Orders, the entry of a final order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having value in excess of $2,500,000, or (y) with respect to any Lien on or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xi) the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii) the failure of any Loan Party to perform any of its material obligations under the Interim Order or the Final Order, which materially and adversely affects the interests of any of the Lenders, taken as a whole, the Administrative Agent or the Issuing Bank as reasonably determined by the Administrative Agent, the Issuing Bank and the Required Lenders, as the case may be;

(xiii) except as otherwise provided by the Financing Orders, the entry of an order in the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Administrative Agent, on behalf of itself and/or the Secured Parties;

(xiv) termination of the exclusive period for the Loan Parties to file a plan of reorganization in the Chapter 11 Cases; or

(xv) any of the Loan Parties' return of goods constituting Collateral pursuant to Section 546(g) of the Bankruptcy Code other than in accordance with any such program (y) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court.

|  |  |
|---|---|
| Adequate Protection<br>For First Lien Lenders: | As adequate protection for any diminution in the value of their collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Borrower and the Guarantors shall (a) grant to the First Lien Lenders replacement liens on all of the Collateral, subordinate only to the liens in favor of the DIP Facility, the Carve-Out, the Wind Down Amount (as defined in the Asset Purchase Agreement) and Permitted Senior Liens (as defined in the First Lien Credit Agreement), (b) provide for a super-priority administrative claim, subject only to the claims of the DIP Facility, the Carve-Out and the Wind Down Amount, (c) timely pay the reasonable fees and expenses of the professionals retained by the First Lien Lenders (including counsel), and (d) timely pay interest due under the First Lien Credit Agreement at the same rate as is being paid on such facility as of the day prior to the Petition Date. |
| Adequate Protection<br>For Second Lien Lenders: | As adequate protection for any diminution in the value of their collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Borrower and the Guarantors shall grant to the Second Lien Lenders replacement liens on all of the Collateral, subordinate only to the liens in favor of the DIP Facility, the Carve-Out, the Wind Down Amount, the Prepetition First Liens, the First Lien Replacement Liens, and Permitted Senior Liens (as defined in the First Lien Credit Agreement), and subject only to the claims of the DIP Facility, the Carve-Out, Permitted Senior Liens, the Wind Down Amount, the First Lien Administrative Claim, and the First Lien Indebtedness. |
| Adequate Protection<br>506(c) Waiver: | Subject to entry of the Final Order, with the exception of the Carve-Out and the Wind Down Amount, and except as otherwise permitted by the DIP Facility, neither the Collateral, Prepetition Collateral nor any Agent, DIP Lender, or any First Lien Secured Parties shall be subject to surcharge, pursuant to sections 105, 506(c), or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Administrative Agent and First Lien Agent and no such consent shall be implied from any other action, |

inaction, or acquiescence by such parties in this proceeding, including but not limited to funding of the Debtors' ongoing operation by the Administrative Agent and DIP Lenders. The "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived. Upon entry of the Final Order, the Administrative Agent, DIP Lenders and the First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral.

Milestones:

| Date | Action/Milestone |
| --- | --- |
| August 4, 2010 | Interim Order approving DIP Facility to be entered. |
| August 3, 2010 | Borrower and Guarantors shall file a motion to sell substantially all of their assets (the "363 Sale"), in form and substance reasonably acceptable to the DIP Administrative Agent and the Required Lenders (the "Sale Motion"). |
| August 27, 2010 | Final Order approving the DIP Facility to be entered. |
| September 28, 2010 | Auction for 363 Sale. |
| October 5, 2010 | Hearing to approve 363 Sale. |
| October 8, 2010 | The Bankruptcy Court shall have entered an order approving the 363 Sale, in form and substance acceptable to the Administrative Agent and the Required Lenders. |
| October 22, 2010[7] | Closing of 363 Sale. |

The above dates are subject to extension as set forth in the DIP Credit Agreement. In the event that (a) the petition date for the Chapter 11 cases occurs after July 30, 2010 or (b) the Bankruptcy Court is unable or unwilling to schedule a hearing on the required date(s), the dates set forth above shall be deemed automatically extended by an equal number of days (or such later date as would constitute the next Business Day) up to a maximum of seven (7) Business Days.

---

[7]    Subject to automatic extension for HSR approval per the Asset Purchase Agreement.

## CASE BACKGROUND

22.     On July 28, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

## JURISDICTION

23.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code.

## BASIS FOR RELIEF

**A.     The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

24.     As set forth above, the Debtors' ability to maximize the value of their estates hinges upon their being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a

senior lien on unencumbered property or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c).

25.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Ames") (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

26.     As set forth above, the Debtors have effectively solicited proposals for financing from various institutions and engaged in intense negotiations and diligence efforts in an effort to secure debtor in possession financing on the best terms available.  The Debtors simply were unable to procure satisfactory alternative financing on terms as good, or better, than those provided by the DIP Lenders.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

27.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected (as such lienholders consent).  See 11 U.S.C. § 364(d)(1).

