# EXHIBIT B

## DIP Credit Agreement

**$25,000,000**

**SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT
dated as of July 28, 2010**

among

**AMERICAN SAFETY RAZOR COMPANY, LLC,
as Borrower,**

and

**RSA HOLDINGS CORP. OF DELAWARE,
as Holdings,**

and

**THE OTHER GUARANTORS PARTY HERETO,
as Guarantors,**

and

**THE LENDERS PARTY HERETO**

and

**UBS SECURITIES LLC,
as Arranger and Bookmanager,**

and

**UBS AG, STAMFORD BRANCH,
as Issuing Bank and Administrative Agent,**

and

**GENERAL ELECTRIC CAPITAL CORPORATION,
as Collateral Agent and Syndication Agent,**

and

**ALADDIN CREDIT ADVISORS, L.P.,
as Documentation Agent**

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street N.E., Suite 2400
Atlanta, GA 30308

**TABLE OF CONTENTS**

Section                                                                                                    Page

ARTICLE I
DEFINITIONS

SECTION 1.01    Defined Terms ................................................................................... 2
SECTION 1.02    Classification of Loans and Borrowings ............................................. 25
SECTION 1.03    Terms Generally ............................................................................... 25
SECTION 1.04    Accounting Terms; GAAP ................................................................ 26
SECTION 1.05    Resolution of Drafting Ambiguities.................................................. 26
SECTION 1.06    Timing of Payment and Deliveries ................................................... 26

ARTICLE II
THE CREDITS

SECTION 2.01    Commitments..................................................................................... 26
SECTION 2.02    Loans ................................................................................................ 26
SECTION 2.03    Borrowing Procedure ....................................................................... 28
SECTION 2.04    Evidence of Debt; Repayment of Loans............................................ 28
SECTION 2.05    Fees .................................................................................................. 29
SECTION 2.06    Interest on Loans.............................................................................. 30
SECTION 2.07    Termination and Reduction of Commitments.................................... 31
SECTION 2.08    Interest Elections.............................................................................. 31
SECTION 2.09    Reserved ........................................................................................... 32
SECTION 2.10    Optional and Mandatory Prepayments of Loans................................ 32
SECTION 2.11    Alternate Rate of Interest.................................................................. 35
SECTION 2.12    Increased Costs ................................................................................ 35
SECTION 2.13    Breakage Payments .......................................................................... 36
SECTION 2.14    Payments Generally; Pro Rata Treatment; Sharing of Set Off ............ 36
SECTION 2.15    Taxes ................................................................................................ 38
SECTION 2.16    Mitigation Obligations; Replacement of Lenders ............................. 40
SECTION 2.17    Reserved ........................................................................................... 41
SECTION 2.18    Letters of Credit ............................................................................... 41
SECTION 2.19    Defaulting Lenders ........................................................................... 46
SECTION 2.20    Reserved ........................................................................................... 48
SECTION 2.21    Payment of Obligations .................................................................... 48
SECTION 2.22    No Discharge; Survival of Claims .................................................... 48

ARTICLE III
REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Organization; Powers ....................................................................... 48
SECTION 3.02    Authorization; Enforceability ........................................................... 49
SECTION 3.03    No Conflicts...................................................................................... 49
SECTION 3.04    Financial Statements; Projections ..................................................... 49
SECTION 3.05    Properties.......................................................................................... 50
SECTION 3.06    Intellectual Property ......................................................................... 51
SECTION 3.07    Equity Interests and Subsidiaries ..................................................... 51
SECTION 3.08    Litigation; Compliance with Laws.................................................... 52

SECTION 3.09   [Reserved].................................................................................................52
SECTION 3.10   Federal Reserve Regulations ...................................................................52
SECTION 3.11   Investment Company Act; Public Utility Holding Company Act...........................53
SECTION 3.12   Use of Proceeds ...........................................................................................53
SECTION 3.13   Taxes ...........................................................................................................53
SECTION 3.14   No Material Misstatements.............................................................................53
SECTION 3.15   Labor Matters................................................................................................53
SECTION 3.16   [Reserved].....................................................................................................53
SECTION 3.17   Employee Benefit Plans ................................................................................54
SECTION 3.18   Environmental Matters...................................................................................54
SECTION 3.19   Insurance .......................................................................................................56
SECTION 3.20   Legality; Validity and Enforceability of Liens .....................................................56
SECTION 3.21   Foreign Assets Control Regulations.................................................................56
SECTION 3.22   Anti-Terrorism Law ........................................................................................56


ARTICLE IV
CONDITIONS TO CREDIT EXTENSIONS

SECTION 4.01   Conditions to Initial Credit Extensions ..................................................................57
SECTION 4.02   Conditions to All Credit Extensions.......................................................................59
SECTION 4.03   Exit Credit Facility..............................................................................................60


ARTICLE V
AFFIRMATIVE COVENANTS

SECTION 5.01   Financial Statements, Reports, etc ......................................................................61
SECTION 5.02   Litigation and Other Notices ...............................................................................64
SECTION 5.03   Existence; Businesses and Properties....................................................................64
SECTION 5.04   Insurance .......................................................................................................65
SECTION 5.05   Obligations and Taxes .......................................................................................66
SECTION 5.06   Employee Benefits .............................................................................................66
SECTION 5.07   Maintaining Records; Access to Properties and Inspections; Annual Meetings.......67
SECTION 5.08   Use of Proceeds ...............................................................................................67
SECTION 5.09   Compliance with Environmental Laws; Environmental Reports............................67
SECTION 5.10   Meetings with Lenders .......................................................................................68
SECTION 5.11   Additional Collateral; Additional Guarantors..........................................................68
SECTION 5.12   Security Interests; Further Assurances ...................................................................69
SECTION 5.13   Information Regarding Collateral ..........................................................................70
SECTION 5.14   Subordination of Loans .....................................................................................70
SECTION 5.15   [Reserved].......................................................................................................70
SECTION 5.16   [Reserved].......................................................................................................70
SECTION 5.17   Cooperation with Advisors.................................................................................70


ARTICLE VI
NEGATIVE COVENANTS

SECTION 6.01   Indebtedness ....................................................................................................71

SECTION 6.02    Liens ................................................................................................................. 72
SECTION 6.03    Investments, Loans and Advances ..................................................................... 75
SECTION 6.04    Mergers and Consolidations ............................................................................... 76
SECTION 6.05    Asset Sales .......................................................................................................... 76
SECTION 6.06    Acquisitions ........................................................................................................ 77
SECTION 6.07    Dividends ............................................................................................................. 77
SECTION 6.08    Transactions with Affiliates ............................................................................... 78
SECTION 6.09    Compliance with 13-Week Budget ..................................................................... 78
SECTION 6.10    Prepayments of Indebtedness; Modifications of Organizational Documents
                and Other Documents, etc ................................................................................... 78
SECTION 6.11    Limitation on Certain Restrictions on Subsidiaries ............................................ 79
SECTION 6.12    Limitation on Issuance of Capital Stock ............................................................. 79
SECTION 6.13    Limitation on Creation of Subsidiaries ............................................................... 80
SECTION 6.14    Business ............................................................................................................... 80
SECTION 6.15    Limitation on Accounting Changes ..................................................................... 80
SECTION 6.16    Fiscal Year ........................................................................................................... 80
SECTION 6.17    No Further Negative Pledge ................................................................................ 80
SECTION 6.18    Anti-Terrorism Law; Anti-Money Laundering ................................................... 80
SECTION 6.19    Embargoed Person ............................................................................................... 81
SECTION 6.20    [Reserved] ............................................................................................................ 81
SECTION 6.21    Critical Vendor and Other Payments ................................................................... 81
SECTION 6.22    Pre-Petition Indebtedness ................................................................................... 81

ARTICLE VII
GUARANTEE

SECTION 7.01    The Guarantee ...................................................................................................... 81
SECTION 7.02    Obligations Unconditional ................................................................................... 82
SECTION 7.03    Reinstatement ...................................................................................................... 83
SECTION 7.04    Subrogation; Subordination ................................................................................ 83
SECTION 7.05    Remedies ............................................................................................................. 83
SECTION 7.06    Instrument for the Payment of Money ................................................................. 83
SECTION 7.07    Continuing Guarantee .......................................................................................... 83
SECTION 7.08    General Limitation on Guarantee Obligations .................................................... 83
SECTION 7.09    Release of Subsidiary Guarantors ....................................................................... 84
SECTION 7.10    Right of Contribution .......................................................................................... 84

ARTICLE VIII
EVENTS OF DEFAULT

SECTION 8.01    Events of Default ................................................................................................. 84

ARTICLE IX
COLLATERAL ACCOUNT; APPLICATION OF COLLATERAL PROCEEDS

SECTION 9.01    Collateral Account ............................................................................................... 89
SECTION 9.02    Reserved ............................................................................................................... 90

SECTION 9.03    Application of Proceeds .................................................................. 90

## ARTICLE X
## THE ADMINISTRATIVE AGENT

SECTION 10.01   Appointment ........................................................................... 91
SECTION 10.02   Agent in Its Individual Capacity .................................................. 91
SECTION 10.03   Exculpatory Provisions ............................................................. 91
SECTION 10.04   Reliance by Agent .................................................................... 92
SECTION 10.05   Delegation of Duties ................................................................. 92
SECTION 10.06   Successor Agent ....................................................................... 92
SECTION 10.07   Non-Reliance on Agent and Other Lenders ................................... 93
SECTION 10.08   Name Agents ............................................................................ 93
SECTION 10.09   Indemnification ........................................................................ 93
SECTION 10.10   Actions in Concert ................................................................... 94
SECTION 10.11   Enforcement ............................................................................. 94
SECTION 10.12   Withholding Tax ....................................................................... 94

## ARTICLE XI
## MISCELLANEOUS

SECTION 11.01   Notices .................................................................................... 95
SECTION 11.02   Waivers; Amendment ............................................................... 97
SECTION 11.03   Expenses; Indemnity ................................................................ 99
SECTION 11.04   Successors and Assigns ........................................................... 100
SECTION 11.05   Survival of Agreement ............................................................ 103
SECTION 11.06   Counterparts; Integration; Effectiveness ................................... 103
SECTION 11.07   Severability ............................................................................ 103
SECTION 11.08   Right of Setoff ........................................................................ 103
SECTION 11.09   Governing Law; Jurisdiction; Consent to Service of Process ......... 104
SECTION 11.10   Waiver of Jury Trial ............................................................... 104
SECTION 11.11   Headings ................................................................................ 105
SECTION 11.12   Confidentiality ....................................................................... 105
SECTION 11.13   Interest Rate Limitation .......................................................... 105
SECTION 11.14   Lender Addendum ................................................................... 106
SECTION 11.15   Obligations Absolute ............................................................... 106
SECTION 11.16   USA PATRIOT Act Notice ....................................................... 106
SECTION 11.17   Parties including the Trustees; Bankruptcy Court Proceedings ........ 106

## SCHEDULES

| | |
|---|---|
| Schedule A-1 | First Day Motions and Orders |
| Schedule E-1 | Existing Letters of Credit |
| Schedule M | Milestones |
| Schedule R | Foreign Subsidiary Restructuring Transactions |
| Schedule 1.01(b) | Mortgaged Property |
| Schedule 1.01(c) | Subsidiary Guarantors |
| Schedule 3.03 | Governmental Approvals; Compliance with Laws |
| Schedule 3.05(b) | Real Property |
| Schedule 3.06(c) | Violations or Proceedings |
| Schedule 3.07(a) | Subsidiaries |
| Schedule 3.07(c) | Corporate Organizational Chart |
| Schedule 3.17 | ERISA Liabilities |
| Schedule 3.18 | Environmental Matters |
| Schedule 3.19 | Insurance |
| Schedule 6.01(b) | Existing Indebtedness |
| Schedule 6.02(c) | Existing Liens |
| Schedule 6.03(a) | Existing Investments |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Assumption |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Form of Interest Election Request |
| Exhibit F | Form of Joinder Agreement |
| Exhibit G | Form of LC Request |
| Exhibit H | Form of Lender Addendum |
| Exhibit I | Form of Note |
| Exhibit J | Form of Intercompany Note |
| Exhibit K | Form of Non-Bank Certificate |
| Exhibit L | Form of 13-Week Budget |
| Exhibit M-1 | Form of Monthly Variance Report |
| Exhibit M-2 | Form of Weekly Variance Report |
| Exhibit N | Exit Credit Facility Term Sheet |
| Exhibit O | Closing Conditions to Exit Credit Facility |

# SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**"), dated as of July 28, 2010, among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), the Lenders (as defined herein), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), GENERAL ELECTRIC CAPITAL CORPORATION, as collateral agent (in such capacity, the "**Collateral Agent**"), and as syndication agent (in such capacity, the "**Syndication Agent**"), ALADDIN CREDIT ADVISORS, L.P., as documentation agent (in such capacity, the "**Documentation Agent**"), and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, the "**Issuing Bank**"), and as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**").

## WITNESSETH:

WHEREAS, on July 28, 2010 (the "**Petition Date**"), the Borrower and the Guarantors (collectively, the "**Debtors**" and each, individually, a "**Debtor**") commenced Chapter 11 Case Nos. 10-[_____] through 10-[_____] as administratively consolidated at Chapter 11 Case No. 10-[_____] (each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

WHEREAS, from and after the Petition Date, each Debtor will continue to operate its business and manage its property as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, the Prior Lenders (as defined herein) provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of July 31, 2006, among the Borrower, as borrower, Holdings and the Subsidiaries of the Borrower signatory thereto, as guarantors, the Prior Agents (as defined herein) and the Prior Lenders, as amended by that certain First Amendment and Waiver to Credit Agreement (First Lien) and First Amendment to Security Agreement, dated as of April 21, 2010, but effective as of April 1, 2010 (as further amended, restated, supplemented or otherwise modified on or prior to the Petition Date, the "**Pre-Petition Credit Agreement**").

WHEREAS, the Borrower has requested that the Lenders provide a senior secured, super-priority debtor-in-possession credit facility to the Borrower in an aggregate principal amount of $25,000,000 to fund the working capital requirements and other financing needs of the Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases and to be used in accordance with Section 3.12 herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Lenders are willing to extend such post-petition loans to the Borrower and the Issuing Bank is willing to issue letters of credit for the account of the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

**SECTION 1.01** <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the meanings specified below:

"**13-Week Budget**" shall mean a 13-week cash flow forecast for the Loan Parties substantially in the form attached hereto as <u>Exhibit L</u> or such other form as shall be reasonably acceptable to the Administrative Agent. As used herein, "13-Week Budget" shall initially refer to the "13-Week Budget" delivered by the Borrower to the Administrative Agent and the Lenders on the Closing Date as authorized by the Interim Order and, thereafter, the most recent 13-Week Budget delivered by the Borrower to the Administrative Agent in accordance with <u>Section 5.01(i)</u>.

"**363 Sale**" shall mean a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code.

"**ABR**" when used in reference to any Loan or Borrowing, is used when such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**ABR Borrowing**" shall mean a Borrowing comprised of ABR Loans.

"**ABR Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of <u>Article II</u>.

"**Adjusted LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) the result of (i) an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest Period <u>divided by</u> (ii) 1 <u>minus</u> the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (b) 2.50% per annum.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as the successor pursuant to <u>Article X.</u>

"**Administrative Agent Fees**" shall have the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of <u>Exhibit A</u>, or such other form as may be supplied from time to time by the Administrative Agent.

"**Advisors**" shall mean (a) outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers or other advisors of the Administrative Agent and (b) outside legal counsel of the Collateral Agent.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided*, *however*, that, for purposes of <u>Section 6.08</u>, the term "Affiliate" shall also include (i) any person that directly or indirectly owns more than 10% of any class of Equity Interests of the person specified or (ii) any person that is an executive officer or director of the person specified.

"**Agents**" shall mean the Arranger and the Administrative Agent; and "**Agent**" shall mean any of them.

"**Agents Fee Letters**" shall mean the confidential Agents Fee Letter, dated July 28, 2010, by and among the Borrower, the Collateral Agent, the Syndication Agent, the Documentation Agent and the Administrative Agent.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Alternate Base Rate**" shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.50%, (c) the LIBOR Rate for an Interest Period of one-month beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) plus 1.00% and (d) 3.50%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate, the Federal Funds Effective Rate or the LIBOR Rate shall be effective on the effective date of such change in the Base Rate, the Federal Funds Effective Rate or the LIBOR Rate, respectively.

"**Anti-Terrorism Laws**" shall mean any requirement of law related to terrorism financing or money-laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("Patriot Act") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Fee**" shall mean 1.00% per annum.

"**Applicable Margin**" shall mean, (a) for all Eurodollar Loans, 5.50%, and (b) for all ABR Loans, 4.50%.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arranger**" shall have the meaning assigned to such term in the preamble hereto.

"**Arranger Fee Letter**" shall mean the confidential Arranger Fee Letter, dated July 28, 2010, by and among the Borrower, the Arranger and the Administrative Agent.

"**Asset Purchase Agreement**" shall mean that certain Asset Purchase Agreement, by and among RZR Acquisition Company LLC, a Delaware limited liability company, as Purchaser, RZR Holding Corporation, a Delaware corporation, as Parent, the Borrower, as Seller and UBS AG, Stamford Branch, in its capacity as Pre-Petition Agent, for certain limited provisions thereof, dated as of July 28, 2010.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property (excluding sales of inventory and dispositions of Cash Equivalents, in each case, in the ordinary course of business and also excluding sales of receivables made in the ordinary course of business pursuant to customer initiated discounting programs), by Holdings or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Holdings, in each case, to any person other than (i) the Borrower, (ii) any Subsidiary Guarantor, (iii) Holdings or (iv) other than for purposes of Section 6.05, any other Subsidiary.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of each party whose consent is required by Section 11.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"**Availability Period**" shall mean the period from and including the Closing Date to but excluding the earlier of: (i) the Stated Maturity Date and (ii) the date of termination of the Commitments of all Lenders.

"**Avoidance Actions**" shall mean any and all claims or causes of action arising under Chapter 5 (other than Section 506(c) or Section 724(a)) of the Bankruptcy Code to avoid transfers, preserve or transfer liens or otherwise recover property of the estate and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise. "Avoidance Actions" do not include claims or causes of action pursuant to Section 549 of the Bankruptcy Code and the proceeds thereof, to the extent the transfer avoided was of an asset otherwise constituting Collateral (as defined in the Pre-Petition Credit Agreement) or Collateral.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Base Rate**" shall mean, for any day, a rate per annum that is equal to the corporate base rate of interest established by the Administrative Agent from time to time; each change in the Base Rate shall be effective on the date such change is publicly announced as being effective. The corporate base rate is not necessarily the lowest rate charged by the Administrative Agent to its customers.

"**Blade Acquisition Co**" shall mean Blade Acquisition Company, a Delaware corporation.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person and (ii) in any other case, the functional equivalent of the foregoing.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrowing**" shall mean Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Borrowing Availability**" shall mean, as of any date of determination, the Commitment less Loan Exposure less the Carve-Out Reserve, subject to any limitations contained in the Financing Orders.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close; *provided, however,* that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures (whether paid in cash or accrued as a liability) by Holdings and its Subsidiaries during such period, that, in conformity with GAAP, are or are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of Holdings and its Subsidiaries.

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" shall have the meaning assigned to such term in the Interim Order or, upon entry of the Final Order, in the Final Order.

"**Carve-Out Reserve**" shall mean, as of any date of determination, a reserve in an amount equal to the Carve-Out.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $1.0 billion with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's, and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; (f) demand deposit accounts maintained in the ordinary course of business; and (g) in the case of Foreign

Subsidiaries, Investments made locally of a type comparable to those described in clauses (a)-(f) of this definition.

"**Casualty Event**" shall mean any loss of title or any loss of or damage to or destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of Holdings or any of its Subsidiaries. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*

"**Chapter 11 Case**" and "**Chapter 11 Cases**" shall have the meaning assigned to each such term in the recitals hereto.

"**Change in Law**" shall mean (a) the adoption of any law, treaty, order, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender or Issuing Bank (or for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"**Charges**" shall have the meaning assigned to such term in Section 11.13.

"**Closing Date**" shall mean the first date on which all of the conditions set forth in Section 4.01 were satisfied as specified by the Administrative Agent.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean, collectively, all assets of the Loan Parties now owned or hereafter acquired and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, the Financing Orders or any other order of the Bankruptcy Court in the Chapter 11 Cases; *provided*, *however*, that "Collateral" shall not include any Avoidance Actions.

"**Collateral Account**" shall mean a collateral account or sub-account in the form of a deposit account established and maintained by the Administrative Agent for the benefit of the Secured Parties, in accordance with the provisions of Section 9.01.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Commercial Letter of Credit**" shall mean any letter of credit or similar instrument issued for the purpose of providing credit support in connection with the purchase of materials, goods or services by the Borrower or any of its Subsidiaries in the ordinary course of their businesses.

"**Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder during the Availability Period in the amount set forth on Schedule I to the Lender Addendum executed and delivered by such Lender, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable, as the same may be (a)

reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 11.04.  The initial aggregate amount of the Lenders' Commitments is $25,000,000.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Committee**" shall mean the official committee of unsecured creditors formed in the Chapter 11 Cases.

"**Communications**" shall have the meaning assigned to such term in Section 11.01(g).

"**Companies**" shall mean Holdings and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit D.

"**Confidential Information**" shall have the meaning assigned to such term in Section 11.12.

"**Contested Collateral Lien Conditions**" shall mean, with respect to any Permitted Lien of the type described in clauses (a), (b), (e) and (f) of Section 6.02, the following conditions:

(a)     the Borrower shall cause any proceeding instituted contesting such Lien to stay the sale or forfeiture of any portion of the Collateral on account of such Lien;

(b)     the Borrower shall maintain, to the extent it deems appropriate or is required by GAAP, cash reserves in an amount sufficient to pay and discharge such Lien and the Administrative Agent's reasonable estimate of all interest and penalties related thereto; and

(c)     such Lien shall in all respects be subject and subordinate in priority to the Lien and security interest created by the Financing Orders and evidenced by the Financing Orders and/or the Security Documents, except if and to the extent that the law or regulation creating, permitting or authorizing such Lien provides that such Lien is or must be superior to the Lien and security interest created by the Financing Orders and evidenced by the Financing Orders and/or Security Documents.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided, however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in

the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Controlled Investment Affiliate**" shall mean, as to any person, any other person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such person and is organized by such person (or any person Controlling such person) primarily for making equity or debt investments in Holdings or other portfolio companies.

"**Credit Extension**" shall mean, as the context may require, (i) the making of a Loan by a Lender or (ii) the issuance of any Letter of Credit, or the amendment, extension or renewal of any existing Letter of Credit, by the Issuing Bank.

"**Debt Issuance**" shall mean the incurrence by Holdings or any of its Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor**" and "**Debtors**" shall have the meaning assigned to each such term in the recitals hereto.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(c).

"**Defaulting Lender**" shall mean any Lender that (a) has failed to fund any portion of the Loans or participations in LC Commitments required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, the Issuing Bank, any Lender and/or the Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit, (d) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute or such failure is subsequently cured or (e) in the case of a Lender that has a Commitment or LC Exposure outstanding at such time, shall take, or is the Subsidiary of any person that has taken, any action or be (or is) the subject of any action or proceeding (i) under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (ii) with respect to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Lender (or its direct or indirect parent), or for a substantial part of the property of such Lender; (iii) with respect to the winding-up or liquidation of such Lender, (iv) with respect to which such Lender makes a general

assignment for the benefit of its creditors, become unable, admits in writing its inability or fails generally to pay its debt as they become due; or (v) takes any action for the purpose of effecting any of the foregoing.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the latest Stated Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the latest Stated Maturity Date, or (c) contains any repurchase obligation other than repurchase obligations with respect to Holdings' common Equity Interests issued to employees and directors of Holdings and its Subsidiaries upon death, disability, retirement, severance or termination of employment or service and which provide that any repurchase obligation shall not be effective during the continuance of an Event of Default or if such repurchase of Holdings' Equity Interests would not otherwise be permitted by this Agreement or would result in an Event of Default under this Agreement and customary change of control or asset sale proceeds repurchase obligations and which may come into effect prior to payment in full of all Obligations (other than indemnity obligations under the Loan Documents that are not then due and payable and for which no events or claims that could give rise thereto are then pending or outstanding).

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests).  Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia.

"**Effect of Bankruptcy**" shall mean, with respect to any obligation, contract or agreement to which the Borrower, Holdings or any Subsidiary of Holdings is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Cases, as applicable (including the implementation of any stay), or the rejection of any such obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"**Eligible Assignee**" shall mean (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other person (other than a natural person) approved by (i) the Administrative Agent and the Issuing Bank and (ii) unless a Default or an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed); *provided* that notwithstanding the foregoing, "Eligible Assignee" shall not include (i) the Borrower or any of the

Borrower's Affiliates or Subsidiaries, (ii) any Lender (as defined in the Second Lien Credit Agreement) unless such Person is also a Lender or a Lender (as defined in the Pre-Petition Credit Agreement), or (iii) any Lender (as defined in the Holdings Credit Agreement).

"**Embargoed Person**" shall have the meaning assigned to such term in <u>Section 6.19</u>.

"**Environment**" shall mean ambient air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation of Environmental Law, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health.

"**Environmental Permit**" shall mean any permit, license, approval, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the UCC.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on, or issued after, the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event**,**" as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not

waived, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (g) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company.

"**Eurodollar Borrowing**" shall mean a Borrowing comprised of Eurodollar Loans.

"**Eurodollar Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate in accordance with the provisions of Article II.

"**Event of Default**" shall have the meaning assigned to such term in Article VIII.

"**Excess Amount**" shall have the meaning assigned to such term in Section 2.10(h)(ii).

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income, branch profits or franchise taxes imposed on (or measured by) its overall net income or overall gross income by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or is otherwise doing business (other than a business deemed to arise as a result of the transactions contemplated by this Agreement) or, in the case of any Lender, in which its applicable lending office is located, (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.16 or a participant pursuant to Section 2.14(c)) upon a Default of the Borrower, any U.S. Federal withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement or designates a new lending office, except to the extent that such Foreign Lender was entitled, at the time of designation of a new lending office, to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.15(a), and (c) any Taxes that are attributable to the failure to comply with Section 2.15(e) or (f). It is understood and agreed, for the avoidance of doubt, that any U.S. Federal withholding tax imposed on a Foreign Lender (including an assignee) as a result of a Change in Law or regulation or interpretation thereof occurring after the time such Foreign Lender became a party to this Agreement shall not be an Excluded Tax.

"**Executive Orders**" shall have the meaning assigned to such term in Section 6.19.

"**Existing Letters of Credit**" shall mean the letters of credit described on Schedule E-1.

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**Exit Credit Facility**" has the meaning assigned to such term in <u>Section 4.03</u>.

"**Exit Term Sheet**" has the meaning assigned to such term in <u>Section 4.03</u>.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letters**" shall mean (a) Arranger Fee Letter and (b) the Agents Fee Letter.

"**Fees**" shall mean the Initial Fee**,** the Commitment Fees, the Administrative Agent Fees, the First Extension Fee, the Second Extension Fee, the LC Participation Fees and the Fronting Fees.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be substantially in the form of the Interim Order and shall otherwise be reasonably satisfactory in form and substance to the Administrative Agent, and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Borrower) and such order in any respect is not subject of a stay pending appeal (unless the Administrative Agent and the Required Lenders waive such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance reasonably satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes the Borrower or the Guarantors to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Agents' and the Lenders' claims.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financing Orders**" shall mean the Interim Order, the Final Order and any amendment, modification or supplement thereto in form and substance reasonably acceptable to the Administrative Agent.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Day Orders**" shall mean the First Day Orders set forth on <u>Schedule A-1</u>, which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"**First Extension Date**" shall have the meaning assigned to such term in the definition of Stated Maturity Date.

"**First Extension Fee**" shall have the meaning assigned to such term in the definition of Stated Maturity Date.

