## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
                                )

In re                          )

                                )    Chapter 11

AMERICAN SAFETY           )

RAZOR COMPANY, LLC, <u>et al.</u>,[1]   )    Case No. 10-12351 (MFW)

                                )

                    Debtors.   )    Joint Administration Pending

                                )

-------------------------------------------------------x

## DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE, AND BANKRUPTCY RULES 2002, 6004, 6006, FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ENCUMBRANCES AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by and through their proposed undersigned counsel, hereby file this motion (the "<u>Motion</u>"), pursuant to sections 105(a), 363, 365 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order, substantially in the form annexed hereto as Exhibit A, (A) approving and authorizing the sale (the "<u>Sale</u>") of substantially all of the Debtors' assets (the "<u>Assets</u>"), free and clear of Encumbrances (as defined below),

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: American Safety Razor Company, LLC (0207), American Safety Razor Corporation (5475), ASR Holdings, Inc. (6509), Blade Acquisition Company (2053), Industrias Manufactureras ASR de Puerto Rico, Inc. (4894), Megas Beauty Care, Inc. (0321), Megas de Puerto Rico, Inc. (3065), Personna International de Puerto Rico, Inc. (0814), RSA Holdings Corp. of Delaware (3029), RSA Soap Company, Inc. (7635), and Valley Park Realty, Inc. (3691). The following entities are non-debtor foreign affiliates of the Debtors: American Safety Razor Australia Pty; American Safety Razor do Brasil Ltda.; American Safety Razor of Canada Limited; ASR Exportacao, Importacao, Comercio e Industria de Produtos de Barbear Ltda; Personna International CZ s.r.o.; Personna International de Mexico, S.A. de C.V.; Personna International Israel Ltd.; Personna International Limited; Personna International UK Limited; Personna International UK Ltd; and Wolco Holland BV. The corporate address of American Safety Razor Company, LLC is 240 Cedar Knolls Road, Cedar Knolls, NJ 07927.

other than Permitted Encumbrances and Assumed Liabilities (each as defined below), on the terms of that certain Asset Purchase Agreement, dated as of July 28, 2010, between American Safety Razor Company, LLC, RZR Acquisition Company LLC (the "Stalking Horse Bidder"), RZR Holding Corporation, and UBS AG, Stamford Branch (the "Stalking Horse APA"), and (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Sale Order").  In support of this Motion, the Debtors rely upon and incorporate by reference the *Affidavit of J. Andrew Bolt, Executive Vice President and Chief Financial Officer of American Safety Razor Company, LLC and Blade Acquisition Company, and Vice President and Authorized Officer of the other Debtors, in Support of the First Day Motions* (the "First Day Affidavit"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The filing of this Motion and these cases is the culmination of several months of diligence and negotiations, which have been focused on, among other things, restructuring the Debtors' highly leveraged capital structure and preparing to market the Debtors' assets (the "Assets") for a potential sale.  In the summer of 2009, in response to lower than projected earnings, the Debtors engaged investments bankers to assist in a dialogue with their first-lien lenders (the "First Lien Lenders") and second-lien lenders (the "Second Lien Lenders", together with the First Lien Lenders, the "Prepetition Secured Lenders") to amend the financial covenants under the respective loan documents.  In September 2009, the Debtors engaged an operational and financial advisor to assist in an operational and cost-cutting program. Notwithstanding those significant efforts, mounting competitive pressures and continuing weak macroeconomic demand compelled the Debtors to begin a discussion with the Prepetition Secured Lenders regarding a restructuring of the Debtors' capital structure.

2.     Since February 2010, the Debtors have expended extensive efforts to provide the Prepetition Secured Lenders, in addition to the lenders under the Debtors unsecured mezzanine credit facility, with due diligence, extensive access to management including, multiple in person meetings, access to a data room, site tours and weekly update calls.

3.     On April 21, 2010, the Debtors entered into waiver agreements with the Prepetition Secured Lenders (the "Waivers").  Pursuant to the Waivers, the Debtors were required to deliver to the Prepetition Secured Lenders (a) a "business plan" by May 20, 2010 and (b) a "restructuring proposal" by June 9, 2010.  While the Waivers allowed the Debtors to preserve their short-term liquidity, the Debtors recognized the need for a comprehensive rationalization of their capital structure.  The Waivers expired on June 29, 2010.

4.     In May 2010, the First Lien Lenders submitted a proposal to the Debtors to purchase substantially all of the Assets (the "First Lien Bid").  In addition to purchasing the Assets, the First Lien Lenders proposed to assume substantially all of the Debtors' operating liabilities, including the Debtors' pension, trade and wage obligations, and to fund the orderly and expeditious wind down of these cases.  Later in May, a group of Second Lien Lenders advised the Debtors of their desire to submit a competing proposal to purchase the Assets.  As described more fully in the First Day Affidavit, the Debtors actively supported the attempted syndication of the Second Lien Lenders' proposal by (a) obtaining an extension of the Waivers through July 29, 2010 (the "Extended Waivers"), (b) assisting in the preparation of syndication materials, (c) made a lender presentation to over 85 financial institutions, (d) conducted one-on-one meeting with potential investors in support of the syndication, (d) provided extensive due diligence materials, and (e) entered into negotiations with Goldman Sachs regarding the material agreements required to implement the Second Lien Proposal.  Despite the Company's exhaustive

efforts to support the syndication effort, to date, the commitments submitted to Goldman Sachs Lending Partners LLC, the proposed syndication agent, are insufficient to fund the Second Lien Proposal.

