# Exhibit B, Part 1

## Stalking Horse APA

<u>**Execution Version**</u>

**ASSET PURCHASE AGREEMENT**

by and among

**RZR ACQUISITION COMPANY LLC,**

as Purchaser,

**RZR HOLDING CORPORATION,**

as Parent,

**AMERICAN SAFETY RAZOR COMPANY, LLC,**

as Seller,

and

**UBS AG, STAMFORD BRANCH,**

in its capacity as First Lien Agent on behalf of the First Lien Lenders, for certain limited provisions hereof.

**Dated as of July 28, 2010**

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| Article I | PURCHASE AND SALE OF THE PURCHASED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES | 2 |
| 1.1 | Agreement to Purchase and Sell the Purchased Assets | 2 |
| 1.2 | Excluded Assets | 3 |
| 1.3 | Assumed Liabilities | 4 |
| 1.4 | Excluded Liabilities | 4 |
| 1.5 | Disclosure Schedule Updates | 4 |
| 1.6 | Cure Costs | 5 |
| 1.7 | Assumption/Rejection of Certain Contracts | 5 |
| Article II | CONSIDERATION | 5 |
| 2.1 | Consideration | 5 |
| 2.2 | Cancellation of First Lien Indebtedness | 5 |
| Article III | CLOSING AND TERMINATION | 5 |
| 3.1 | Closing | 5 |
| 3.2 | Closing Deliveries by the Seller | 6 |
| 3.3 | Closing Deliveries by the Purchaser | 7 |
| 3.4 | Termination of Agreement | 7 |
| 3.5 | Effect of Termination | 9 |
| Article IV | REPRESENTATIONS AND WARRANTIES OF SELLER | 9 |
| 4.1 | Organization and Qualification; Subsidiaries | 9 |
| 4.2 | Capitalization | 10 |
| 4.3 | Authorization of Agreement | 10 |
| 4.4 | Conflicts; Consents; Compliance with Law | 11 |
| 4.5 | Absence of Certain Developments | 11 |
| 4.6 | Litigation | 11 |
| 4.7 | Intellectual Property | 12 |
| 4.8 | Agreements, Contracts and Commitments; Certain Other Agreements | 12 |
| 4.9 | Permits | 14 |
| 4.10 | Brokers and Finders | 14 |
| 4.11 | Title to Assets | 14 |

| | | |
|---|---|---|
| 4.12 | Real Property | 14 |
| 4.13 | Tax Returns; Taxes | 15 |
| 4.14 | Employees | 16 |
| 4.15 | Company Benefit Plans | 16 |
| 4.16 | Insurance Policies | 17 |
| 4.17 | Environmental Matters | 17 |
| 4.18 | Customers, Vendors and Suppliers | 18 |
| 4.19 | Financial Statements | 18 |
| 4.20 | Absence of Undisclosed Liabilities | 19 |
| 4.21 | Cure Costs | 19 |
| 4.22 | Disclaimer | 19 |
| Article V | REPRESENTATIONS AND WARRANTIES OF PARENT AND THE PURCHASER | 19 |
| 5.1 | Organization and Qualification | 19 |
| 5.2 | Authority | 20 |
| 5.3 | Parent Consideration | 20 |
| 5.4 | Conflicts; Consents | 20 |
| 5.5 | Litigation | 21 |
| 5.6 | Brokers | 21 |
| 5.7 | Adequate Assurances Regarding Assigned Contracts | 21 |
| 5.8 | Available Financing | 21 |
| 5.9 | Direction to First Lien Agent | 22 |
| 5.10 | No Inducement or Reliance; Independent Assessment | 22 |
| 5.11 | Anti-Money Laundering | 22 |
| Article VI | BANKRUPTCY COURT MATTERS | 23 |
| 6.1 | Competing Bid and Other Matters | 23 |
| 6.2 | Sale Order | 24 |
| Article VII | COVENANTS AND AGREEMENTS | 24 |
| 7.1 | Conduct of Business of the Seller and the Acquired Subsidiaries | 24 |
| 7.2 | Name Change | 25 |
| 7.3 | Access to Information | 25 |
| 7.4 | Assignability of Certain Contracts | 26 |
| 7.5 | Rejected Contracts | 26 |

| | | |
|---|---|---|
| 7.6 | Adequate Assurances Regarding Assigned Contracts | 26 |
| 7.7 | Performance Under Assigned Contracts | 26 |
| 7.8 | Reasonable Efforts; Cooperation | 27 |
| 7.9 | Publicity | 28 |
| 7.10 | Guarantees | 28 |
| 7.11 | Further Assurances | 29 |
| 7.12 | Preservation of Records | 29 |
| 7.13 | Notification of Certain Matters | 29 |
| 7.14 | Transfer Taxes | 29 |
| 7.15 | Director and Officer Liability and Indemnification | 29 |
| 7.16 | Employee Matters | 30 |
| 7.17 | Transition Services Agreement | 31 |
| 7.18 | Wind Down Amount | 31 |
| Article VIII | CONDITIONS TO CLOSING | 31 |
| 8.1 | Conditions Precedent to the Obligations of Parent, the Purchaser and the Seller | 31 |
| 8.2 | Conditions Precedent to the Obligations of the Seller | 32 |
| 8.3 | Conditions Precedent to the Obligations of Parent and the Purchaser | 32 |
| Article IX | DEFINITIONS | 33 |
| 9.1 | Definitions | 33 |
| Article X | TAX MATTERS | 44 |
| 10.1 | Section 368(a)(1)(G) Reorganization | 44 |
| Article XI | STRUCTURAL CONSIDERATIONS | 44 |
| 11.1 | Structural Considerations | 44 |
| Article XII | MISCELLANEOUS | 45 |
| 12.1 | Payment of Expenses | 45 |
| 12.2 | Survival | 45 |
| 12.3 | Entire Agreement; Amendments and Waivers | 45 |
| 12.4 | Execution of Agreement; Counterparts; Electronic Signatures | 45 |
| 12.5 | Governing Law | 46 |
| 12.6 | Jurisdiction, Waiver of Jury Trial | 46 |
| 12.7 | Notices | 46 |
| 12.8 | Binding Effect; Assignment | 47 |

12.9    Severability ...................................................................................................48

12.10   Injunctive Relief ..........................................................................................48

12.11   Non Recourse ..............................................................................................48

12.12   Bulk Sales Laws ..........................................................................................48

12.13   Certain Interpretations ................................................................................48

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of July 28, 2010 (the "<u>Agreement Date</u>"), by and among American Safety Razor Company, LLC, a Delaware limited liability company (the "<u>Seller</u>"), RZR Holding Corporation, a Delaware corporation (the "<u>Parent</u>"), RZR Acquisition Company LLC, a Delaware limited liability company (the "<u>Purchaser</u>") and, for certain limited provisions hereof, UBS AG, Stamford Branch, in its capacity as First Lien Agent on behalf of the First Lien Lenders.  For the purposes of this Agreement, capitalized terms used in herein shall have the meanings set forth in <u>Article IX</u>.