28.     Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.     The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtors' assets. Courts advocate using a "holistic approach" to evaluate super-priority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens.  See In re Aqua Assocs, 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis

for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

30.     In furtherance of this approach, courts consider a number of factors, including, without limitation:  (a) whether alternative financing is available on any other basis (e.g., whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors.  See Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003).  Each of these considerations has been met here.

(i)     The DIP Facility Represents the Best Financing Available.

31.     As explained above, the Debtors were unable to obtain satisfactory alternative financing.  The DIP Facility offers the most advantageous terms.

(ii)    The DIP Facility Is Necessary to Preserve the Assets of the Debtors' Estates.

32.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize the estate's assets.  See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003).  The DIP Facility, if approved, will provide essential working capital, allowing the Debtors to continue funding their day-to-day operations.  Without the DIP Facility,

the Debtors will be unable to preserve the going-concern value of their estates, thereby

endangering the success of these chapter 11 cases.

(iii)   <u>The Terms of the DIP Credit Agreement Are Reasonable and Adequate Under the Circumstances.</u>

33.    The DIP Credit Agreement was negotiated in good faith and at arm's length

among the parties, culminating in a carefully-crafted agreement designed to maintain the

Debtors' business as a going concern and preserve value for all parties in interest. Given the

urgent needs of the Debtors to obtain financial and operational stability for the benefit of all

parties in interest, the terms of the proposed DIP Credit Agreement are the best available.

Indeed, when viewed in its totality, the DIP Credit Agreement reflects the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties and supported by fair

consideration.

(iv)   <u>The Debtors' Proposed Adequate Protection Is Appropriate</u>.

34.    The proposed adequate protection is comprised of the "customary package" of the

payment of interest (for the First Lien Lenders), the payment of fees and expenses of the First

Lien Lenders' professionals, and the granting of liens and super-priority claims to the First Lien

Lenders and the Second Lien Lenders in respect of any diminution in value. This adequate

protection has been consented to, or not opposed, by the primed First Lien Secured Parties (as

defined in the Interim Order) and, therefore, pursuant to the Intercreditor Agreement, the Second

Lien Secured Parties (as defined in the Interim Order) are deemed to consent.

(v)   <u>The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility.</u>

35.    Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money. <u>See</u>, <u>e.g.</u>, <u>Group of Inst. Investors</u>

<u>v. Chicago, Mil., St. P. & Pac. Ry.</u>, 318 U.S. 523, 550 (1943) (holding that decisions regarding

assumption or rejection of leases are left to the business judgment of the debtor); <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" <u>In re Dura Auto. Sys. Inc.</u>, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting <u>In re Exide Techs., Inc.</u>, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

36. Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); <u>see also</u> <u>In re Trans World Airlines, Inc.</u>, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." <u>Curlew Valley</u>, 14 B.R. at 513-14 (footnotes omitted).

37. As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement. The DIP Credit Agreement contains terms that are the best available under the circumstances.

38. The funds provided by the DIP Facility are essential to enable the Debtors to retain the confidence of vendors and customers and ensure the continued supply of goods and services they need to sustain their operations and maintain a competitive position in the marketplace through the pendency of these chapter 11 cases. Indeed, failure to obtain approval of the DIP Facility will irreparably harm the going-concern value of their businesses which, in turn, will adversely affect the value ultimately received by their stakeholders.

39. Accordingly, pursuant to sections 364(c) and (d), the Debtors respectfully submit that they should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured and administrative super-priority basis described herein.

(vi)    The Debtors' Request for Use of Cash Collateral is Appropriate.

40. The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

41. Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are adequately protected. See In re McCormick, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). "Cash Collateral" is defined as, "cash, negotiable instruments, documents

of title, securities, deposit accounts or other cash equivalents in which the estate and an entity

other than the estate have an interest." 11 U.S.C. § 363(a).

42. The Debtors have an urgent need for the immediate use of the cash collateral

pending the final hearing on this Motion and seek to use all cash collateral existing on or after

the Petition Date. The Debtors require the use of the cash collateral to, among other things, pay

present operating expenses, including payroll and vendors, and ensure a continued supply of

goods and services essential to the Debtors' continued viability. The First Lien Secured Parties

do not object to the Debtors' use of the cash collateral upon the terms and conditions set forth in

the Orders. Moreover, courts in this district have granted similar relief in other recent chapter 11

cases. See, e.g., In re Motor Coach Indus. Int'l, Inc., No. 08-12136 (BLS) (Bankr. D. Del. Oct.

7, 2008); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. March 7, 2008); In re

Buffets Holdings, Inc., No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Pope &

Talbot, Inc., No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007).