"**Foreign Lender**" shall mean any Administrative Agent, Lender or Issuing Bank that is not a "United States person" within the meaning of Section 7701(a) (30) of the Code.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

"**Foreign Subsidiary Restructuring Transactions**" shall mean the transactions described on <u>Schedule R</u>, as amended from time to time with the prior written consent of the Administrative Agent in its sole discretion.

"**Foreign Subsidiary**" shall mean a Subsidiary that is not a Domestic Subsidiary.

"**Fronting Fee**" shall have the meaning assigned to such term in <u>Section 2.05(c)</u>.

"**Fund**" shall mean any person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean any federal, state, local or foreign court, central bank or governmental agency, authority, instrumentality or regulatory body or any subdivision thereof.

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in <u>Section 7.01</u>.

"**Guarantees**" shall mean the guarantees issued pursuant to <u>Article VII</u> by Holdings and the Subsidiary Guarantors.

"**Guarantors**" shall mean Holdings and the Subsidiary Guarantors.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Holdings**" shall have the meaning assigned to such term in the preamble hereto.

"**Holdings Credit Agreement**" shall mean the Credit Agreement, dated as of July 31, 2006, among UBS Securities LLC, as sole arranger, UBS AG, Stamford Branch, as administrative agent, the several banks and other financial institutions or entities parties thereto and RSA Holdings Corp. of Delaware, as such agreement may be amended, supplemented or otherwise modified in accordance with the terms of this Agreement.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person upon which interest charges are customarily paid or accrued; (d) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (e) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business); (f) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property; (g) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (h) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (i) all Attributable Indebtedness of such person; (j) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (k) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor. In no event will obligations or liabilities in respect of any Qualified Capital Stock constitute Indebtedness hereunder.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 11.03(b).

"**Initial Fee**" shall have the meaning assigned to such term in Section 4.01(j).

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit J or such other form as is agreed to by the Administrative Agent.

"**Interest Election Request**" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.08(b), substantially in the form of Exhibit E.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan, the last Business Day of the calendar month to occur during any period in which such Loan is outstanding, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Loan with an Interest Period of more than one (1) month's duration, each day prior to the last day of such Interest Period that occurs at intervals of one month's duration after the first day of such Interest Period and (c) in either case, the Stated Maturity Date.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interim Order**" shall mean collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which, among other matters, but not by way of limitation, authorizes, on an interim basis, the Borrower and the other Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, together with all extensions, modifications, amendments and supplements thereto, in form and substance reasonably satisfactory to the Administrative Agent.

"**Investments**" shall have the meaning assigned to such term in Section 6.03.

"**Issuing Bank**" shall mean, as the context may require, (a) UBS AG, Stamford Branch, with respect to Letters of Credit issued by it; (b) any other Lender that may become an Issuing Bank pursuant to Sections 2.18(j) and (k) with respect to Letters of Credit issued by such Lender; (c) each issuing bank of an Existing Letter of Credit; or (d) collectively, all of the foregoing.

"**Joinder Agreement**" shall mean a joinder agreement substantially in the form of Exhibit F.

"**LC Commitment**" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.18. The amount of the LC Commitment shall initially be $7,500,000, but in no event exceed the Commitment.

"**LC Disbursement**" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" shall mean at any time the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time *plus* (b) the aggregate principal amount of all Reimbursement Obligations outstanding at such time. The LC Exposure of any Lender at any time shall mean its Pro Rata Percentage of the aggregate LC Exposure at such time.

"**LC Participation Fee**" shall have the meaning assigned to such term in Section 2.05(c).

"**LC Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.18(b) and substantially in the form of Exhibit G, or such other form as shall be approved by the Administrative Agent.

"**LC Sub-Account**" shall have the meaning assigned to such term in Section 9.01(d).

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lender Addendum**" shall mean with respect to any Lender on the Closing Date, a lender addendum in the form of Exhibit H, to be executed and delivered by such Lender on the Closing Date as provided in Section 11.14.

"**Lenders**" shall mean (a) the financial institutions that have become a party hereto pursuant to a Lender Addendum and (b) any financial institution that has become a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**Letters of Credit**" shall mean any (a) (i) Standby Letter of Credit and (ii) Commercial Letter of Credit, in each case, issued or to be issued by an Issuing Bank for the account of the Borrower and on behalf of the Borrower or its Subsidiaries pursuant to Section 2.18, and (b) upon entry of the Final Order, the Existing Letters of Credit.

"**Letter of Credit Expiration Date**" shall mean the date which is fifteen (15) days prior to the Stated Maturity Date unless otherwise agreed to by the Issuing Bank.

"**LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent to be the arithmetic mean (rounded upward, if necessary, to the nearest 1/100th of 1%) of the offered rates for deposits in dollars with a term comparable to such Interest Period that appears on the Telerate British Bankers Assoc. Interest Settlement Rates Page (as defined below) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; *provided, however*, that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Telerate British Bankers Assoc. Interest Settlement Rates Page, "LIBOR Rate" shall mean, with respect to each day during each Interest Period pertaining to Eurodollar Borrowings comprising part of the same Borrowing, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in dollars at approximately 11:00 a.m., London, England time, two (2) Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to the amount of such Eurodollar Borrowing to be outstanding during such Interest Period. Notwithstanding the foregoing, for purposes of clause (c) of the definition of Alternate Base Rate, the rates referred to above shall be the rates as of 11:00 a.m., London, England time on the date of determination (rather than the second Business Day preceding the date of determination). "**Telerate British Bankers Assoc. Interest Settlement Rates Page**" shall mean the display designated as Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of

displaying the rates at which dollar deposits are offered by leading banks in the London interbank deposit market).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities (other than securities representing an interest in a joint venture), any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean this Agreement, the Letters of Credit, the Notes (if any), the Security Documents, each Hedging Agreement that evidences or governs a Hedging Obligation that constitutes an Obligation relating to the Loans entered into with any counter-party that was a Lender or an Affiliate of a Lender at the time such Hedging Obligation was entered into and, solely for purposes of paragraph (e) of <u>Article VIII</u> hereof, the Fee Letters.

"**Loan Exposure**" shall mean, with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding Loans of such Lender, plus the aggregate amount at such time of such Lender's LC Exposure.

"**Loan Parties**" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

"**Loans**" shall mean the term loans made by the Lenders to the Borrower pursuant to <u>Section 2.01(a)</u>. Each Loan shall be either an ABR Loan or a Eurodollar Loan.

"**Management Services Agreement**" shall mean the financial oversight and advisory agreement by and among Holdings, the Borrower, Blade Acquisition Co and Lion Capital LLP, a limited liability partnership organized under the laws of England and Wales.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, property, results of operations, prospects or condition, financial or otherwise, of Holdings and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Loan Parties (taken as a whole) to perform any of their obligations under any Loan Document; or (c) material impairment of the rights of or benefits or remedies available to the Lenders or the Administrative Agent under any Loan Document; *provided* that a Material Adverse Effect shall not be deemed to exist as a result of the Chapter 11 Cases or the Effect of Bankruptcy.

"**Maximum Rate**" shall have the meaning assigned to such term in <u>Section 11.13</u>.

"**Milestones**" shall mean certain milestones related to the sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code and the Chapter 11 Cases, as set forth on <u>Schedule M</u> (unless extended or modified with the consent of the Administrative Agent).

"**Monthly Variance Report**" shall have the meaning assigned to such term in <u>Section 5.01(i)</u>.

"**Moody's**" shall mean Moody's Investors Service Inc. or any successor by merger or consolidation to its business.

"**Mortgaged Property**" shall mean (a) the Real Property identified on Schedule 3.05(b) and (b) each Real Property, if any, which shall be required to be mortgaged after the Closing Date pursuant to Section 5.11(c).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any ERISA Affiliate is then making or accruing an obligation to make contributions; (b) to which any Company or any ERISA Affiliate has within the preceding five plan years made contributions; or (c) with respect to which any Company could incur liability.

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by Holdings or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Holdings or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Holdings' good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations associated with such Asset Sale or any other liabilities retained by Holdings or any of its Subsidiaries associated with the properties sold in such Asset Sale and, to the extent such amount equals or exceeds $1,000,000, held in the Collateral Account (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) Holdings' good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within two (2) years of such Asset Sale and to the extent such amount equals or exceeds $1,000,000, held in the Collateral Account (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within two (2) years of such Asset Sale and placed in the Collateral Account, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)     with respect to any Debt Issuance or any issuance of Equity Interests by Holdings or any of its Subsidiaries, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)     with respect to any Casualty Event, the insurance proceeds, condemnation awards and other compensation received in cash in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds and the reasonable cost of putting any real property in a safe and secure condition, awards or other compensation in respect of such Casualty Event.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit I.

"**Obligations**" shall mean (a) obligations of the Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrower and the other Loan Parties under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of Reimbursement Obligations, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall mean the U.S. Treasury Department Office of Foreign Assets Control.

"**Officer's Certificate**" shall mean, as to any person, a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president or any one of the Financial Officers of such person, each in his or her official (and not individual) capacity.

"**Organizational Documents**" shall mean, with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other List**" shall have the meaning assigned to such term in Section 6.19.

"**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including related interest, fines, penalties and additions to tax) arising from any payment made or required to be made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"**Participant**" shall have the meaning assigned to such term in Section 11.04(e).

"**Patriot Act**" shall have the meaning assigned to such term in Section 11.15.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Permitted Collateral Liens**" means (i) Contested Liens (as defined in the Security Agreement), (ii) the Liens described in clauses (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (m), (n) and (subject to the provisions set forth therein) of Section 6.02 and (iii) in the case of Mortgaged Property, "Permitted Collateral Liens" shall mean the Liens described in clauses (a), (b), (d), (e) and (g) of Section 6.02; *provided, however*, upon the Closing Date or upon the date of delivery of each additional mortgage under Section 5.11 or 5.12, Permitted Collateral Liens shall mean only those Liens set forth in Schedule B to the applicable mortgage and the Liens set forth in Sections 6.02 (a) and (e) to the extent

such Liens are the obligations of the Borrower or any Subsidiary prior to any acquisition of Real Property which shall be subject to a mortgage under Section 5.11(c) or Section 5.12.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Monthly Variance**" shall have the meaning assigned to such term in Section 5.01(i).

"**Permitted Senior Liens**" shall mean Liens permitted under the Pre-Petition Credit Agreement, but only to the extent such Liens are valid, enforceable, non-avoidable Liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Liens under the Pre-Petition Credit Agreement under applicable law and after giving effect to any applicable subordination or intercreditor agreements.

"**Permitted Tax Distributions**" shall mean, (i) with respect to any period during which the Borrower or any other Subsidiary of Holdings is treated as a disregarded entity for federal, state and/or local tax purposes, to the extent relating to the tax liability for such period, the payment of distributions by the Borrower or such other Subsidiary of Holdings to Holdings in respect of Holdings' tax liabilities solely as a result of the Borrower (or a Subsidiary of the Borrower) or a Subsidiary of Holdings being a disregarded entity for federal, state and/or local tax purposes, in an amount not to exceed the amount of the relevant taxes that the Borrower (or a Subsidiary of the Borrower) or such other Subsidiary of Holdings would owe if it were filing a separate tax return with respect to such taxes less any such taxes that are paid or will be paid directly by the Borrower (or a Subsidiary of the Borrower) or such other Subsidiary of Holdings (as applicable), and (ii) for any period in which Holdings, the Borrower or a Subsidiary of the Borrower is a member of a group filing consolidated, combined or unitary tax returns for which it is not the common parent, payments to the parent of such group to be used to pay the consolidated, combined, unitary or similar federal, state and/or local taxes attributable to Holdings, the Borrower or such Subsidiary (as applicable) in an amount not to exceed the amount of the relevant taxes that Holdings, the Borrower or such Subsidiary (as applicable) would owe if it were filing a separate tax return, taking into account any carryforwards or carrybacks of tax attributes (such as net operating losses) of Holdings, the Borrower or such Subsidiary (as applicable) from other taxable years, less any such taxes that are paid or will be paid directly by Holdings, the Borrower or such Subsidiary (as applicable).

"**Permitted Variances**" shall have the meaning assigned to such term in Section 5.01(i).

"**Permitted Weekly Variance**" shall have the meaning assigned to such term in Section 5.01(i).

"**person**" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership or government, or any agency or political subdivision thereof, in any case, whether acting in a personal, fiduciary or other capacity.

"**Petition Date**" shall have the meaning assigned in the recitals hereto.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or its ERISA Affiliate or with respect to which any Company could incur liability (including under Section 4069 of ERISA).

"**Platform**" shall have the meaning assigned to such term in <u>Section 11.01</u>.

"**Pre-Petition**" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Pre-Petition Credit Agreement**" shall have the meaning assigned in the recitals hereof.

"**Pre-Petition Loan Documents**" shall mean the Loan Documents (as defined in the Pre-Petition Credit Agreement).

"**Prior Agents**" shall mean the Arranger, the Administrative Agent and the Collateral Agent (each as defined in the Pre-Petition Credit Agreement).

"**Prior Lenders**" shall mean the "Lenders" from time to time party to the Pre-Petition Credit Agreement.

"**Pro Rata Percentage**" of any Lender at any time shall mean the percentage of the total Commitments of all Lenders represented by such Lender's Commitment; *provided* that for purposes of <u>Sections 2.19(b)</u> and <u>(c)</u>, "Pro Rata Percentage" shall mean the percentage of the total Commitments (disregarding the Commitment of any Defaulting Lender to the extent its LC Exposure is reallocated to the non-Defaulting Lenders) represented by such Lender's Commitment.

"**Proceeding**" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding-up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) other marshalling of the assets of such person.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any person) or the cost of installation, construction or improvement of any property and any refinancing thereof; *provided, however*, that (i) such Indebtedness is incurred within ninety (90) days after such acquisition of such property by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned, or leased by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto and all improvements and appurtenant fixtures.

"**Register**" shall have the meaning assigned to such term in <u>Section 11.04(c)</u>.

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Reimbursement Obligations**" shall mean Borrower's obligations under <u>Section 2.18(e)</u> to reimburse LC Disbursements.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganization Plan**" shall mean a plan of reorganization in the Chapter 11 Cases of the Debtors.

"**Required Lenders**" shall mean, at any time, Lenders having Loans, LC Exposure and unused Commitments representing more than 50% of the sum of all Loans outstanding, LC Exposure and unused Commitments at such time; *provided*, that "Required Lenders" shall include not less than two (2) Lenders; *provided*, *further*, that the Loans, LC Exposure and unused Commitments held or deemed held by any Defaulting Lender shall be excluded for purpose of making a determination of Required Lenders.

"**Requirements of Law**" shall mean, collectively, any and all requirements of any Governmental Authority including any and all laws, ordinances, rules, regulations or similar statutes or case law.

"**Response**" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person or any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**S&P**" shall mean Standard & Poor's Rating Services, Inc., a division of the McGraw-Hill Companies, Inc.

"**Sale and Leaseback Transaction**" shall mean any arrangement, directly or indirectly, with any person whereby Holdings or any of its Subsidiaries shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or

lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**SDN List**" shall have the meaning assigned to such term in <u>Section 6.20</u>.

"**Second Extension Fee**" shall have the meaning assigned to such term in the definition of Stated Maturity Date.

"**Second Lien Credit Agreement**" shall mean that certain credit agreement, dated as of July 31, 2006, among the Borrower, Holdings, the Subsidiaries of the Borrower party thereto, the lenders party thereto, UBS Securities LLC, as lead arranger and Cantor Fitzgerald Securities, as successor to UBS AG, Stamford Branch, as administrative agent and as collateral agent for the Secured Parties (as defined in the Second Lien Credit Agreement), as amended, restated, supplemented or modified from time to time.

"**Secured Obligations**" shall mean (a) the Obligations, (b) the due and punctual payment and performance of all obligations of the Borrower and the other Loan Parties under each Hedging Agreement entered into with any counterparty that is a Secured Party and (c) the due and punctual payment and performance of all obligations of the Borrower and the other Loan Parties (including overdrafts and related liabilities) under each Treasury Services Agreement entered into with any counterparty that is a Secured Party.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent, each other Agent, the Lenders and each counterparty to a Hedging Agreement or Treasury Services Agreement if at the date of entering into such Hedging Agreement or Treasury Services Agreement such person was an Agent or a Lender or an Affiliate of an Agent or a Lender and such person executes and delivers to the Administrative Agent a letter agreement in form and substance acceptable to the Administrative Agent pursuant to which such person (i) appoints the Administrative Agent as its agent under the applicable Loan Documents and (ii) agrees to be bound by the provisions of <u>Sections 10.03</u> and <u>10.09</u> as if it were a Lender.

"**Securities Collateral**" shall have the meaning assigned to such term in the applicable Security Agreement.

"**Security Agreement**" shall mean that certain Security Agreement, dated as of the Closing Date, among the Loan Parties and Administrative Agent for the benefit of the Secured Parties.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the applicable Security Agreement delivered on the Closing Date or thereafter pursuant to <u>Section 5.11</u>.

"**Security Documents**" shall mean, collectively, the Security Agreement and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as collateral for the Secured Obligations, and all UCC or other financing statements or instruments of perfection required by this Agreement, the Security Agreement, any mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the Security Agreement or any mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest in or Lien on any Property as collateral for the Secured Obligations any property.

"**Standby Letter of Credit**" shall mean any standby letter of credit or similar instrument issued for the purpose of supporting (a) workers' compensation liabilities of the Borrower or any of its Subsidiaries, (b) the obligations of third-party insurers of the Borrower or any of its Subsidiaries arising by virtue of the laws of any jurisdiction requiring third-party insurers to obtain such letters of credit, (c) performance, payment, deposit or surety obligations of the Borrower or any of its Subsidiaries if required by law or governmental rule or regulation or (d) other purposes that are typical in accordance with custom and practice in the industry and in the ordinary course of business.

"**Stated Maturity Date**" shall mean January 31, 2011 (the "**Original Maturity Date**"); provided that, so long as no Default or Event of Default has occurred and is continuing on the Original Maturity Date, the Borrower shall have the right to extend such date for an additional three (3) months to May 2, 2011 so long as the request for such extension is made in writing at least thirty (30) days prior to the Original Maturity Date or such shorter period as may be agreed to by the Administrative Agent (the "**First Extension Date**") for a fee of 1.00% of the aggregate Commitments then outstanding as of the Original Maturity Date (the "**First Extension Fee**"); which shall be due and payable in full in cash on the Original Maturity Date; provided, further, that, so long as no Default or Event of Default has occurred and is continuing on the First Extension Date, the Borrower shall have the right to extend such date for an additional three (3) months to August 1, 2011 so long as the request for such extension is made in writing at least thirty (30) days prior to the First Extension Date or such shorter period as may be agreed to by the Administrative Agent for fee of 2.00% of the aggregate Commitments then outstanding as of the First Extension Date (the "**Second Extension Fee**"); which shall be due and payable in full in cash on the First Extension Date. The First Extension Fee and the Second Extension Fee actually paid shall be paid to the Administrative Agent for the pro rata benefit of the Lenders holding the Commitments as of the date of payment.

"**Statutory Reserves**" shall mean (a) for any Interest Period for any Eurodollar Borrowing in dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurodollar liabilities" (as such term is used in Regulation D) or (b) for any Interest Period for any portion of a Borrowing in euros, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in euros required to be maintained by commercial banks that lend in euros. Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"**Subordinated Indebtedness**" shall mean Indebtedness of the Borrower or any Guarantor that is by its terms subordinated in right of payment to the Obligations of the Borrower and such Guarantor, as applicable.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (ii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iii) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of Holdings.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(c), and each other Subsidiary that is or that becomes a party to this Agreement as a Subsidiary Guarantor pursuant to Section 5.11.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges, whether computed on a separate, consolidated, unitary, combined or other basis and any and all liabilities (including related interest, fines, penalties or additions to tax) with respect to the foregoing.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Loan Documents and the Chapter 11 Cases, including (a) the execution, delivery and performance of the Loan Documents; and (b) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Treasury Services Agreement**" shall mean any agreement relating to treasury, depositary and cash management services or automated clearinghouse transfer of funds.

"**Type,**" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBOR Rate or the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**Weekly Variance Report**" shall have the meaning assigned to such term in Section 5.01(i).

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**SECTION 1.02    Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (*e.g.*, a "Eurodollar Borrowing").

**SECTION 1.03    Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and

"including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless otherwise indicated, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

SECTION 1.04     **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the Closing Date, in each case unless otherwise agreed to by the Borrower and the Required Lenders.

SECTION 1.05     **Resolution of Drafting Ambiguities**.  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

SECTION 1.06     **Timing of Payment and Deliveries**.  Solely in connection with the payment of any obligation or the performance of any covenant, duty or obligation, if stated to be due on a day that is not a Business Day or delivery of any notice, document, certificate or other writing is stated to be required on a day that is not a Business Day, the date of such payment (other than as described in the definition of Interest Period), performance or delivery shall be extended to the immediately succeeding Business Day.

## ARTICLE II

## THE CREDITS

SECTION 2.01     **Commitments**.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender severally, and not jointly, agrees on or after the Closing Date and during the Availability Period to make Loans to the Borrower in dollars in an aggregate principal amount not to exceed, its Commitment; *provided* that in no event shall Loans be issued and outstanding hereunder on any date in excess of Borrowing Availability.  Within the limits set forth above and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Loans.

SECTION 2.02     **Loans**.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  Except for Loans deemed made pursuant to Section 2.18(e)(ii), (x) ABR Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $1,000,000 or (ii) equal to the remaining available balance of the applicable Commitments and (y) the Eurodollar Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $1,000,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Subject to Sections 2.11 and 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03.  Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.  Borrowings of more than one Type may be outstanding at the same time; *provided* that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than ten (10) Eurodollar Borrowings outstanding hereunder at any one time.  For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Except with respect to Loans deemed made pursuant to Section 2.18(e)(ii), each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 2:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by the Borrower in the applicable Borrowing Request maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower, severally, agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement, and the Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(d) shall cease.

(e)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Stated Maturity Date.

**SECTION 2.03     Borrowing Procedure**.  To request a Borrowing, the Borrower shall deliver, by hand delivery or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent (i) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing, or (ii) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing.  Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(a)     the aggregate amount of such Borrowing;

(b)     the date of such Borrowing, which shall be a Business Day;

(c)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(d)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(e)     the location and number of Borrower's account to which funds are to be disbursed; and

(f)     that the conditions set forth in Sections 4.02(b)-(d) have been satisfied as of the date of the notice.

If no election as to the Type of Borrowing is specified, then the requested Borrowing if in dollars shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

**SECTION 2.04     Evidence of Debt; Repayment of Loans**.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the unpaid principal amount of each Loan of such Lender on the Stated Maturity Date.  All payments or repayments of Loans made pursuant to this Section 2.04(a) shall be made in dollars.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)　　The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.  In the event of a conflict between records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(e)　　Any Lender by written notice to the Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit I.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 11.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**SECTION 2.05**　　Fees.

(a)　　Commitment Fee.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee (a "**Commitment Fee**") equal to the Applicable Fee per annum on the average daily unused amount of the Commitment of such Lender during the period from and including the Closing Date to but excluding the date on which such Commitment terminates.  Accrued Commitment Fees shall be payable in arrears (A) on the last Business Day of  each month, commencing on the first such date to occur after the Closing Date, and (B) on the date on which the Commitment terminates.  Commitment Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  For purposes of computing Commitment Fees with respect to Commitments, a Commitment of a Lender shall be deemed to be used to the extent of the outstanding Loans and LC Exposure of such Lender.

(b)　　Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative agent fees set forth in the Arranger Fee Letter or such other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent (the "**Administrative Agent Fees**").

(c)　　LC and Fronting Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee ("**LC Participation Fee**") with respect to its participations in Letters of Credit, which shall accrue at a rate equal to the Applicable Margin from time to time used to determine the interest rate on Eurodollar Loans pursuant to Section 2.06 on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the Issuing Bank a fronting fee ("**Fronting Fee**"), which shall accrue at the rate of 0.375% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's customary fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing

of drawings thereunder. Accrued LC Participation Fees and Fronting Fees shall be payable in arrears (i) on the last Business Day of each month, commencing on the first such date to occur after the Closing Date, and (ii) on the date on which the Commitments terminate. Any such fees accruing after the date on which the Commitments terminate shall be payable on demand. Any other fees payable to the Issuing Bank pursuant to this paragraph shall be payable within 10 days after demand therefor. All LC Participation Fees and Fronting Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(d) All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Borrower shall pay the Fronting Fees directly to the Issuing Bank. Once paid, none of the Fees shall be refundable under any circumstances absent manifest error.

### SECTION 2.06 Interest on Loans.

(a) Subject to the provisions of Section 2.06(c), the Loans comprising each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b) Subject to the provisions of Section 2.06(c), the Loans comprising each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c) Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing, at the request of the Administrative Agent or the Required Lenders, all Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of principal and premium, if any, of or interest on any Loan, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% *plus* the rate applicable to ABR Loans as provided in Section 2.06(a) (in either case, the "**Default Rate**").

(d) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted LIBOR Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

**SECTION 2.07**     **Termination and Reduction of Commitments**.

(a)    The Commitments and the LC Commitment shall automatically terminate on the Stated Maturity Date.

(b)    At its option, the Borrower may at any time terminate, or from time to time permanently reduce, the Commitments; *provided* that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 and (ii) the Commitments shall not be terminated or reduced if, after giving effect to such termination or reduction, the aggregate amount of Loan Exposures would exceed the aggregate amount of Commitments less the Carve-Out Reserve.

(c)    The Borrower shall notify the Administrative Agent in writing of any election to terminate or reduce the Commitments under Section 2.07(b) at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; *provided* that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

**SECTION 2.08**     **Interest Elections**.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. Notwithstanding anything to the contrary, the Borrower shall not be entitled to request any conversion or continuation that, if made, would result in more than ten (10) Eurodollar Borrowings under the Loans outstanding hereunder at any one time.

(b)    To make an election pursuant to this Section, the Borrower shall deliver, by hand delivery or telecopier, a duly completed and executed Interest Election Request to the Administrative Agent not later than the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each Interest Election Request shall be irrevocable.

(c)    Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, or if outstanding Borrowings are being combined, allocation to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration (subject to the proviso in clause (iv) above).

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If an Interest Election Request with respect to a Eurodollar Borrowing is not timely delivered prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, the Administrative Agent or the Required Lenders may require, by notice to the Borrower, that (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

**SECTION 2.09     Reserved**.

**SECTION 2.10     Optional and Mandatory Prepayments of Loans**.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, subject to the requirements of this Section 2.10; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $500,000 or, if less, the outstanding principal amount of such Borrowing.

(b)     Loan Prepayments.  (i) In the event of the termination of all the Commitments, the Borrower shall, on the date of such termination, repay or prepay all its outstanding Loans and replace all outstanding Letters of Credit or cash collateralize all Letters of Credit that are not cash collateralized or provide cash collateral in accordance with the procedures set forth in Section 2.18(i).

(ii)     In the event of any partial reduction of the Commitments, then (x) at or prior to the effective date of such reduction, the Administrative Agent shall notify the Borrower and the Lenders of the sum of the Loan Exposures after giving effect thereto and (y) if the sum of the Loan Exposures

would exceed the aggregate amount of Commitments less the Carve-Out Reserve after giving effect to such reduction, then the Borrower shall, on the date of such reduction, *first*, repay or prepay Loans and *second*, replace outstanding Letters of Credit or cash collateralize outstanding Letters of Credit in accordance with the procedures set forth in Section 2.18(i), in an aggregate amount sufficient to eliminate such excess.

(iii)     In the event that the aggregate LC Exposure exceeds the LC Commitment then in effect, then the Borrower shall, without notice or demand, immediately replace outstanding Letters of Credit or cash collateralize outstanding Letters of Credit in accordance with the procedures set forth in Section 2.18(i), in an aggregate amount sufficient to eliminate such excess.