5.      Over the last three months, the Debtors have worked diligently to provide the First lien Lenders and the Second Lien Lenders and their respective advisors and sources of capital with extensive access to management and information about the Debtors.  Up until the Petition Date, the Debtors worked closely with both the groups to continue to refine each proposal with the goals of maximizing the value of each bid, including maximizing the amount of liabilities assumed by the purchaser, and ensuring the highest certainty that the transaction would close.

6.      The Debtors and their advisors engaged in several weeks of intensive negotiations with the First Lien Lenders over the terms of a definitive asset purchase agreement. The result of those negotiations is the Stalking Horse APA.  Ultimately, the Debtors determined that the proposal of the First Lien Lenders as set forth in the Stalking Horse APA was the highest and best offer available and selected it as the "stalking horse" bid (the "Stalking Horse Bid"). Critically, the Debtors believe that the Stalking Horse Bid will set a floor for any other potential purchaser to bid against, including the Second Lien Lenders.

7.      Pursuant to the terms of the Stalking Horse APA, a copy of which is annexed hereto as Exhibit B, American Safety Razor Company (the "Seller"), will convey the Assets to the Stalking Horse Bidder – an entity formed by or on behalf of the First Lien Lenders – free and clear of Encumbrances (other than Permitted Encumbrances) in exchange for (a) a release of all or a portion of the obligations and indebtedness under the First Lien Credit

Agreement,[2] (b) the Stalking Horse Bidder's assumption of the Assumed Liabilities, (c) the Stalking Horse Bidder's assumption of Cure Costs (defined below) relating to assumed and assigned contracts and unexpired leases and (d) an amount of cash sufficient to repay, on behalf of the Debtors, the outstanding obligations under the Debtors' postpetition credit facility (the "DIP Facility").  The Stalking Horse APA contains no break-up fee or no-shop provisions.

8.	The Debtors submit that initiating these cases with a fully executed Stalking Horse APA agreement and an open back-end remarketing and sale process is the path most likely to maximize the value of their estates.  The proposed marketing and auction process (the "Bidding Procedures"), a copy of which is annexed hereto as Exhibit C, will provide the Debtors with maximum flexibility to solicit higher or otherwise better bids for the Assets.

9.	Therefore, the Debtors respectfully request that the Court enter an order approving the sale of the Assets to the Stalking Horse Bidder (or the successful bidder at the Auction) on the terms of the Stalking Horse APA.

## **JURISDICTION**

10.	This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Federal Rules 2002, 6004 and 6006.

---

[2]	The "First Lien Credit Agreement" means that certain $260,000,000 Credit Agreement, dated as of July 31, 2006, among American Safety Razor Company, LLC, as Borrower, RSA Holdings Corp. of Delaware, as Holdings, and the other guarantors party thereto, as Guarantors, certain lenders party thereto, UBS Securities LLC, as Arranger and Bookmanager, UBS AG, Stamford Branch, Issuing Bank, Administrative Agent and Collateral Agent and UBS Loan Finance LLC, as Swingline Lender.

## CASE BACKGROUND

11.　　On July 28, 2010 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.　The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.　No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.　Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.[3]

## THE STALKING HORSE APA

12.　　A summary of the principal terms of the Stalking Horse APA, set forth in full in the Stalking Horse APA, is as follows:[4]

　　　　(a)　　<u>Purchase Price</u>.　The Purchase Price to be paid for the Assets by the Stalking Horse Bidder shall be (a) shares of capital stock and debt of an affiliate of the Stalking Horse Bidder, to be immediately delivered to the First Lien Lenders in consideration for an acknowledgment of the satisfaction of $243,625,032.05 (or such greater amount as the administrative agent under the First Lien Credit Agreement (the "<u>First Lien Agent</u>") shall determine and advise to the Seller prior to Closing) of Indebtedness under the First Lien Credit Agreement, (b) the Stalking Horse Bidder's assumption of the Assumed Liabilities (defined below), (c) the Stalking Horse Bidder's assumption of all liabilities in respect of Cure Costs[5] relating to assumed and assigned contracts and

---

[3]　　A description of the Debtors' business, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a transition into chapter 11 are set forth in the First Day Affidavit, which was filed contemporaneously with this Motion.

[4]　　This summary of the Stalking Horse APA is provided for the Court's convenience and, as applicable, in compliance with Rule 6004-1(b)(iv) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.　To the extent the summary differs in any way from the terms of the Stalking Horse APA, the terms of the Stalking Horse APA shall control.　Capitalized terms in this paragraph but not otherwise defined herein have the meaning ascribed to them in the Stalking Horse APA.