RECITALS

WHEREAS, the Seller and the Acquired Subsidiaries are debtors and debtors in possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>") filed on July 28, 2010 in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (as Jointly Administered, collectively, the "<u>Bankruptcy Case</u>"); and

WHEREAS, the Seller, together with the Acquired Subsidiaries (as hereinafter defined), conduct the business of manufacturing and marketing wet shaving razors and blades and industrial, specialty and medical blades (the "<u>Business</u>");

WHEREAS, the Purchaser desires to purchase all of the Purchased Assets (as hereinafter defined) and assume the Assumed Liabilities (as hereinafter defined) from the Seller and the Seller desires to sell, convey, assign and transfer to the Purchaser all of the Purchased Assets together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement and the Parties intend to effectuate the transactions contemplated by this Agreement in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of a Sale Order of the Bankruptcy Court under Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, the Purchased Assets and Assumed Liabilities shall be purchased and assumed by the Purchaser pursuant to the Sale Order approving such sale, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by the Seller and assignment to the Purchaser of the Assigned Contracts and the liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "<u>Bankruptcy Rules</u>");

WHEREAS, Purchaser will, among other things, deliver to the Seller shares of Parent Consideration in consideration of the Purchased Assets (subject to the Assumed Liabilities);

WHEREAS, this Agreement contemplates that, for federal income tax purposes, the transactions contemplated hereby will be structured as a reorganization under Section 368(a)(1)(G) of the Code;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Parent, the Purchaser and the Seller hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE PURCHASED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Agreement to Purchase and Sell the Purchased Assets.  Upon the terms and subject to the conditions set forth herein, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase and acquire and accept from the Seller, the Purchased Assets, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances).  As used herein, the term "Purchased Assets" shall mean all of the properties, assets and rights, tangible and intangible, real or personal, of the Seller of whatever kind and nature including, without limitation, the following but excluding the Excluded Assets:

(a)     all Cash and Cash Equivalents, except for the Wind Down Amount, but including the Wind Down Surplus;

(b)     all outstanding shares of capital stock or equity or other ownership interest held by the Seller in the Acquired Subsidiaries (the "Acquired Equity Interests");

(c)     all Inventory;

(d)     all deposits, advances, pre-paid expenses and credits;

(e)     all Equipment;

(f)     to the extent assignable pursuant to Section 365 of the Bankruptcy Code, all Contracts relating to the Business, other than such Contracts that are Non-Assigned Contracts (the "Assigned Contracts");

(g)     the Real Property and, to the extent assignable, all licenses, permits, approvals, easements and other rights relating thereto;

(h)     the Owned Intellectual Property (including the Purchased Names, subject to Section 7.2) and, to the extent assignable, including pursuant to Section 365 of the Bankruptcy Code, the Licensed Intellectual Property;

(i)     the Accounts Receivable, the proceeds thereof, and any security therefor;

(j)    all causes of action, lawsuits, judgments, claims and demands of any nature, whether arising by way of counterclaim or otherwise, including avoidance actions under the Bankruptcy Code in respect of the Purchased Assets;

(k)    all Permits and pending applications therefor, in each case to the extent assignable;

(l)    all Seller Plans;

(m)    all insurance policies, to the extent such insurance policies are assignable, and all insurance proceeds and insurance awards receivable with respect to any of the Purchased Assets which arise from or relate to events occurring prior to or on the Closing Date;

(n)    to the extent permitted by applicable Law, all Documents used in or relating to the Business or in respect of the Purchased Assets or the Assumed Liabilities;

(o)    all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, avoidance actions under the Bankruptcy Code and those arising under, or otherwise relating, to the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, guaranties and causes of action under applicable Law;

(p)    any Claim, right or interest of the Seller in or to any refund, rebate, abatement or other recovery for Taxes with respect to the Business or the Purchased Assets, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(q)    all goodwill of the Business;

(r)    all loans and other indebtedness payable to the Seller; and

(s)    all proceeds and products of any and all of the foregoing Purchased Assets.

1.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall the Seller be deemed to sell, transfer, assign or convey to the Purchaser, and the Seller shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of the Seller (collectively, the "Excluded Assets"):

(a)    the Wind Down Amount, but excluding the Wind Down Surplus;

(b)    all Non-Assigned Contracts;

(c)    corporate seals, minute books, charter documents, stock transfer records, record books, original tax and financial records and such other files, books and records of any Person;

(d)    any avoidance claims or causes of action under the Bankruptcy Code or applicable Law with respect to the Excluded Assets; provided, however, that the Seller agrees not to pursue any such actions against those Persons set forth on Schedule 1.2(d) with respect to the Excluded Assets; and

(e)    the Seller's rights in and to this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by the Seller or the Purchaser in connection with the transactions contemplated hereby, or any side agreement between the Seller and the Purchaser entered into on or after the Agreement Date.

1.3    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, the Purchaser shall assume (and thereafter pay, perform, discharge or otherwise satisfy in accordance with their respective terms) all of the Liabilities of the Seller arising or resulting from events or conditions occurring or existing, prior to Closing, including such Liabilities under or relating to any Environmental Laws, except for the Excluded Liabilities (collectively, the "Assumed Liabilities").

1.4    Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, the Purchaser is assuming only the Assumed Liabilities and the Purchaser is not assuming, nor shall the Purchaser be deemed to have assumed, the Liabilities set forth below (collectively, the "Excluded Liabilities"):

(a)    Liabilities of the Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    Liabilities of the Seller in respect of Contracts that are Non-Assigned Contracts;

(c)    the costs and expenses of professionals retained under Section 327 or Section 1103 of the Bankruptcy Code and the fees of the United States Trustee; and

(d)    Liabilities of the Seller in respect of Indebtedness arising prior to the Petition Date, whether or not relating to the Business or the Purchased Assets, including, without limitation, Indebtedness under the Second Lien Credit Agreement and the Mezzanine Credit Agreement, but excluding Indebtedness under the DIP Credit Agreement.

1.5    Disclosure Schedule Updates.  Notwithstanding anything in this Agreement to the contrary, the Purchaser may (a) revise any Schedule setting forth the Purchased Assets and the Excluded Assets to (i) include in the definition of Purchased Assets (pursuant to the applicable Schedule) and to exclude from the definition of Excluded Assets, any Contract of the Seller, but not previously included in the Purchased Assets, at any time on or prior to the tenth (10th) Business Day prior to the date upon which the Sale Hearing is initiated and require the Seller to give notice to the parties to any such Contract and (ii) exclude from the definition of Purchased Assets (pursuant to the applicable Schedule) and to include in the definition of Excluded Assets, any Assigned Contract or other asset of the Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, and (b) revise Schedule 1.7(b) to include or exclude any executory Contract of the Seller, in each case at any time on or prior to the tenth (10th) Business Day prior to the date upon which the Sale Hearing is initiated, provided,

however, that any such change to a Schedule, the definition of "Purchased Assets" or the definition of "Excluded Assets" shall not reduce the amount of the Purchase Price.

1.6    <u>Cure Costs</u>.  In connection with the transfer and assignment of the Assigned Contracts, the Purchaser shall pay (or cause to be paid) and discharge and be responsible for any and all amounts necessary for the Seller to be able to assume and assign the Assigned Contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code, including without limitation, all monetary defaults, if any, and actual pecuniary losses, if any, that have resulted from such defaults (such amounts, the "<u>Cure Costs</u>") and the Seller shall not have any Liability therefor or otherwise in connection therewith.

1.7    <u>Assumption/Rejection of Certain Contracts</u>.

(a)    As of the Closing, the Seller shall assume pursuant to Section 365(a) of the Bankruptcy Code and sell and assign to the Purchaser pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code each of the Assigned Contracts.

(b)    The Seller agrees to file a motion within twenty (20) Business Days after Closing, seeking rejection of the executory Contracts listed on <u>Schedule 1.7(b)</u>.

## ARTICLE II
## CONSIDERATION

2.1    <u>Consideration</u>.  The aggregate consideration (the "<u>Purchase Price</u>") to be paid for the Purchased Assets by the Purchaser shall be (a) shares of Parent Common Stock and Parent Debt (the "<u>Parent Consideration</u>"), for immediate distribution to the First Lien Lenders (as provided in <u>Section 2.2</u>), (b) the assumption of the Assumed Liabilities, (c) the assumption of all Liabilities in respect of the Cure Costs, and (d) an amount in cash sufficient to repay, on behalf of the Seller, all Indebtedness in respect of the DIP Credit Agreement and terminate all obligations of the Seller and its Affiliates thereunder (the "<u>DIP Repayment Amount</u>").