**B.      Modification of the Automatic Stay is Warranted**

43. The proposed Interim Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of

Default, all rights and remedies provided for in the DIP Credit Agreement, the Interim Order,

and the Final Order, and to take various actions without further order of or application to the

Court. However, the DIP Lenders must provide the Debtors and various other parties with

five business days' written notice prior to exercising any enforcement rights or remedies in

respect of the Collateral or upon a shorter period of time after notice and a hearing. Moreover,

the Debtors and any other parties in interest may seek within the five business day notice period

an expedited hearing before this Court solely for the purpose of considering whether, in fact, an Event of Default has occurred and is continuing.

44.     Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed Orders.

## THE DIP FINANCING MEETS THE REQUIREMENTS OF LOCAL RULE 4001-2

45.     The following provisions of the DIP Credit Agreement are required to be identified in accordance with Local Rule 4001-2 and such provisions are justified and necessary in the context and circumstances of these cases.

A.     Local Rule 4001-2(a)(i)(C) Requirements Are Met.

46.     Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, without notice, of the estates' rights under section 506(c) of the Bankruptcy Code.  The Interim Order provides for a waiver of the Debtors' rights with respect to the First Lien Secured Parties under section 506(c) of the Bankruptcy Code only upon entry of the Final Order.  See Interim Order at ¶7.  As the effectiveness of this waiver will be delayed until the entry of the Final Order, parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

B.     Local Rule 4001-2(a)(i)(E) Requirements Are Met.

47.     Local Rule 4001-2(a)(i)(E) requires a description of provisions which contemplate the use of postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.  See Del. Bankr. L. R. 4001-2(a)(i)(E).

48.     The DIP Facility includes a provision which provides that, upon entry of the Final Order, outstanding amounts in letters of credit issued pursuant to the First Lien Credit

Agreement shall be deemed to have been issued under the DIP Credit Agreement.  See Interim

Order at ¶2.  The aforementioned circumstances demonstrate that the above-described provision

is justified and should be authorized as necessary and appropriate.

## INTERIM APPROVAL OF THE DIP FACILITY

49.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing

on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain

credit under section 364 of the Bankruptcy Code may not be commenced earlier than 14 days

after the service of such motion.  Upon request, however, the Court is empowered to conduct a

preliminary expedited hearing on the motion and to authorize the use of cash collateral and the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's

estate.

50.     Given the immediate and irreparable harm to be suffered by the Debtors absent

interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary

hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the

Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to

utilize Cash Collateral.

## PROCEDURE

51.     No previous application for the relief requested herein has been made by the

Debtors to this or any other court.

52.     Notice of this Motion will be given by facsimile and email to: (i) the thirty (30)

largest creditors listed in the Debtors' consolidated list of creditors (excluding insiders); (ii) the

Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel

to the DIP Administrative Agent; (iv) counsel to the First Lien Agent; (v) counsel to the Second

Lien Agent; (vi) counsel for the Debtors' prepetition mezzanine credit facility; (vii) each of the

financial institutions listed in the Debtors' motion to continue their cash management system[8];

(viii) all known parties asserting a lien against the Collateral; (ix) the Internal Revenue Service,

(x) the Pension Benefit Guaranty Corporation; (xi) the United States Environmental Protection

Agency; (xii) any applicable state environmental agency; and (xiii) any other party that has filed

a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the

Bankruptcy Rules, ((i) through (xiii), the "<u>Notice Parties</u>") (collectively, the "<u>Initial Notice</u>

<u>Parties</u>").  The Debtors submit that, under the circumstances, no further notice of the hearing on

the interim financing is necessary and request that any further notice be dispensed with and

waived.

       53.      The Debtors further respectfully request that the Court schedule the Final

Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date

and manner for the filing of objections, to (i) the Initial Notice Parties; (ii) any party that has

filed prior to such date a request for notices with this Court; and (iii) counsel for any official

committee(s).  The Debtors request that the Court consider such notice of the Final Hearing,

including without limitation, notice that the Debtors will seek approval at the Final Hearing of a

waiver of rights under Bankruptcy Code Section 506(c) to be sufficient notice under Bankruptcy

Rule 4001 and Local Rule 2002-1.

---

[8]      Debtors' Motion For Entry Of Interim And Final Orders Authorizing Debtors To (I) Continue Use Of Existing Bank Accounts And Business Forms; (II) Open New Debtor In Possession Accounts; And (III) Continue Conducting Ordinary Course Intercompany Transactions, dated July 28, 2010.

## CONCLUSION

WHEREFORE the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order; (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as is just.

Dated: July 28, 2010                   DRINKER BIDDLE & REATH LLP
        Wilmington, Delaware

/s/  Andrew C. Kassner
Andrew C. Kassner (DE 4507)
Howard A. Cohen (DE 4082)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile:  (302) 467-4201

– and –

Mark Thompson (*pro hac vice* admission pending)
Elisha D. Graff (*pro hac vice* admission pending)
Morris J. Massel (*pro hac vice* admission pending)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502

*Proposed Attorneys for the Debtors and Debtors in Possession*