(c)     Asset Sales.  Subject to the Financing Orders, not later than one (1) Business Day following the receipt of any Net Cash Proceeds of any Asset Sale by Holdings or any of its Subsidiaries, the Borrower shall apply 100% of such Net Cash Proceeds to make prepayments of the Loans, if any are then outstanding, in accordance with Sections 2.10(h) and (i); *provided* that no such prepayment shall be required under this Section 2.10(c) with respect to (A) any Asset Sale permitted by Section 6.05, (B) the disposition of property that constitutes a Casualty Event, (C) Asset Sales for fair market value resulting in no more than $100,000 in Net Cash Proceeds per Asset Sale (or series of related Asset Sales) and less than $500,000 in Net Cash Proceeds in any fiscal year or (D) any Asset Sale to the extent no Loans are then outstanding on the date of receipt of such Net Cash Proceeds; and

(d)     Debt Issuance.  Subject to the Financing Orders, not later than one (1) Business Day following the receipt of any Net Cash Proceeds of any Debt Issuance by Holdings or any of its Subsidiaries, the Borrower shall make prepayments of the Loans, if any are then outstanding, in accordance with Sections 2.10(h) and (i) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(e)     [Reserved].

(f)     Casualty Events.  Not later than one (1) Business Day following the receipt of any Net Cash Proceeds from a Casualty Event by Holdings or any of its Subsidiaries, the Borrower shall apply an amount equal to 100% of such Net Cash Proceeds to make prepayments in accordance with Sections 2.10(h) and (i); *provided* that no such prepayment shall be required under this Section 2.10(f) with respect to any disposition of property which constitutes a Casualty Event resulting in no more than $100,000 in Net Cash Proceeds per Casualty Event and less than $500,000 in Net Cash Proceeds from Casualty Events in any fiscal year; *provided*, *further*:

(i)     so long as no Event of Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that the Borrower shall have delivered a certificate to the Administrative Agent on or prior to such date stating that such proceeds are expected to be used to purchase replacement assets or repair such assets and, in each case, otherwise in compliance with the terms of the Agreement no later than 365 days following the date of receipt of the entire amount of such proceeds; *provided* that if the property subject to such Casualty Event constituted Collateral under the Security Documents, then all property purchased with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the Lien granted pursuant to the Financing Orders or the Security Documents in favor of the Administrative Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Sections 5.11 and 5.12; and

(ii)    if any portion of such Net Cash Proceeds shall not be so applied within such 365-day period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.10(f).

(g)    [Reserved].

(h)    Application of Prepayments.

(i) Subject to the provisions of this Section 2.10(h), prior to any optional or mandatory prepayment hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to Section 2.10(i).

(ii)    Amounts to be applied pursuant to this Section 2.10 to the prepayment of Loans shall be applied *first* to reduce outstanding ABR Loans and *second* to prepay Eurodollar Loans, in each case without a reduction to the Commitments.  Notwithstanding the foregoing, if the amount of any prepayment of Loans required under this Section 2.10 shall be in excess of the amount of the ABR Loans at the time outstanding (an "**Excess Amount**"), only the portion of the amount of such prepayment as is equal to the amount of such outstanding ABR Loans shall be immediately prepaid and, at the election of the Borrower, the balance of such required prepayment shall be either (A) deposited in the Collateral Account and applied to the prepayment of Eurodollar Loans on the last day of the then next-expiring Interest Period for Eurodollar Loans; *provided* that (i) interest in respect of such Excess Amount shall continue to accrue thereon at the rate provided hereunder for the Loans which such Excess Amount is intended to repay until such Excess Amount shall have been used in full to repay such Loans and (ii) at any time while an Event of Default has occurred and is continuing, the Administrative Agent may, and upon written direction from the Required Lenders shall, apply any or all proceeds then on deposit in the Collateral Account to the payment of such Loans in an amount equal to such Excess Amount or (B) prepaid immediately, together with any amounts owing to the Lenders under Section 2.13.

(i)    Notice of Prepayment.  The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before the date of prepayment and (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment.  Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Such notice to the Lenders may be by electronic communication.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of a Credit Extension of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing and otherwise in accordance with this Section 2.10.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

**SECTION 2.11    Alternate Rate of Interest**.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

>    (a)    the Administrative Agent reasonably determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

>    (b)    the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give written notice thereof to the Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

**SECTION 2.12    Increased Costs**.

>    (a)    If any Change in Law shall:

>    (i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against property of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBOR Rate) or the Issuing Bank; or

>    (ii)    impose on any Lender or the Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, the Issuing Bank or such Lender's or the Issuing Bank's holding company, if any, of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered, it being understood that this Section 2.12 shall not apply to Taxes.

>    (b)    If any Lender or the Issuing Bank determines (in good faith, but in its sole absolute discretion) that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies

and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     A certificate of a Lender or the Issuing Bank setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error. The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; *provided*, *further*, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall not begin earlier than the date of effectiveness of the Change in Law.

**SECTION 2.13     Breakage Payments**.     In the event of (a) the payment or prepayment, whether optional or mandatory, of any principal of any Eurodollar Loan earlier than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.13 shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within five (5) days after receipt thereof.

**SECTION 2.14     Payments Generally; Pro Rata Treatment; Sharing of Set Off**.

(a)     The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or Reimbursement

Obligations, or of amounts payable under Section 2.12, 2.13 or 2.15, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 677 Washington Boulevard, Stamford, Connecticut, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Sections 2.12, 2.13, 2.15 and 11.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, Reimbursement Obligations, interest and fees then due hereunder, such funds shall be applied (subject to the priorities set forth in Section 9.03 in the case of proceeds received by the Administrative Agent in respect of any sale of, collection from or realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent of its remedies) (i) *first*, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, towards payment of principal and Reimbursement Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and Reimbursement Obligations then due to such parties. It is understood that the foregoing does not apply to any adequate protection payments under any federal, state or foreign bankruptcy, insolvency, receivership or similar proceeding, and that the Administrative Agent may, subject to any applicable federal, state or foreign bankruptcy, insolvency, receivership or similar orders, distribute any adequate protection payments it receives on behalf of the Lenders to the Lenders in its sole discretion (*i.e.*, whether to pay the earliest accrued interest, all accrued interest on a pro rata basis or otherwise).

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise (including by exercise of its rights under Section 9.1 of the Security Agreement), obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a

Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any of its Subsidiaries or Affiliates (as to which the provisions of this paragraph shall apply). Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(c) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(c) to share in the benefits of the recovery of such secured claim.

(d) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c), 2.14(d), 2.17(d), 2.18(d), 2.18(e) or 11.03(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

**SECTION 2.15    Taxes**.

(a) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made without setoff, counterclaim or other defense and free and clear of and without deduction or withholding for any and all Indemnified Taxes; *provided* that if any Loan Party shall be required by law to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent, any Lender or the Issuing Bank, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) such Loan Party shall make such deductions or withholdings and (iii) such Loan Party shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law and shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within ten (10) Business Days after written demand therefor, for the full amount of Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be and reasonable expenses arising therefrom

or with respect thereto, whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate accompanied by reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(c)     The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15 and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate accompanied by reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes and in any event within thirty (30) days of any such payment being due, by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments under this Agreement to be made without withholding or at a reduced rate. Each Foreign Lender, on or before the date it becomes a Foreign Lender, shall to the extent it is legally entitled to do so (i) furnish two copies (which shall be accurate and complete, and originally executed) of either (a) U.S. Internal Revenue Service Form W-8BEN (or successor form), (b) U.S. Internal Revenue Service Form W-8ECI (or successor form), certifying, in the case of (a) or (b), to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to payments hereunder, or (c), to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Foreign Lender, U.S. Internal Revenue Service Form W-8IMY (or any successor forms), together with any information, if any, such party chooses to transmit with such form, and any other certificate or statement of exemption required under the Code or the regulations issued thereunder, to establish that such party is not acting for its own account with respect to a portion of any such sums payable to such party, and (ii) to the extent it may lawfully do so at such times, upon reasonable request by the Borrower or the Administrative Agent, provide a new Form W-8BEN (or successor form), Form W-8ECI (or successor form) or Form W-8IMY (or successor form) upon the expiration or obsolescence of any previously delivered form to confirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any payments hereunder, or to establish that such party is not acting for its own account with respect to a portion of any such sums payable to such party; provided that any Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code that

is relying on the "portfolio interest exception" under Section 881(c) of the Code shall also furnish a "Non-Bank Certificate" in the form of Exhibit K if it is furnishing a Form W-8BEN. Each Foreign Lender that does not furnish Internal Revenue Service Form W-8ECI (or successor form) represents that, to its knowledge, any Fees paid hereunder are not attributable to services performed by such Lender in the United States.

(f)     Any Administrative Agent, Lender or Issuing Bank that is not a Foreign Lender and is not an exempt recipient (as defined in Section 6049(b)(4) of the Code and the regulations issued thereunder) shall deliver to the Borrower (with a copy to the Administrative Agent), on or prior to the date it become a party hereto, and at such other times as may be necessary in the determination of the Borrower in its reasonable discretion, two U.S. Internal Revenue Service Form W-9 (or any successor forms) properly completed and duly executed by such party.

(g)     If the Administrative Agent or a Lender (or an assignee) determines in its reasonable discretion that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes or the Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (or assignee) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however*, that such Loan Party, upon the request of the Administrative Agent or such Lender (or assignee), agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (or assignee) within a reasonable time (not to exceed twenty (20) days) after receipt of written notice that the Administrative Agent or such Lender (or assignee) is required to repay such refund to such Governmental Authority.   Nothing contained in this Section 2.15(f) shall require the Administrative Agent or any Lender (or assignee) to make available its Tax Returns or any other information which it deems confidential to the Borrower or any other person.   Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to any Loan Party the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the Indemnified Taxes or Other Taxes giving rise to such refund had never been paid in the first instance.

**SECTION 2.16     Mitigation Obligations; Replacement of Lenders.**

(a)     Mitigation of Obligations.   If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous in any material respect to such Lender. The Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.   A certificate setting forth such costs and expenses in reasonable detail submitted by such Lender to the Administrative Agent shall be conclusive absent manifest error.

(b)    Replacement of Lenders.    If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 11.04), all of its interests, rights and obligations under this Agreement to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and, if the assignee is not then a Lender, the Issuing Bank), which consents shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (assuming for this purpose that the Loans of such Lender were being prepaid) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**SECTION 2.17      Reserved.**

**SECTION 2.18      Letters of Credit.**

(a)    General.  Subject to the terms and conditions set forth herein, the Borrower may request the Issuing Bank, and the Issuing Bank agrees, to issue Letters of Credit in dollars for its own account or the account of a Subsidiary in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period (*provided* that the Borrower shall be a co-applicant, and be jointly and severally liable, with respect to each Letter of Credit issued for the account of a Subsidiary). The Issuing Bank shall have no obligation to issue, and the Borrower shall not request the issuance of, any Letter of Credit at any time if after giving effect to such issuance, the LC Exposure would exceed the LC Commitment or the total Loan Exposure would exceed the total Commitments less the Carve-Out Reserve.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)    Request for Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit or the amendment, renewal or extension of an outstanding Letter of Credit, the Borrower shall hand deliver or telecopier (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) an LC Request to the Issuing Bank and the Administrative Agent not later than 2:00 p.m. on the third Business Day preceding the requested date of issuance, amendment, renewal or extension (or such later date and time as is acceptable to the Issuing Bank).

A request for an initial issuance of a Letter of Credit shall specify in form and detail reasonably satisfactory to the Issuing Bank:

(i)     the proposed issuance date of the requested Letter of Credit (which shall be a Business Day);

(ii)    the amount thereof (in dollars);

(iii)   the expiry date thereof (which shall not be later than the close of business on the Letter of Credit Expiration Date);

(iv)    the name and address of the beneficiary thereof;

(v)     whether the Letter of Credit is to be issued for its own account or for the account of one of its Subsidiaries (*provided* that the Borrower shall be a co-applicant, and therefor jointly and severally liable, with respect to each Letter of Credit issued for the account of a Subsidiary);

(vi)    the documents to be presented by such beneficiary in connection with any drawing thereunder;

(vii)   the full text of any certificate to be presented by such beneficiary in connection with any drawing thereunder; and

(viii)  such other matters as the Issuing Bank may reasonably require.

A request for an amendment, renewal or extension of any outstanding Letter of Credit shall specify in form and detail reasonably satisfactory to the Issuing Bank:

(i)     the Letter of Credit to be amended, renewed or extended;

(ii)    the proposed date of amendment, renewal or extension thereof (which shall be a Business Day);

(iii)   the nature of the proposed amendment, renewal or extension; and

(iv)    such other matters as the Issuing Bank may reasonably require.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and, upon issuance, amendment, renewal or extension of each Letter of Credit, the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, (i) the LC Exposure shall not exceed the LC Commitment, (ii) the total Loan Exposures shall not exceed the total Commitments less the Carve-Out Reserve and the conditions set forth in <u>Article IV</u> in respect of such issuance, amendment, renewal or extension shall have been satisfied.  Unless the Issuing Bank shall agree otherwise, no Letter of Credit shall be in an initial amount less than $10,000, in the case of a Commercial Letter of Credit, or $50,000, in the case of a Standby Letter of Credit.

(c)     <u>Expiration Date</u>.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) in the case of a Standby Letter of Credit, (x) the date that is one year after the date of the issuance of such Standby Letter of Credit (or, in the case of any

renewal or extension thereof, one year after such renewal or extension) and (y) the Letter of Credit Expiration Date and (ii) in the case of a Commercial Letter of Credit, (x) the date that is 360 days after the date of issuance of such Commercial Letter of Credit (or, in the case of any renewal or extension thereof, 360 days after such renewal or extension) and (y) the Letter of Credit Expiration Date.

Upon the issuance of any Letter of Credit or amendment, renewal, extension or modification to a Letter of Credit, the Issuing Bank shall promptly notify the Administrative Agent, who shall promptly notify each Lender, thereof, which notice shall be accompanied by a copy of such Letter of Credit or amendment, renewal, extension or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.18(d). On the first Business Day of each calendar month, the Issuing Bank shall provide to the Administrative Agent a report listing all outstanding Letters of Credit and the amounts and beneficiaries thereof and the Administrative Agent shall promptly provide such report to each Lender.

(d) Participations. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby irrevocably grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Pro Rata Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.18(e), or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e) Reimbursement. (i) If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Issuing Bank an amount equal to such LC Disbursement not later than 3:00 p.m., New York City time, on the date that such LC Disbursement is made if the Borrower shall have received notice of such LC Disbursement prior to 11:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 3:00 p.m., New York City time, on the Business Day immediately following the day that the Borrower receives such notice; *provided* that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 that such payment be financed with ABR Loans, in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Loans.

(ii) If the Borrower fails to make such payment when due, the Issuing Bank shall notify the Administrative Agent and the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Pro Rata Percentage thereof. Each Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 p.m., New York City time, on such date (or, if such Lender shall have received such notice later than 12:00 noon, New York City time, on any day, not later than 11:00

a.m., New York City time, on the immediately following Business Day), an amount equal to such Lender's Pro Rata Percentage of the unreimbursed LC Disbursement in the same manner as provided in Section 2.02(c) with respect to Loans made by such Lender, and the Administrative Agent will promptly pay to the Issuing Bank the amounts so received by it from the Lenders. The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it from the Borrower pursuant to the above clause (e)(i) prior to the time that any Lender makes any payment pursuant to the preceding sentence and any such amounts received by the Administrative Agent from the Borrower thereafter will be promptly remitted by the Administrative Agent to the Lenders that shall have made such payments and to the Issuing Bank, as appropriate.

(iii)    If any Lender shall not have made its Pro Rata Percentage of such LC Disbursement available to the Administrative Agent as provided above, each of such Lender and the Borrower severally agrees to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with the foregoing to but excluding the date such amount is paid by such Lender, to the Administrative Agent for the account of the Issuing Bank at (i) in the case of Borrower, the rate per annum set forth in Section 2.18(h) and (ii) in the case of such Lender, at a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(f)    Obligations Absolute.   The Reimbursement Obligation of the Borrower as provided in Section 2.18(e) shall be absolute, unconditional and irrevocable, and shall be paid and performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein; (ii) any draft or other document presented under a Letter of Credit being proved to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that fails to comply with the terms of such Letter of Credit; (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.18, constitute a legal or equitable discharge of, or provide a right of setoff against, the obligations of the Borrower hereunder; (v) the fact that a Default shall have occurred and be continuing; or (vi) any material adverse change in the business, property, results of operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries.  None of the Agents, the Lenders, the Issuing Bank or any of their Affiliates shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; *provided* that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank, (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of

Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g) <u>Disbursement Procedures</u>. The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall promptly give written notice to the Administrative Agent and the Borrower of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; *provided* that any failure to give or delay in giving such notice shall not relieve the Borrower of its Reimbursement Obligation to the Issuing Bank and the Lenders with respect to any such LC Disbursement (other than with respect to the timing of such Reimbursement Obligation set forth in <u>Section 2.18(e)</u>).

(h) <u>Interim Interest</u>. If the Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest payable on demand, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum determined pursuant to <u>Section 2.06(c)</u>. Interest accrued pursuant to this paragraph shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to <u>Section 2.18(e)</u> to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i) <u>Cash Collateralization</u>. If any Event of Default shall occur and be continuing, then, at the Administrative Agent's request or on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with LC Exposure representing greater than 50% of the total LC Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit in the LC Sub-Account, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to 103% of the LC Exposure as of such date plus any accrued and unpaid interest thereon. Funds in the LC Sub-Account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of outstanding Reimbursement Obligations or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with LC Exposure representing greater than 50% of the total LC Exposure), be applied to satisfy other Obligations of the Borrower under this Agreement.

(j) <u>Additional Issuing Banks</u>. The Borrower may, at any time and from time to time, designate one or more additional Lenders to act as an Issuing Bank under the terms of this Agreement, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld), the Issuing Bank and such designated Lender(s). Any Lender designated as an issuing bank pursuant to this <u>paragraph (j)</u> shall be deemed to be the Issuing Bank with respect to Letters of Credit issued or to be issued by such Lender, and all references herein and in the other Loan Documents to the term "Issuing Bank" shall, with respect to such Letters of Credit, be deemed to refer to such Lender in its capacity as Issuing Bank, as the context shall require.

(k) <u>Resignation or Removal of the Issuing Bank</u>. The Issuing Bank may resign as Issuing Bank hereunder at any time upon at least 30 days' prior written notice to the Lenders,

the Administrative Agent and the Borrower. The Issuing Bank may be replaced at any time by written agreement among Borrower, each Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank or any such additional Issuing Bank. At the time any such resignation or replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.05(c). From and after the effective date of any such resignation or replacement or addition, as applicable, (i) the successor or additional Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or such addition or to any previous Issuing Bank, or to such successor or such addition and all previous Issuing Banks, as the context shall require. After the resignation or replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit. If at any time there is more than one Issuing Bank hereunder, the Borrower may, in its discretion, select which Issuing Bank is to issue any particular Letter of Credit.

(l)     Other.  The Issuing Bank shall be under no obligation to issue any Letter of Credit if

(i)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the Issuing Bank in good faith deems material to it; or

(ii)     the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank.

The Issuing Bank shall be under no obligation to amend any Letter of Credit if (A) the Issuing Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

**SECTION 2.19     Defaulting Lenders**.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)     if any LC Exposure exists at the time a Lender becomes a Defaulting Lender, then:

(i)     all or any part of such LC Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Pro Rata Percentage but only to the extent the sum of all non-Defaulting Lenders' Loan Exposures plus such Defaulting Lender's

LC Exposure does not exceed the total of all non-Defaulting Lenders' Commitments less the Carve-Out;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within one (1) Business Day following notice by the Administrative Agent cash collateralize such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.18(i) for so long as such LC Exposure is outstanding;

(iii)     if any portion of such Defaulting Lender's LC Exposure is cash collateralized pursuant to clause (ii) above, the Borrower shall not be required to pay the LC Participation Fee with respect to such portion of such Defaulting Lender's LC Exposure so long as it is cash collateralized;

(iv)     if any portion of such Defaulting Lender's LC Exposure is reallocated to the non-Defaulting Lenders pursuant to clause (i) above, then the LC Participation Fee with respect to such portion shall be allocated among the non-Defaulting Lenders in accordance with their Pro Rata Percentages; or

(v)     if any portion of such Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.19(a), then, without prejudice to the rights or remedies of the Issuing Bank or any Lender hereunder, the Commitment Fee that otherwise would have been payable to such Defaulting Lender (with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) and the LC Participation Fee payable with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated;

(b)     so long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend or increase the stated amount of any Letter of Credit, unless it is satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated by being 100% covered by the Commitments of the non-Defaulting Lenders, or by cash collateralization or a combination of both in accordance with clause (a) above;

(c)     Commitment Fees pursuant to Section 2.05(a) shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender; and

(d)     any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.14(c) but excluding Section 2.16(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) *second*, *pro rata*, to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank hereunder, (iii) *third*, to the funding of any Loan or the funding or cash collateralization of any participation in any Letter of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iv) *fourth*, if so determined by the Administrative Agent and the Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (v) *fifth*, *pro rata*, to the payment of any amounts owing to Borrower or the Lenders as a result of any judgment of a court of competent

jurisdiction obtained by the Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (vi) *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided*, that if such payment is (x) a payment of the principal amount of any Loans or Reimbursement Obligations in respect of LC Disbursements which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Section 4.02 are satisfied, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations owed to, all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender.

In the event that each of the Administrative Agent, the Borrower and the Issuing Bank, each agrees in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Pro Rata Percentage. The rights and remedies against a Defaulting Lender under this Section 2.19 are in addition to other rights and remedies that the Borrower, the Administrative Agent, the Issuing Bank and the non-Defaulting Lenders may have against such Defaulting Lender. The arrangements permitted or required by this Section 2.19 shall be permitted under this Agreement, notwithstanding any limitations on Liens or the pro rata sharing provisions or otherwise.

**SECTION 2.20    Reserved**.

**SECTION 2.21    Payment of Obligations**.  Upon the Stated Maturity Date, the Lenders shall be entitled to immediate payment of such Obligations then due and owing without further application to or order of the Bankruptcy Court, subject to the terms of the Loan Documents and the Financing Orders.

**SECTION 2.22    No Discharge; Survival of Claims**.  Each Loan Party agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan the Chapter 11 Cases (and each Loan Party pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (b) the super priority administrative claim granted to the Agents and the Lenders pursuant to the Financing Orders and described in Section 2.19 and the Liens granted to the Agents pursuant to the Financing Orders and described in Section 2.19 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in the Chapter 11 Cases.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent, the Issuing Bank and each of the Lenders that:

**SECTION 3.01    Organization; Powers**.  Each Company  (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has, upon the entry of the Financing Orders by the Bankruptcy Court, all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such

qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. On the Closing Date, there is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

SECTION 3.02    **Authorization; Enforceability**.  Upon the entry of the Financing Orders by the Bankruptcy Court, the Transactions to be entered into by each Loan Party, including any Credit Extensions hereunder, are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party.  Subject to the entry of the Financing Orders by the Bankruptcy Court, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03    **No Conflicts**.  Except as set forth on Schedule 3.03, upon entry of the Financing Orders by the Bankruptcy Court, the Transactions, including any Credit Extensions hereunder, (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect or to the extent such noncompliance is permitted by the Bankruptcy Court, (b) will not violate the Organizational Documents of any Company or any judgment, decree or order of any Governmental Authority that is binding on any Company, (c) will not violate or result in a default (except in respect of the Pre-Petition Credit Agreement, the Second Lien Credit Agreement and the Holdings Credit Agreement) or require any consent or approval under any indenture, agreement, Organizational Document or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect, and (d) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens (including pursuant to the Financing Orders).

SECTION 3.04    **Financial Statements; Projections**.

(a)    The Borrower has heretofore delivered to the Lenders (i) the unaudited consolidated balance sheet as of May 31, 2010 and related statements of income and cash flows of Holdings and its consolidated Subsidiaries for the 5 months ended May 31, 2010 and (ii) the consolidated balance sheets and related statements of income and cash flows of the Borrower as of and for the fiscal year ended December 31, 2009 and the consolidated balance sheets and related statements of income and cash flows of Holdings and its consolidated Subsidiaries for the fiscal years ended December 31, 2007, December 31, 2008, and December 31, 2009 audited by and accompanied by the opinion of Ernst & Young LLP, independent public accountants, and certified by the chief financial officer of the Borrower and Holdings, as applicable.  Such financial statements and all financial statements delivered pursuant to Sections 5.01(a), (b) and (c) have been prepared in accordance with GAAP (in the case of financial statements delivered pursuant to Sections 5.01(b) and (c), subject to normal year-end audit adjustments and the absence of footnotes) and present fairly and in all material respects the financial condition and results of operations and cash flows of the Borrower or Holdings, as applicable, as of the dates

and for the periods to which they relate. Except as set forth in such financial statements and other than the commencement of the Chapter 11 Cases, there are no post-Petition Date liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a post-Petition Date liability, other than liabilities under the Loan Documents.

(b)     [Reserved].

(c)     The forecasts of financial performance of the Borrower or Holdings, as applicable, including projected income statements, statements of cash flows and balance sheets, and its subsidiaries furnished to the Lenders have been prepared in good faith by the Borrower or Holdings, as applicable, and based on assumptions believed by the Borrower or Holdings, as applicable, to be reasonable (it being understood that forecasts are subject to uncertainties and contingencies and that no representation or warranty is given that any forecast will be realized).

(d)     [Reserved].

**SECTION 3.05     Properties**.

(a)     Each Company has good title to, or valid leasehold interests in all its property material to its business, or licenses or other rights to use, free and clear of all Liens except for, in the case of Collateral that is Real Property, Permitted Collateral Liens and, in the case of all other material property, Permitted Liens (including pursuant to the Financing Orders) and minor irregularities or deficiencies in title that, individually or in the aggregate, do not in any material respect interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted), except to the extent that the failure to be in such condition could not reasonably be expected to result in a Material Adverse Effect, and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)     Schedule 3.05(b) contains a true and complete list of each interest in Real Property (i) owned by any Company as of the Closing Date and describes the type of interest therein held by such Company and (ii) leased or subleased by any Loan Party, as lessee or sublessee as of the Closing Date and describes the type of interest therein held by such Loan Party.

(c)     As of the Closing Date, no Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event currently affecting all or any portion of its property.

(d)     Each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Company's business as currently conducted. The use by each Loan Party of such Collateral and all such rights with respect to the foregoing does not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)    As far as each Company is aware, the Equipment of each Company is in good repair, working order and condition, reasonable wear and tear excepted.  Each Company shall use reasonable endeavors to cause the Equipment to be maintained and preserved in good repair, working order and condition, reasonable wear and tear excepted, and shall as quickly as commercially practicable make or cause to be made all repairs, replacements and other improvements which are necessary or appropriate in the conduct of each Company's business except in each case as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

**SECTION 3.06    Intellectual Property**.

(a)    <u>Ownership/No Claims</u>.  Each Loan Party owns, or is licensed to use, all patents, patent applications, trademarks, trade names, servicemarks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No written claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Loan Party know of any valid basis for any such claim.  The use of such Intellectual Property by each Loan Party does not infringe the rights of any person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Registrations</u>.  Except pursuant to licenses and other user agreements entered into by each Loan Party in the ordinary course of business that are listed in <u>Schedules 1(a)</u>, <u>1(b)</u> or <u>1(c)</u> to the Security Agreement, on and as of the Closing Date (i) each Loan Party owns and possesses the right to use, and has done nothing to authorize or enable any other person to use, any copyright, patent or trademark (as such terms are defined in the Security Agreement) listed in <u>Schedules 1(a)</u>, <u>1(b)</u> or <u>1(c)</u> to the Security Agreement and (ii) all registrations listed in <u>Schedules 1(a)</u>, <u>1(b)</u> or <u>1(c)</u> to the Security Agreement are valid and in full force and effect.

(c)    <u>No Violations or Proceedings</u>.  To each Loan Party's knowledge, on and as of the Closing Date, there is no material violation by others of any right of such Loan Party with respect to any copyright, patent or trademark listed in <u>Schedules 1(a)</u>, <u>1(b)</u> or <u>1(c)</u> to the Security Agreement, respectively, pledged by it under the name of such Loan Party except as may be set forth on <u>Schedule 3.06(c)</u>.