[5]　　The "Cure Costs" include any and all amounts necessary for the Debtors to be able to assume and assign the Assigned Contracts to the Stalking Horse Bidder pursuant to section 365 of the Bankruptcy Code, including without limitation, all monetary defaults, if any, and actual pecuniary losses, if any, that have resulted from such defaults.　See Stalking Horse APA, § 1.6.　As of the Agreement Date, the aggregate

unexpired leases, and (d) the Stalking Horse Bidder's assumption of the Debtors' liabilities under the DIP Facility. <u>See</u> Stalking Horse APA, §§ 2.1 and 2.2.

(b)    <u>Purchased Assets</u>.  The Assets include, among other things: (i) all of the properties, assets and rights, tangible and intangible, real or personal, of the Seller of whatever kind and nature (excluding the Excluded Assets) including, without limitation, (i) all outstanding shares of capital stock or equity or other ownership interest held by the Seller in the Acquired Subsidiaries (collectively, the "<u>Acquired Equity Interests</u>") and (ii) Assigned Contracts.  <u>See</u> Stalking Horse APA, § 1.1.

(c)    <u>Excluded Assets</u>.  The "Excluded Assets" include, among other things:

    (i)    the Wind Down Amount, but excluding the Wind Down Surplus;[6]

    (ii)    contracts and unexpired leases that are not assumed and assigned (the "<u>Non-Assigned Contracts</u>"); and

    (iii)    any avoidance claims or causes of action under the Bankruptcy Code or applicable Law with respect to the Excluded Assets.

<u>See</u> Stalking Horse APA, § 1.2.

(d)    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in the Stalking Horse APA and the Sale Order, effective as of the Closing, the Purchaser shall assume (and thereafter pay, perform, discharge or otherwise satisfy in accordance with their respective terms) all of the Liabilities of the Seller arising or resulting from events or conditions occurring or existing, prior to Closing, including such Liabilities under or relating to any Environmental Laws, except for the Excluded Liabilities (collectively, the "<u>Assumed Liabilities</u>").  <u>See</u> Stalking Horse APA, § 1.3.

(e)    <u>Excluded Liabilities</u>.  The Stalking Horse Bidder shall not assume the following Liabilities (collectively, the "<u>Excluded Liabilities</u>"):

---

amount necessary to cure, under Section 365 of the Bankruptcy Code, defaults under the Assigned Contracts is not expected to exceed $1.5 million.

[6]    The "Wind Down Amount" means $10 million.  <u>See</u> Stalking Horse APA, § 9.1(pppp).

(i) Liabilities of the Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(ii) Liabilities of the Seller in respect of Contracts that are Non-Assigned Contracts;

(iii) the costs and expenses of professionals retained under Section 327 or Section 1103 of the Bankruptcy Code and the fees of the United States Trustee; and

(iv) Liabilities of the Seller in respect of Indebtedness arising prior to the Petition Date, whether or not relating to the Business or the Purchased Assets, including, without limitation, Indebtedness under the Second Lien Credit Agreement and the Mezzanine Credit Agreement, but excluding Indebtedness under the DIP Credit Agreement.

See Stalking Horse APA, § 1.4.

(f) <u>Assumption/Rejection of Certain Contracts</u>.

(i) As of the Closing, the Seller shall assume pursuant to Section 365(a) of the Bankruptcy Code and sell and assign to the Purchaser pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code each of the Assigned Contracts.

(ii) The Seller agrees to file a motion within twenty (20) Business Days after Closing, seeking rejection of the executory Contracts listed on Schedule 1.7(b) to the Stalking Horse APA.

See Stalking Horse APA, § 1.7.

(g) <u>Key Representations and Warranties of the Seller</u>.

(i) *Title to the Assets*.

• Immediately prior to or at the Closing, the Seller will have, and, upon delivery to the Purchaser on the Closing Date of the instruments of transfer contemplated by <u>Section 3.2</u>, and subject to the terms of the Sale Order, the Seller will thereby transfer to the Purchaser, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances; and

- Immediately prior to or at the Closing, subject to the terms of the Sale Order, the Acquired Subsidiaries will have good and valid title to, or valid leasehold interests in, all of their properties and assets, in each case free and clear of all Encumbrances, except for Permitted Encumbrances.

See Stalking Horse APA, § 4.11.

(h) <u>Key Representations and Warranties of the Stalking Horse Bidder</u>.

   (i) *Adequate Assurances Regarding Assigned Contracts*. As of the Closing, the Stalking Horse Bidder will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts. <u>See</u> Stalking Horse APA, § 5.7.

   (ii) *Available Financing*. At the Closing, the Stalking Horse Bidder will have the all funds necessary to consummate the transactions contemplated by the Stalking Horse APA, including to promptly pay, when due, all of the Assumed Liabilities and Cure Costs. <u>See</u> Stalking Horse APA, § 5.8.

(i) <u>Key Covenants and Agreements</u>.

   (i) *Conduct of Business of the Debtors and the Acquired Subsidiaries*. During the Pre-Closing Period, and except (A) as required by applicable law, the Bankruptcy Code or the Court, (B) as otherwise expressly contemplated by the Stalking Horse APA or (C) with the prior consent of the Stalking Horse Bidder, the Debtors shall, and the Debtors shall cause each applicable Acquired Subsidiary, to, among other things, conduct its business and operations in the Ordinary Course of Business. <u>See</u> Stalking Horse APA, § 7.1.