2.2    <u>Cancellation of First Lien Indebtedness</u>.  On the Closing Date and immediately following the Closing, the Seller shall deliver to the First Lien Agent (or a wholly owned subsidiary of the First Lien Agent, as directed by the First Lien Agent in writing to Seller at least two Business Days prior to the Closing) the Parent Consideration for immediate distribution to the First Lien Lenders in consideration of which the First Lien Agent shall acknowledge on behalf of the First Lien Lenders the full satisfaction of the First Lien Indebtedness due and owing under the First Lien Credit Agreement (such principal amounts due and owing as of July 27, 2010 being $243,625,032.05).

## ARTICLE III
## CLOSING AND TERMINATION

3.1    <u>Closing</u>.  Upon the terms and subject to the satisfaction or waiver by the appropriate party of the conditions applicable to it set forth in <u>Article VIII</u>, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") shall occur on the third Business Day following the date on which the

conditions set forth in Article VIII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or on such other date as the Parties may mutually agree. The Closing shall take place at the offices of Paul, Hastings, Janofsky & Walker LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308 or at such other place as the Parties may mutually agree. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Seller in the Purchased Assets to be acquired by the Purchaser hereunder shall be deemed to have passed to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

3.2    Closing Deliveries by the Seller.  At or prior to the Closing, the Seller shall deliver to the Purchaser:

(a)    executed bills of sale, instruments of assignment, certificates of title and other conveyance documents, dated as of the Closing Date, transferring to the Purchaser all of the Seller's right, title and interest in and to the Purchased Assets, together with possession of the Purchased Assets, including the Bill of Sale substantially in the form of Exhibit 3.2(a) (the "Bill of Sale");

(b)    documents evidencing the assignment of the Assigned Contracts and the assignment of any assignable Permits, including the Assignment and Assumption Agreement substantially in the form of Exhibit 3.2(b) (the "Assignment and Assumption Agreement");

(c)    certificates representing the Acquired Equity Interests, duly endorsed in blank or accompanied by duly executed stock powers or other instruments of assignment requested by and reasonably satisfactory in form and substance to the Purchaser;

(d)    a duly executed non foreign person affidavit of the Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that the Seller is not a "foreign person" as defined in Section 1445 of the Code;

(e)    copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Purchased Assets from all Encumbrances (other than Permitted Encumbrances), including any applicable UCC termination statements, all in a form reasonably satisfactory to the Purchaser;

(f)    copies of the waivers, consents and approvals set forth on Schedule 3.2(f) if such waivers, consents and approvals are required to be obtained by the Seller to validly transfer and assign any Assigned Contract in accordance with its terms after giving effect to the relevant provisions of the Bankruptcy Code and the Sale Order (the "Required Consents"), to the extent obtained;

(g)    duly executed and acknowledged special warranty deeds in respect of the Owned Real Property in recordable form, duly executed title affidavits and gap indemnities in the form reasonably required by the title company issuing the Purchaser's title insurance policy for the Owned Real Property and such other transfer, recordation and deed intake forms and

LEGAL_US_E # 88128317. 24

6

other statements, disclosures, documents and certifications reasonably and customarily required to convey real property in the jurisdictions in which the Owned Real Property are located;

(h)    a certificate executed by a duly authorized officer of the Seller certifying that the conditions set forth in Sections 8.3(b) and 8.3(c) have been satisfied; and

(i)    all other certificates, agreements and other documents required by this Agreement to be delivered by the Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3    Closing Deliveries by the Purchaser.    At the Closing, the Purchaser shall deliver to (or at the direction of) the Seller:

(a)    the Purchase Price, including in the form of the (i) Parent Consideration, for immediate distribution as contemplated by Section 2.2, including stock certificates together with stock powers duly executed and undated, for the Parent Common Stock, (ii) documentation reasonably acceptable to the Seller evidencing the release of all Encumbrances on or against the Purchased Assets under the Second Lien Credit Agreement, the assumption of all Liabilities in respect of the Cure Costs and (iii) the DIP Repayment Amount, payable to the lenders under the DIP Credit Agreement;

(b)    the Assignment and Assumption Agreement duly executed by the Purchaser;

(c)    a certificate executed by a duly authorized officer of the Purchaser certifying that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied;

(d)    instruments and documents reasonably acceptable to the Seller evidencing satisfaction of the portion of the First Lien Indebtedness contemplated by Section 2.2; and

(e)    all other certificates, agreements and other documents required by this Agreement to be delivered by the Purchaser or Parent at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4    Termination of Agreement.    This Agreement may be terminated only in accordance with this Section 3.4.    This Agreement may be terminated at any time prior to the Closing Date, as follows:

(a)    by the mutual written consent of the Seller and the Purchaser;

(b)    by written notice of either the Seller or the Purchaser, if the Closing shall not have been consummated prior to October 29, 2010 (the "Outside Date") for any reason other than delay or nonperformance of or breach by the Party seeking such termination; provided, however, that if on such date the only condition to Closing in Article VIII that has not been (or would not be) satisfied or waived on such date is the condition set forth in Section 8.1(c), then the Outside Date shall be extended until the earlier of (i) five Business Days following the date as of which the condition set forth in Section 8.1(c) has been satisfied or waived, and (ii) November 26, 2010; provided further, however, that if the Purchaser is not the prevailing party at

the conclusion of the Auction, the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4(b) unless the Outside Back-Up Date has passed;

(c)     by written notice of either the Seller or the Purchaser, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(d)     by written notice from the Purchaser to the Seller, if any Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the Business or the reorganization of the Seller is appointed in any Bankruptcy Case;

(e)     by written notice of either the Seller or the Purchaser, if (i) the Sale Order shall not have been approved by the Bankruptcy Court by the close of business on the day that is ninety (90) days after the Petition Date or (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of the Purchaser and the Seller, provided that the right to terminate this Agreement under this Section 3.4(e) shall not be available to any Party whose failure to fulfill any covenant or obligation in any material respect under this Agreement has been the cause of, or resulted in, the failure of such order to meet these requirements on or before such date;

(f)     automatically upon the occurrence of an Alternative Transaction of the type described in item (ii) of the definition thereof;

(g)     by written notice of either the Seller or the Purchaser, if the Seller has entered into an Alternative Transaction (other than an Alternative Transaction of the type described in item (ii) of the definition thereof), provided that the Outside Back-Up Date has passed;

(h)     automatically upon the consummation of an Alternative Transaction (other than an Alternative Transaction of the type described in item (ii) of the definition thereof);

(i)     by written notice from the Seller to the Purchaser, if the Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b), (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to the Purchaser of such breach or failure to perform and (iii) has not been waived by the Seller; provided, however, that the Seller shall not be permitted to terminate this Agreement pursuant to this Section 3.4(h) if the Seller is then in material breach of the terms of this Agreement;

(j)     by written notice from the Purchaser to the Seller, if the Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Section 8.3(b) or Section 8.3(c), (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to the Seller of such breach or failure to perform and

(iii) has not been waived by the Purchaser; provided, however, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4(i) if the Purchaser is then in material breach of the terms of this Agreement;

(k)    by written notice from the Purchaser to the Seller in the event that an Event of Default (as defined in the DIP Credit Agreement) has occurred under Section 8.01(a), 8.01(b) or 8.01(m) of the DIP Credit Agreement that, in any case, results in an acceleration of remedies thereunder in accordance with the terms thereof; provided, however, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4(k) unless any such acceleration of remedies under the DIP Credit Agreement has been effectuated in accordance with the DIP Order; or

(l)    by written notice from the Purchaser to the Seller in the event the Seller has received a bona fide written proposal (including, without limitation, a binding commitment letter to underwrite debt or equity securities on behalf of the lenders under the Second Lien Credit Agreement) to repay in full the First Lien Indebtedness, whether pursuant to an Alternative Transaction, a debtor in possession financing, a plan of reorganization or otherwise, if such transaction (or, if there are more than one such proposals, one of such transactions) is not approved by the entry of an order of the Bankruptcy Court within 45 days after the later of the Seller's receipt of such proposal and the Petition Date, throughout which period of time such proposal remains in effect and capable of acceptance by the Seller (unless the Seller has earlier definitively rejected such proposal or definitively terminated negotiations with respect to such proposal, in which case the Purchaser shall have the right to terminate this Agreement pursuant to this Section 3.4(l)).