**SECTION 3.07    Equity Interests and Subsidiaries**.

(a)    <u>Equity Interests</u>.  <u>Schedule 2</u> to the Security Agreement sets forth a list of (i) all the Subsidiaries of Holdings and their jurisdiction of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date.  All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable.  All Equity Interests of the Borrower are owned directly by Holdings.  Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it pursuant to the Financing Orders or under the Security Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created pursuant to the Financing Orders and by the Security Agreement and Permitted Liens (including pursuant to the Financing Orders), and except as set forth on <u>Schedule 3.07(a)</u>, on the Closing Date there are no outstanding warrants, options or other rights to purchase with

respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)  **No Consent of Third Parties Required**.  Upon the entry of the Financing Orders by the Bankruptcy Court, no consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties pursuant to the Financing Orders or under the Security Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

(c)  **Organizational Chart**.  An accurate organization chart, showing the ownership structure of Holdings, the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

### SECTION 3.08    **Litigation; Compliance with Laws**.

(a)  Except for the Chapter 11 Cases and for litigation that is stayed by the commencement and continuation of the Chapter 11 Cases, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company (i) that challenge the enforceability or validity of any Loan Document or any of the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)  Except for matters covered by Section 3.18, no Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any judgment, writ, injunction, decree, rule or order of any Governmental Authority, in each case where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

### SECTION 3.09    **[Reserved]**.

### SECTION 3.10    **Federal Reserve Regulations**.

(a)  No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)  No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.  The pledge of the Securities Collateral pursuant to the Financing Orders or the Security Agreement does not violate such regulations.

**SECTION 3.11** <u>Investment Company Act; Public Utility Holding Company Act</u>. No Company is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to registration under, the Investment Company Act of 1940, as amended.

**SECTION 3.12** <u>Use of Proceeds</u>. The Borrower will use the proceeds of the Loans in a manner consistent with the 13-Week Budget (subject to Permitted Variances) and the Financing Orders for payment of (i) post-petition operating expenses and other working capital and financing requirements of the Borrower and the Guarantors, (ii) certain transaction and bankruptcy related fees, costs and expenses, (iii) the Carve-Out and (iv) Pre-Petition claims permitted by the Bankruptcy Court. Notwithstanding the foregoing, at the closing of the Asset Purchase Agreement, the Borrower may borrow an amount sufficient, and shall use the proceeds of the Loans so borrowed, to fund the Wind Down Amount (as defined in the Asset Purchase Agreement), which shall thereafter be deposited and distributed as provided in Section 7.18 of the Asset Purchase Agreement.

**SECTION 3.13** <u>Taxes</u>. Except as would not, individually or in the aggregate, have a Material Adverse Effect, each Company has (a) timely filed or caused to be timely filed all federal, state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all respects and (b) duly and timely paid or caused to be duly and timely paid all Taxes (whether or not shown as due on any Tax Return) and all assessments received by it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves in accordance with GAAP and (ii) any taxes, fees, or other charges, the nonpayment of which is required or permitted by the Bankruptcy Code. Each Company has made adequate provision in accordance with GAAP on its *pro forma* financial statements referred to in <u>Section 3.04(b)</u> for all material Taxes not yet due and payable as of the date of such financial statements. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

**SECTION 3.14** <u>No Material Misstatements</u>. No information, report, financial statement, certificate, Borrowing Request, LC Request, exhibit or schedule furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection or pro forma adjustment, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule (it being understood that forecasts are subject to uncertainties and contingencies and that no representation or warranty is given that any forecast will be realized).

**SECTION 3.15** <u>Labor Matters</u>. As of the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any

collective bargaining agreement to which any Company is bound where such termination or right of renegotiation could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.16** [Reserved].

**SECTION 3.17** **Employee Benefit Plans**.

(a) Each Company and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. Except as disclosed on Schedule 3.17, no ERISA Event (other than the commencement of the Chapter 11 Cases) has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in material liability of any Company or any of its ERISA Affiliates or the imposition of a Lien on any of the property of any Company. Except as disclosed on Schedule 3.17, the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Borrower's or Holdings' annual audited financial statements, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that could reasonably be expected to have a Material Adverse Effect if any of the Plans were to be terminated. The aggregate liabilities of each Company or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, could not reasonably be expected to result in a Material Adverse Effect.

(b) To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities.

**SECTION 3.18** **Environmental Matters**.

(a) Except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(i) The Companies and their businesses, operations and Real Property are and in the last three years have been in compliance with, and the Companies have no liability under, Environmental Law;

(ii) The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five (5) years;

(iii) There has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability by the Companies under Environmental Law;

(iv)     There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim; and

(v)     No person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)     Except as set forth in <u>Schedule 3.18</u>:

(i)     No Company is obligated to perform any material action or otherwise incur any material expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract or agreement, and no Company is conducting or financing any material Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)     No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)     No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or property of the Companies;

(iv)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law; and

(v)     The Companies have made available to the Lenders all material records and files in the possession, custody or control of, or otherwise reasonably available to, the Companies concerning compliance with or liability under Environmental Law, including those concerning the existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

**SECTION 3.19    Insurance**.  Schedule 3.19 sets forth a true, complete and correct summary description of all insurance maintained by the Loan Parties as of the Closing Date.  All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid and no Company has received notice of violation or cancellation thereof except, in such case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.  The Mortgaged Property, and the use, occupancy and operation thereof, comply in all respects with all Insurance Requirements, and there exists no default under any material Insurance Requirement, in each case to the extent the same could not reasonably be expected to have a Material Adverse Effect.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

**SECTION 3.20    Legality; Validity and Enforceability of Liens**.  Upon entry of the Financing Orders by the Bankruptcy Court, the Secured Parties will have legal, valid and enforceable Liens having the priority specified in the Financing Orders on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral and the proceeds thereof.

**SECTION 3.21    Foreign Assets Control Regulations**.  No Loan Party is, or will be after the consummation of the Transactions and the application of the proceeds of the Loans, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation in any material respect of, any United States Federal statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof or the ownership or operation of any property.

**SECTION 3.22    Anti-Terrorism Law**.

(a)    No Loan Party and, to the knowledge of the Loan Parties, none of its Affiliates is in violation of any Anti-Terrorism Laws.

(b)    No Loan Party and to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)    a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Orders;

(ii)    a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Orders;

(iii)    a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a person that commits, threatens or conspires to commit or supports "**terrorism**" as defined in the Executive Orders; or

(v)    a person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

(c)     No Loan Party and, to the knowledge of the Loan Parties, no broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in paragraph (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Orders, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.


# ARTICLE IV

## CONDITIONS TO CREDIT EXTENSIONS

**SECTION 4.01     Conditions to Initial Credit Extensions**.  The obligation of each Lender and, if applicable, each Issuing Bank to fund the initial Credit Extension requested to be made by it shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.01.

(a)     Loan Documents.  All legal matters incident to this Agreement, the Credit Extensions hereunder and the other Loan Documents shall be satisfactory to the Lenders, to the Issuing Bank and to the Administrative Agent and there shall have been delivered to the Administrative Agent an executed counterpart of each of the Loan Documents.

(b)     Corporate Documents.  The Administrative Agent shall have received:

(i)     a certificate of the secretary or assistant secretary of each Loan Party dated as of the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i)); and

(ii)     a certificate as to the good standing of each Loan Party (in so-called "long-form" if available) as of a recent date, from such Secretary of State of its jurisdiction of incorporation or organization, as applicable.

(c)     Officer's Certificate.  The Administrative Agent shall have received a certificate, dated as of the Closing Date and signed by the executive vice president of Borrower, confirming compliance with the conditions precedent set forth in this Section 4.01 and Sections 4.02(b), (c) and (d).

(d)    Opinions of Counsel.  The Administrative Agent shall have received, on behalf of itself and the Lenders, a favorable written opinion of Simpson Thacher & Bartlett LLP, counsel for the Loan Parties.

(e)    Fees.  The Arranger, the Administrative Agent, the Collateral Agent, the Syndication Agent and the Documentation Agent shall have received all Fees and other amounts due and payable required to be paid on the Closing Date under the Fee Letters and, to the extent invoiced on or before the Closing Date, reimbursement or payment of all reasonable out-of-pocket expenses (including the reasonable fees and expenses of Paul, Hastings, Janofsky & Walker, LLP, counsel to the Administrative Agent, and the reasonable fees and expenses of any local counsel, foreign counsel, appraisers, consultants and other advisors) required to be reimbursed or paid on the Closing Date by the Borrower hereunder or under any other Loan Document.

(f)    Personal Property Requirements.  The Borrower shall have delivered to the Administrative Agent (except, in each case, if such item was previously delivered to the Prior Agent):

(i)    all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)    the Intercompany Note;

(iii)    UCC financing statements in appropriate form for filing under the UCC, filings with the United States Patent and Trademark Office and United States Copyright Office and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Administrative Agent, desirable to perfect the Liens created, or purported to be created, by the Financing Orders or the Security Documents;

(iv)    certified copies of UCC, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any property of any Loan Party is located and the state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Collateral Liens or any other Liens acceptable to the Administrative Agent).

(g)    Insurance.  The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent.

(h)    USA Patriot Act Information.  The Lenders shall have received, sufficiently in advance of the Closing Date, all documentation and other information that may be required by the Lenders in order to enable compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of

Pub. L. 107-56 (signed into law October 26, 2001)) including the information described in Section 11.16.

(i)  Budget.  The Administrative Agent and the Required Lenders shall have received a copy of the 13-Week Budget, in form and substance acceptable to the Required Lenders.

(j)  Initial Fee.  The Borrower shall have paid to the Administrative Agent, for the *pro rata* benefit of each Lender who is a party to this Agreement on the Closing Date, a fee due and payable on the Closing Date in an aggregate amount equal to 2.10% of the aggregate amount of Commitments actually provided on the Closing Date (the "**Initial Fee**").

(k)  Chapter 11 Case Administration.  Entry by the Bankruptcy Court of the Interim Order, by no later than five (5) days after the Petition Date in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, which date, at the request of the Borrower and with the consent of the Administrative Agent, may be extended for another five (5) Business Days.

(l)  First Day Orders.  All first day orders described on Schedule A-1 that are filed in the Chapter 11 Cases entered by the Bankruptcy Court shall be in form and substance satisfactory to the Administrative Agent.

(m)  No Excess Cash.  The Borrower shall have delivered an Officer's Certificate to the Administrative Agent certifying that to the extent that the Loan Parties have any cash on hand on the Petition Date not subject to a Lien in favor of the Pre-Petition Agent, such unencumbered cash shall be utilized or deemed utilized prior to the utilization of the proceeds from the initial Credit Extension (other than the deemed issuance of the Existing Letters of Credit as a Letter of Credit hereunder or any other issuance of a Letter of Credit hereunder) in accordance with the Interim Order.

All obligations of the Agents and Lenders under this Agreement shall automatically terminate without any further action if the conditions required under this Section 4.01 (including, without limitation, Section 4.01(k)) have not been satisfied on or before August 12, 2010.

**SECTION 4.02**  **Conditions to All Credit Extensions**.  The obligation of each Lender and each Issuing Bank to make any Credit Extension (including the initial Credit Extension) shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)  Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) if Loans are being requested or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.18(b).

(b)  No Default.  The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default shall have occurred and be continuing on such date.

(c)    <u>Representations and Warranties</u>.  Each of the representations and warranties made by any Loan Party set forth in <u>Article III</u> hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(d)    <u>No Legal Bar</u>.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.

(e)    <u>Bankruptcy Matters</u>.   At the time of such Credit Extension, (i) if such Credit Extension is prior to the entry and effectiveness of the Final Order, the Interim Order shall not have terminated or expired, and the date of such Credit Extension shall not be more than thirty (30) days from the entry and effectiveness of the Interim Order or more than thirty-five (35) days from the Petition Date, (ii) if such Credit Extension is after the entry and effectiveness of the Final Order, the Final Order shall be effective, and shall not have been terminated or expired, (iii) no Financing Order shall have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of the Administrative Agent), (iv) no motion for reconsideration of any Financing Order shall be pending, and (v) no appeal of any Financing Order shall be pending and no Financing Order shall be the subject of a stay pending appeal or a motion for a stay pending appeal.

(f)    <u>Budget</u>.  At the time of such Credit Extension, if such Credit Extension is a Borrowing of a Loan, the amount of such Credit Extension shall not be in excess of the amounts necessary to fund disbursements (in the aggregate) permitted under the most recently delivered 13-Week Budget in effect at such time, subject to any Permitted Variance under <u>Section 6.09</u>.

(g)    <u>Commitment</u>.  After giving effect to such Credit Extension, the aggregate then outstanding principal amount of the Loans plus the aggregate stated amount of all Letters of Credit then outstanding shall not exceed the Commitment less the Carve-Out Reserve at such time.

Each of the delivery of a Borrowing Request or notice requesting the issuance, amendment, extension or renewal of a Letter of Credit and the acceptance by the Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by the Borrower and each other Loan Party that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the conditions contained in this <u>Section 4.02</u> have been satisfied.   The Borrower shall provide such information (including calculations in reasonable detail of the covenants in <u>Section 6.09</u>) as the Administrative Agent may reasonably request to confirm that the conditions in this <u>Section 4.02</u> have been satisfied. Notwithstanding anything to the contrary contained herein, the Credit Extensions described in the last sentence of <u>Section 3.12</u> shall be subject to no conditions precedent other than those set forth in <u>Sections 4.02(a)</u>, <u>(d)</u>, <u>(e)</u> and <u>(g)</u>.

**SECTION 4.03**    <u>Exit Credit Facility</u>.

(a)    Subject to the terms and conditions of the Summary of Preliminary Terms and Conditions of the $25,000,000 Exit Credit Facility, dated as of July 28, 2010, and attached hereto as <u>Exhibit N</u> (the "**Exit Term Sheet**"), each Lender hereby agrees, upon the closing of a sale of substantially all of the assets of the Borrower pursuant to a 363 Sale that is proposed by

the Borrower and executed by the Administrative Agent, to convert its Commitment under this Agreement into commitments under an exit credit facility (the "**Exit Credit Facility**") for the Borrower (as defined in the Exit Term Sheet) in the same amount of its Commitment hereunder. The Exit Credit Facility shall be subject to the terms and conditions contained in the Exit Term Sheet and shall otherwise be on substantially similar terms as contained in this Agreement, as modified to take into account the current financial condition of the Borrower and Guarantors (each as defined in the Exit Term Sheet), the exit from the Chapter 11 Cases, the longer term of the Exit Credit Facility and as otherwise may be agreed to by the parties.

(b)      Each Lender's obligations under this Section 4.03 shall be subject to the negotiation, execution and delivery of definitive documentation relating to the Exit Credit Facility reasonably satisfactory to the Administrative Agent (as defined in the Exit Term Sheet) and such Lender, and satisfaction of the closing conditions for the Exit Credit Facility contained in Exhibit O.   All obligations of the Lenders under this Section 4.03 shall automatically terminate without any further action if the closing of the Exit Credit Facility does not occur on or before July 30, 2011.


# ARTICLE V

# AFFIRMATIVE COVENANTS

Each Loan Party agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts due and payable under any Loan Document shall have been paid in full and all Letters of Credit have been canceled or have expired or have been collateralized in a manner reasonably acceptable to the Administrative Agent and all amounts drawn thereunder have been reimbursed in full, unless the Required Lenders shall otherwise consent in writing, each Loan Party will, and will cause each of its Subsidiaries to:

**SECTION 5.01**      Financial Statements, Reports, etc.  Furnish to the Administrative Agent and, upon the request of the Administrative Agent or any Lender, to each such Lender making the request to the Borrower or the Administrative Agent:

(a)      Annual Reports.  Within ninety (90) days after the end of each fiscal year, (i) the consolidated balance sheet of Holdings as of the end of such fiscal year and related consolidated statements of income, cash flows for such fiscal year, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto, all prepared in accordance with GAAP and accompanied by an opinion of Ernst & Young LLP or other independent public accountants of recognized national standing satisfactory to the Administrative Agent, stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Holdings as of the dates and for the periods specified in accordance with GAAP, (ii) a management's discussion and analysis of the financial condition and results of operations for such fiscal year (including an unaudited consolidated breakout of the results of operations of each of the Wet Shaving and Industrial/Medical divisions), as compared to the previous fiscal year and (iii) a consolidating balance sheet and statements of income separating out Holdings and the Subsidiaries, which shall be accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition,

results of operations and cash flows of Holdings as of the date and for the periods specified on a basis consistent with audited financial statements in clause (i) above;

(b)     **[Reserved]**;

(c)     Monthly Reports.  Within thirty (30) days after the end of each fiscal month, the consolidated balance sheet of Holdings as of the end of such month and the related consolidated statements of income and cash flows of Holdings for such month and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of Holdings as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(d)     Financial Officer's Certificate.  (i) Concurrently with any delivery of financial statements under Section 5.01(a) or (c) above, a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; and (ii) in the case of Section 5.01(a) above, a report of the accounting firm opining on or certifying such financial statements stating that in the course of its regular audit of the financial statements of Holdings and its Subsidiaries, which audit was conducted in accordance with GAAP, such accounting firm obtained no knowledge that any Default under Section 6.09 has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof;

(e)     Financial Officer's Certificate Regarding Collateral.     Concurrently with any delivery of financial statements under Section 5.01(a) above, a certificate of a Financial Officer (i) updating, to the extent necessary, to reflect (A) any changes to the names or locations of any Loan Party or (B) any other information reasonably required by the Administrative Agent with respect to the Collateral or (ii) confirming that there has been no change in such information since the Closing Date or the latest supplement to the schedules to the Credit Agreement or Security Agreement, as applicable.

(f)     Public Reports.  As soon as reasonably practicable after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(g)     Management Letters.  As soon as reasonably practicable after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

(h)     Reserved.

(i)     13-Week Budget; Operating Forecasts.

(i)     Commencing on August 26, 2010 and on each fourth Thursday thereafter, furnish on or before 5:00 p.m., New York City time, to the Administrative Agent for prompt further distribution to each Lender, (A) an updated 13-Week Budget (covering the period beginning on the Monday immediately preceding the Thursday that such 13-Week Budget is delivered), in form and substance acceptable to the Administrative Agent and the Required Lenders, and (B) a report of net aggregate unfavorable variances of Net Operating Cash Flow (as defined in the 13-Week Budget) (the "**Monthly Variance Report**") in the form attached hereto as Exhibit M-1 evidencing net unfavorable variances of no more than $4,000,000 for the prior four (4) week period as set forth in the prior 13-Week Budget (the "**Permitted Monthly Variance**") (it being understood that the incurrence of net aggregate unfavorable variances in excess of $4,000,000 for the prior four (4) week period shall constitute an Event of Default). It is hereby understood and agreed by the parties hereto and the Required Lenders that (Y) the Required Lenders shall be deemed to have consented to such 13-Week Budget if the Required Lenders fail to submit to the Administrative Agent a written objection to such 13-Week Budget by 5:00 p.m., New York City time, on Monday of the following week; *provided*, that the Borrower delivers the 13-Week Budget in a timely manner in accordance with the first sentence of this clause (i) and (Z) such 13-Week Budget shall not become the applicable 13-Week Budget until the Administrative Agent shall have delivered a notice of approval of such 13-Week Budget to the Borrower; *provided*, that if the Administrative Agent does not deliver a notice of approval to the Borrower, the previously delivered 13-Week Budget shall continue to constitute the applicable 13-Week Budget until a 13-Week Budget is agreed to among the Borrower and the Administrative Agent in accordance with this Section.

(ii)    Commencing on August 5, 2010 and on each Thursday thereafter, furnish to the Administrative Agent for prompt further distribution to each Lender (A) a comparison of actual to budgeted weekly results of operation for each prior four (4) week period, as applicable, (B) a report of weekly net aggregate unfavorable variances of Net Operating Cash Flow (the "**Weekly Variance Report**") in the form attached hereto as Exhibit M-2 evidencing net aggregate unfavorable variances of no more than $3,000,000 per week (the "**Permitted Weekly Variance**" and, together with the Permitted Monthly Variance, the "**Permitted Variances**")) (it being understood that the incurrence of net aggregate unfavorable variances in excess of $3,000,000 shall constitute an Event of Default) and (C) a report containing a summary of accrued, but unpaid, professional fees and expenses of the Borrower, the Guarantors and the Committee incurred in the Chapter 11 Cases as of such date.

(j)     Organization.  Within sixty (60) days after the close of each fiscal year of Holdings, Holdings shall deliver an accurate organization chart as required by Section 3.07(c), or confirm that there are no changes to Schedule 3.07(c);

(k)     Organizational Documents.  As soon as reasonably practicable, provide copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within fifteen (15) days after such Company gives or receives such notice; and

(l)     Documents filed with the Bankruptcy Court or Delivered to the U.S. Trustee or Committee.  Promptly, upon their being filed with the Bankruptcy Court, provide copies of all monthly reports as well as all pleadings, motions, applications, judicial information or other information with respect to each Loan Party's financial condition filed by or on behalf of each Loan Party with the Bankruptcy Court or served by a Loan Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any

Committee, at the time such document is filed with the Bankruptcy Court or served by a Loan Party to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any Committee, to the extent such document has not otherwise been served pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise.

(m)    Other Information.  As soon as reasonably practicable, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request, or that is provided to lenders under the Second Lien Credit Agreement or the lenders under the Holdings Credit Agreement pursuant to any requirement substantially the same as this Section 5.01(m).

**SECTION 5.02**    **Litigation and Other Notices**.  Furnish to the Administrative Agent, and upon the request of the Administrative Agent or any Lender, to each such Lender making the request to the Borrower or the Administrative Agent, written notice of the following as soon as reasonably practicable (and, in any event, within five Business Days of the occurrence thereof):

(a)    any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)    the occurrence of a Casualty Event; and

(d)    the incurrence of any material Lien (other than Permitted Liens and the Carve-Out) on, or claim asserted against any of the Collateral (other than as a result of the filing of proofs of claims in the Chapter 11 Cases).

**SECTION 5.03**    **Existence; Businesses and Properties**.  Except as resulting from the Chapter 11 Cases, continue to:

(a)    do or cause to be done all things reasonably necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; and

(b)    do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except in all cases where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Loan Documents; and at all times maintain, preserve and protect all property material to the conduct

of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business subject to condemnation and casualty events) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times, except in all cases where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; *provided* that nothing in this <u>Section 5.03(b)</u> shall prevent (i) sales of property, consolidations or mergers by or involving any Company in accordance with <u>Section 6.04</u> or <u>Section 6.05</u>; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (iii) the abandonment by any Company of any property, rights, franchises, licenses, trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable.

**SECTION 5.04** <u>Insurance</u>.

(a)      Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to Mortgaged Properties and other properties material to the business of the Companies against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations, including (i) physical hazard insurance on an "all risk" basis, (ii) commercial general liability against claims for bodily injury, death or property damage covering any and all insurable claims, (iii) explosion insurance in respect of any boilers, machinery or similar apparatus constituting Collateral, (iv) business interruption insurance, (v) worker's compensation insurance and such other insurance as may be required by any Requirement of Law and (vi) such other insurance against risks as the Administrative Agent may from time to time require (acting reasonably) (such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Administrative Agent); *provided* that if and so long as an Event of Default has occurred and is continuing with respect to physical hazard insurance, neither the Administrative Agent nor the applicable Company shall agree to the adjustment of any claim thereunder in excess of $1,000,000 without the consent of the other (such consent not to be unreasonably withheld or delayed).

(b)      All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Administrative Agent of written notice thereof and if an endorsement providing such notice is commercially impracticable by the Borrower's carrier, the Borrower will use its commercially reasonable efforts to provide thirty (30) days notice to the Administrative Agent prior to the cancellation, material reduction in amount or material change in coverage, (ii) name the Administrative Agent as mortgagee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable and (iii) be reasonably satisfactory in all other respects to the Administrative Agent.

(c)      Notify the Administrative Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this <u>Section 5.04</u> is taken out by any Company; and as soon as practicable deliver to the Administrative Agent a duplicate original copy of such policy or policies.

(d)     With respect to Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time reasonably require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)     Deliver to the Administrative Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent may from time to time reasonably request.

(f)     No Loan Party that is an owner of Mortgaged Property shall knowingly take any action that is reasonably likely to be the basis for termination, revocation or denial of any insurance coverage required to be maintained under such Loan Party's respective mortgage or that could be the basis for a defense to any claim under any Insurance Policy maintained in respect of the Mortgaged Property, and each Loan Party shall otherwise comply in all material respects with all Insurance Requirements in respect of the premises; *provided, however*, that each Loan Party may, at its own expense and after written notice to the Administrative Agent, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under this <u>Section 5.04</u> or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of this <u>Section 5.04</u>.

**SECTION 5.05     <u>Obligations and Taxes</u>**.

(a)     Except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, subject to the approval of the Bankruptcy Court in the Chapter 11 Cases and to the restrictions set forth in this Agreement, pay its Indebtedness and other obligations in accordance with their terms and pay and discharge promptly when due and payable all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, services, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof.

(b)     Timely and correctly file all Tax Returns required to be filed by it, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

(c)     The Borrower does not intend to treat the Loans as being a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4. In the event the Borrower determines to take any action inconsistent with such intention, it will promptly notify the Administrative Agent thereof.

**SECTION 5.06     <u>Employee Benefits</u>**. Subject to the applicable provisions of the Bankruptcy Code and except as a result of the Chapter 11 Cases (including the effects of the Chapter 11 Cases on the funding of the Plans), (a) with respect to any Plan, comply in all material respects with the applicable provisions of ERISA and the Code and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within ten (10) days after any Responsible Officer of any Company knows or has reason to know, that any ERISA Event has occurred that, alone or together with any other ERISA Event,

could reasonably be expected to result in liability of the Companies or any of their ERISA Affiliates in an aggregate amount exceeding $1,000,000 or the imposition of a Lien, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event and the action, if any, that the Companies propose to take with respect thereto, and (y) upon request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all notices received by any Company or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Company) as the Administrative Agent shall reasonably request.

SECTION 5.07    **Maintaining Records; Access to Properties and Inspections; Annual Meetings**.  Keep proper books of record and account (i) in which full, true and correct entries are made in conformity with all Requirements of Law (ii) in form permitting financial statements conforming with GAAP to be derived therefrom and (iii) in which all dealings and transactions in relation to its business and activities are recorded.  Each Company will permit any representatives designated by the Administrative Agent or any Lender (in the case of any Lender only, during the continuance of a Default or an Event of Default) to visit and inspect the financial records and, subject to the rights of tenants, the property of such Company upon reasonable prior notice during regular business hours and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender (in the case of any Lender only, during the continuance of a Default or an Event of Default) to discuss the affairs, finances, accounts and condition of any Company with and be advised as to the same by the officers and employees thereof and the independent accountants therefor, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any Lender (in the case of any Lender only, during the continuance of a Default or an Event of Default) may request; *provided*, that unless a Default or an Event of Default is continuing, the Borrower shall not be required to pay the expenses of more than one such visit per calendar year.  The Borrower shall be permitted to reasonably coordinate the visits and inspections of individual Lenders to minimize inconvenience.

SECTION 5.08    **Use of Proceeds**.  Use the proceeds of the Loans only for the purposes set forth in Section 3.12 and request the issuance of Letters of Credit only for the purposes set forth in the definition of Commercial Letter of Credit or Standby Letter of Credit, as the case may be.

SECTION 5.09    **Compliance with Environmental Laws; Environmental Reports**.

(a)    Comply, and cause all lessees and other persons occupying Real Property owned, operated or leased by any Company to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)    If a Default caused by reason of a breach of Section 3.18 or Section 5.09(a) shall have occurred and be continuing for more than 20 days without the Companies commencing activities reasonably likely to cure such Default, at the written request of the Administrative Agent or the Required Lenders through the Administrative Agent, provide to the Lenders within forty-five (45) days after such request, at the expense of the Borrower, an environmental assessment report regarding the matters which are the subject of such Default,

including, where appropriate, any soil and/or groundwater sampling, prepared by an environmental consulting firm and, in the form and substance, reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or Response to address them.