   (ii) *Assignability of Certain Contracts*. In the event the assignment of any Assigned Contracts cannot be effected by the Court or Sale Order, the Parties will use their commercially reasonable efforts to obtain the applicable counterparties' consent to such assignment as requested by the Stalking Horse Bidder or make commercially feasible arrangements to provide the Stalking Horse Bidder with equivalent benefits of any such Contract. <u>See</u> Stalking Horse APA, § 7.4.

   (iii) *Rejected Contracts.* Until the earlier of the Closing Date and the date upon which Stalking Horse APA terminates

pursuant to Section 3.4 thereof, the Seller shall not reject any of the Assigned Contracts without the Stalking Horse Bidder's written consent. <u>See</u> Stalking Horse APA, § 7.5.

(iv)   *Adequate Assurances Regarding Assigned Contracts.*  The Stalking Horse Bidder will use commercially reasonable efforts to provide adequate assurance of future performance with respect to each Assigned Contract, including any actions required to assist in obtaining a Court finding to such effect. <u>See</u> Stalking Horse APA, § 7.6.

(v)    *Performance under Assigned Contracts.*  Subject to the terms and conditions of the Stalking Horse APA, the Stalking Horse Bidder shall, from and after the Closing Date, assume all Liabilities of the Seller under the Assigned Contracts. <u>See</u> Stalking Horse APA, § 7.7.

(vi)   *HSR and Anti-Trust Approvals.*  The Stalking Horse Bidder shall be responsible for the applicable filing fee under the HSR Act and any non-US antitrust or competition Laws, but not the Seller's costs and expenses associated with the Seller's preparation of the Seller's portion of such filings. The Stalking Horse Bidder and the Seller will make all required HSR filings within 15 days following the date of the Stalking Horse APA. <u>See</u> Stalking Horse APA, § 7.8.

(vii)  *Transfer Taxes.*  All Transfer Taxes associated with the Sale, whether levied on the Stalking Horse Bidder or the Debtors, shall be borne by the Stalking Horse Bidder. <u>See</u> Stalking Horse APA, § 7.14.

(viii) *Director and Officer Liability and Indemnification.*  At the Closing, on the terms set forth in the Stalking Horse APA, the Stalking Horse Bidder shall obtain, maintain and purchase "tail" insurance policies naming the directors and officers of the Seller and the Acquired Subsidiaries as direct beneficiaries with a claims period of six years from the Closing Date. <u>See</u> Stalking Horse APA, § 7.15

(ix)   *Employee Matters.*

•   For the twelve (12) months after the Closing Date, the Stalking Horse Bidder shall provide the Continuing Employees with the following categories of compensation at the level specified as compared with to that which was in effect as of the Closing Date: (i) base salaries or wages, at the same

level; (ii) employee benefits that are substantially equivalent in the aggregate as to welfare and fringe benefits, and pension benefits under a 401(k) and/or other pension plan, as applicable; and (iii) the opportunity to receive, subject to the performance of the Business, substantially comparable bonuses. <u>See</u> Stalking Horse APA, § 7.16(a).

- For purposes of determining eligibility to participate and vesting where length of service is relevant under any employee benefit plan of the Stalking Horse Bidder after the Closing Date, the Stalking Horse Bidder shall cause the Continuing Employees to receive service credit for service with the Seller to the same extent such service was credited under similar employee benefit plans of the Seller <u>provided</u>, <u>however</u>, that such service shall not be credited to the extent that it would result in a duplication of benefits. <u>See</u> Stalking Horse APA, § 7.16(b).

- From and after the Closing Date, the Stalking Horse Bidder shall assume and honor in accordance with their terms, all employment agreements of Continuing Employees and pay to each Continuing Employee any amounts that become payable to such Continuing Employee following the Closing Date in accordance with the terms of the applicable employment agreement. <u>See</u> Stalking Horse APA, § 7.16(c).

- Prior to the Closing Date, the Stalking Horse Bidder and the Seller will negotiate in good faith to adopt a new management equity incentive plan or arrangement acceptable to the Parties. <u>See</u> Stalking Horse APA, § 7.16(d).

(x)  *Guarantee*. The First Lien Agent, solely in its capacity as First Lien Agent under the First Lien Credit Agreement and on behalf of the First Lien Lenders, hereby guarantees the full and timely performance of all of the Stalking Horse Bidder's agreements and covenants made in the Stalking Horse APA and each other document executed and delivered by or on behalf of the Stalking Horse Bidder to the Seller at Closing with respect to the transactions contemplated by the Stalking Horse APA. <u>See</u> Stalking Horse APA, § 7.10(b).

(j)     Conditions to Closing.

    (i)    *Conditions Precedent to Each Party's Obligation to Effect the Closing.*  Prior to the Closing:

- there shall be no injunction or judicial decree prohibiting consummation of the Sale;

- the Court shall have entered the Sale Order (as provided in Article VI of the Stalking Horse APA) and such order shall be a Final Order; and

- any waiting period (including any extension thereof) applicable to the purchase and sale of the Assets under the HSR Act or under the regulations of any other applicable governmental antitrust or competition authority shall have terminated or expired.

See Stalking Horse APA, § 8.1.