3.5    Effect of Termination.  In the event of termination of this Agreement by either Party, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided, however, that this Section 3.5, Section 7.9 (Publicity) and Article XII (Miscellaneous) shall expressly survive the expiration or termination of this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Purchaser and Parent as follows:

4.1    Organization and Qualification; Subsidiaries.

(a)    The Seller and each Acquired Subsidiary is duly formed, validly existing and in good standing under the Laws of its jurisdiction of organization. The Seller and each Acquired Subsidiary is duly qualified or registered as a foreign entity to transact business and is in good standing under the Laws of each jurisdiction where the character of its activities or the location of the properties owned, leased or operated by it requires such qualification or registration, except where the failure to be so qualified, registered or in good standing would not have a Material Adverse Effect. The Seller and each Acquired Subsidiary has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Business) as it is now being conducted, subject to the provisions of the Bankruptcy Code. The

Seller has previously delivered to the Purchaser complete and correct copies of each of their and each of the Acquired Subsidiaries' organizational documents, as amended and in effect on the Agreement Date (the "<u>Organizational Documents</u>").

(b)    <u>Schedule 4.1(b)</u> sets forth all of the Subsidiaries of the Seller and each Acquired Subsidiary. Except as set forth on <u>Schedule 4.1(b)</u>, neither the Seller nor any Acquired Subsidiary owns, beneficially or otherwise, any shares or other securities of, or any direct or indirect equity or other ownership interest in, any Person (other than investment securities held in the Ordinary Course of Business). Neither the Seller nor any Acquired Subsidiary has agreed or is obligated to make any future investment in or capital contribution to any Person. Except as set forth on <u>Schedule 4.1(b)</u>, neither the Seller nor any Acquired Subsidiary has guaranteed or entered into any "keep well" or other agreement to be responsible (contingently or otherwise) in respect of any financial or other material obligation of any other Person.

4.2    <u>Capitalization</u>.

(a)    <u>Schedule 4.2(a)</u> sets forth a true and complete list of the name, jurisdiction of organization, jurisdiction of qualification or registration as a foreign entity, as applicable, the number of authorized and outstanding equity interests, and record owner of the equity interests of the Seller, each Acquired Subsidiary and each Subsidiary of the Acquired Subsidiaries. All of the outstanding equity interests of each Acquired Subsidiary (including the Acquired Equity Interests) and each Subsidiary of the Acquired Subsidiaries are duly authorized, validly issued, fully paid and non-assessable, and, except as set forth on <u>Schedule 4.2(a)</u>, are free and clear of all Encumbrances (other than Permitted Encumbrances). Except as set forth on <u>Schedule 4.2(a)</u>, there are no voting trusts or other outstanding equity interests of the Seller or any Acquired Subsidiary entitled to vote on the transactions contemplated by this Agreement.

(b)    Except as set forth on <u>Schedule 4.2(b)</u>, neither the Seller, any Acquired Subsidiary, or any Subsidiary of an Acquired Subsidiary has any (i) outstanding subscription, option, call, warrant or right (whether or not currently exercisable) to acquire any shares of capital stock or other securities of the Seller, such Acquired Subsidiary or such Subsidiary of an Acquired Subsidiary, (ii) outstanding security, instrument or obligation that is or may become convertible into or exchangeable for any shares of capital stock or other securities of the Seller, such Acquired Subsidiary or such Subsidiary of an Acquired Subsidiary or (iii) Contract under which the Seller, such Acquired Subsidiary or such Subsidiary of an Acquired Subsidiary is or may become obligated to sell or otherwise issue any shares of its capital stock or other securities.

4.3    <u>Authorization of Agreement</u>. Subject to the entry of the Sale Order, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Ancillary Documents to which it is a party, the performance by the Seller of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of the Seller. This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by the Seller and, subject to the due authorization, execution and delivery by the other Parties, and

the entry of the Sale Order, this Agreement constitutes, and each Ancillary Document to which it is a party when so executed and delivered, subject to the due authorization, execution and delivery by the other parties thereto, and the entry of the Sale Order, will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms.

4.4    Conflicts; Consents; Compliance with Law.

(a)    Except as set forth on Schedule 4.4(a) and subject to the receipt of the Required Consents and the entry of the Sale Order, the execution, delivery and performance by the Seller of this Agreement or any Ancillary Document to which it is a party, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by the Seller of any other action contemplated hereby or thereby, do not and will not (i) contravene, violate or conflict with any term or provision of its Organizational Documents; (ii) contravene, violate or conflict with, constitute a breach of or default under (with or without notice or lapse of time, or both), result in the loss of any benefit under, or give rise to a right of acceleration, payment, termination or cancellation under any provision of any Material Contract to which it is a party or by which any of its properties or assets are bound; (iii) contravene, violate or conflict with any Order applicable to the Seller or any of the properties or assets (including the Purchased Assets) of the Seller or of any Acquired Subsidiary, or the Business; (iv) contravene, violate or conflict with any Law applicable to the Seller or any Acquired Subsidiary, (v) create or impose any Encumbrances (other than Permitted Encumbrances) on any Purchased Asset, or (vi) adversely affect any Permit; other than, in the case of clauses (ii) through (vi), any such contravention, violation, conflict, creation, imposition or affect that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    The Seller and each Acquired Subsidiary is in compliance with all Laws (other than Environmental Laws, which are addressed in Section 4.17), except for any such violation or non-compliance that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Neither the Seller nor any Acquired Subsidiary has received any written notice from any Governmental Body regarding any actual or possible material violation of, or failure to comply in all material respects with, any such Laws. Neither the Seller nor any Acquired Subsidiary is in default in any material respect of any Order specifically applicable to the Business or the Purchased Assets.

4.5    Absence of Certain Developments.    Except for actions taken in connection with the Bankruptcy Case, or as set forth in Schedule 4.5, since the date of the Most Recent Balance Sheet:

(a)    The Seller has conducted the Business in the Ordinary Course of Business; and

(b)    there has not occurred a Material Adverse Effect.

4.6    Litigation.    Except as set forth in Schedule 4.6, there is no material Action pending, or to the Knowledge of the Seller, threatened against the Seller or any Acquired Subsidiary, any property or asset of the Seller, any Acquired Subsidiary, any Subsidiary of an

Acquired Subsidiary or the Business. Except as set forth in Schedule 4.6, neither the Seller nor any Acquired Subsidiary is subject to any material Order that relates specifically to the Business, the Purchased Assets or the assets and properties of the Acquired Subsidiaries.

      4.7    Intellectual Property.

      (a)    Schedule 4.7(a) sets forth a true, complete and correct list of each (i) registration which has been issued to the Seller or any Acquired Subsidiary and has not expired, been canceled or abandoned with respect to any Owned Intellectual Property (with any relevant registration numbers identified), and (ii) pending application for registration which the Seller or any Acquired Subsidiary has made with respect to any Owned Intellectual Property.

      (b)    Except as set forth on Schedule 4.7(b), to the Knowledge of the Seller, neither the Seller nor any Acquired Subsidiary has, in any material respect, infringed upon, misappropriated, diluted, violated or otherwise come into conflict with the Intellectual Property of any other Person, and no written claims have been asserted by any Person alleging such infringement, misappropriation, dilution, violation or conflict.

      (c)    Except as set forth on Schedule 4.7(c), neither the Seller nor any Acquired Subsidiary has notified any Person in writing that it believes that such Person is interfering with, infringing upon, misappropriating, diluting, violating or otherwise acting in conflict with any Owned Intellectual Property and, to the Seller's Knowledge, no Person is interfering with, infringing upon, misappropriating, diluting, violating or otherwise acting in conflict with any Owned Intellectual Property.