(c)     Each Loan Party that is an owner of Mortgaged Property shall not install nor permit to be installed in the Mortgaged Property any Hazardous Materials, other than in compliance with applicable Environmental Laws.

**SECTION 5.10     Meetings with Lenders**.  On a bi-weekly basis, or otherwise at the reasonable request of the Administrative Agent, hold, or be available to hold, a meeting (at a mutually agreeable location and time or telephonically) with the Lenders and management of the Borrower regarding the financial results and operations of the Companies and monitoring any developments in the Chapter 11 Cases.

**SECTION 5.11     Additional Collateral; Additional Guarantors**.

(a)     Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents or the Financing Orders but is not so subject (but in any event excluding any assets described in the last sentence of paragraph (b) of this Section 5.11), promptly (and in any event within thirty (30) days after the acquisition thereof) (i) execute and deliver to the Administrative Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent shall reasonably deem necessary to grant to the Administrative Agent, for its benefit and for the benefit of the other applicable Secured Parties, a Lien on such property having the priority specified in the Financing Orders, and (ii) to the extent not already created and/or perfected, take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document or the Financing Orders and not already perfected in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.  The Borrower shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall reasonably require to confirm the validity, perfection and priority of the Lien under the Financing Orders or the Security Documents against such after-acquired properties.

(b)     With respect to any person that is or becomes a Subsidiary after the Closing Date (other than (i) any Foreign Subsidiary that is not a direct Subsidiary of a Loan Party and (ii) any Subsidiary of any Foreign Subsidiary), promptly (and in any event within 30 days after such person becomes a Subsidiary) (A) deliver to the Administrative Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary that are owned by any Loan Party, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the relevant Loan Party, and all intercompany notes owing from such Subsidiary to any Loan Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Loan Party and (B) cause such new Subsidiary (other than a Foreign Subsidiary or Subsidiary of a Foreign Subsidiary) (1) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor, a joinder agreement to the applicable Security Document or Financing Order, substantially in the form annexed thereto, and a joinder agreement to the Intercompany Note and (2) to the extent not already created and/or perfected, to take all actions reasonably necessary or advisable in the opinion of the Administrative Agent to cause the Lien created by the applicable Security Agreement to be duly perfected to the extent required by such agreement

in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.

(c)     At the request of the Administrative Agent, as soon as practicable, grant to the Administrative Agent, within sixty (60) days of the acquisition thereof, a first priority (subject only to the Permitted Senior Liens and the Carve-Out) security interest in and mortgage on (i) each Real Property owned in fee by such Loan Party as is acquired by such Loan Party after the Closing Date, and (ii) each leased Real Property of such Loan Party, in each case, as additional security for the Secured Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 6.02). At the request of the Administrative Agent, the applicable Loan Party shall execute such mortgages and documentation reasonably satisfactory in form and substance to the Administrative Agent and shall constitute valid and enforceable perfected Liens having the priority specified in the Financing Orders. The mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the respective Liens in favor of the Administrative Agent required to be granted pursuant to the mortgages and all applicable taxes, fees and other charges payable in connection therewith shall be paid in full when due and payable. Such Loan Party shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall reasonably require to confirm the validity, perfection and priority of the Liens of any existing mortgages or new mortgages against such after-acquired Real Property.

**SECTION 5.12     Security Interests; Further Assurances**.     As soon as reasonably practicable, upon the reasonable request of the Administrative Agent, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents, the Financing Orders or otherwise deemed by the Administrative Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Collateral Liens as permitted by the applicable Security Document or the Financing Orders, or use commercially reasonable efforts to obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent as the Administrative Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents or the Financing Orders. Upon the exercise by the Administrative Agent of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent may reasonably require. If the Administrative Agent or the Required Lenders determine that they are required by law or regulation to have appraisals prepared in respect of the Real Property of any Loan Party constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Administrative Agent.

**SECTION 5.13     Information Regarding Collateral**.

(a)     Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each

case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 10 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the applicable Secured Parties in the Collateral, if applicable. Each Loan Party agrees, as soon as practicable, to provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence. Each Loan Party also agrees to promptly notify the Administrative Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property, in each case if different than the location relating to such Collateral set forth in the schedules to the Security Agreement or the most recent supplement thereto.

(b)     Concurrently with the delivery of financial statements pursuant to Section 5.01(a), deliver to the Administrative Agent a supplement to the schedules to the Security Agreement or confirmation that there have been no changes to the information set forth in such schedules since the date of the Security Agreement or the last supplement thereto provided pursuant to this Section 5.13(b).

**SECTION 5.14**     **Subordination of Loans**.  Each Loan Party covenants and agrees that any existing and future loans or notes owing by a Loan Party to a Subsidiary that is not a Loan Party shall be Subordinated Indebtedness.

**SECTION 5.15**     **[Reserved]**.

**SECTION 5.16**     **[Reserved]**.

**SECTION 5.17**     **Cooperation with Advisors**.    Each of the Loan Parties will use commercially reasonable efforts to cooperate and assist Advisors hired by or at the discretion of the Administrative Agent to enable such Advisors to perform the services for which they were engaged, including, without limitation, promptly providing such information and documents as such Advisors may reasonably request.

# ARTICLE VI

# NEGATIVE COVENANTS

Each Loan Party agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts due and payable under any Loan Document have been paid in full and all Letters of Credit have been canceled or have expired or have been collateralized in a manner reasonably acceptable to the Administrative Agent and all amounts drawn thereunder have been reimbursed in full, unless the Required Lenders shall otherwise consent in writing, no Loan Party will, nor will they cause or permit any Subsidiaries to:

**SECTION 6.01** **Indebtedness**. Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except

(a) Indebtedness incurred under (i) this Agreement and the other Loan Documents, (ii) the Pre-Petition Credit Agreement and related loan documents, (iii) the Second Lien Credit Agreement and related loan documents and (iv) the Holdings Credit Agreement and related loan documents;

(b) (i) Indebtedness outstanding on the Petition Date and listed on Schedule 6.01(b) and (ii) refinancings or renewals thereof; *provided* that (A) any such refinancing Indebtedness is in an aggregate principal amount not greater than the aggregate principal amount of the Indebtedness being renewed or refinanced, plus the amount of any premiums required to be paid thereon and reasonable fees and expenses associated therewith, (B) such refinancing Indebtedness has a later or equal final maturity and longer or equal weighted average life than the Indebtedness being renewed or refinanced and (C) the covenants, events of default, subordination and other provisions thereof (including any guarantees thereof) shall be, in the aggregate, no less favorable to the Lenders than those contained in the Indebtedness being renewed or refinanced;

(c) Indebtedness under Hedging Obligations that are designed to protect against fluctuations in interest rates, foreign currency exchange rates or commodity prices, in each case not entered into for speculative purposes; *provided* that if such Hedging Obligations relate to interest rates, (a) such Hedging Obligations relate to payment obligations on Indebtedness otherwise permitted to be incurred by the Loan Documents and (b) the notional principal amount of such Hedging Obligations at the time incurred does not exceed the principal amount of the Indebtedness to which such Hedging Obligations relate;

(d) Indebtedness permitted by Section 6.03(e);

(e) Indebtedness incurred after the Petition Date in respect of Purchase Money Obligations and Capital Lease Obligations, in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(f) Indebtedness in respect of bid, performance or surety, appeal or similar bonds issued for the account of and completion guarantees provided by any Company in the ordinary course of business, in an aggregate amount not to exceed $4,000,000 at any time outstanding;

(g) Contingent Obligations of any Loan Party in respect of Indebtedness otherwise permitted under this Section 6.01;

(h) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(i) Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(j) other unsecured Indebtedness of any Subsidiary of the Borrower in an aggregate amount not to exceed (together with any amounts outstanding under clause (e) above) $5,000,000 at any time outstanding;

(k)     Indebtedness incurred by Foreign Subsidiaries in an aggregate amount not to exceed $7,000,000 at any time outstanding provided that Indebtedness of any Foreign Subsidiary owing to the Borrower or any Subsidiary Guarantor shall also be subject to Section 6.03(k); and

(l)     Indebtedness incurred in connection with any Foreign Subsidiary Restructuring Transaction.

Notwithstanding the foregoing, no Indebtedness under Sections 6.01(b), (c), (d), (g), (h), (i), (j) and (k) shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the super priority administrative expense claims of the Administrative Agent and Lenders except as specifically set forth herein or in the Financing Orders.

**SECTION 6.02     Liens**.  Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)     Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which (i) are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien or (ii) in the case of any such charge or claim which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(b)     Liens in respect of property of any Company imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, including, without limitation, carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of the business of the Company, and (i) which do not in the aggregate materially detract from the value of the property of the Companies, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Companies, taken as a whole, (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (iii) in the case of any such Lien which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(c)     any Lien in existence on the Petition Date and set forth on Schedule 6.02(c) and any Lien granted as a replacement or substitute therefor; *provided* that any such replacement or substitute Lien (i) except as permitted by Section 6.01(b)(ii)(A), does not secure an aggregate amount of Indebtedness, if any, greater than that secured on the Closing Date and (ii) does not encumber any property other than the property subject thereto on the Closing Date (any such Lien, an "**Existing Lien**");

(d)     easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in

existence, not (i) securing Indebtedness or (ii) interfering with the ordinary conduct of the business of the Companies at such Real Property;

(e)     Liens arising out of judgments, attachments or awards not resulting in an Event of Default;

(f)     Liens (other than any Lien imposed by ERISA) (x) arising by virtue of deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that such Liens shall in no event encumber any property other than cash and Cash Equivalents and the aggregate amount of deposits at any time pursuant to clause (y) and clause (z) of this paragraph (f) shall not exceed $7,000,000 in the aggregate;

(g)     Leases of the properties of any Company, in each case entered into in the ordinary course of such Company's business; *provided, however*, with respect to any properties acquired by a Loan Party after the Closing Date which are mortgaged under Section 5.11(c), and which are encumbered by existing Lease(s) on the date of such acquisition, such Lease(s) shall be Permitted Liens and Permitted Collateral Liens so long as (i) such Lease(s) are subordinate by their terms to the Administrative Agent's Liens with respect to such Mortgaged Property, or (ii) the applicable Loan Party obtains a subordination, non-disturbance and attornment agreement from each tenant thereunder in form and substance reasonably satisfactory to Administrative Agent or (iii) the applicable Loan Party is unable to obtain such subordination, non-disturbance and attornment agreement despite its commercially reasonable efforts to do so and the Lease is otherwise reasonably satisfactory to Administrative Agent;

(h)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Company in the ordinary course of business in accordance with the past practices of such Company;

(i)     Liens securing Indebtedness incurred pursuant to Section 6.01(e); *provided* that any such Liens attach only to the property being financed pursuant to such Indebtedness and do not encumber any other property of any Company;

(j)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and other account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)     the Carve-Out and the Wind Down Amount except to the extent of the Wind Down Surplus (as defined in the Asset Purchase Agreement), if any, to the extent provided for in the Financing Orders;

(l)      (i) Liens granted pursuant to the Financing Orders or the Security Documents to secure the Secured Obligations, (ii) Liens granted under the Security Documents (as defined in the Pre-Petition Credit Agreement) to secure the Obligations (as defined in the Pre-Petition Credit Agreement) and (iii) Liens granted under the Security Documents (as defined in the Second Lien Credit Agreement) to secure Obligations (as defined in the Second Lien Credit Agreement);

(m)      licenses of Intellectual Property granted by any Company in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Companies;

(n)      the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or consignment of goods; and

(o)      Liens securing other obligations that do not in the aggregate exceed $10,000,000 at any time outstanding, so long as such Liens, to the extent covering any Collateral, (i) are junior to the Liens granted to the Administrative Agent pursuant to the Financing Orders or the Security Documents or (ii) constituting cash if any cash deposits or cash collateral is provided, such cash deposits or cash collateral shall be made in accordance with the 13-Week Budget;

*provided, however*, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens granted pursuant to the Financing Orders or the Security Documents, the Security Documents (as defined in the Pre-Petition Credit Agreement) and the Security Documents (as defined in the Second Lien Credit Agreement).   Notwithstanding the foregoing, Liens permitted under Sections 6.02(a) through (o) shall at all times be junior and subordinate to the Liens under the Loan Documents and the Financing Orders (and the adequate protection Liens of the Prior Agents and Prior Lenders), other than the Carve-Out, the Wind Down Amount (except to the extent of the Wind Down Surplus, if any) and the Permitted Senior Liens.  The prohibition provided for in this Section 6.02 specifically includes, without limitation, the Borrower, any Loan Party, any Committee, or any other party-in-interest in the Chapter 11 Case or any successor case to priming or creating *pari passu* to any claims, Liens or interests of the Administrative Agent and the Lenders (and the adequate protection claims and Liens of the Prior Agents and Prior Lenders) any Lien (other than for the Carve-Out and the Permitted Senior Liens) irrespective of whether such claims, Liens or interests may be "adequately protected" (unless the Obligations and adequate protection claims will be paid in full in cash upon the granting of any such Lien and the Commitments terminated).

**SECTION 6.03      Investments, Loans and Advances**.  Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person, or purchase or acquire any stock, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)      Investments outstanding on the Petition Date and identified on Schedule 6.03(a);

(b)      the Companies may (i) acquire and hold accounts receivable owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms and historical practice, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course

of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c) Hedging Obligations incurred pursuant to Section 6.01(c);

(d) loans and advances to directors, employees and officers of the Borrower and the other Subsidiaries for bona fide business purposes, in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(e) Investments (i) by the Borrower in any Subsidiary Guarantor, (ii) by Holdings in the Borrower or any Subsidiary Guarantor, (iii) by a Subsidiary Guarantor in another Subsidiary Guarantor and (iv) by a Subsidiary that is not a Subsidiary Guarantor in any other Subsidiary that is not a Subsidiary Guarantor; *provided* that any Investment in the form of a loan or advance shall be evidenced by the Intercompany Note;

(f) Investments in securities of trade creditors or customers in the ordinary course of business and consistent with such Company's past practices that are received in settlement of *bona fide* disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(g) Investments made by the Borrower or any other Subsidiary as a result of consideration received in connection with an Asset Sale made in compliance with Section 6.05;

(h) other investments in an aggregate amount not to exceed the amounts set forth in, and for the purposes set forth in the 13-Week Budget; *provided, however*, that it shall not be deemed a breach of this clause (h) if the amount of any such investments exceed the limits set forth in the 13-Week Budget by amounts less than the Permitted Variance;

(i) any Foreign Subsidiary Restructuring Transaction to the extent such Foreign Subsidiary Restructuring Transaction shall constitute an Investment;

(j) by a Loan Party consisting of Contingent Obligations permitted under Section 6.01(g); and

(k) Investments by the Borrower or any Subsidiary Guarantor in Foreign Subsidiaries after the Petition Date in an aggregate amount at any one time outstanding, not to exceed $15,000,000; *provided* that any Investment in the form of a loan or advance shall be evidenced by the Intercompany Note.

**SECTION 6.04    Mergers and Consolidations**.  Wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation (or agree to do any of the foregoing at any future time), except that the following shall be permitted:

(a) Asset Sales in compliance with Section 6.05;

(b) acquisitions in compliance with Section 6.06;

(c) (x) any Company may merge or consolidate with or into the Borrower or any Subsidiary Guarantor (as long as the Borrower or a Subsidiary Guarantor is the surviving person in such merger or consolidation and remains, directly or indirectly, a Wholly Owned Subsidiary of Holdings); *provided* that the Lien on and security interest in such property granted or to be

granted in favor of the Administrative Agent pursuant to the Financing Orders or under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable, and (y) any Subsidiary that is not a Guarantor may transfer property or lease to or acquire or lease property from any Subsidiary that is not a Guarantor or may be merged into any other Subsidiary that is not a Guarantor;

(d) any Subsidiary of the Borrower may dissolve, liquidate or wind up its affairs at any time; *provided* that (i) such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect and (ii) if such Subsidiary is a Subsidiary Guarantor, then the property and assets of any such Subsidiary, if any, are transferred to the Borrower or another Subsidiary Guarantor; and

(e) any wind up, liquidation, dissolution, merger or consolidation consummated that is a Foreign Subsidiary Restructuring Transaction.

**SECTION 6.05**     <u>Asset Sales</u>.   Effect any Asset Sale, except that the following shall be permitted:

(a) disposition of used, worn out, obsolete or surplus property in the ordinary course of business and consistent with past practices and the abandonment or other disposition of Intellectual Property that is, in the reasonable judgment of Holdings, no longer economically practicable to maintain or useful in the conduct of the business of the Companies taken as a whole;

(b) other Asset Sales; *provided* that the fair market value of the assets sold (as reasonably determined by the Borrower) pursuant to this Section 6.05(b) shall not exceed (i) $1,500,000 in the aggregate during the period from the Closing Date until the Original Maturity Date or (ii) $2,500,000 in the aggregate during the term of this Agreement;

(c) leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(d) mergers and consolidations in compliance with Section 6.04;

(e) Investments in compliance with Section 6.03;

(f) without duplication, Investments permitted as Capital Expenditures pursuant to 13-Week Budget;

(g) any Asset Sale that is a Foreign Subsidiary Restructuring Transaction.

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 6.05 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.05, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created pursuant to the Financing Orders or by the Security Documents.

**SECTION 6.06**    **Acquisitions**.  Purchase or otherwise acquire (in one or a series of related transactions) any part of the property (whether tangible or intangible) of any person, except that the following shall be permitted:

      (a)    Capital Expenditures by Holdings and the Subsidiaries in accordance with the 13-Week Budget;

      (b)    purchases and other acquisitions of inventory, materials, equipment and intangible property in the ordinary course of business;

      (c)    Investments in compliance with Section 6.03;

      (d)    leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

      (e)    mergers and consolidations in compliance with Section 6.04;

      (f)    any acquisition that is a Foreign Subsidiary Restructuring Transaction;

*provided* that the Lien on and security interest in such property granted or to be granted in favor of the Administrative Agent pursuant to the Financing Orders or under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable.

**SECTION 6.07**    **Dividends**.  Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Company, except that the following shall be permitted:

      (a)    any Subsidiary of Holdings (i) may pay cash Dividends to the Borrower or any Wholly Owned Subsidiary of the Borrower and (ii) if such Subsidiary is not a Wholly Owned Subsidiary of Holdings, may pay cash Dividends to its shareholders generally so long as the Borrower or its Subsidiary which owns the equity interest or interests in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holdings of equity interests in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests in such Subsidiary);

      (b)    any Dividend that is a Foreign Subsidiary Restructuring Transaction;

      (c)    (i) to the extent actually used by Holdings to pay such taxes, costs and expenses, payments by the Borrower to or on behalf of Holdings or Blade Acquisition Co. in an amount sufficient to pay franchise taxes and other fees required to maintain the legal existence of Holdings or Blade Acquisition Co., (ii) payments by the Borrower to or on behalf of Holdings in an amount sufficient to pay out-of-pocket legal, accounting and filing costs, incidental expenses and other expenses in the nature of corporate overhead in the ordinary course of business of Holdings or Blade Acquisition Co. and (iii) payments by the Borrower to or on behalf of Holdings in an amount sufficient to pay trustee's fees and other fees, costs and expenses incurred by Holdings or Blade Acquisition Co. associated with the Chapter 11 Cases in accordance with the 13-Week Budget; *provided* that the aggregate amount of all Dividends and distributions made pursuant to Section 6.07(c)(i) and (ii) shall not exceed $200,000 during the term of this Agreement; and

(d)     Permitted Tax Distributions by Holdings or the Borrower, so long as such amounts are (i) used to pay Taxes attributable to such entity (or any Subsidiary of such entity) or are to be distributed to the payor of such Taxes and (ii) in accordance with the 13-Week Budget.

**SECTION 6.08     Transactions with Affiliates**.     Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Borrower and one or more Subsidiary Guarantors), other than on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)     Dividends permitted by Section 6.07;

(b)     Investments permitted by Sections 6.03(e) and (f);

(c)     reasonable director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification and reimbursement arrangements, in each case approved by the Board of Directors and consistent with the historical practice of the Loan Parties;

(d)     transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited by the Loan Documents;

(e)     the reimbursement of reasonable out-of-pocket costs and expenses related to the Management Services Agreement (as in effect on the Closing Date) in an amount not to exceed $40,000 in any fiscal quarter;

(f)     the Foreign Subsidiary Restructuring Transactions;

(g)     [Reserved];

(h)     [Reserved];

(i)     The Borrower or any of its Subsidiaries may enter into employment, non-competition or confidentiality agreements with their employees in the ordinary course of business; and

(j)     transactions conducted in the ordinary course of business on a basis consistent with past practices with Holdings and its Subsidiaries or with joint ventures to which Holdings or any Subsidiary is a party relating to the purchase or sale of inventory and equipment and operational, management and technical services.

**SECTION 6.09     Compliance with 13-Week Budget**.     Comply with the 13-Week Budget within the Permitted Variances.

**SECTION 6.10     Prepayments of Indebtedness; Modifications of Organizational Documents and Other Documents, etc.**     Directly or indirectly:

(a)     except as specifically set forth in the Financing Orders, make (or give any notice in respect thereof) any voluntary or optional payment or mandatory prepayment on or

redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, Change in Control or similar event of, (i) any Subordinated Indebtedness, (ii) the Obligations (as defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement, (iii) the Obligations (as defined in the Second Lien Credit Agreement) under the Second Lien Credit Agreement or (iv) the Obligations (as defined in the Holdings Credit Agreement) under the Holdings Credit Agreement, except, in any such case in connection with the refinancing thereof as permitted pursuant to <u>Section 6.01</u>;

(b)      amend or modify, or permit the amendment or modification of, any provision of any Subordinated Indebtedness, in any manner that is adverse in any material respect to the interests of the Lenders;

(c)      terminate, amend, modify (including electing to treat any Pledged Interests (as defined in the Security Agreement) as a "security" under Section 8-103 of the UCC) or change any of its Organizational Documents (including by the filing or modification of any certificate of designation) or amend or modify the Management Services Agreement and, in each case, other than any such amendments, modifications or changes or such new agreements which are not adverse in any material respect to the interests of the Lenders;

(d)      make any payments or transfer, or agree to any setoff or recoupment, with respect to any Pre-Petition claim, Pre-Petition Lien or Pre-Petition Indebtedness, except as approved by order of the Bankruptcy Court; or

(e)      amend or modify, or permit the amendment or modification of, (i) any Financing Order without the prior written consent of the Administrative Agent or (ii) any First Day Order except for amendments or modifications which are not in any way adverse in any material respect to the interests of the Agents or Lenders in such capacities.

**SECTION 6.11      <u>Limitation on Certain Restrictions on Subsidiaries</u>**.  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any of its Subsidiaries, or pay any Indebtedness owed to the Borrower or any Subsidiary, (b) make loans or advances to the Borrower or any of its Subsidiaries or (c) transfer any of its properties to Holdings or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable law; (ii) this Agreement, the other Loan Documents, the Loan Documents (as defined in the Pre-Petition Credit Agreement) and the Loan Documents (as defined in the Second Lien Credit Agreement); (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest; (iv) customary provisions restricting assignment of any agreement entered into in the ordinary course of business; (v) any holder of a Lien permitted by <u>Section 6.02</u> restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under <u>Section 6.05</u> pending the consummation of such sale; (vii) in the case of any joint venture which is not a Loan Party in respect of any matters referred to in <u>clauses (b)</u> and <u>(c)</u> above, restrictions in such person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity.

**SECTION 6.12      <u>Limitation on Issuance of Capital Stock</u>**.  With respect to Holdings, the Borrower or any other Subsidiary, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except in connection with any Foreign Subsidiary Restructuring Transaction.

**SECTION 6.13    Limitation on Creation of Subsidiaries**.  Establish, create or acquire any additional Subsidiaries without the prior written consent of the Administrative Agent, except in connection with any Foreign Subsidiary Restructuring Transaction.

**SECTION 6.14    Business**.

(a)    With respect to Holdings, engage in any business activities or have any properties or liabilities, other than (i) its ownership of the Equity Interests of the Borrower and intragroup balances, (ii) obligations under the Loan Documents, the Loan Documents (as defined in the Pre-Petition Credit Agreement), the Loan Documents (as defined in the Second Lien Credit Agreement) and the Loan Documents (as defined in the Holdings Credit Agreement) and (iii) activities and properties incidental to the foregoing clauses (i) and (ii).

(b)    With respect to the Borrower and its Subsidiaries, engage (directly or indirectly) in any business other than those businesses in which the Borrower and its Subsidiaries are engaged on the Petition Date and businesses that are similar, complementary or reasonably related to or are reasonable extensions thereof.

**SECTION 6.15    Limitation on Accounting Changes**.  Make or permit, any change in accounting policies or reporting practices, without the consent of the Required Lenders, which consent shall not be unreasonably withheld, except changes that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect or are required by GAAP.

**SECTION 6.16    Fiscal Year**.  Change its fiscal year-end to a date other than December 31.

**SECTION 6.17    No Further Negative Pledge**.  Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (1) this Agreement and the other Loan Documents; (2) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens on the properties encumbered thereby; (3) the Pre-Petition Loan Documents, the Loan Documents (as defined in the Second Lien Credit Agreement) and the Loan Documents (as defined in the Holdings Credit Agreement, in each case as in effect on the Closing Date; (4) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; and (5) any prohibition or limitation of the sort described in clauses (i), (iii), (iv), (v), (vi), (vii), (viii) or (ix) of Section 6.11.

**SECTION 6.18    Anti-Terrorism Law; Anti-Money Laundering**.

(a)    Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 3.21, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.18).

(b)     Cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of law.

**SECTION 6.19     Embargoed Person**.  Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any person subject to sanctions or trade restrictions under United States law ("**Embargoed Person**" or "**Embargoed Persons**") that is identified on the "List of Specially Designated Nationals and Blocked Persons" (the "**SDN List**") maintained by OFAC and/or on any other similar list ("**Other List**") maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, and any executive order or regulation promulgated thereunder with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by law, or the Loans made by the Lenders would be in violation of law, the executive order, any related enabling legislation or any other similar executive orders (collectively, "**Executive Orders**"), or (2) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by law or the Loans are in violation of law.

**SECTION 6.20     [Reserved].**

**SECTION 6.21     Critical Vendor and Other Payments**.  The Loan Parties shall not make or agree to make (a) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (b) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, or (c) payments under any plan or on account of any claim that requires approval pursuant to Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (y) are approved by order of the Bankruptcy Court and (z) are expressly permitted by the terms of the Loan Documents and the 13-Week Budget or as otherwise expressly permitted under the First Day Orders.

**SECTION 6.22     Pre-Petition Indebtedness.**  Except as provided in the Financing Orders or other orders entered by the Bankruptcy Court, the Loan Parties shall not make any adequate protection payments on account of any Pre-Petition Indebtedness.

**ARTICLE VII**

**GUARANTEE**

**SECTION 7.01     The Guarantee**.  The Guarantors hereby, jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Guarantors hereby, jointly and severally, agree that if the Borrower or other Guarantors shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the

Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**SECTION 7.02 Obligations Unconditional**. The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i) at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii) any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv) any Lien or security interest granted to, or in favor of, Issuing Bank or any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v) the release of any other Guarantor.

To the extent permitted by law, the Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. To the extent permitted by law, the Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee

therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

SECTION 7.03    **Reinstatement**.  The obligations of the Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or any other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

SECTION 7.04    **Subrogation; Subordination**.  Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(d) shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note.

SECTION 7.05    **Remedies**.  The Guarantors jointly and severally agree that, subject to the terms of the Financing Orders, as between the Guarantors and the Lenders, the obligations of Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Article VIII (and shall be deemed to have become automatically due and payable in the circumstances provided in said Article VIII) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

SECTION 7.06    **Instrument for the Payment of Money**.  Each Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213 to the extent permitted thereunder.