    (ii)    *Conditions Precedent to Obligations of the Debtors.*  Prior to the Closing:

- the representations and warranties of the Stalking Horse Bidder shall be true and correct in all material respects as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date);

- the Stalking Horse Bidder shall have performed and complied in all material respects with all obligations and covenants contained in the Stalking Horse APA;

- the Stalking Horse Bidder shall be prepared to deliver, or shall cause to be delivered, all of the items set forth in Section 3.3 of the Stalking Horse APA.

See Stalking Horse APA, § 8.2.

    (iii)    *Conditions Precedent to Obligations of the Stalking Horse Bidder.*  Prior to the Closing:

- the Seller shall have delivered to the Stalking Horse Bidder (i) a certified copy of the Sale Order (which shall contain the terms described in Section 6.2) of the Stalking Horse APA and (ii) copies of all affidavits of service of the Motion or notice of such motion filed by or on behalf of the Seller (which service shall comply with Section 6.1(d) of the Stalking Horse APA);

- The representations and warranties of the Seller contained herein shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of such date;

- the Seller shall have performed and complied in all material respects with all obligations and covenants contained in the Stalking Horse APA (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date);

- there shall not have occurred and be continuing a Material Adverse Effect since the Petition Date, and no event shall have occurred since the date of the Stalking Horse APA that, in combination with any other events or circumstances, would reasonably be expected to have a Material Adverse Effect; and

- the Seller shall be prepared to deliver, or shall cause to be delivered, all of the items set forth in Section 3.2 of the Stalking Horse APA.

See Stalking Horse APA, § 8.3.

(k) Bankruptcy Court Matters.

(i) The Debtors may consider higher or better competing bids and initiate contact with prospective purchasers with respect to the Debtors' businesses or a material portion of the Assets (each a "Competing Bid"). See Stalking Horse APA, § 6.1(b).

(ii) If an Auction is conducted, and the Stalking Horse Bidder is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), the Stalking Horse Bidder shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep the Stalking Horse Bidder's bid open and irrevocable until the earlier of

(A) 5:00 p.m. (prevailing Eastern time) on the date which is sixty (60) days after the date of the Sale Hearing (the "Outside Back-Up Date") (provided, however, that in no event will the Outside Back-up Date be later than November 26, 2010), (ii) the date on which there has occurred an Alternative Transaction[7] of the type described in item (ii) of the definition thereof in the Purchase Agreement, or (iii) the date of closing of an Alternative Transaction (other than the type of Alternative Transaction described in item (ii) of the definition thereof) with the Prevailing Bidder. See Stalking Horse APA, § 6.1(c).

(iii)    Following the Sale Hearing and prior to the Outside Back-Up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder (if the Back-up Bidder is the next highest bidder at the Auction) will be deemed to have the new prevailing bid, and the Debtors will be authorized to consummate the transactions contemplated by the Stalking Horse APA. See Stalking Horse APA, § 6.1(c).

(iv)    The Sale Order must contain a number of customary provisions including, among other things, (A) authority to sell the Assets free and clear of Encumbrances pursuant to section 363(f) of the Bankruptcy Code; (B) authority to assume and assign the Assigned Contracts pursuant to section 365 of the Bankruptcy Code and (C) a finding that the Stalking Horse Bidder is entitled to the "good faith protections" of section 363(m) of the Bankruptcy Code. See Stalking Horse APA, § 6.2.

(l)    Termination. Among other ways, the Stalking Horse APA may be terminated prior to the Closing Date as follows:

(i)    by the mutual written consent of the Seller and the Purchaser;

---

[7]    "Alternative Transaction" means (i) the approval by the Bankruptcy Court of a sale or sales of a material portion of the Purchased Assets, a material portion of the capital stock or other assets of the Seller, or a material portion of the assets and properties of the Acquired Subsidiaries, to a Person other than Purchaser, (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser in accordance with the terms hereof and (iii) the approval by the Bankruptcy Court and consummation of a refinancing of the DIP Credit Agreement or the First Lien Credit Agreement. See Stalking Horse APA, § 9.1(g).

(ii)     by either party upon written notice to the other party, if the Closing shall not have been consummated prior to October 29, 2010 (the "<u>Outside Date</u>") for any reason other than delay or nonperformance of or breach by the Party seeking such termination; <u>provided</u>, <u>however</u>, that if on such date the only condition to Closing in Article VIII of the Stalking Horse APA that has not been (or would not be) satisfied or waived on such date is the condition set forth in Section 8.1(c), then the Outside Date shall be extended until the earlier of (A) five Business Days following the date as of which the condition set forth in Section 8.1(c) has been satisfied or waived, and (B) November 26, 2010; <u>provided further</u>, <u>however</u>, that if Stalking Horse Bidder is not the prevailing party at the conclusion of the Auction, the Stalking Horse Bidder shall not be permitted to terminate the Stalking Horse APA pursuant to Section 3.4(b) thereof unless the Outside Back-Up Date has passed. <u>See</u> Stalking Horse APA, § 3.4(b);