      (d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Seller and each Acquired Subsidiary has taken all necessary action, including the payment of maintenance and renewal fees due and owing prior to the date of this Agreement, in all appropriate jurisdictions to register and maintain the registration or to otherwise preserve the proprietary nature of all of the Owned Intellectual Property.

      4.8    Agreements, Contracts and Commitments; Certain Other Agreements.

      (a)    Each correspondingly lettered section of Schedule 4.8(a) sets forth a true, correct and complete list of the following Contracts currently in force relating to the Business, the Purchased Assets, or any of the properties and assets of the Acquired Subsidiaries, to which the Seller or any Acquired Subsidiary is a party or under which the Seller or any Acquired Subsidiary has continuing Liabilities (collectively, the "Material Contracts"):

      (i)    Contracts relating to the Leased Real Property or the Owned Real Property;

      (ii)    Contracts that do not terminate or expire or are not terminable without penalty within 90 days pursuant to which the Seller or any Acquired Subsidiary would be required to make or entitled to receive, as applicable, payments in excess of $500,000 on an annual basis (other than purchase orders entered into in the Ordinary Course of Business) and Contracts that do terminate or expire or are terminable within 90

days pursuant to which the Seller or any Acquired Subsidiary would be required to make or entitled to receive, as applicable, payments in excess of $500,000 during the remainder of the term of such Contract (other than purchase orders entered into in the Ordinary Course of Business);

        (iii)    employment agreements (excluding offer letters entered into in the Ordinary Course of Business), severance agreements and collective bargaining agreements with any labor union;

        (iv)    joint venture, partnership or other similar Contracts entitling any Person to any profits, revenues or cash flows of the Seller or any Acquired Subsidiary or requiring payments or other distributions based on such profits, revenues or cash flows;

        (v)    Contracts with the customers, vendors, suppliers and distributors set forth on Schedule 4.18, and any Contracts with a term of more than twelve (12) months with any other customers, vendors, suppliers or distributors requiring the payment or receipt by the Seller or any Acquired Subsidiary of an amount in excess of $500,000 on an annual basis (other than purchase orders entered into in the Ordinary Course of Business);

        (vi)    Contracts with any Affiliate (excluding employment and indemnification or expense reimbursement arrangements with officers and directors entered into in the Ordinary Course of Business);

        (vii)    Contracts that (A) limit or restrict the Business, the Seller or any of the Acquired Subsidiaries from engaging in any business or other activity in any jurisdiction; or (B) create an exclusive relationship or arrangement;

        (viii)    Contracts for the granting or receiving of a franchise or under which any Person is obligated to pay or has the right to receive a franchise fee or similar payment;

        (ix)    Contracts (A) with respect to material Seller Intellectual Property licensed or transferred to any third party or (B) pursuant to which a third party has licensed or transferred any material Intellectual Property to the Seller or any Acquired Subsidiary (in the case of both (A) and (B), except for off the shelf software and licenses implied in the sale of such software or other agreements with a value of less than $500,000); and

        (x)    Contracts (other than those described in clauses (i) through (ix) of this Section 4.8) to which the Seller or any Acquired Subsidiary is a party or by which any of their properties or assets are bound that is material to the Seller or any Acquired Subsidiary or the Business as defined in Item 601 of Regulation S-K.

        (b)    True, correct and complete copies of all written Material Contracts (including all amendments, modifications, schedules and supplements thereto, and all waivers with respect thereto) have been made available to the Purchaser. Schedule 4.8(a) provides an accurate description of the terms of each Material Contract that is not in written form. Except as

set forth on Schedule 4.8(b), to the Seller's Knowledge, each Material Contract is in full force and effect and is a valid and binding obligation of the Seller or Acquired Subsidiary party thereto in all material respects, and to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally. Upon entry of the Sale Order and payment of the Cure Costs, and except as set forth on Schedule 4.8(b), (i) neither the Seller nor any Acquired Subsidiary will be in breach or default of its respective obligations under any Assigned Contract in any material respect and (ii) to the Seller's Knowledge, no other party to any of the Assigned Contracts is in material breach or default thereunder.

4.9    Permits. Schedule 4.9 sets forth a true, complete and correct list of all of the material Permits that are necessary for the operation of the Business as currently conducted and the ownership of the Purchased Assets (collectively, the "Material Permits"). To the Seller's Knowledge, all Material Permits are valid and in full force and effect and, to the Seller's Knowledge, there exists no threatened suspension, cancellation or invalidation of any Material Permit. The Seller and each Acquired Subsidiary is in compliance in all material respects with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits.

4.10    Brokers and Finders. Except as set forth on Schedule 4.10, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller, any Acquired Subsidiary or any of their Affiliates in connection with the transactions contemplated by this Agreement and Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of the Seller, any Acquired Subsidiary or any of their Affiliates.

4.11    Title to Assets.

(a)    Immediately prior to or at the Closing, the Seller will have, and, upon delivery to the Purchaser on the Closing Date of the instruments of transfer contemplated by Section 3.2, and subject to the terms of the Sale Order, the Seller will thereby transfer to the Purchaser, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances, except (i) for the Assumed Liabilities and (ii) for Permitted Encumbrances.

(b)    Immediately prior to or at the Closing, subject to the terms of the Sale Order, the Acquired Subsidiaries will have good and valid title to, or valid leasehold interests in, all of their properties and assets, in each case free and clear of all Encumbrances, except (i) for the Assumed Liabilities and (ii) for Permitted Encumbrances.

4.12    Real Property.

(a)    Schedule 4.12(a) sets forth a true, correct and complete list of the Owned Real Property. The Seller or the Acquired Subsidiary that owns such Owned Real Property has good, valid, indefeasible, fee simple title thereto. The Seller has made available to the Purchaser true, correct and complete copies of the deeds and other instruments (as recorded) by which the

applicable Seller or Acquired Subsidiary acquired the Owned Real Property, and true, correct and complete copies of all title insurance policies, abstracts and surveys relating to the Owned Real Property that are in the Seller's or an Acquired Subsidiary's possession.

(b)    Schedule 4.12(b) sets forth a true, correct and complete list of all Leased Real Property specifying the address or other information sufficient to identify all such Leased Real Property.  To the Knowledge of the Seller, each lease or sublease for each Leased Real Property grants the applicable Seller or Acquired Subsidiary the right to use and occupy the applicable Leased Real Property, in accordance with the terms thereof.

(c)    Neither the Seller nor any Acquired Subsidiary has received any written notice of condemnation or eminent domain proceedings pending or threatened that affect the Owned Real Property or Leased Real Property.

4.13    Tax Returns; Taxes.  Except as set forth in Schedule 4.13:

(a)    All material Tax Returns required to have been filed by the Seller or any Acquired Subsidiary have been duly filed and are true, correct and complete in all material respects.  No extension of time in which to file any such Tax Return is in effect.

(b)    All material Taxes due and payable by the Seller or any Acquired Subsidiary (whether or not shown on any Tax Return) have been paid in full or are accrued as appropriate as Liabilities for Taxes on the books and records of the Seller or such Acquired Subsidiary, as applicable.

(c)    No claims, proposals or deficiencies for any material Taxes of the Seller or any Acquired Subsidiary are being asserted, proposed or, to the Knowledge of the Seller, threatened, and no audit or investigation of any material Tax Return of the Seller or any Acquired Subsidiary has occurred in the last (5) years or is currently underway or pending.

(d)    In the last five (5) years, no claim has ever been made in writing against the Seller or any Acquired Subsidiary by any Governmental Body in a jurisdiction where the Seller or such Acquired Subsidiary does not file Tax Returns that the Seller or such Acquired Subsidiary is or may be subject to any material taxation in such jurisdiction.

(e)    The Seller and each Acquired Subsidiary has withheld and paid all material Taxes required to have been withheld and paid by it to the appropriate Government Body in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

(f)    There are no Encumbrances for Taxes with respect to the Seller or an Acquired Subsidiary or their respective assets, nor is there any such Encumbrance that is pending, other than Permitted Encumbrances.