SECTION 7.07    **Continuing Guarantee**.  The guarantee in this Article VII is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

SECTION 7.08    **General Limitation on Guarantee Obligations**.  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Subsidiary Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Subsidiary Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**SECTION 7.09** <u>Release of Subsidiary Guarantors</u>. If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Subsidiary Guarantor owned by a Loan Party or property of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is a Borrower or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be released from its obligations under this Agreement (including under <u>Section 11.03</u> hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document or the Financing Orders and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor owed by a Loan Party, the pledge of such Equity Interests to the Administrative Agent pursuant to the Security Agreement and the Financing Orders shall be released, and the Administrative Agent shall take such actions as are necessary to effect each release described in this <u>Section 7.09</u> in accordance with the relevant provisions of the Security Documents and the Financing Orders.

**SECTION 7.10** <u>Right of Contribution</u>. Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of <u>Section 7.04</u>. The provisions of this <u>Section 7.10</u> shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent, the Issuing Bank, and the Lenders and each Subsidiary Guarantor shall remain liable to the Administrative Agent, the Issuing Bank, and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

**ARTICLE VIII**

**EVENTS OF DEFAULT**

**SECTION 8.01** <u>Events of Default</u>. Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a) default shall be made in the payment of any principal of any Loan or any Reimbursement Obligation when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b) default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in <u>paragraph (a)</u> above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five (5) Business Days;

(c) any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any, certificate, or other document furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d) default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in <u>Section 5.02</u>, <u>5.03(a)</u>, <u>5.08</u>, or in <u>Article VI</u>;

(e) default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in any Loan Document (other than those

specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after written notice thereof from the Administrative Agent or any Lender to the Borrower;

(f)     any Company shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations) incurred or entered into after the Petition Date, when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness entered into after the Petition Date if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity; *provided* that, it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds $5,000,000 at any one time (*provided* that, the "principal amount" in respect of any Hedging Obligations of any Loan Party at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if the related Hedging Agreement were terminated at such time);

(g)     [Reserved];

(h)     [Reserved];

(i)     one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $5,000,000 (exclusive of amounts covered by insurance for which coverage is not denied) in respect of obligations arising after the Petition Date shall be rendered against any Company or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Company to enforce any such judgment;

(j)     one or more ERISA Events arising after the Petition Date shall have occurred (other than any ERISA Event that arises out of (i) any Company's seeking of a funding waiver under Code Section 412(c), (ii) failing to satisfy the minimum funding standard prior to or during the pendency of any funding waiver request or (iii) attempting to terminate any of the pension plans listed on Schedule 3.17, each such event arising out of (i)-(iii), hereinafter called an "**Excluded ERISA Event**") that, when taken together with all other such ERISA Events that have occurred after the Petition Date (other than an Excluded ERISA Event), could reasonably be expected to result in liability for any Company and its ERISA Affiliates or the imposition of a Lien on any properties of any Company, in either event in an amount which could reasonably be expected to exceed $5,000,000;

(k)     any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Administrative Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents or the Financing Orders (including a perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in such Security Document or the Financing Orders)) in favor of the Administrative Agent, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, such

Security Document or the Financing Orders) security interest in or Lien on the Collateral covered thereby;

(l)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the payment of Obligations;

(m)      the Loan Parties shall fail to achieve the milestones set forth in Schedule M by the dates specified therein (or such later date as may be agreed to by the Administrative Agent in its sole discretion);

(n)      a termination of the Asset Purchase Agreement shall have occurred; or

(o)      the occurrence of any of the following in the Chapter 11 Cases:

(i)      the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations due under this Agreement and the Pre-Petition Credit Agreement with the termination of all related lending commitments thereunder; (x) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of the Administrative Agent (unless the granting of such Lien is simultaneous with a refinancing to pay in full in cash all Obligations due under this Agreement and the Pre-Petition Credit Agreement); or (y) except as provided in the Financing Orders, to use cash collateral of Administrative Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent;

(ii)      the filing of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party (y) which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement, or (b) if such plan does not propose payment in full in cash of all Obligations under this Agreement, in each case to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iii)      the entry of an order in the Chapter 11 Cases confirming a Reorganization Plan that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement, to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iv)      the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order (except with respect to ministerial changes) without the written consent of the Administrative Agent or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

(v)      the Final Order is not entered on or before the date that is thirty-five (35) days after the Petition Date (which date, at the request of the Borrower and with the consent of the Administrative Agent, may be extended for another five (5) Business Days), or prior to or immediately following the expiration of the Interim Order;

(vi)     the entry of an order allowing any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, the Issuing Bank, any Lender or any of the Collateral;

(vii)     the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, the reorganization of such Loan Party (or any Loan Party seeks or acquiesces in such relief);

(viii)     the sale without the Administrative Agent's and the Required Lenders' consent, of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code, through a confirmed Reorganization Plan in the Chapter 11 Cases, or otherwise (or any Loan Party seeks or acquiesces in such relief) that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitments (or conversion of such Obligations and Commitment to an exit facility);

(ix)     the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code (except as consented to by the Administrative Agent and the Required Lenders) or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code, conversion of the Chapter 11 Cases or otherwise;

(x)     other than pursuant to the First Day Orders or the Financing Orders, the entry of a final order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having value in excess of $2,500,000, or (y) with respect to any Lien on or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xi)     Reserved;

(xii)     the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiii)     the failure of any Loan Party to perform any of its material obligations under the Interim Order or the Final Order, which materially and adversely affects the interests of any of the Lenders, taken as a whole, the Administrative Agent or the Issuing Bank as reasonably determined by the Administrative Agent, the Issuing Bank and the Required Lenders, as the case may be;

(xiv)     except as otherwise provided by the Financing Orders, the entry of an order in the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Administrative Agent, on behalf of itself and/or the Secured Parties;

(xv)     termination of the exclusive period for the Loan Parties to file a plan of reorganization in the Chapter 11 Cases; or

(xvi)     any of the Loan Parties' return of goods constituting Collateral pursuant to Section 546(g) of the Bankruptcy Code other than in accordance with any such program (y) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court (but subject to any applicable provisions of the Loan Documents and the Financing Orders) by notice to the Borrower, take any or all of the following actions, at the same or different times:

(A)     suspend the Commitments with respect to additional Loans and/or the incurrence of additional Letters of Credit, whereupon any additional Credit Extension and additional Letter of Credit shall be made or incurred in the Administrative Agent's sole discretion (or in the sole discretion of the Required Lenders, if such suspension occurred at their direction) so long as such Event of Default is continuing;

(B)     declare the Commitments and the Issuing Bank's obligations to issue the Letters of Credit to be terminated forthwith, whereupon the Commitments and such obligations shall immediately terminate;

(C)     increase the rate of interest applicable to the Loans and Letters of Credit to the interest rate specified in Section 2.06(c);

(D)     declare the Loans and Reimbursement Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans and Reimbursement Obligations so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind (except as provided in the Loan Documents and the Financing Orders), all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding;

(E)     direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Agents and the Required Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and the Administrative Agent (on behalf of the Lenders) shall have the right to "credit bid" the allowed amount of the Lenders' claims during any sale of all or substantially all of the Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any Reorganization Plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code,

(F)     enter onto the premises of any Loan Party in connection with an orderly liquidation of the Collateral, and/or

(G)     exercise any rights and remedies provided to such Agent under the Loan Documents or at law or in equity, including all remedies provided for under the UCC and, pursuant to the Interim Order and the Final Order.

Upon the occurrence and during the continuance of an Event of Default and the exercise by the Administrative Agent, on behalf of the Lenders, of their rights and remedies under this Agreement

and the other Loan Documents, the Borrower shall use commercially reasonably efforts to assist the Administrative Agent and the Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Administrative Agent and the Required Lenders. All payments under this Article VIII on account of undrawn Letters of Credit that have not been cash collateralized pursuant to Section 2.18(i) shall be made by the Borrower directly to a cash collateral account established by the Administrative Agent pursuant to Section 2.18(i) for such purpose for application to reimbursement of LC Disbursements as drafts are presented under Letters of Credit, with the balance, if any, to be applied to the Borrower's obligations under this Agreement and the Notes as the Administrative Agent shall determine with the approval of the Required Lenders.

## ARTICLE IX

## COLLATERAL ACCOUNT; APPLICATION OF COLLATERAL PROCEEDS

### SECTION 9.01  Collateral Account.

(a)     The Administrative Agent is hereby authorized to establish and maintain at its office at 677 Washington Boulevard, Stamford, Connecticut 06901, in the name of the Administrative Agent, a restricted deposit account designated "ASR Collateral Account." Each Loan Party shall deposit into the Collateral Account from time to time (i) the cash proceeds of any of the Collateral (including pursuant to any disposition thereof) to the extent contemplated herein or in any other Loan Document, (ii) the cash proceeds of any Casualty Event with respect to Collateral, to the extent contemplated herein or in any other Loan Document, and (iii) any cash such Loan Party is required to pledge as additional collateral security hereunder pursuant to the Loan Documents.

(b)     The balance from time to time in the Collateral Account shall constitute part of the Collateral and shall not constitute payment of the Obligations until applied as hereinafter provided. So long as no Event of Default has occurred and is continuing or will result therefrom, the Administrative Agent shall within one (1) Business Day of receiving a request of the applicable Loan Party for release of cash proceeds (i) from the Collateral Account constituting Net Cash Proceeds relating to any Casualty Event or Asset Sale remit such cash proceeds on deposit in the Collateral Account to or upon the order of such Loan Party, so long as such Loan Party has satisfied the conditions relating thereto set forth in Section 9.02 and (ii) with respect to the LC Sub-Account, remit such Net Cash Proceeds on deposit in the LC Sub-Account to or upon the order of such Loan Party (x) at such time as all Letters of Credit shall have been terminated and all of the liabilities in respect of the Letters of Credit have been paid in full or (y) otherwise in accordance with Section 2.18(i). At any time following the occurrence and during the continuance of an Event of Default, the Administrative Agent may (and, if instructed by the Required Lenders as specified herein, shall) in its (or their) discretion apply or cause to be applied (subject to collection) the balance from time to time outstanding to the credit of the Collateral Account to the payment of the Obligations in the manner specified in Section 9.03 hereof subject, however, in the case of amounts deposited in the LC Sub-Account, to the provisions of Sections 2.18(i) and 9.03 and shall provide written notice of any such application. The Loan Parties shall have no right to withdraw, transfer or otherwise receive any funds deposited in the Collateral Account except to the extent specifically provided herein.

(c)     Amounts on deposit in the Collateral Account shall be invested and reinvested from time to time in Cash Equivalents as the applicable Loan Party (or, after the occurrence and during the continuance of an Event of Default, the Administrative Agent) shall determine by written instruction to the Administrative Agent, or if no such instructions are given, then as the

Administrative Agent, in its sole discretion, shall determine which Cash Equivalents shall be held in the name and be under the control of the Administrative Agent (or any sub-agent); *provided* that at any time after the occurrence and during the continuance of an Event of Default, the Administrative Agent may (and, if instructed by the Required Lenders as specified herein, shall) in its (or their) discretion at any time and from time to time elect to liquidate any such Cash Equivalents and to apply or cause to be applied the proceeds thereof to the payment of the Obligations in the manner specified in Section 9.03 hereof subject, however, in the case of amounts deposited in the LC Sub-Account, to the provisions of Section 2.18(i).

(d)     Amounts deposited into the Collateral Account as cover for liabilities in respect of Letters of Credit under any provision of this Agreement requiring such cover shall be held by the Administrative Agent in a separate sub-account designated as the "LC Sub-Account" (the "**LC Sub-Account**") and, subject to Section 2.18(i), all amounts held in the LC Sub-Account shall constitute collateral security to be applied in accordance with Section 2.18(i).

**SECTION 9.02     Reserved**.

**SECTION 9.03     Application of Proceeds**.   The proceeds received by the Administrative Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent of its remedies shall be applied, in full or in part, together with any other sums then held by Administrative Agent pursuant to this Agreement, promptly by the Administrative Agent as follows:

(a)     *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)     *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)     *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations (other than principal, Reimbursement Obligations and obligations to cash collateralize Letters of Credit) and any fees, premiums and scheduled periodic payments due under Hedging Agreements or Treasury Services Agreements constituting Secured Obligations and any interest accrued thereon, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)     *Fourth*, to the payment in full in cash, *pro rata*, of principal amount of the Obligations and any premium thereon (including Reimbursement Obligations and obligations to cash collateralize Letters of Credit) and any breakage, termination or other payments under Hedging Agreements and Treasury Services Agreements constituting Secured Obligations and any interest accrued thereon; and

(e)     *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 9.03, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE X

## THE ADMINISTRATIVE AGENT

**SECTION 10.01    Appointment**.    Each Lender and the Issuing Bank hereby irrevocably designates and appoints the Administrative Agent as an agent of such Lender under this Agreement and the other Loan Documents.    Each Lender that holds Loans or has Commitments and each holder of any related Hedging Agreements and each person holding Overdraft Obligations (in each case, in its capacity as such) hereby irrevocably designates and appoints the Administrative Agent as an agent of such person under this Agreement.    Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.    Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order.

**SECTION 10.02    Agent in Its Individual Capacity**.    Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

**SECTION 10.03    Exculpatory Provisions**.    No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.    Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as such Agent or any of its Affiliates in any capacity.    No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.02) or in the absence of its own gross negligence or willful misconduct.    No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any

other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.

SECTION 10.04    **Reliance by Agent**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by a proper person.  Each Agent also may rely upon any statement made to it orally and believed by it to be made by a proper person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

SECTION 10.05    **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through or delegate any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Affiliates.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

SECTION 10.06    **Successor Agent**.

(a)    Each Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower.  Upon receipt of any such notice, the Required Lenders shall have the right to appoint a successor to such Agent from among the Lenders; and so long as no Default has occurred and is continuing the Borrower (such approval not to be unreasonably withheld).  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after such retiring Agent gives notice of its resignation, then such retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor to such Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least $500,000,000; *provided* that if such retiring Agent is unable to find a commercial banking institution which is willing to accept such appointment and which meets the qualifications set forth above, such retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor to such Agent with the approval of the Borrower (which approval shall not be unreasonably withheld).  Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article X and Section 11.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

(b)    Any resignation by UBS AG, Stamford Branch as Administrative Agent pursuant to Section 10.06(a) shall, unless UBS AG, Stamford Branch gives notice to the

Borrower otherwise, also constitute its resignation as Issuing Bank, and such resignation as Issuing Bank shall become effective simultaneously with the discharge of the Administrative Agent of its duties and obligations as set forth in the immediately preceding paragraph (except as to already outstanding Letters of Credit, as to which the Issuing Bank shall continue in such capacities until the LC Exposure relating thereto shall be reduced to zero or until the successor Administrative Agent shall succeed to the role of Issuing Bank in accordance with the next sentence and perform the actions required by the next sentence). Upon the acceptance of a successor's appointment as Administrative Agent hereunder, unless UBS AG, Stamford Branch and such successor give notice to the Borrower otherwise, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and (ii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit. At the time any such resignation of the Issuing Bank shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the retiring Issuing Bank pursuant to Section 2.05(b).

SECTION 10.07    **Non-Reliance on Agent and Other Lenders**.  Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender further represents and warrants that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

SECTION 10.08    **Name Agents**.  The parties hereto acknowledge that Collateral Agent, Syndication Agent and [**Documentation**] Agents hold such titles in name only, and that such titles confer no additional rights or obligations relative to those conferred on any Lender hereunder.

SECTION 10.09    **Indemnification**.  The Lenders severally agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower or the Guarantors and without limiting the obligation of the Borrower or the Guarantors to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 10.09 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans and Reimbursement Obligations shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans and Reimbursement Obligations) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 10.10    **Actions in Concert**.  Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action

to protect or enforce its rights arising out of this Agreement or the Notes (including exercising any rights of setoff) without first obtaining prior written consent of the Administrative Agent and the Required Lenders, it being the intent of the Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of the Administrative Agent or the Required Lenders and as provided in Section 8.01.

SECTION 10.11   **Enforcement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent, or as the Required Lenders may require or otherwise direct the Administrative Agent, for the benefit of all Lenders and the Issuing Bank; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the Issuing Bank from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank), (c) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

SECTION 10.12   **Withholding Tax**.   To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  Without limiting the provisions of Section 2.15(a) or (c), each Lender and the Issuing Bank shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).   A certificate as to the amount of such payment or liability delivered to any Lender or the Issuing Bank by the Administrative Agent shall be conclusive absent manifest error. Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or Issuing Bank under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 10.12.  The agreements in this Section 10.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

## ARTICLE XI

## MISCELLANEOUS

SECTION 11.01   **Notices**.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier, as follows:

(a)    if to any Loan Party, to the Borrower at:

American Safety Razor Company, LLC

240 Cedar Knolls Road, Suite 401
Cedar Knolls, NJ 07927
Attention:  Chief Financial Officer
Telecopier No.:  (973) 326-9004;

with copies to (which shall not constitute notice):

American Safety Razor Company, LLC
One Razor Blade Lane
Verona, Virginia 24482
Attention:  Treasurer
Telecopier No.:  (540) 248-7514

Simpson, Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954
Attention:        Mark J. Thompson, Esq.
                        Brian M. Steinhardt, Esq.
Telecopier No.:  (212) 455-2502

(b)        if to the Administrative Agent, to it at:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention:  Marouan Grissa
Telecopier No.:  (203) 719-4136;

with a copy to (which shall not constitute notice):

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30308
Attention: Jesse H. Austin, III, Esq.
Telecopier No.: (404) 815-2424
Email: jessaustin@paulhastings.com; and

(c)        if to a Lender, to it at its address (or telecopier number) set forth on the applicable Lender Addendum or in the Assignment and Assumption pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by telecopier or by certified or registered mail, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 11.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 11.01, and failure to deliver courtesy copies of notices and other communications shall in no event affect the validity or effectiveness of such notices and other communications.

(e)        Electronic Communications.  Notices and other communications to the Lenders and the Issuing Bank hereunder may (subject to Section 11.01(g)) be delivered or furnished by electronic

communication (including email and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Article II if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including as set forth in Section 11.01(g)); *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(f)     Change of Address, etc. Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

(g)     Posting. Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at marouangrissa@ubs.com or at such other e-mail address(es) provided to the Borrower from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. Nothing in this Section 11.01 shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

To the extent consented to by the Administrative Agent in writing from time to time, Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents; *provided* that the Borrower shall also deliver to the Administrative Agent an executed original of each Compliance Certificate required to be delivered hereunder.

Each Loan Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**"). The Platform is provided "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its employees, agents, officers or directors have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

**SECTION 11.02    Waivers; Amendment**.

(a)    No failure or delay by any Agent, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of each Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)    Except as provided in paragraphs (c) and (d) below, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall:

(i)    increase the Commitment of any Lender without the written consent of such Lender;

(ii)    reduce the principal amount or premium of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any Fees payable hereunder, or change the currency of payment of any Obligation, without the written consent of each Lender affected thereby;

(iii)    postpone or extend the maturity of any Loan  or the required date of payment of any Reimbursement Obligation, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment or postpone the scheduled date of expiration of

any Letter of Credit beyond the Stated Maturity Date, without the written consent of each Lender affected thereby or amend the definition of "Interest Period" so as to allow intervals of greater than six months without the regard to the consent of each affected Lender;

(iv)     change Section 2.14(b) or (c) in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Lender;

(v)     change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

(vi)     release any Guarantor from its Guarantee (except as expressly provided in Article VII), or limit its liability in respect of such Guarantee, without the written consent of each Lender; or

(vii)     release all or substantially all of the Collateral from the Liens under the Financing Orders or the Security Documents or alter the relative priorities of the Obligations entitled to the Liens under the Financing Orders or the Security Documents (except in connection with securing additional Obligations equally and ratably with the other Obligations), in each case without the written consent of each Lender;

*provided, further,* that (1) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Bank without the prior written consent of the Administrative Agent or the Issuing Bank, as the case may be and (2) no such agreement shall increase the aggregate amount of Commitments (or increase the principal amount of outstanding Loans) without the prior written consent of the Required Lenders.  Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent (and, if its rights or obligations are affected thereby, the Issuing Bank) if (x) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (y) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of, premium, if any, and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

Notwithstanding anything to the contrary contained in this Section 11.02, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except to the extent the consent of such Lender would be required under clause (i), (ii) or (iii) in the proviso to the first sentence of this Section 11.02(b).

(c)     If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 11.02(b) (other than clause (iii) of such Section), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right to replace (subject to the last sentence of Section 11.02(b)) all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.16 so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination.

**SECTION 11.03     Expenses; Indemnity**.

(a)      The Loan Parties agree, jointly and severally, to pay, promptly upon demand:

(i)      all reasonable out-of-pocket costs and expenses incurred by the Arranger, the Administrative Agent and the Issuing Bank, including the reasonable fees, charges and disbursements of Advisors for the Arranger, the Administrative Agent and the Issuing Bank, in connection with the syndication of the Loans and Commitments, the preparation, execution and delivery of the Loan Documents, the administration of the Loans and Commitments, the perfection and maintenance of the Liens securing the Collateral and any actual or proposed amendment, supplement or waiver of any of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated);

(ii)      all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent, including the reasonable fees, charges and disbursements of Advisors for the Administrative Agent, in connection with any action, suit or other proceeding affecting the Collateral or any part thereof, in which action, suit or proceeding the Administrative Agent is made a party or participates or in which the right to use the Collateral or any part thereof is threatened, or in which it becomes necessary in the reasonable judgment of the Administrative Agent to defend or uphold the Liens granted pursuant to the Financing Orders or by the Security Documents (including any action, suit or proceeding to establish or uphold the compliance of the Collateral with any Requirements of Law);

(iii)      all costs and expenses incurred by the Arranger, the Administrative Agent, the Issuing Bank or any Lender, including the reasonable fees, charges and disbursements of Advisors for the Arranger, the Administrative Agent, the Issuing Bank or any Lender, incurred in connection with the enforcement or protection of its rights under the Loan Documents, including its rights under this <u>Section 11.03(a)</u>, or in connection with the Loans made or Letters of Credit issued hereunder and the collection of the Obligations, including all such costs and expenses incurred during any workout, restructuring or negotiations in respect of the Obligations; and

(iv)      all of the reasonable out-of-pocket fees and expenses of the Advisors in connection with the preparation, reproduction, delivery and review of pleadings, documents and reports related to the Chapter 11 Cases (including, without limitation, the Loan Documents) and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code; *provided*, *however*, that the Loan Parties shall not be required to pay more than $100,000 in respect of  fees and expenses of the Advisors of the Collateral Agent.

(b)      The Loan Parties agree, jointly and severally, to indemnify the Agents, each Lender, the Issuing Bank, each Affiliate of any of the foregoing persons and each of their respective partners, controlling persons, directors, officers, trustees, employees and agents (each such person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, penalties, judgments, suits and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents, (ii) any actual or proposed use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding

relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any property owned, leased or operated by any Company at any time, or any Environmental Claim related in any way to any Company; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     The provisions of this Section 11.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Loans and Reimbursement Obligations, the release of all or any portion of the Collateral, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the Issuing Bank or any Lender.  All amounts due under this Section 11.03 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(d)     To the extent that the Borrower fails to promptly pay any amount required to be paid by it to the Agents or the Issuing Bank under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Agents or the Issuing Bank, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against any of the Agents or the Issuing Bank in its capacity as such.  For purposes hereof, a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total Loan Exposure, outstanding Loans and unused Commitments at the time.

**SECTION 11.04     Successors and Assigns**.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, the Issuing Bank and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, express or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender shall have the right at any time to assign to an Eligible Assignee all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* (i) that except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, any assignment made in connection with the primary syndication of the Commitment and Loans by the Arranger or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is

delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consents, (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, except that this clause (ii) shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Type of Commitments or Loans, (iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (*provided* that only one such fee shall be payable in the event of contemporaneous Assignments to or by two or more Approved Funds), and (iv) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  Subject to acceptance and recording thereof pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (*provided* that any liability of the Borrower to such assignee under Section 2.12, 2.13 or 2.15 shall be limited to the amount, if any, that would have been payable thereunder by the Borrower in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.15 and 11.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be null and void to effect such assignment or transfer and instead shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with and subject to the limitations on sales of participations set forth in this Section 11.04.

(c)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive in the absence of manifest error, and Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Any Lender shall have the right at any time, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, to sell participations to one or more

banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) such participation is recorded in the register described in the last sentence of this Section 11.04(e). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (i), (ii) or (iii) of the first proviso to Section 11.02(b) that affects such Participant. Subject to paragraph (f) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.15 (subject to the requirements and limitations of Section 2.15) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; *provided* that such Participant agrees in writing to be subject to Section 2.14(c) as though it were a Lender. Each Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain at one of its offices a register on which it records the names and addresses of its Participants, and the amount and terms of its participations.

(f)     A Participant shall not be entitled to receive any greater payment under Section 2.12, 2.13 or 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(g)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In the case of any Lender that is a fund that invests in bank loans, such Lender may, without the consent of the Borrower or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities; *provided* that, with respect to any Loans, the documentation governing or evidencing such collateral assignment or pledge shall provide that any foreclosure or similar action by such trustee or representative shall be subject to the provisions of this Section 11.04 concerning assignments and shall not be effective to transfer any rights under this Agreement or in any Loan under this Agreement unless the requirements of this Section 11.04 concerning assignments are fully satisfied.

(h)     The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the used of a paper-based recording system, as the case may be, to the extent and as provided for under any Applicable Law, including the

Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**SECTION 11.05    Survival of Agreement**.    All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.    The provisions of Sections 2.12, 2.14, 2.15 and 11.03 and Article X shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the payment of the Reimbursement Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

**SECTION 11.06    Counterparts; Integration; Effectiveness**.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.    This Agreement, the other Loan Documents and the Fee Letters constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.    This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.    Delivery of an executed counterpart of a signature page of this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 11.07    Severability**.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 11.08    Right of Setoff**.    If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates are hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion to, hearing before, or order from, the Bankruptcy Court) but subject in all cases to the provisions of the Financing Orders, at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.    The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**SECTION 11.09    Governing Law; Jurisdiction; Consent to Service of Process**.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York. Each Loan Party hereby consents and agrees that the Bankruptcy Court (or if the reference is withdrawn, the applicable United States District Court) shall have exclusive jurisdiction to hear and determine any claims or disputes between the Loan Parties, Agents, the Arranger and the Lenders pertaining to this Agreement or any of the other Loan Documents related to this Agreement or to any other matter arising out of or relating to this Agreement; *provided*, that Agents, the Arranger, the Lenders and the Loan Parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court; *provided*, *further*, that nothing in this Agreement shall be deemed or operate to preclude Agents and the Arranger from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Agents and the Arranger. Each Loan Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any court, and each Loan Party hereby waives any objection that such Loan Party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Each Loan Party hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by registered or certified mail addressed to such Loan Party at the address set forth in Section 11.01 of this Agreement and that service so made shall be deemed completed upon the earlier of such Loan Party's actual receipt thereof or three (3) days after deposit in the United States mail, proper postage prepaid.