(iii)    by either party upon written notice to the other party, if (A) the Sale Order shall not have been approved by the Court by the close of business on the day that is ninety (90) days after the Agreement Date or (B) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of the Stalking Horse Bidder and the Debtors, <u>provided</u> that the right to terminate the Stalking Horse APA under this subsection shall not be available to any Party whose failure to fulfill any covenant or obligation in any material respect under the Stalking Horse APA has been the cause of, or resulted in, the failure of such order to meet these requirements on or before such date. <u>See</u> Stalking Horse APA, § 3.4(e);

(iv)    automatically upon the occurrence of an Alternative Transaction of the type described in item (ii) of the definition thereof. <u>See</u> Stalking Horse APA, § 3.4(f);

(v)     by written notice of either the Seller or the Purchaser, if the Seller has entered into an Alternative Transaction (other than an Alternative Transaction of the type described in item (ii) of the definition thereof), provided that the Outside Back-Up Date has passed. <u>See</u> Stalking Horse APA, § 3.4(g);

(vi) automatically upon the consummation of an Alternative Transaction (other than an Alternative Transaction of the type described in item (ii) of the definition thereof). <u>See</u> Stalking Horse APA, § 3.4(h);

(vii) by written notice from the Stalking Horse Bidder to the Seller if there has been a default under the DIP Credit Agreement that results in an acceleration of remedies thereunder. <u>See</u> Stalking Horse APA, § 3.4(k);

(viii) by written notice from the Stalking Horse Bidder to the Seller in the event the Seller has received a bona fide, written proposal to repay in full the First Lien Indebtedness, whether pursuant to an Alternative Termination or otherwise. <u>See</u> Stalking Horse APA, § 3.4(l); and

(m) <u>Structural Considerations</u>. The Stalking Horse Bidder, after the entry of the Sale Order and at least five Business Days prior to the Closing, may request certain changes to the structure of the transaction or the form and mix of consideration. <u>See</u> Stalking Horse APA, § 11.1.

<u>Survival</u>. The representations and warranties contained in the Stalking Horse APA shall expire upon the Closing Date. The covenants contained in the Stalking Horse APA to be performed at or after the Closing shall survive the Closing Date in accordance with the terms of the particular covenant or until fully performed. <u>See</u> Stalking Horse APA, § 12.2.

## <u>THE COMPETITIVE AUCTION PROCESS</u>

13. In order to maximize the value of the Debtors' assets, the Debtors will be conducting a competitive auction process. Importantly, the Stalking Horse APA does not provide for any break-up fee, expense reimbursement or other bidding protections. In order to insure an orderly auction process, the Debtors will implement auction procedures that are designed to allow for great flexibility for competitive bids, so long as such bids are higher or otherwise better.

14. The salient terms of the Bidding Procedures are follows:[8]

(a)
olicit Qualified Bids from Qualified Bidders prior to the bid deadline of September 20, 2010 at 4:00 p.m. (prevailing Eastern Time);

(b)
onduct an auction on September 23, 2010 at 10:00 a.m. (prevailing Eastern Time); and

(c)
romptly thereafter, seek the Court's approval of the Final Sale Agreement.[9]

## RELIEF REQUESTED

15. Through this Motion, the Debtors seek entry of the Sale Order, in the form annexed hereto as Exhibit A, (a) approving the sale of the Assets free and clear of all Encumbrances to the Stalking Horse Bidder and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale.

## BASIS FOR RELIEF

**A.      The Sale of the Assets to the Stalking Horse Bidder Pursuant to the Stalking Horse APA Should Be Approved**

**i.      Applicable Authority**

16. Section 363(b) does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan. However, as described above, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the Debtors. See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76

---

[8]      This summary of the Bidding Procedures is provided for the Court's convenience and, as applicable, in compliance with Rule 6004-1(c)(i) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

(D. Del. 1991); In re Trans World Airlines Inc., No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

17. In evaluating whether a debtor has exercised sound business judgment in the context of section 363(b), courts often scrutinize the propriety of the sale process. See In re Summit Global Logistics, Inc., No 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. March 26, 2008) ("The Debtors and the Secured Lenders have proposed a transaction that is the result of a fair and open sale process facilitated by the investment bankers that maximizes value and return to interested parties."); In re Castre, Inc., 312 B.R. 426, 428 (Bankr. D. Colo. 2004) (citing In re Gulf States Steel Inc. of Alabama, 285 B.R. 497 (Bankr. D. Ala. 2002) (noting that most of the factors considered by courts for § 363(b) purposes focus on "process" issues – such as adequate procedures, proper notice to interested parties, proper market exposure and the preparation for and conduct during the auction – "rather than the business rationale for why the successful bid was chosen."); Quality Stores, 272 B.R. at 643 ("a sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.").

18. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) whether adequate and reasonable notice has been provided to interested persons; (c) whether the debtor has obtained a fair and reasonable price; and (d) whether the parties have acted in good faith. See Abbotts Dairies, 788 F.2d 143 (3d Cir. 1986); Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa.

---

[9] The Debtors respectfully request that a hearing be scheduled on or about September 28, 2010.