(g)    Neither the Seller nor any Acquired Subsidiary is a party to or bound by any tax sharing, tax indemnity or tax allocation agreement or other similar arrangement with any other party.

4.14    Employees.

(a)    Schedule 4.14(a) contains a true, complete and correct list of the salaried Employees as of the Agreement Date who have written employment agreements under which they are entitled to annual compensation of at least $250,000, which list specifies their position and date of hire.

(b)    Schedule 4.14(b) lists the number of Employees or former Employees by job site who have experienced an Employment Loss in the 90 days immediately preceding the fifth Business Day prior to the date of this Agreement (excluding Employees who are employed for an average of fewer than 20 hours per week or who have been employed for fewer than six of the 12 months preceding the date of this Agreement). Except as set forth in this Agreement, neither the Seller or nor any Acquired Subsidiary will take any action that would result in a "mass layoff" or "plant closing" as defined in the WARN Act between the date of this Agreement and the Closing Date. At the Closing, the Seller shall provide an update of Schedule 4.14(b) that discloses all Employees (including former Employees) who have experienced an Employment Loss in the 90 days immediately preceding the Closing Date. With respect to any Employment Loss that occurred within the one year preceding the date of this Agreement, the Seller and each Acquired Subsidiary has complied in all material respects with the requirements of the WARN Act.

(c)    Except as provided in Schedule 4.14(c), neither the Seller nor any Acquired Subsidiary is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment or written communication to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting Employees nor is the Seller or any Acquired Subsidiary subject to any union organization effort, nor is the Seller or any Acquired Subsidiary engaged in any labor negotiation. There are no strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Seller, threatened against or involving the Seller or any Acquired Subsidiary. Except as provided in Schedule 4.14(c), neither the Seller nor any Acquired Subsidiary has an obligation to make any severance or termination payment to any Employee in excess of any amount payable under applicable Law.

4.15    Company Benefit Plans.

(a)    Schedule 4.15(a) contains a true, complete and correct list of each material Seller Plan.

(b)    None of Seller Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is a "multiple employer welfare arrangement" (as defined in Section 3(40)(A) of ERISA), nor, to the Knowledge of the Seller, is or has been subject to Sections 4063 or 4064 of ERISA. Neither the Seller, nor any Acquired Subsidiary, nor any of their ERISA Affiliates have incurred any Liability under Title IV of ERISA or Code Section 412 or 430 which would reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 4.15(b): (i) no legal or administrative action has been taken by the PBGC to terminate or to appoint a trustee to administer any Seller Plan, (ii) no Seller Plan has had any "accumulated

funding deficiency," as defined in Section 302 of ERISA and Section 412 of the Code prior to December 31, 2009, whether or not waived, that would reasonably be expected to have a Material Adverse Effect, and (iii) no Retirement Plan has had a "reportable event" within the meaning of Section 4043 of ERISA and the regulations thereunder for which the 30-day notice requirement has not been waived by the PBGC or which would be triggered by the transactions contemplated by this Agreement or the occurrence of a proceeding under the Bankruptcy Code.

(c)     Each Seller Plan has been established, administered and invested in accordance with its terms and in material compliance with all applicable Laws and the Seller and each Acquired Subsidiary has performed and complied in all material respects with all of their respective obligations under or with respect to Seller Plans, except where such failure to comply or perform would not reasonably be expected to have a Material Adverse Effect.

(d)     All contributions or premiums required to be made by the Seller and each Acquired Subsidiary to or under each Seller Plan have been made in a timely fashion in accordance with applicable Law, the terms of the applicable Seller Plan and any applicable collective bargaining agreement, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and neither the Seller nor any Acquired Subsidiary has, or as of the Closing Date will have, any actual or potential unfunded Liabilities with respect to any Seller Plan, other than as set forth in its Financial Statements or as set forth on Schedule 4.15(d).

(e)     Except as set forth on Schedule 4.15(e), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local, or foreign Tax law) or in the imposition of an excise tax under Code Section 4999 (or any corresponding provisions of state, local or foreign Tax Law) that would reasonably be expected to have a Material Adverse Effect.

4.16   Insurance Policies.  Schedule 4.16(a) contains a true, correct and complete list of all material insurance policies owned or held by the Seller or any Acquired Subsidiary or otherwise applicable to the Business or the Purchased Assets (the "Insurance Policies").  To the Knowledge of the Seller, (i) all such policies are in full force and effect, all premiums that have been invoiced with respect thereto covering all periods up to and including the date hereof have been paid, and no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy and (ii) except as set forth on Schedule 4.16(b), there are no pending or threatened claims under any Insurance Policy.

4.17   Environmental Matters.  Except as set forth on Schedule 4.17, (a) the Seller and each Acquired Subsidiary is in compliance with all applicable Environmental Laws, (b) there is no investigation, suit, claim, action or judicial or administrative proceeding relating to or arising under applicable Environmental Laws that is pending or against the Seller or any Acquired Subsidiary or any real property owned, operated or leased by the Seller or any Acquired Subsidiary, (c) none of the Owned Real Property or, to the Knowledge of Seller, Leased Real Property, is listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or to the Knowledge of Seller any other

similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or Released by the Seller or any Acquired Subsidiary at any location at, on or under the Owned Real Property or the Leased Real Property in any manner or concentration that requires investigation, removal or remediation under applicable Environmental Laws or would otherwise cause the Purchaser or any Acquired Subsidiary to incur liability under Environmental Laws, and (e) neither the Seller nor any Acquired Subsidiary has received any notice of or entered into any order, writ, injunction, judgment or decree involving uncompleted, outstanding or unresolved obligations, liabilities or requirements relating to or arising under applicable Environmental Laws, except, in the case of clauses (a) through (e), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.   This Section 4.17 constitutes the sole and exclusive representations and warranties of the Seller regarding environmental matters.

4.18    Customers, Vendors and Suppliers.    Schedule 4.18 contains a true, correct and complete list of the names and addresses of the top ten (10) customers, and suppliers (measured by dollar volume of purchases or sales in each case) of the Business during the fiscal year ended December 31, 2009.

4.19    Financial Statements.    Schedule 4.19 sets forth true, correct and complete copies of the following financial statements (collectively, the "Financial Statements"): (a) an audited consolidated balance sheet of the Seller and the Acquired Subsidiaries and the related audited consolidated statements of operations, changes in stockholder's equity, and cash flows as of and for the fiscal year ended December 31, 2009 (the "Audited Financial Statements", and (b) an unaudited consolidated balance sheet of the Seller and the Acquired Subsidiaries as of May 29, 2010 (the "Most Recent Balance Sheet") and the related unaudited consolidated statements of operations, changes in stockholder's equity, and cash flows as of and for the five-month period then ended (the "Unaudited Financial Statements").   The Audited Financial Statements were prepared in accordance with GAAP consistently applied and maintained throughout the period indicated (except as otherwise set forth therein) and have been prepared from, and are in accordance with, the books and records of the Seller and the Acquired Subsidiaries, which books and records have been maintained on a basis consistent with the past practice of the Seller and each of the Acquired Subsidiaries, and fairly present in all material respects the consolidated financial position, the results of operations, changes in stockholder's equity and changes in cash flows of the Seller and each of the Acquired Subsidiaries as of the date thereof and the periods covered thereby. The Unaudited Financial Statements were prepared in accordance with GAAP (subject to normal, recurring year-end adjustments and except for the omission of certain footnotes and other presentation items required by GAAP) consistently applied and maintained throughout the periods indicated, and have been prepared from, and are in accordance with, the books and records of the Seller and the Acquired Subsidiaries, which books and records have been maintained on a basis consistent with the past practice of the Seller and each of the Acquired Subsidiaries, and fairly present in all material respects the consolidated financial position, the results of operations, changes in stockholder's equity and changes in cash flows, as the case may be, of the Seller and each of the Acquired Subsidiaries as of the date thereof and for the period covered thereby. Since the date of the Most Recent Balance Sheet through the date hereof, there has been no change in any accounting (including tax accounting) policy, practice or procedure of the Seller or any Acquired Subsidiary.   The Seller and each Acquired Subsidiary

maintains, in all material respects, accurate books and records reflecting its assets, Liabilities, revenues and expenses.