(b)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 11.09(a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier) in Section 11.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

**SECTION 11.10     Waiver of Jury Trial**. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Loan Document or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

**SECTION 11.11     Headings**. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 11.12     Confidentiality**. Neither any Agent nor any Lender shall disclose any Confidential Information to any person without the consent of the Borrower, other than (a) to such

Agent's or such Lender's Affiliates and their officers, directors, employees, agents and advisors and to potential lenders, pledgees under Section 11.04(g) and Participants, and then only if such potential lender or Participant has agreed to be bound by the terms of this Section 11.12 (*provided* that if such potential lender or participant is not a commercial lending institution or fund that makes or holds bank loans in the ordinary course of its business the consent of the Borrower shall be required prior to such disclosure and such consent shall not affect the Borrower's consent rights provided for in Section 11.04) and any other confidentiality agreement entered into by such Agent or such Lender with respect to such Confidential Information, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, federal or foreign Governmental Authority or regulatory authority or examiner regulating such Lender Party (including the National Association of Insurance Commissioners), (d) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or such professional advisor) agrees to be bound by the provisions of this Section 11.12, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder in a related court proceeding so long as such Confidential Information is (i) filed under seal with the applicable court, (ii) used in a manner consistent with any applicable protective order entered by any applicable court proceeding, or (iii) as may be agreed between the Administrative Agent and the Borrower and (f) when required by it, to S&P, Administrative Agent, *provided* that, prior to any such disclosure, each such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender. Neither any Agent nor any Lender shall disclose any Confidential Information to any person in contravention of any confidentiality agreement entered into by such Agent or such Lender. "**Confidential Information**" means information concerning the Borrower of any of its direct or indirect shareholders, or any of their respective employees, directors, or Subsidiaries, or Affiliates (including without limitation the Permitted Holders) received by any Agent or any Lender on a confidential basis from the Borrower or any other person under or pursuant to this Agreement or any other Loan Document including without limitation financial terms and financial and organizational information contained in any documents, statements, certificates, materials or information furnished, or to be furnished, by or on behalf of the Borrower or any other person on a confidential basis in connection with this Agreement and the Loan Documents, but does not include any such information that (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower or any of its direct or indirect shareholders, or any of their respective employees, directors, Subsidiaries or Affiliates (including without limitation, the Permitted Holders) or any of their respective agents or representatives.

SECTION 11.13    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 11.14    Lender Addendum.  Each Lender to become a party to this Agreement on the Closing Date shall do so by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

**SECTION 11.15** **Obligations Absolute**. To the fullest extent permitted by applicable law, all obligations of the Loan Parties hereunder with respect to any Guarantee or granting of any Lien on any property shall be absolute and unconditional irrespective of:

> (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Loan Party;

> (b) any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any other Loan Party;

> (c) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

> (d) any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

> (e) any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

> (f) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the other Loan Parties.

**SECTION 11.16** **USA PATRIOT Act Notice**. Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name, address and tax identification number of the Borrower and other information regarding the Borrower that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Lenders and the Administrative Agent.

**SECTION 11.17** **Parties including the Trustees; Bankruptcy Court Proceedings**. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the bankruptcy estate of each Loan Party, and any trustee, other bankruptcy estate representative or any successor-in-interest of any Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agents and Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law. No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the express written consent of the Agents and Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of Agents and Lenders shall be

void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, Agents and Lenders with respect to the transactions contemplated hereby and no person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

[remainder of page left blank intentionally]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWER:

AMERICAN SAFETY RAZOR COMPANY, LLC

By: _____

Name:  J. Andrew Bolt
Title:  Executive Vice President

**HOLDINGS:**

**RSA HOLDINGS CORP. OF DELAWARE**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

**SUBSIDIARY GUARANTORS:**

**AMERICAN SAFETY RAZOR CORPORATION**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

**MEGAS BEAUTY CARE, INC.**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

**PERSONNA INTERNATIONAL DE PUERTO RICO, INC.**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

**RSA SOAP COMPANY, INC.**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

**ASR HOLDINGS, INC.**

By: _J. Andrew Bolt_
Name: J. Andrew Bolt
Title: Vice President

CREDIT AGREEMENT

**UBS SECURITIES LLC**, as Arranger

By: _____
Name:
Title:

Irja R. Otsa
Associate Director
Banking Products
Services, US

By: _____
Name:
Title:

April Varner-Nanton
Director
Banking Products
Services, US

CREDIT AGREEMENT

**UBS AG, STAMFORD BRANCH**, as Issuing
Bank and Administrative Agent

By: _____
Name:
Title:

Mrja R. Otsa
Associate Director
Banking Products
Services, US

By: _____
Name:
Title:

April Varner-Nanton
Director
Banking Products
Services, US

**GENERAL ELECTRIC CAPITAL
CORPORATION**, as Collateral Agent and
Syndication Agent

By: _____
　　Name: Scott W. Renzulli
　　Title: Duly Authorized Signatory

**ALADDIN CREDIT ADVISORS, L.P.,** as
Documentation Agent

By: ACA Holdings LLC, its General Partner

By: _____
    Name:   Luke Gosselin
    Title:    Managing Member

**SCHEDULE M**

**MILESTONES**

Date                             Action/Milestone

August 4, 2010                   Interim order approving the Credit Agreement to be entered

August 3, 2010                   Loan Parties shall file a motion for a 363 Sale, in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders (the "Sale Motion").

August 27, 2010                  Final order approving the Credit Agreement to be entered

September 28, 2010               Auction for 363 Sale.

October 5, 2010                  Hearing to approve 363 Sale.

October 8, 2010                  The Bankruptcy Court shall have entered an order approving the 363 Sale, in form and substance acceptable to the Administrative Agent and the Required Lenders.

October 22, 2010[1]              Closing of 363 Sale.

The above dates are subject to extension as will be provided in the definitive documentation for the DIP Credit Facility.  In the event that (a) the petition date for the Chapter 11 cases occurs after July 30, 2010 or (b) the Bankruptcy Court is unable or unwilling to schedule a hearing on the required date(s), the dates set forth above shall be deemed automatically extended by an equal number of days (or such later date as would constitute the next Business Day) up to a maximum of seven (7) Business Days.

---

[1] Subject to automatic extension for HSR approval per the Asset Purchase Agreement.

EXHIBIT A

[Form of]
**ADMINISTRATIVE QUESTIONNAIRE**

**AMERICAN SAFETY RAZOR COMPANY, LLC**

---

**Lending Institution:** _____

Name for Signature Pages: _____

Will sign Credit Agreement:  [ ]
Will come via Assignment:    [ ]    Number of days post-closing: _____

Name for Signature Blocks: _____

Name for Publicity: _____

Address: _____

Main Telephone: _____

Telex No./Answer back: _____

---

CONTACT-Credit          Name: _____
                        Address: _____
                        _____
                        Telephone: _____
                        Fax: _____

CONTACT-Operations      Name: _____
                        Address: _____
                        _____
                        Telephone: _____
                        Fax: _____

---

**PAYMENT INSTRUCTIONS**

Bank Name: _____
ABA/Routing No.: _____
Account Name: _____
Account No.: _____
For further credit: _____
Account No.: _____
Attention: _____
Reference: _____

---

**UBS AG, STAMFORD BRANCH, ADMINISTRATIVE DETAILS**

| UBS AG, Stamford Branch | Account Administrator | Secondary Contact |
|---|---|---|
| 677 Washington Boulevard | Attn: [          ] | Attn: [          ] |
| Stamford, Connecticut 06901 | Tel: [          ] | Tel: [          ] |
| Main Telephone:  (203) 719-3000 | Fax: [          ] | Fax: [          ] |

Wire Instructions:          The Agent's wire instructions will be disclosed at the time of closing.

EXHIBIT B

[Form of]
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including participations in any Letters of Credit included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor:                    _____

2.   Assignee:                   _____
                                          [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.   Borrower:                   American Safety Razor Company, LLC

4.   Administrative Agent:   UBS AG, Stamford Branch, as the administrative agent under the
     Credit Agreement

---

[1] Select as applicable.

5.    Credit Agreement:    The Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[2] |
|---|---|---|---|
| Loans | $ | $ | % |

[remainder of page left blank intentionally]

---

[2] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

LEGAL_US_E # 88397899.8

Effective Date: _____ ___, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.][3]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By:_____
Name:
Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By:_____
Name:
Title:

[Consented to and Accepted:

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower

By:_____
Name:
Title:][4]


UBS AG, STAMFORD BRANCH,
 as Administrative Agent and Issuing Bank


By: _____
Name:
Title:

---

[3] This date may not be fewer than 5 Business days after the date of assignment unless the Administrative Agent otherwise agrees.

[4] To be completed to the extent consent is required under Section 11.04(b) of the Credit Agreement.

By:  _____
Name:
Title

AMERICAN SAFETY RAZOR COMPANY, LLC
CREDIT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.     Representations and Warranties.

1.1     Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of Holdings, any of its Subsidiaries or Affiliates or any other person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Borrower, any of their Subsidiaries or Affiliates or any other person of any of their respective obligations under any Loan Document.

1.2.     Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Sections 4.01(e) or 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (v) if it is not already a Lender under the Credit Agreement, attached to the Assignment and Assumption an Administrative Questionnaire in the form of Exhibit A to the Credit Agreement, (vi) the Administrative Agent has received a processing and recordation fee of $3,500 as of the Effective Date and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 2.15 of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

3. <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be construed in accordance with and governed by, the law of the State of New York.

EXHIBIT C

[Form of]
**BORROWING REQUEST**

UBS AG, Stamford Branch,
as Administrative Agent for
the Lenders referred to below,
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Marouan Grissa

Re: American Safety Razor Company, LLC

[Date]

Ladies and Gentlemen:

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**"). Borrower hereby gives you notice pursuant to Section 2.03 of the Credit Agreement that it requests a borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such borrowing is requested to be made:

(A)     Principal amount of borrowing[1,2]     _____

(B)     Date of borrowing
          (which is a Business Day)     _____

(C)     Type of borrowing     [ABR] [Eurodollar]

(D)     Interest Period and the last day thereof     _____

_____

[1] ABR Loans must be in an amount that is at least $1,000,000 and an integral multiple of $500,000 or equal to the remaining available balance of the applicable Commitments.

[2] Eurodollar Loans must be in an amount that is at least $1,000,000 and an integral multiple of $500,000 or equal to the remaining available balance of the applicable Commitments.

(E)     Funds are requested to be disbursed to Borrower's account
        with UBS AG, Stamford Branch (Account No.       ).

        Borrower hereby represents and warrants that the conditions to lending specified in Sections 4.02(b), (c), (d), (e), (f), and (g) of the Credit Agreement are satisfied as of the date hereof.

[Signature Page Follows]

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower

By: _____
             Name:
             Title:

EXHIBIT D

[Form of]
**COMPLIANCE CERTIFICATE**

I, [          ], the [Financial Officer] of [                              ](in such capacity and not in my individual capacity), hereby certify that, with respect to that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among American Safety Razor Company, LLC, a Delaware limited liability company (the "**Borrower**"), RSA Holdings Corp. of Delaware, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used herein but not defined herein shall having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger, the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, the "**Issuing Bank**")and as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**").

       a.      [Attached hereto as <u>Schedule 1</u> is a Monthly Variance Report demonstrating compliance by the Loan Parties with Section 6.09 of the Credit Agreement. The Loan Parties are in compliance with such Section as of the date hereof.] [Attached hereto as <u>Schedule 2</u> is the report of [accounting firm.]][1]

       b.      No Default has occurred under the Credit Agreement which has not been previously disclosed, in writing, to the Administrative Agent pursuant to a Compliance Certificate.[2]

[remainder of page left blank intentionally]

---

[1] To accompany annual financial statements only. The report must opine or certify that, with respect to its regular audit of such financial statements, which audit was conducted in accordance with GAAP, the accounting firm obtained no knowledge that any Default under Section 6.09 has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof.

[2] If a Default shall have occurred, an explanation specifying the nature and extent of such Default shall be provided on a separate page together with an explanation of the corrective action taken or proposed to be taken with respect thereto (include, as applicable, information regarding actions, if any, taken since prior certificate).

Dated this [  ] day of [          ], 20[  ].

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower


By: _____
          Name:
          Title:  [Financial Officer]

## SCHEDULE 1

## Monthly Variance Report

[See attached.]

EXHIBIT E

[Form of]
**INTEREST ELECTION REQUEST**

UBS AG, Stamford Branch,
as Administrative Agent
677 Washington Boulevard
Stamford, Connecticut  06901
Attention:  Marouan Grissa

[Date]

Re:  American Safety Razor Company, LLC

Ladies and Gentlemen:

This Interest Election Request is delivered to you pursuant to Section 2.08 of the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

The Borrower hereby requests that on [_____][1] (the "**Interest Election Date**"),

1.    $[    ] of the presently outstanding principal amount of the Loans originally made on [_____],

2.    and all presently being maintained as [ABR Loans] [Eurodollar Loans],

3.    be [converted into] [continued as],

4.    [Eurodollar Loans having an Interest Period of [one/two/three] months] [ABR Loans].

---

[1] Shall be a Business Day that is (a) the date hereof in the case of a conversion into ABR Loans to the extent this Interest Election Request is delivered to the Administrative Agent prior to 11:00 a.m., New York City time on the date hereof, otherwise the Business Day following the date of delivery hereof and (b) three Business Days following the date hereof in the case of a conversion into/continuation of Eurodollar Loans to the extent this Interest Election Request is delivered to the Administrative Agent prior to 1:00 p.m. New York City time on the date hereof, otherwise the fourth Business Day following the date of delivery hereof, in each case.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the proposed Interest Election Date, both before and after giving effect thereto and to the application of the proceeds therefrom:

(a)    the foregoing [conversion] [continuation] complies with the terms and conditions of the Credit Agreement (including, without limitation, Section 2.08 of the Credit Agreement);

(b)    no Default has occurred and is continuing, or would result from such proposed [conversion] [continuation].

[Signature Page Follows]

Borrower has caused this Interest Election Request to be executed and delivered by its duly authorized officer as of the date first written above.

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower

By: _____
      Name:
      Title:

# EXHIBIT F

[Form of]
## JOINDER AGREEMENT

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

W I T N E S S E T H:

WHEREAS, the Guarantors have entered into the Credit Agreement and the Security Agreement in order to induce the Lenders to make the Loans and the Issuing Bank to issue Letters of Credit to or for the benefit of the Borrower;

WHEREAS, pursuant to Section 5.11(b) of the Credit Agreement, each Subsidiary that was not in existence on the date of the Credit Agreement is required to become a Guarantor under the Credit Agreement by executing a Joinder Agreement. The undersigned Subsidiary (the "**New Guarantor**") is executing this joinder agreement ("**Joinder Agreement**") to the Credit Agreement in order to induce the Lenders to make additional Loans and the Issuing Bank to issue Letters of Credit and as consideration for the Loans previously made and Letters of Credit previously issued.

NOW, THEREFORE, the Administrative Agent, Collateral Agents and the New Guarantor hereby agree as follows:

1. **Guarantee**. In accordance with Section 5.11(b) of the Credit Agreement, the New Guarantor by its signature below becomes a Guarantor under the Credit Agreement with the same force and effect as if originally named therein as a Guarantor.

2. **Representations and Warranties**. The New Guarantor hereby (a) agrees to all the terms and provisions of the Credit Agreement applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date. Each reference to a Guarantor in the Credit Agreement shall be deemed to include the New Guarantor. The New Guarantor hereby attaches supplements to each of the schedules to the Credit Agreement applicable to it.

3. **Severability**.  Any provision of this Joinder Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

4. **Counterparts**.  This Joinder Agreement may be executed in counterparts, each of which shall constitute an original.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic method of transmission shall be as effective as delivery of a manually executed counterpart of this Joinder Agreement.

5. **No Waiver**.  Except as expressly supplemented hereby, the Credit Agreement shall remain in full force and effect.

6. **Notices**.  All notices, requests and demands to or upon the New Guarantor, any Agent or any Lender shall be governed by the terms of Section 11.01 of the Credit Agreement.

7. **Governing Law**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

[remainder of page left blank intentionally]

IN WITNESS WHEREOF, the undersigned have caused this Joinder Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

[NEW GUARANTOR]

By: _____
      Name:
      Title:

Address for Notices:

UBS AG, STAMFORD BRANCH, as Administrative Agent

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

[Note:  Schedules to be attached.]

EXHIBIT G

[Form of]
**LC REQUEST [AMENDMENT]**

Dated ($^1$)

UBS AG, Stamford Branch, as Administrative Agent under that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), dated as of July 28, 2010, by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Marouan Grissa

[Name and Address of Issuing Bank
if different from Administrative Agent]

Ladies and Gentlemen:

We hereby request that [name of proposed Issuing Bank], as Issuing Bank under the Credit Agreement, [issue] [amend] [renew] [extend] [a] [an existing] [Standby] [Commercial] Letter of Credit for the account of the undersigned($^2$) on ($^3$) (the "Date of [Issuance] [Amendment] [Renewal] [Extension]") in the aggregate stated amount of ($^4$). [Such Letter of Credit was originally issued on [date].] The requested Letter of Credit [shall be] [is] denominated in Dollars.

For purposes of this LC Request, unless otherwise defined herein, all capitalized terms used herein which are defined in the Credit Agreement shall have the respective meaning provided therein.

---

$^1$ Date of LC Request.

$^2$ Note that if the LC Request is for the account of a Subsidiary, the Borrower shall be a co-applicant, and be jointly and severally liable, with respect to each Letter of Credit issued for the account or in favor of any Subsidiary.

$^3$ Date of Issuance [Amendment] [Renewal] [Extension] which shall be at least three Business Days after the date of this LC Request, if this LC Request is delivered to the Issuing Bank by 2:00 p.m., New York City time (or such shorter period as is acceptable to the Issuing Bank).

$^4$ Aggregate initial stated amount of Letter of Credit.

The beneficiary of the requested Letter of Credit [will be] [is] ($^5$), and such Letter of Credit [will be] [is] in support of ($^6$) and [will have] [has] a stated expiration date of ($^7$). [Describe the nature of the amendment, renewal or extension.]

We hereby certify that:

(1)     The Borrower and each other Loan Party is in compliance in all material respects with all the terms and provisions set forth in each Loan Document on its part to be observed or performed, and, as of today and at the time of and immediately after giving effect to the [issuance] [amendment] [renewal] [extension] of the Letter of Credit requested herein, no Default has or will have occurred and be continuing.

(2)     Each of the representations and warranties made by any Loan Party set forth in any Loan Document are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) on and as of today's date and with the same effect as though made on and as of today's date, except to the extent such representations and warranties expressly relate to an earlier date.

(3)     After giving effect to the request herein, the LC Exposure will not exceed the LC Commitment and the total Loan Exposures will not exceed the total Commitments less the Carve-Out Reserve.

Copies of all relevant documentation with respect to the supported transaction are attached hereto.

[Signature Page Follows]

---

[5] Insert name and address of beneficiary.

[6] Insert description of the obligation to which it relates in the case of Standby Letters of Credit and a description of the commercial transaction which is being supported in the case of Commercial Letters of Credit.

[7] Insert last date upon which drafts may be presented which may not be later than (i) in the case of a Standby Letter of Credit, (x) the date which is one year after the date of the issuance of such Standby Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (y) the Letter of Credit Expiration Date and (ii) in the case of a Commercial Letter of Credit, (x) the date that is 360 days after the date of issuance of such Commercial Letter of Credit (or, in the case of any renewal or extension thereof, 360 days after such renewal or extension) and (y) the Letter of Credit Expiration Date. [revise if evergreen LC facility.]

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower


By: _____
          Name:
          Title:


[BENEFICIARY]


By: _____
          Name:
          Title:

EXHIBIT H

[Form of]
**LENDER ADDENDUM**

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 11.14 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the Commitment set forth in <u>Schedule 1</u> hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile or other electronic method of transmission shall be effective as delivery of a manually executed counterpart hereof.

[remainder of page left blank intentionally]

LEGAL_US_E # 88624451.5

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this ___ day of [          ], 2010.

                                      _____

as a Lender
[Please type legal name of Lender above]


By: _____
      Name:
      Title:

[If second signature is necessary:


By: _____
      Name:
      Title: ]

Accepted and agreed:

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower

By: _____
    Name:
    Title:

UBS AG, STAMFORD BRANCH, as
Administrative Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

## COMMITMENTS AND NOTICE ADDRESS

1.      **Name of Lender:** _____
        **Notice Address:** _____
                            _____
                            _____
        **Attention:**       _____
        **Telephone:**       _____
        **Facsimile:**       _____

2.      **Commitment:**      _____

EXHIBIT I

[Form of]
**NOTE**

$_____                                    New York, New York

                                                                        [Date]


FOR VALUE RECEIVED, the undersigned, American Safety Razor Company, LLC, a Delaware limited liability company (the "**Borrower**"), hereby promises to pay to the order of [          ] (the "**Lender**") on the Stated Maturity Date (as defined in the Credit Agreement referred to below) in lawful money of the United States and in immediately available funds, the principal amount of _____ DOLLARS ($_____). The Borrower further agrees to pay interest in like money at such office specified in Section 2.14 of the Credit Agreement on the unpaid principal amount hereof from time to time from the date hereof at the rates, and on the dates, specified in Section 2.06 of such Credit Agreement.

The holder of this Note may endorse and attach a schedule to reflect the date and amount of each Loan of the Lender outstanding under the Credit Agreement, the date and amount of each payment or prepayment of principal hereof; *provided* that the failure of the Lender to make any such recordation (or any error in such recordation) shall not affect the obligations of the Borrower hereunder or under the Credit Agreement.

This Note is one of the Notes referred to in the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Borrower, RSA Holdings Corp. of Delaware, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger, the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank and as administrative agent for the Lenders, is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein. Terms used herein which are defined in the Credit Agreement shall have such defined meanings unless otherwise defined herein or unless the context otherwise requires.

This Note is secured and guaranteed as provided in the Credit Agreement and the Security Documents. Reference is hereby made to the Credit Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided therein.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE CREDIT AGREEMENT. TRANSFERS OF THIS NOTE MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

[Signature Page Follows]

AMERICAN SAFETY RAZOR COMPANY, LLC,
as the Borrower

By:_____
Name:
Title:

[Form of]
**INTERCOMPANY NOTE**

New York, New York
July 28, 2010

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on the signature page hereto (each, in such capacity, a "**Payor**"), hereby promises to pay on demand to the order of such other entity listed below (each, in such capacity, a "**Payee**"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as a Payee shall from time to time designate, the unpaid principal amount of all loans and advances (including trade payables) made by such Payee to such Payor. Each Payor promises also to pay interest on the unpaid principal amount of all such loans and advances in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee.

Capitalized terms used in this intercompany promissory note (this "<u>Note</u>") but not otherwise defined herein shall have the meanings given to them in that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among American Safety Razor Company, LLC, a Delaware limited liability company (the "**Borrower**"), RSA Holdings Corp. of Delaware, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the lenders party thereto from time to time (the "**Lenders**"), and UBS AG, Stamford Branch, as issuing bank (in such capacity, the "**Issuing Bank**") and administrative agent for the Lenders (in such capacity, the "**Administrative Agent**") and the other agents party thereto from time to time.

This Note is being pledged by each Payee that is a Loan Party to the Administrative Agent, for the benefit of the Secured Parties, pursuant to the Security Documents as collateral security for the full and prompt payment when due of, and the performance of, the Obligations. Each Payee hereby acknowledges and agrees that (i) after the occurrence of and during the continuance of an Event of Default under and as defined in the Credit Agreement, the Administrative Agent may, in addition to the other rights and remedies provided pursuant to the Security Documents and otherwise available to it, exercise all rights of the Payees which are Loan Parties with respect to this Note.

Anything in this Note to the contrary notwithstanding, the indebtedness evidenced by this Note owed by any Payor that is a Loan Party to any Payee shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all Obligations of such Payor until the Stated Maturity Date; *provided* that each Payor may make payments to the applicable Payee so long as no Event of Default under and as defined in the Credit Agreement shall have occurred and be continuing (such Obligations and other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest is an allowed claim in such proceeding, being hereinafter collectively referred to as "<u>Senior Indebtedness</u>"):

(i) if any Event of Default (as under and defined in either Credit Agreement) occurs and is continuing, then no payment or distribution of any kind or character shall be made by or on behalf of the Payor or any other Person on its behalf with respect to this Note;

(ii)     if any payment or distribution of any character, whether in cash, securities or other property, in respect of this Note shall (despite these subordination provisions) be received by any Payee in violation of clause (i) or (ii) before all Senior Indebtedness shall have been irrevocably paid in full in cash (other than Hedging Obligations not yet due and payable and contingent indemnification obligations), such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered to the Administrative Agent in accordance with the Security Documents.

To the fullest extent permitted by law, no present or future holder of Senior Indebtedness shall be prejudiced in its right to enforce the subordination of this Note by any act or failure to act on the part of any Payor or by any act or failure to act on the part of such holder or any trustee or agent for such holder. Each Payee and each Payor hereby agree that the subordination of this Note is for the benefit of the Administrative Agent and the other Secured Parties. The Administrative Agent and the other Secured Parties are obligees under this Note to the same extent as if their names were written herein as such and the Administrative Agent may, on behalf of itself, and the Secured Parties, proceed to enforce the subordination provisions herein.

The indebtedness evidenced by this Note owed by any Payor that is not a Loan Party shall not be subordinated to, and shall rank *pari passu* in right of payment with, any other obligation of such Payor.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Indebtedness.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting *prima facie* evidence of the accuracy of the information contained therein.

Each Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note. All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

It is understood that this Note shall not evidence indebtedness in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and their respective successors and assigns, including subsequent holders hereof. Notwithstanding anything to the contrary contained herein, in any other Loan Document or in any other promissory note or other instrument, this Note replaces and supersedes any and all promissory notes or other instruments which create or evidence any loans or advances made on, before or after the date hereof by any Payee to any other Subsidiary.

From time to time after the date hereof, additional Subsidiaries of Holdings may become parties hereto (as Payor and/or Payee, as the case may be) by executing a counterpart signature page to this Note (each additional Subsidiary, an "Additional Party"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party

shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other person becomes or fails to become or ceases to be a Payor or Payee hereunder.

*[Signature Pages Follow]*

**AMERICAN SAFETY RAZOR COMPANY, LLC**

By: _____
Name:
Title:


**RSA HOLDINGS CORP. OF DELAWARE**

By: _____
Name:
Title:


**AMERICAN SAFETY RAZOR CORPORATION**

By: _____
Name:
Title:


**ASR HOLDINGS, INC.**

By: _____
Name:
Title:


**RSA SOAP COMPANY, INC.**

By: _____
Name:
Title:


**MEGAS BEAUTY CARE, INC.**

By: _____
Name:
Title:

**PERSONNA INTERNATIONAL DE PUERTO RICO, INC.**


By: _____
Name:
Title:


**BLADE ACQUISITION COMPANY**


By: _____
Name:
Title:


**ASR EXPORTACAO, IMPORTACAO, COMERCIO
E INDUSTRIA DE PRODUTOS DE BARBEAR LTDA**


By: _____
Name:
Title:


**AMERICAN SAFETY RAZOR DO BRASIL LTDA.**


By: _____
Name:
Title:


**AMERICAN SAFETY RAZOR AUSTRALIA PTY**


By: _____
Name:
Title:


**PERSONNA INTERNATIONAL ISRAEL LTD.**


By: _____
Name:
Title:

**AMERICAN SAFETY RAZOR OF CANADA LIMITED**


By: _____
Name:
Title:


**INDUSTRIAS MANUFACTURERAS ASR DE PUERTO RICO, INC.**


By: _____
Name:
Title:


**PERSONNA INTERNATIONAL DE MEXICO, S.A. de C.V.**


By: _____
Name:
Title:


**PERSONNA INTERNATIONAL LIMITED**


By: _____
Name:
Title:


**PERSONNA INTERNATIONAL CZ s.r.o.**


By: _____
Name:
Title:


**PERSONNA INTERNATIONAL UK LIMITED**


By: _____
Name:
Title:

**WOLCO HOLLAND BV**

By: _____
Name:
Title:


**VALLEY PARK REALTY, INC.**

By: _____
Name:
Title:


**MEGAS DE PUERTO RICO, INC.**

By: _____
Name:
Title:


**LION/ BLADE LUXEMBOURG S.A.R.L.**

By: _____
Name:
Title:

EXHIBIT K

[Form of]
**NON-BANK CERTIFICATE**

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

The undersigned is not a bank (as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended.

[NAME OF LENDER]

By:_____
     Name:
     Title:

[ADDRESS]


Dated: _____, 20__.