1989); In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

> ### ii. Approval of the Sale to the Stalking Horse Bidder on the Terms of the Stalking Horse APA is Justified Under the Circumstances
>
> #### I. A "Sound Business Purpose" Justifies the Sale of the Assets Outside the Ordinary Course of Business

19.     The Debtors, with the assistance of their advisors, have determined that a sale of the Assets to the Stalking Horse Bidder is most likely to maximize the value of the Debtors' estates. The Debtors have faced, among other things, severe competitive pressures and large legacy pension obligations, all of which demand that the Debtors right size their capital structure. While the Debtors have been vigilant about implementing various cost cutting initiatives, these savings have been insufficient to allow the Debtors to continue to support their existing capital structure. Thus, as stated above, the Debtors worked with both the First Lien Lenders and the Second Lien Lenders and their respective advisors to formulate a restructuring of the Debtors that both maximized value and could be implemented quickly. This ultimately led the Debtors to choose the Stalking Horse Bidder. To date, no other option has been presented that is higher and better with a certainty of closure.

20.     As discussed above, the Debtors and their advisors have been actively working with the Second Lien Lenders in their attempt to formulate a proposal. To date, even with the additional time afforded by the Extended Waivers, the Second Lien Lenders have not been able to propose a fully financed deal. Accordingly, the Debtors believe that the transaction proposed by the Stalking Horse Bidder is the best available option for the Debtors to maximize value.

21.     To confirm that the Purchase Price for the Assets is the best available in the market, the Debtors have proposed a fair and open process for achieving the objective of

obtaining the highest or best offer and sale of their businesses for the benefit of the Debtors' estates and their creditors. Through the Bidding Procedures and the Auction, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. In addition, the Debtors have structured the Bidding Procedures to provide the Debtors with maximum flexibility to also consider proposals that implement a recapitalization through a plan of reorganization, including one proposed by the Second Lien Lenders. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[10]

## II. Adequate and Reasonable Notice Has Been Provided to Interested Persons

22. The Debtors are providing notice of this Motion, the Bidding Procedures, the Auction (if necessary) and the Sale Hearing to all parties who have previously expressed interest in acquiring any portion of the Assets (the "Interested Parties") in addition to the Debtors' entire creditor matrix. The Debtors submit that such service provides adequate and reasonable notice for any interested party to conduct due diligence, submit a competing offer for the Assets or otherwise object to the sale. Accordingly, adequate and reasonable notice has been provided to "interested persons."

## III. The Debtors Have Obtained a Fair and Reasonable Price for the Assets

23. The Purchase Price to be paid by the Stalking Horse Bidder to the Debtors for the Assets is not only fair and reasonable, but the best price obtainable for the Assets under

---

[10] The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors, in consultation with the First Lien Agent, for approval to the Bankruptcy Court.

the circumstances. After actively negotiating with its constituents a recapitalization of the Debtors' capital structure for more than four months, the Debtors are satisfied that the Sale is a reasonable market price for the Assets, which will be confirmed by the bidding process and potentially the Auction. In consideration of this process, the Debtors are confident that the Purchase Price reflects the true future earning capacity of the Debtor's businesses and the Assets.

## IV. All Parties Have Acted in Good Faith

24. The proposed sale to the Stalking Horse Bidder is the product of good faith, arm's length negotiations between and among the Debtors and the Stalking Horse Bidder. The Sale was negotiated with the active involvement of the Debtors' management and other advisors. For nearly two months, the Stalking Horse Bidder and the Debtors, with their respective advisors, have engaged in detailed negotiations and due diligence. In addition, the Stalking Horse Bidder (a) does not share common ownership with any of the Debtors or their non-Debtor affiliates, (b) is independently controlled and operated, and (c) is not otherwise affiliated with the Debtors or their officers and directors.

### iii. The Sale of the Assets May be Free and Clear of Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code

25. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:

    (a) uch a sale is permitted under applicable non-bankruptcy law;

    (b) he party asserting such a lien, claim or interest consents to such sale;

    (c) he interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

(d)
        he interest is the subject of a *bona fide* dispute; or

(e)
        he party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

See 11 U.S.C. § 363(f); Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

26.    The Debtors have satisfied the standards under section 363(f) of the Bankruptcy Code to allow for the sale of the Assets free and clear of Encumbrances.

27.    With respect to any other party asserting Encumbrances against, in or to the Assets who do not object to the sale thereof can and should be deemed to consent to the Sale under section 363(f)(2) of the Bankruptcy Code.  In addition, the First Lien Lenders have consented to the sale free and clear of Encumbrances.  Pursuant to the Intercreditor Agreement between the First Lien Lenders and the Second Lien Lenders (the "Intercreditor Agreement"), the Second Lien Lenders are deemed to consent to the Sale.  If any party asserting an Encumbrance objects to the Sale, the Debtors will demonstrate that such objection should be overruled under one or more of the other subsections of section 363(f) of the Bankruptcy Code. For example, certain Encumbrances may be subject to *bona fide* disputes or the Debtors will be able to satisfy the requirements of section 363(f)(1) or (5).[11]  In reviewing the interests of holders of Encumbrances, such interests will be adequately protected by the terms of the proposed Sale Order.  All Encumbrances on the Assets will attach with the same order, priority, enforceability

---

[11]    To the extent required, the Debtors reserve the right to supplement this Motion to respond to such objections either at or prior to a hearing on the Motion to address any specific objections.

and validity to the consideration paid by the Stalking Horse Bidder to Debtors as such Encumbrances currently have with respect to such secured creditors' assets.