4.20    Absence of Undisclosed Liabilities. Except as set forth in Schedule 4.20, to the Knowledge of the Seller, neither the Seller nor any Acquired Subsidiary has any Liabilities, except (i) Liabilities reflected on or reserved against in the Most Recent Balance Sheet, (ii) Liabilities that have arisen after the date of the Most Recent Balance Sheet in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement, (iii) Liabilities incurred in connection with the DIP Credit Agreement and (iv) Liabilities that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

4.21    Cure Costs. As of the Agreement Date, the aggregate amount necessary to cure, under Section 365 of the Bankruptcy Code, defaults under the Assigned Contracts is not expected to exceed $1.5 million.

4.22    Disclaimer.    SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE IV, PURCHASER IS ACQUIRING THE PURCHASED ASSETS AND THE BUSINESS "AS-IS, WHERE-IS AND WITH ALL FAULTS", AND SELLER DOES NOT MAKE (AND SELLER EXPRESSLY DISCLAIMS) ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR THE BUSINESS, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PARENT AND THE PURCHASER

Parent and the Purchaser each hereby jointly and severally represent and warrant to the Seller as follows:

5.1    Organization and Qualification. The Purchaser is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Parent is a corporation duly formed, validly existing and in good standing under the Laws of the State of Delaware. Each of Parent and the Purchaser is duly qualified and registered as a foreign entity to transact business, and is in good standing under the Laws of the jurisdiction where the character of its activities or the location of the properties owned, leased or operated by it requires such qualification or registration, except where the failure to be so qualified or registered would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's or Parent's ability to consummate the transactions contemplated hereby. Each of Parent and the Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Business) as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's or Parent's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby.

5.2    <u>Authority</u>.  Each of Parent and the Purchaser has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and for Purchaser to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by each of Parent and the Purchaser and each of the Ancillary Documents to which they are a party, the performance by each of Parent and the Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities by Purchaser have been duly and validly authorized by all necessary action on the part of each of Parent and the Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by each of Parent and the Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by the Seller and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Parent and the Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of each of Parent and the Purchaser, enforceable against each of Parent and the Purchaser in accordance with its terms.

5.3    <u>Parent Consideration</u>.

(a)    At the Closing, (i) the Parent Common Stock shall be duly authorized, validly issued, fully paid and non-assessable, and the Parent Debt shall be duly authorized and validly issued and (ii) no shares of capital stock of Parent will be issued and outstanding at the Closing other than shares of Parent Common Stock included in the Parent Consideration.

(b)    Other than the mandatory provisions of the securities and blue sky laws of the United States, there are no restrictions on transfer of the Parent Consideration (whether at Law, contractual, pursuant to governing documents or otherwise) that would prohibit the transfer of the Parent Consideration by Seller to the First Lien Agent pursuant to <u>Section 2.2</u>.  Assuming Seller takes no action in respect of the Parent Consideration other than as contemplated by <u>Section 2.1</u> and <u>Section 2.2</u>, Seller shall not incur any Encumbrance, liability or obligation in respect of the Parent Consideration solely by virtue of its ownership of the Parent Consideration at the Closing and prior to transfer to the First Lien Agent pursuant to <u>Section 2.2</u>.

5.4    <u>Conflicts; Consents</u>.

(a)    The execution, delivery and performance by each of Parent and the Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Parent and the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Parent and the Purchaser of any other action contemplated hereby or thereby, do not and will not (i) contravene, violate or conflict with any term or provision of Parent's or the Purchaser's organizational documents, (ii) contravene, violate or conflict with, constitute a breach of or default under (with or without notice or lapse of time, or both), result in the loss of any benefit under, or give rise to a right of acceleration, payment, termination or cancellation under any provision of any material Contract to which Parent or Purchaser is a party or by which any of Parent's or Purchaser's properties or assets are bound; (iii) contravene, violate or conflict with any Order applicable to Parent, the

20

Purchaser or any of Parent's or Purchaser's properties or assets, (iv) contravene, violate or conflict with any Law applicable to Parent or the Purchaser, other than, in the case of clauses (ii), (iii) and (iv), any such contravention, violation, conflict, creation, imposition or affect that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Parent's or the Purchaser's ability to perform its respective obligations under this Agreement and the Ancillary Documents to which it is a party, for Purchaser to assume and perform the Assumed Liabilities or for Parent or the Purchaser to consummate on a timely basis the transactions contemplated hereby.

(b)    No consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Person or Governmental Body is required in connection with the execution, delivery and performance by Parent or the Purchaser of this Agreement or the Ancillary Documents to which it is a party, the performance by Parent or the Purchaser with its obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Parent or the Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Parent's or Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, for Purchaser to assume and perform the Assumed Liabilities or for Parent or the Purchaser to consummate on a timely basis the transactions contemplated hereby or thereby.

5.5    <u>Litigation</u>.  There are no pending or, to the knowledge of Parent or the Purchaser, threatened Actions by any Person or Governmental Body against or relating to Parent or the Purchaser (or any Affiliate of the Purchaser) or by which Parent or the Purchaser or their respective assets or properties are or may be bound which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Parent or the Purchaser to perform their respective obligations under this Agreement and the Ancillary Documents to which they are a party, for Purchaser to assume and perform the Assumed Liabilities or for Parent or the Purchaser to consummate on a timely basis the transactions contemplated hereby or thereby.

5.6    <u>Brokers</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Parent or the Purchaser in connection with the transactions contemplated by this Agreement and no Seller is or will become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Parent or the Purchaser or any of their Affiliates.

5.7    <u>Adequate Assurances Regarding Assigned Contracts</u>.  As of the Closing, the Purchaser will be capable of satisfying the conditions contained in Sections 365(b) (1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

5.8    <u>Available Financing</u>.  The Purchaser will have, and Parent will cause the Purchaser to have, at the Closing Date, all funds necessary to consummate the transactions

contemplated by this Agreement, including to promptly pay, when due, all of the Assumed Liabilities and Cure Costs.

     5.9    <u>Direction to First Lien Agent</u>.   Under the First Lien Credit Agreement, the Consenting Lenders hold the requisite authority to direct the First Lien Agent to take all actions contemplated under this Agreement.   On or before the date hereof, the Consenting Lenders shall have directed the First Lien Agent to take all of the actions contemplated to be taken by the First Lien Agent under this Agreement, including the satisfaction of indebtedness specified in <u>Section 2.2</u>.

     5.10    <u>No Inducement or Reliance; Independent Assessment</u>.   With respect to Purchased Assets or any other rights or obligations to be transferred hereunder, neither Parent nor the Purchaser has been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by the Seller, any of its Affiliates, or any agent, employee, attorney or other representative of the Seller representing or purporting to represent the Seller that are not expressly set forth herein (including the schedules and exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally, and neither the Seller, any Affiliates of the Seller, or any agent, employee, attorney, other representative of the Seller or any other Person will have or be subject to any Liability to Parent or the Purchaser or any other Persons resulting from the distribution to Parent or the Purchaser, or Parent's or the Purchaser's use of, any such information, including any information, document or material made available to Parent or the Purchaser in expectation of the transactions contemplated by this Agreement.