# EXHIBIT L
# FORM OF BUDGET

**American Safety Razor Company**
**13 Week Cash Forecast for Week Ending 07/30/10**
**Consolidated Debtor Affiliates (US and Puerto Rico)**
**(USD in 000's)**

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 07/30/10 | 08/06/10 | 08/13/10 | 08/20/10 | 08/27/10 | 09/03/10 | 09/10/10 | 09/17/10 | 09/24/10 | 10/01/10 | 10/08/10 | 10/15/10 | 10/22/10 | |
| **Cash Receipts** | $5,346 | $4,579 | $3,892 | $3,603 | $5,147 | $2,889 | $4,125 | $4,297 | $5,631 | $3,274 | $4,529 | $5,796 | $3,861 | $56,966 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Vendor Payments | 2,991 | 4,485 | 4,439 | 4,478 | 2,454 | 914 | 886 | 929 | 924 | 886 | 1,014 | 793 | 808 | 26,003 |
| Freight | 280 | 258 | 261 | 258 | 265 | 258 | 247 | 250 | 247 | 244 | 241 | 244 | 241 | 3,292 |
| Employee Costs | 1,393 | 646 | 1,395 | 653 | 621 | 1,408 | 622 | 1,392 | 617 | 1,395 | 617 | 1,408 | 622 | 12,792 |
| Overhead | 294 | 745 | 818 | 794 | 846 | 880 | 662 | 651 | 670 | 839 | 629 | 589 | 600 | 9,020 |
| Rent/Lease | 30 | 47 | 10 | 10 | 30 | 57 | 10 | 10 | 10 | 30 | 47 | 10 | 10 | 311 |
| Utilities | 111 | 393 | 118 | 16 | 101 | 274 | 100 | 12 | 12 | 102 | 381 | 18 | 16 | 1,655 |
| Taxes | - | - | - | - | - | - | - | 257 | - | - | - | - | - | 257 |
| Pension Funding | - | - | - | - | - | - | - | 4,184 | - | - | - | 3,055 | - | 7,239 |
| Capital Expenditures | 217 | 1,647 | 1,647 | 1,477 | 1,344 | 1,342 | 1,342 | 1,242 | 742 | 542 | 286 | 286 | 286 | 12,400 |
| Other | - | - | 102 | - | 104 | - | 82 | - | 81 | - | - | 83 | 2 | 454 |
| **Total Operating Disbursements** | 5,317 | 8,222 | 8,790 | 7,686 | 5,766 | 5,134 | 3,952 | 8,927 | 3,304 | 4,038 | 3,215 | 6,486 | 2,585 | 73,422 |
| **Net Operating Cash Flows** | 29 | (3,643) | (4,898) | (4,084) | (619) | (2,245) | 172 | (4,631) | 2,327 | (764) | 1,313 | (690) | 1,276 | (16,457) |
| **Financing Disbursements** | | | | | | | | | | | | | | |
| Interest on Pre-Petition Loans | - | 1,439 | - | - | - | 1,420 | - | - | - | 1,476 | - | - | - | 4,336 |
| Restructuring Professional Fees | 569 | 1,611 | 412 | - | - | - | 124 | 288 | 2,190 | - | - | 412 | 2,125 | 7,731 |
| DIP Loan Fees and Interest | - | 1,263 | - | - | - | - | - | - | - | 30 | - | - | - | 1,293 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Financing Disbursements** | 569 | 4,312 | 412 | - | - | 1,420 | 124 | 288 | 2,190 | 1,507 | - | 412 | 2,125 | 13,359 |
| **Net Cash Flows** | (539) | (7,955) | (5,310) | (4,084) | (619) | (3,666) | 48 | (4,919) | 137 | (2,271) | 1,313 | (1,102) | (849) | (29,815) |
| Beginning Cash (Book Balance) | 20,718 | 20,179 | 12,224 | 6,914 | 2,830 | 2,211 | 1,851 | 1,820 | 1,791 | 1,792 | 1,925 | 1,943 | 1,879 | 20,718 |
| Add: Net Cash Flows | (539) | (7,955) | (5,310) | (4,084) | (619) | (3,666) | 48 | (4,919) | 137 | (2,271) | 1,313 | (1,102) | (849) | (29,815) |
| DIP Draw (Paydown) | - | - | - | - | - | 3,306 | (79) | 4,890 | (136) | 2,404 | (1,295) | 1,038 | 873 | 11,000 |
| **Ending Cash (Book Balance)** | 20,179 | 12,224 | 6,914 | 2,830 | 2,211 | 1,851 | 1,820 | 1,791 | 1,792 | 1,925 | 1,943 | 1,879 | 1,903 | 1,903 |
| Beginning DIP Loan Balance | - | - | - | - | - | - | 3,306 | 3,227 | 8,116 | 7,980 | 10,384 | 9,089 | 10,127 | - |
| DIP Draw (Paydown) | - | - | - | - | - | 3,306 | (79) | 4,890 | (136) | 2,404 | (1,295) | 1,038 | 873 | 11,000 |
| **Ending DIP Loan Balance** | - | - | - | - | - | 3,306 | 3,227 | 8,116 | 7,980 | 10,384 | 9,089 | 10,127 | 11,000 | 11,000 |
| **Liquidity:** | | | | | | | | | | | | | | |
| DIP Loan Commitment ($25 million less carve out) | - | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 |
| Less: DIP Drawn | - | - | - | - | - | (3,306) | (3,227) | (8,116) | (7,980) | (10,384) | (9,089) | (10,127) | (11,000) | (11,000) |
| Net DIP Availability | - | 21,000 | 21,000 | 21,000 | 21,000 | 17,694 | 17,773 | 12,884 | 13,020 | 10,616 | 11,911 | 10,873 | 10,000 | 10,000 |
| Ending Cash Balance (Book Balance) | 20,179 | 12,224 | 6,914 | 2,830 | 2,211 | 1,851 | 1,820 | 1,791 | 1,792 | 1,925 | 1,943 | 1,879 | 1,903 | 1,903 |
| **Total Liquidity** | 20,179 | $33,224 | $27,914 | $23,830 | $23,211 | $19,545 | $19,593 | $14,675 | $14,812 | $12,541 | $13,854 | $12,752 | $11,903 | 11,903 |

# EXHIBIT M-1
## FORM OF MONTHLY VARIANCE REPORT

**American Safety Razor Company**
**Cumulative Actual vs. Budget Variance Report for 4 Weeks Ending 8/26/10**
**Consolidated Debtor Affiliates (US and Puerto Rico)**
**(USD in 000's)**

| | Actual | Budget | Variance | Comments |
|---|---|---|---|---|
| **Week #:** | | | | |
| **Week Ending:** | | | | |

**Cash Receipts**

**Operating Disbursements**
  Vendor Payments
  Freight
  Employee Costs
  Overhead
  Rent/Lease
  Utilities
  Taxes
  Pension Funding
  Capital Expenditures
  Other
**Total Operating Disbursements**

**Net Operating Cash Flows**

**Financing Disbursements**
  Interest on Pre-Petition Loans
  Restructuring Professional Fees
  DIP Loan Fees and Interest
  Other
**Total Financing Disbursements**

**Net Cash Flows**

  Beginning Cash (Book Balance)
  Add: Net Cash Flows
  DIP Draw (Paydown)

**Ending Cash (Book Balance)**

Beginning DIP Loan Balance
  DIP Draw (Paydown)

**Ending DIP Loan Balance**

**Liquidity:**
  DIP Loan Commitment ($25 million less carve out)
  Less: DIP Drawn
  Net DIP Availability

  Ending Cash Balance (Book Balance)

**Total Liquidity**

**American Safety Razor Company**
**Actual vs. Budget Variance Report for Week Ending 8/5/10**
**Consolidated Debtor Affiliates (US and Puerto Rico)**
**(USD in 000's)**

**Week #:**

| Week Ending: | Actual | Budget | Variance | Comments |
|---|---|---|---|---|

**Cash Receipts**

**Operating Disbursements**
  Vendor Payments
  Freight
  Employee Costs
  Overhead
  Rent/Lease
  Utilities
  Taxes
  Pension Funding
  Capital Expenditures
  Other
**Total Operating Disbursements**

**Net Operating Cash Flows**

**Financing Disbursements**
  Interest on Pre-Petition Loans
  Restructuring Professional Fees
  DIP Loan Fees and Interest
  Other
**Total Financing Disbursements**

**Net Cash Flows**

  Beginning Cash (Book Balance)
  Add: Net Cash Flows
  DIP Draw (Paydown)

**Ending Cash (Book Balance)**

  Beginning DIP Loan Balance
  DIP Draw (Paydown)

**Ending DIP Loan Balance**

**Liquidity:**
  DIP Loan Commitment ($25 million less carve out)
  Less: DIP Drawn
  Net DIP Availability

  Ending Cash Balance (Book Balance)

**Total Liquidity**

EXHIBIT N

**EXIT TERM SHEET**

*THIS EXIT CREDIT FACILITY TERM SHEET IS NOT INTENDED TO, AND DOES NOT, CONSTITUTE A BINDING AGREEMENT WITH RESPECT TO THE CREDIT FACILITY OUTLINED HEREIN OR OTHERWISE.*

*UPON THE CLOSING OF A SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF AMERICAN SAFETY RAZOR COMPANY, LLC, A DELAWARE LIMITED LIABILITY COMPANY, ("ASR") (SUCH SALE, THE "363 SALE") PURSUANT TO THE ASSET PURCHASE AGREEMENT[1], THE DIP LOAN COMMITMENTS AND ALL OUTSTANDING OBLIGATIONS UNDER THE DIP CREDIT FACILITY SHALL CONVERT INTO COMMITMENTS UNDER THIS EXIT CREDIT FACILITY FOR THE BORROWER IN THE SAME AMOUNT OF SUCH EXISTING COMMITMENTS, WHICH SUCH RESTRUCTURED EXIT CREDIT FACILITY SHALL BE ON TERMS AND CONDITIONS AS SET FORTH HEREIN.*

**SUMMARY OF PRELIMINARY TERMS AND CONDITIONS OF $25,000,000 EXIT CREDIT FACILITY**

**JULY 28, 2010**

| | |
|---|---|
| Borrower: | RZR Acquisition Company LLC, a newly-formed Delaware corporation, which will purchase the assets of ASR pursuant to a 363 Sale as described more fully in the Asset Purchase Agreement (the "Borrower"). |
| Guarantors: | The Exit Credit Facility (as defined below) will be fully and unconditionally guaranteed, on a joint and several basis, by the Borrower, RZR Holding Corporation, a newly-formed Delaware corporation which will hold all of the equity interests of the Borrower ("NewCo"), and all of the existing and future direct and indirect domestic subsidiaries of the Borrower including, without limitation, certain of the loan parties under that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, |

---

[1] "Asset Purchase Agreement" shall mean that certain Asset Purchase Agreement, by and among RZR Acquisition Company LLC, a Delaware limited liability company, as Purchaser, RZR Holding Corporation, a Delaware corporation, as Parent, the Borrower, as Seller and UBS AG, Stamford Branch, in its capacity as administrative agent under the Existing First Lien Credit Agreement, for certain limited provisions thereof, dated as of July 28, 2010.

by and among the ASR, as borrower, RSA Holdings Corp. of Delaware, a Delaware corporation ("Holdings"), and certain of the ASR's subsidiaries, as guarantors, UBS AG, Stamford Branch, as administrative agent, the other agents party thereto and the other lenders party thereto (the "DIP Credit Facility") (collectively, the "Guarantors").

| | |
|---|---|
| Administrative Agent: | UBS AG, Stamford Branch (the "Administrative Agent"), as agent for the lenders party to the Exit Credit Facility. |
| Arranger: | UBS Securities LLC (the "Arranger"). |
| Collateral Agent: | General Electric Capital Corporation ("GECC"). |
| Syndication Agent: | GECC |
| Documentation Agent: | Aladdin Credit Partners I, LP |
| Lenders: | A syndicate of banks, financial institutions and/or institutional lenders (which shall include all of the lenders under the DIP Credit Facility) (collectively, the "Lenders"). |
| Type and Amount of Exit Credit Facility: | A first priority, senior secured multi-draw term loan facility (the "Exit Credit Facility") in an aggregate principal amount of $25,000,000 (the "Exit Facility Amount"), including a sublimit for letters of credit in an amount to be determined. |
| Use of Proceeds: | The proceeds of the loans under the Exit Credit Facility shall be used by the Borrower to (a) to repay the outstanding obligations under the DIP Credit Facility and (b) to fund general corporate working capital and capital expenditure needs including, without limitation, payment of interest and fees under the Exit Credit Facility and cash collateral for letters of credit of the Borrower and its subsidiaries. |
| Maturity: | 3 years from the closing date. |
| Availability: | Upon the closing of the 363 Sale, the outstanding obligations due and owing under the DIP Credit Facility shall be "rolled" into and restructured as a senior secured, first priority, multi-draw term loan facility in an aggregate principal amount of up to $25,000,000. |
| L/C Sublimit: | $7,500,000 |
| LIBOR Floor: | 2.50%. |
| Base Rate Floor: | 3.50% |

| | |
|---|---|
| Pricing: | LIBOR plus 5.50%; Base Rate plus 4.50%. |
| Default Interest: | 2.00% per annum plus the rate otherwise applicable. |
| Interest Payments: | All interest shall accrue and be payable on a monthly basis. |

Fees:

1.      Initial Fee – 1.275% of the Exit Loan Commitment to Administrative Agent, for the pro rata benefit of the Lenders, in accordance with the principal amount of the Exit Loan Commitment held by each such Lender on the closing date of the Exit Credit Facility.

2.      Other Agents' fees in an amount to be determined.

3.      All fees shall be fully earned on the closing date and shall be non-refundable once paid.

| | |
|---|---|
| Unused Fee: | 1.00% per annum. |

Letter of Credit Fees:      (i) Fronting fee equal to 0.375% per annum on average daily amount of the letter of credit exposure, (ii) letter of credit participation fees equal to the applicable margin for LIBOR loans under the Exit Credit Facility times the average daily amount of the letter of credit exposure and (iii) customary fees and expenses with respect to the issuance or administration of such letters of credit.

Amortization:      No scheduled amortization required, but mandatory prepayments as to excess cash flow sweep, asset sales, issuance of debt and such other liquidity events as agreed in the definitive documentation. Any payments or prepayments shall be without penalty.

Security:      The Exit Credit Facility will be secured by first priority liens on all assets of the Borrower and the Guarantors specifically including, but not limited to, all equity interests in all Guarantors (collectively, the "Collateral").

Conditions Precedent:      The definitive documentation for the Exit Credit Facility will include such conditions precedent as are usual and customary for financings of this kind, and consistent with the conditions precedent contained in the DIP Credit Facility, including, but not limited to the terms of all orders of the Bankruptcy Court confirming, approving, implementing or affecting the 363 Sale and the Exit Credit Facility, or affecting the rights, remedies and obligations of Administrative Agent and Lenders thereunder, shall be in form and substance acceptable to Administrative Agent and Required Lenders.

| Representations and Warranties: | The definitive documentation for the Exit Credit Facility will include such representations and warranties as are usual and customary for financings of this kind, and consistent with the representations and warranties contained in the DIP Credit Facility (as modified to take account of current financial condition of the Borrower and the Guarantors and the exit from the bankruptcy cases and as may be otherwise required by the Administrative Agent and the Required Lenders). |
|---|---|
| Affirmative Covenants: | The definitive documentation for the Exit Credit Facility will include such affirmative covenants as are usual and customary for financings of this kind, and consistent with the affirmative covenants contained in the DIP Credit Facility (as modified to take account of current financial condition of the Borrower and the Guarantors, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by the Administrative Agent and the Required Lenders). |
| Negative Covenants: | The definitive documentation for the Exit Credit Facility will include such negative covenants as are usual and customary for financings of this kind, and consistent with the negative covenants contained in the DIP Credit Facility (as modified to take account of current financial condition of the Borrower and the Guarantors, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by the Administrative Agent and the Required Lenders). |
| Financial Covenants: | The definitive documentation for the Exit Credit Facility will include such financial covenants as are usual and customary for financings of this kind, including total maximum leverage, total minimum interest coverage, and maximum capital expenditures. |
| Financial Reports: | The definitive documentation for the Exit Credit Facility will include financial reporting requirements as are usual and customary for financings of this kind and consistent with the financial reporting required under the DIP Credit Facility, (as modified to take account of current financial condition of the Borrower and the Guarantors, the exit from the bankruptcy cases, the longer term of the Exit Credit Facility and as may be otherwise required by the Administrative Agent and the Required Lenders). |
| Events of Default: | The definitive documentation for the Exit Credit Facility will include such events of default as are usual and customary for financings of this kind, and consistent with the events of default |

contained in the DIP Credit Facility (as modified to take account of current financial condition of the Borrower and the Guarantors and the exit from the bankruptcy cases and as may be otherwise required by the Administrative Agent and the Required Lenders).

Documentation:

Implementation of the terms and conditions for the Exit Credit Facility shall be subject to execution of definitive documentation. In the event of any inconsistencies between this term sheet and the definitive documentation, the definitive documentation shall control.

Required Lenders:

Lenders holding more than 50% of total commitments and/or exposure under the Exit Credit Facility; provided that Required Lenders shall include not less than two (2) Lenders.

Fee Reimbursement:

The Administrative Agent shall be entitled to prompt reimbursement of its reasonable fees and expenses of its counsel, arising from or related to the Exit Credit Facility.

Governing Law:

New York.

Counsel to Administrative
Agent and Arranger:

Paul, Hastings, Janofsky & Walker, LLP.

# EXHIBIT O

## Closing Conditions to Exit Credit Facility[1]

The obligations of the Lenders under Section 4.03 of the DIP Credit Agreement with respect to the Exit Credit Facility, including any funding under the Exit Credit Facility, are subject to the terms and conditions set forth in the Exit Term Sheet and satisfaction of each of the conditions precedent set forth below.

1.      The Administrative Agent and the Required Lenders shall have reviewed, and be reasonably satisfied with, the final structure, terms and conditions and the documentation relating to the 363 Sale pursuant to the Asset Purchase Agreement (such structure, terms and conditions and documentation collectively referred to herein as the "363 Sale Documentation"). Each of the transactions (the "Transactions") contemplated by the 363 Sale Documentation shall be consummated concurrently with the initial funding of the Exit Credit Facility in accordance with the 363 Sale Documentation and such other documentation without waiver or amendment thereof unless consented to by the Administrative Agent and the Required Lenders.

2.      The negotiation, execution and delivery of definitive loan documentation with respect to the Exit Credit Facility reasonably satisfactory to the Administrative Agent and the other Lenders reflecting, among other things, the terms and conditions set forth in the Exit Term Sheet.

3.      The Administrative Agent and the Required Lenders shall have received, reviewed, and be reasonably satisfied with, unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and the Guarantors (each as defined in the Exit Term Sheet) for the year-to-date period most recently completed. The financial statements referred to in this paragraph 3 shall be prepared in accordance with generally accepted accounting principles in the United States.

4.      The Lenders shall have received all opinions, certificates and closing documentation as the Administrative Agent and the Required Lenders shall reasonably request, in form and substance reasonably satisfactory to Administrative Agent and Required Lenders.

5.      The Borrower and the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

6.      All reasonable costs, fees, expenses (including, without limitation, legal fees and expenses and the fees and expenses of appraisers, consultants and other advisors) and

---

[1]      All capitalized terms used but not defined herein shall have the meanings provided in the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement to which this Exhibit O is attached (the "DIP Credit Agreement").

other compensation payable to the Lenders, the Administrative Agent, the Arranger, the Collateral Agent and the Documentation Agent shall have been paid to the extent due.

7.      All documents and instruments required to perfect the Administrative Agent's (as defined in the Exit Term Sheet) security interest in the collateral described under the heading "Security" in the Exit Term Sheet shall have been executed and delivered and, if applicable, be in proper form for filing, and none of such collateral shall be subject to any other pledges, security interests or mortgages, except customary permitted liens and other limited exceptions permitted under the loan documentation for the Exit Credit Facility.

8.      The terms of the 363 Sale pursuant to the Asset Purchase Agreement shall have been confirmed by the Bankruptcy Court by a final order entered by the Bankruptcy Court (the "363 Sale Order"), in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders, which 363 Sale Order has not been stayed by the Bankruptcy Court or any other court having jurisdiction to issue any such stay.  The 363 Sale Order shall have been entered in form and substance acceptable to the Administrative Agent and the Required Lenders. Moreover, (i) the time to appeal the 363 Sale Order or to seek review, rehearing or certiorari with respect to the 363 Sale Order must have expired, (ii) no appeal, stay, or petition for review, rehearing or certiorari with respect to the 363 Sale Order may be pending and (iii) the 363 Sale Order must otherwise be in full force and effect.  All conditions to the effectiveness of the 363 Sale shall have been satisfied or waived in a manner reasonably acceptable to Agents and Required Lenders.

9.      There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the Administrative Agent and the Required Lenders, could reasonably be expected to have a Material Adverse Effect.

10.      The Administrative Agent shall be named as loss payee (property/casualty) and additional insured (liability), and non-renewal/ cancellation/ amendment riders to provide 30 days advance notice to the Administrative Agent.

11.      The Borrower and each Guarantor shall be in good standing in its respective state (or other applicable jurisdiction) of incorporation or formation and qualified to do business in all other states (or other applicable jurisdictions) where its ownership or lease of property or the conduct of its business requires such qualification to the extent material to the business of the Borrowers and Guarantors.

12.      The Administrative Agent, if required, shall have received UCC, tax lien, litigation, real property and intellectual property searches, the results of which are reasonably satisfactory to the Administrative Agent.

13.      The Borrower and each Guarantor shall deliver account control agreements (in form and substance reasonably satisfactory to the Administrative Agent) necessary to perfect the liens in favor of the Administrative Agent for the benefit of the Lenders on any deposit account or securities account.

14.     The Administrative Agent shall have received title polices with respect to all fee owned property substantially similar to the title policies delivered in connection with the Pre-Petition Credit Agreement; *provided* such title policies may be delivered on a post-closing basis with the prior written consent of the Administrative Agent.

15.     The Borrower shall have received all governmental or shareholder approvals necessary to complete the financing contemplated in the loan documentation.

16.     The Administrative Agent shall have received reasonably detailed projections for the Borrower and its Subsidiaries for the three years following the closing of the Exit Credit Facility.

# LENDER ADDENDUM

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 11.14 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the Commitment set forth in Schedule 1 hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile or other electronic method of transmission shall be effective as delivery of a manually executed counterpart hereof.

[remainder of page left blank intentionally]

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this 20th day of July, 2010.

**UBS LOAN FINANCE LLC,**
as a Lender

By: _____  Irja R. Otsa
Name:                            Associate Director
Title:                           Banking Products
                                 Services. US

By: _____  April Varner-Nanton
Name:                            Director
Title:                           Banking Products
                                 Services. US

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
    Name: J. Andrew Bolt
    Title: Executive Vice President

**UBS AG, STAMFORD BRANCH**, as
Administrative Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
    Name: J. Andrew Bolt
    Title: Executive Vice President

**UBS AG, STAMFORD BRANCH,** as
Administrative Agent

By: _____
    Name:
    Title:

Irja R. Otsa
Associate Director
Banking Products
Services, US

By: _____
    Name:
    Title:

April Varner-Nanton
Director
Banking Products
Services, US

## COMMITMENTS AND NOTICE ADDRESS

| | | |
|---|---|---|
| **1.** | **Name of Lender:** | UBS Loan Finance LLC |
| | **Notice Address:** | On file with Administrative Agent |
| | **Attention:** | On file with Administrative Agent |
| | **Telephone:** | On file with Administrative Agent |
| | **Facsimile:** | On file with Administrative Agent |
| **2.** | **Commitment:** | $21,937,500 (other than with respect to any obligations under Section 4.03 of the Credit Agreement) |

# LENDER ADDENDUM

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 11.14 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the Commitment set forth in Schedule 1 hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile or other electronic method of transmission shall be effective as delivery of a manually executed counterpart hereof.

[remainder of page left blank intentionally]

LEGAL_US_E # 89037464.2

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this 28th day of July, 2010.

GENERAL ELECTRIC CAPITAL
CORPORATION, as a Lender

By: _____
Name: Scott W. Renzulli
Title: Duly Authorized Signatory

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
  Name: J. Andrew Bolt
  Title: Executive Vice President

**UBS AG, STAMFORD BRANCH,** as
Administrative Agent

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
    Name: J. Andrew Bolt
    Title: Executive Vice President

**UBS AG, STAMFORD BRANCH,** as
Administrative Agent

By: _____
    Name:             Irja R. Otsa
    Title:             Associate Director
                     Banking Products
                     Services. US

By: _____
    Name:             April Varner-Nanton
    Title:             Director
                     Banking Products
                     Services. US

## COMMITMENTS AND NOTICE ADDRESS

| | | |
|---|---|---|
| **1.** | **Name of Lender:** | General Electric Capital Corporation |
| | **Notice Address:** | On file with Administrative Agent |
| | | |
| | **Attention:** | On file with Administrative Agent |
| | **Telephone:** | On file with Administrative Agent |
| | **Facsimile:** | On file with Administrative Agent |
| | | |
| **2.** | **Commitment:** | $1,850,000.00 |

# LENDER ADDENDUM

Reference is made to the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of July 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among AMERICAN SAFETY RAZOR COMPANY, LLC, a Delaware limited liability company (the "**Borrower**"), RSA HOLDINGS CORP. OF DELAWARE, a Delaware corporation ("**Holdings**"), the Subsidiary Guarantors, the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I of the Credit Agreement), UBS SECURITIES LLC, as lead arranger (in such capacity, "**Arranger**"), the other agents party thereto, and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**") and as administrative agent for the Lenders (in such capacity, "**Administrative Agent**").

Upon execution and delivery of this Lender Addendum by the parties hereto as provided in Section 11.14 of the Credit Agreement, the undersigned hereby becomes a Lender thereunder having the Commitment set forth in <u>Schedule 1</u> hereto, effective as of the Closing Date.

THIS LENDER ADDENDUM SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile or other electronic method of transmission shall be effective as delivery of a manually executed counterpart hereof.

[remainder of page left blank intentionally]

Aladdin Credit Partners I, L.P.

By: Aladdin Credit Partners, LLC, its General
Partner

By: _____
Name: Luke Gosselin
Title: Managing Member

Aladdin Credit Intermediate Fund LLC,

MANAGING MEMBER:
Aladdin Credit Offshore Fund I, L.P.
By Aladdin Credit Advisors, LLC, its General
    Partner

By: _____
    Name: Luke Gosselin
    Title: Managing Member

MC Credit Products DIP SMA, L.P.

By: Aladdin Credit Partners, LLC, its General
    Partner

By: _____
    Name: Luke Gosselin
    Title: Managing Member

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
     Name: J. Andrew Bolt
     Title: Vice President

**UBS AG, STAMFORD BRANCH,** as
Administrative Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Accepted and agreed:

**AMERICAN SAFETY RAZOR COMPANY, LLC,**
as the Borrower

By: _____
    Name: J. Andrew Bolt
    Title: Vice President


**UBS AG, STAMFORD BRANCH,** as
Administrative Agent

By: _____
    Name:
    Title:

                                       irja R. Otsa
                                       Associate Director
                                       Banking Products
                                       Services, US

By: _____
    Name:
    Title:

                                       April Varner-Nanton
                                       Director
                                       Banking Products
                                       Services, US

## COMMITMENTS AND NOTICE ADDRESS

1. **Name of Lender:** Aladdin Credit Partners I, L.P.

   **Notice Address:** On file with Administrative Agent.

   **Attention:** On file with Administrative Agent

   **Telephone:** On file with Administrative Agent

   **Facsimile:** On file with Administrative Agent

2. **Commitment:** $16,005.00

1. **Name of Lender:** Aladdin Intermediate Fund LLC

   **Notice Address:** On file with Administrative Agent

   **Attention:** On file with Administrative Agent

   **Telephone:** On file with Administrative Agent

   **Facsimile:** On file with Administrative Agent

2. **Commitment:** $1,090,522.50

1.  **Name of Lender:** MC Credit Products DIP
    SMA, L.P.

    **Notice Address:** On file with
    Administrative Agent

    **Attention:** On file with
    Administrative Agent

    **Telephone:** On file with
    Administrative Agent

    **Facsimile:** On file with
    Administrative Agent

2.  **Commitment:** $105,972.50