28. Without permitting the sale of the Assets free and clear of the Encumbrances, the Debtors would not be able to satisfy a key provision of the Stalking Horse APA (see Stalking Horse APA, § 4.11) and would not be able to close the Sale. Furthermore, as indicated in the Stalking Horse APA, the Stalking Horse Bidder would be unwilling to close on the sale if the Encumbrances remain attached to the Assets. Even if the Stalking Horse Bidder was willing to consummate the sale with the Encumbrances in place, the Stalking Horse Bidder certainly would insist on a substantially reduced purchase price, yielding substantially less value to the Debtors' estates.

**iv.    The Stalking Horse Bidder is Entitled to the "Good Faith" Protections Provided by Section 363(m) of the Bankruptcy Code**

29. The Debtors additionally requests that the Court find that the Stalking Horse Bidder is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

30. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) protects a buyer of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

31. Although the Bankruptcy Code does not define "good faith buyer," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "[t]he

requirement that a buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." Abbotts Dairies, 788 F.2d at 147 (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (internal quotations omitted).  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the buyer and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing Rock Indus. Mach. Corp., 572 F.2d at 1198; see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Banks. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."  In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978)).

32.     As required by section 363(m) of the Bankruptcy Code, the Debtors and Stalking Horse Bidder have acted in good faith in negotiating the sale.  There is no evidence of fraud or collusion in the terms of the sale.  To the contrary, the sale is the culmination of a negotiation process in which all parties have been represented by sophisticated counsel and advisors.  In addition, Stalking Horse Bidder is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of the Debtors or any non-Debtor affiliates, and all negotiations have been conducted at arm's length and on a good faith basis.   Under the circumstances, Stalking Horse Bidder should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provide to good faith buyers.

**B.     Assumption and Assignment of Executory Contracts and Unexpired Leases**

        **i.     Applicable Authority**

33.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

34.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors fee assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994)

(noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

35.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

ii.     **The Assumption and Assignment of the Assigned Contracts is Justified under the Circumstances**

36.     The Debtors' assumption of the Assigned Contracts is sound exercise of their business judgment and will confer a clear benefit to their estates. Notably, because the Stalking Horse Bidder is purchasing all of the Assets with the intention of continuing the operation of the Debtors' business, retention of these key contracts and leases are integral to the business. Pursuant to the terms of the Stalking Horse APA, all applicable Cure Costs in connection with the Assigned Contracts will be paid. Furthermore, the Stalking Horse Bidder

has sufficient assets to continue the performance called for by those agreements. To the extent necessary to satisfy the Court, the Debtors will demonstrate at the Sale Hearing that the Stalking Horse Bidder (a) has assets sufficient to provide adequate assurance of future performance and (b) is willing and able to perform under the Assigned Contracts from and after the Closing Date. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, the Debtors should be authorized to assume and assign the Assigned Contracts.

**C.     Relief under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

37.     Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**<u>PROCEDURE</u>**

38.     No prior request for the relief requested herein has been made to this Court or any other Court.

39.     No trustee, examiner or creditors' committee has been appointed in these cases. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' 30 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to the administrative

agent under the first lien senior secured credit facility; (d) counsel to the administrative agent under the second lien senior secured credit facility; (e) counsel to the lenders under the mezzanine credit facility; (f) counsel to the Stalking Horse Bidder; (g) all entities known to have asserted any Encumbrances in, upon or against the Assets; (h) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion or with jurisdiction over the Debtors' businesses or Assets or any part thereof; (i) all Interested Parties; (j) all parties entitled to receive notice in these cases pursuant to Bankruptcy Rule 2002; (k) the Debtors' equity holders; (l) the Pension Benefit Guaranty Corporation; (m) the United States Environmental Protection Agency and any applicable state environmental agency; and (n) all parties listed in the Debtors' creditor matrix.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Sale Order, substantially in the form annexed hereto as Exhibit A, (a) approving the Sale of the Assets free and clear of Encumbrances, other than Permitted Encumbrances and Assumed Liabilities, to the Stalking Horse Bidder (or the Successful Bidder at the Auction) on the terms of the Stalking Horse APA; (b) authorizing the assumption and assignment of the Assigned Contracts in connection with the Sale; (c) granting such other and further relief as may be just and proper.

Dated: July 28, 2010  
   Wilmington, Delaware

DRINKER BIDDLE & REATH LLP

  /s/ Andrew C. Kassner     
Andrew C. Kassner (DE 4507)  
Howard A. Cohen (DE 4082)  
1100 N. Market Street, Suite 1000  
Wilmington, DE 19801  
Telephone: (302) 467-4200  
Facsimile: (302) 467-4201

-- and --

Mark Thompson (*pro hac vice* admission pending)  
Elisha D. Graff (*pro hac vice* admission pending)  
Morris J. Massel (*pro hac vice* admission pending)  
SIMPSON THACHER & BARTLETT LLP  
425 Lexington Avenue  
New York, New York 10017  
Telephone: (212) 455-2000  
Facsimile: (212) 455-2502

*Proposed Attorneys for the Debtors and*  
*Debtors in Possession*