     5.11    <u>Anti-Money Laundering</u>.   Each of Parent and the Purchaser is in material compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("<u>USA Patriot Act</u>"), as amended, and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, Effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Parent and the Purchaser operate or do business. Neither Parent, the Purchaser nor any of their respective directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("<u>OFAC</u>") list of "Specially Designated Nationals and Blocked Persons" (the "<u>SDN List</u>") or otherwise the target of an economic sanctions program administered by OFAC, and neither Parent nor the Purchaser is affiliated in any way with, or providing financial or material support to, any such Persons. Each of Parent and the Purchaser agrees that should Parent or the Purchaser be named, or if Parent or the Purchaser receives written notice that any of their respective directors, officers or Affiliates are named, on the SDN List or any other similar list maintained by a Governmental Body in each case prior to Closing, Parent or the Purchaser, as applicable, shall promptly inform the Seller in writing.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

6.1    Competing Bid and Other Matters.

(a)    On the Petition Date, the Seller shall file with the Bankruptcy Court a motion seeking approval of the Sale Order.

(b)    This Agreement and the transactions contemplated hereby are subject to the Seller's right and ability to consider higher or better competing bids with respect to the Business or a material portion of Purchased Assets (each a "Competing Bid"). Parent and the Purchaser acknowledge that from and after the date hereof and until the Closing Date, the Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission or any inquiries, proposals or offers by, any Person (in addition to Parent, the Purchaser and their respective Affiliates, agents and representatives) in connection with any sale or other disposition of Purchased Assets. In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of Purchased Assets and perform any and all other acts related thereto which are required by the Bankruptcy Court or other applicable law, including supplying information relating to the Business and the assets of the Seller to prospective purchasers. Nothing herein shall limit the Seller's fiduciary duty with respect to maximizing the value of the Business and in connection therewith the Seller may solicit and consider Competing Bids including for Alternative Transactions.

(c)    If an auction in respect of the Purchased Assets (the "Auction") is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), the Purchaser shall be required (subject to Section 3.4) to serve as a back-up bidder (the "Back-up Bidder") and keep the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is sixty (60) days after the date of the Sale Hearing (the "Outside Back-Up Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-Up Date be later than November 26, 2010, (ii) the date on which there has occurred an Alternative Transaction of the type described in item (ii) of the definition thereof, or (iii) the date of closing of an Alternative Transaction (other than the type of Alternative Transaction described in item (ii) of the definition thereof) with the Prevailing Bidder. Following the Sale Hearing and prior to the Outside Back-Up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder (if the Back-up Bidder is the next highest bidder at the Auction) will be deemed to have the new prevailing bid, and the Seller will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder.

(d)    The Seller shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware and any other applicable order of the Bankruptcy Court.

6.2    Sale Order. The Parties will use commercially reasonable efforts to cause the Sale Order to be entered by the Bankruptcy Court. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by the Seller of its obligations under this Agreement; (ii) authorize and empower the Seller to assume and assign to Purchaser the Assigned Contracts; and (iii) find that the Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to the Seller and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code. The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, the Seller shall use reasonable efforts to defend such appeal.

## ARTICLE VII
## COVENANTS AND AGREEMENTS

7.1    Conduct of Business of the Seller and the Acquired Subsidiaries. During the Pre-Closing Period, except (a) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (b) as required by applicable Law, (c) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 7.1 or (d) with the prior written consent of the Purchaser (not to be unreasonably withheld, delayed or conditioned), the Seller shall, and shall cause each applicable Acquired Subsidiary to:

(i)    conduct its business and operations in the Ordinary Course of Business;

(ii)    use its commercially reasonable efforts to preserve in all material respects the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, Employees and others having material business dealings with the Seller and the Acquired Subsidiaries;

(iii)    use commercially reasonable efforts to maintain in full force and effect policies of insurance comparable in amount and scope of coverage to that maintained as of the Agreement Date by or on its behalf with respect to the Business and the Purchased Assets; and

(iv)    not make or rescind any material Tax election or take any material Tax position (unless required by Law) or file any material amended Tax Return or change

its fiscal year or financial or Tax accounting methods, policies or practices, or settle any material Tax Liability, or authorize, commit or agree to take any of the foregoing actions.

7.2    Name Change.  Within five (5) Business Days following the Closing Date, the Seller shall, at the Seller's expense, prepare and file with the appropriate Governmental Body appropriate documents, including articles of amendment, if necessary, changing its name so as to effectuate the same and promptly deliver evidence of such name change to the Purchaser.  As promptly as commercially practicable, but in any event within three (3) months following the Closing Date, the Seller shall (i) revoke any filing, that they may have made prior to the Closing Date with any Governmental Body relating to their use of the Purchased Names and (ii) cease using the Purchased Names.  In connection with enabling the Purchaser at or as soon as practicable following the Closing to use the Purchased Names, the Seller shall execute and deliver to the Purchaser all necessary consents related to such change of name as may be reasonably requested by the Purchaser, and shall otherwise cooperate with the Purchaser. Notwithstanding the foregoing, the Seller shall have the right after the Closing Date to use the Purchased Names (i) in a non-trademark manner to describe the history of the Business and (ii) as required by applicable Law.

7.3    Access to Information.

(a)    Subject to customary confidentiality agreements in a form reasonably acceptable to the Seller, the Seller agrees that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Parent and the Purchaser shall be entitled, through their respective officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, Employees, accountants (subject to customary access letters), counsel and operations of the Seller and the Acquired Subsidiaries as the Purchaser's Representatives may reasonably request, provided access should not include any invasive testing of any Real Property or access to any information subject to any attorney-client privilege or for which disclosure is prohibited by Law or Contract.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  The Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with Parent, Parent's Representatives, the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and Parent and the Purchaser shall, and use their commercially reasonably efforts to cause their respective Representatives to, reasonably cooperate with the Seller and its respective Representatives, and shall use their commercially reasonable efforts to minimize any disruption to the Business.

(b)    From and after the Closing Date, Seller shall give Parent, Parent's Representatives, Purchaser and Purchaser's Representatives, and Parent and the Purchaser shall give the Seller and the Seller's Representatives (for the sole purpose of enabling the Seller and its Subsidiaries to wind up their respective Businesses and complete the Bankruptcy Case), reasonable access during normal business hours to the offices, facilities, plans, properties, assets, Employees, Documents and books and records of the other pertaining to the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date, provided such access

should not include any access to any information subject to any attorney-client privilege or for which disclosure is prohibited by Law or Contract. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  The Seller shall, and shall use commercially reasonable efforts to cause its Representatives to, reasonably cooperate with Parent, Parent's Representatives, the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and Parent and the Purchaser shall, and shall use their commercially reasonably efforts to cause their respective Representatives to, reasonably cooperate with the Seller and its respective Representatives in connection with such investigations and examinations, and in each case the parties shall, and shall cause their respective Representatives to, use their commercially reasonable efforts to minimize any disruption to the Business.

7.4    Assignability of Certain Contracts.   To the extent that the assignment to the Purchaser of any Assigned Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the Parties will use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, the Seller and the Purchaser will reasonably cooperate with each other in any lawful and commercially feasible arrangement designed to provide the Purchaser with the benefits and obligations of any such Contract and the Purchaser shall be responsible for performing all obligations under such Contract required to be performed by the Seller on or after the Closing Date to the extent set forth in this Agreement.

7.5    Rejected Contracts.  Until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Seller shall not reject any Assigned Contract in the Bankruptcy Case following the Agreement Date without the prior written consent of the Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned).

7.6    Adequate Assurances Regarding Assigned Contracts.   With respect to each Assigned Contract, the Purchaser will, and Parent will cause the Purchaser to, use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by the Purchaser of each such Assigned Contract.  Parent, the Purchaser and the Seller agree that they will promptly take all action reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making the Purchaser's and the Seller's employees and representatives available to testify before the Bankruptcy Court.

7.7    Performance Under Assigned Contracts.  Without limiting the terms set forth in Section 1.3, but subject to the terms and conditions of this Agreement, the Purchaser shall, and Parent will cause the Purchaser to, from and after the Closing Date, assume all Liabilities of the Seller under the Assigned Contracts.

LEGAL_US_E # 88128317. 24