# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                          )
In re                                     )   Chapter 11
                                          )   Case No. 10-12351 (MFW)
AMERICAN SAFETY                           )
RAZOR COMPANY, LLC, et al.,               )   Jointly Administered
                                          )
               Debtors.                   )   Re: Docket Nos. 17 and 33
                                          )
-------------------------------------------------------x
```

**OBJECTION OF BLACKROCK KELSO CAPITAL CORPORATION AND GSO/BLACKSTONE DEBT FUNDS MANAGEMENT LLC, AS COLLATERAL MANAGER, TO DEBTORS' MOTIONS FOR ORDERS APPROVING: (1) PROPOSED POST-PETITION FINANCING; AND (2) TERMS OF THE DEBTORS' RETENTION OF LAZARD MIDDLE MARKET LLC**

BlackRock Kelso Capital Corporation and GSO/Blackstone Debt Funds Management LLC, as Collateral Manager (the "Second-Lien Lenders"), institutions collectively holding approximately 27.6% of the $178.1 million "second-lien" bank debt owed by the above-captioned debtors (the "Debtors" or "ASR"), by and through their undersigned counsel, respectfully submit this Objection to:

1. *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing*, dated July 28, 2010 [Docket No. 17] (the "DIP Motion"); and

2. *Debtors' Application for an Order (I) Authorizing the Retention and Employment of Lazard Middle Market LLC as Investment Banker and Financial Advisor to the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code Nunc Pro Tunc to the Petition Date, and (II) Waiving Certain Reporting Requirements Pursuant to Delaware Local Rule 2016-2(g)*, dated July 28, 2010 [Docket No. 33] (the "Lazard Application").

In support of this Objection, the Second-Lien Lenders respectfully state as follows:

# **PRELIMINARY STATEMENT**[1]

1.      In the Debtors' "first-day" pleadings and at the "first-day" hearing, the Debtors presented a story to this Court, describing a series of unfortunate events that led to Chapter 11. According to the Debtors, they are but another casualty of dour macro-economics, an overly competitive industry, a frozen refinancing market, and inflexible lenders. Thus, they claim that there are no restructuring alternatives, and the only option available is to "throw the keys" to the first-lien lenders, which are owed approximately $245 million. So the story goes.

2.      The Second-Lien Lenders believe that the story as presented is, at best, incomplete and, at worst, inaccurate. Indeed, the story begins to unravel almost immediately when one considers some very basic case facts: (1) ASR makes wet-shave razors and blades, a product category that is viewed as a personal grooming necessity by more than 80% of the global population; (2) the industry is dominated by fewer than a half-dozen manufacturers, and ASR is the fourth largest; (3) ASR's razors are sold by retailers under each retailer's propriety "private label" brand, such as "Walgreen's" brand razors; (4) these razors are of a high quality and, thus, ASR is by far the dominant player in this segment of the industry; (5) ASR's razors are designed to have the same look and feel as premium brand Gillette and Schick razors and, in fact, are packaged similarly; (6) ASR's "private label" razors sell for a fraction of the cost of comparative premium brand razors; (7) the retailers make considerably higher margins on ASR razors than comparable Gillette and Schick products, thus strongly incentivizing retailers to "push" ASR products; (8) ASR has been grinding blades and running its operations generally in the same manner for years, meaning that there have not been any recent extraordinary events in production

---

[1] While Brown Rudnick LLP previously represented an *ad hoc* consortium of second-lien lenders, that consortium has now disbanded. Brown Rudnick was retained by the Second-Lien Lenders (as defined herein) only shortly before the filing of this Objection. Accordingly, circumstances did not permit the filing of this Objection within the response deadlines established for the DIP Motion and the Lazard Application.

that might explain a sudden change in fortunes; and (9) Gillette and Schick have run their businesses in generally the same manner for several decades, meaning that there have not been any recent extraordinary events in competition that might explain a sudden change in fortunes.

3. In fact, for many months now, the Second-Lien Lenders have been desperately trying to answer the following question: if ASR makes a product that objectively should "sell like hot-cakes," especially in a recessionary economic cycle (when people are motivated to find less expensive alternatives for basic household products), why is it now facing financial ruin? Rather, one would think the Debtors would be a highly profitable business enterprise right about now.

4. After months of diligence (assisted by Chanin Capital Markets and Goldman Sachs, as well as a well-known industry expert), the Second-Lien Lenders concluded that ASR actually does have a very good business, and produces very good products. But, the Second-Lien Lenders also concluded that the Debtors' financial positioning has fallen because it is run by a weak senior management team that has not been sufficiently attentive to the needs of retail customers. Defaults under the Debtors' first and second-lien credit agreements were, after all, directly caused by Wal-Mart's decision at the end of 2009 to discontinue a disappointing manufacturer-customer relationship with ASR.

5. Based on the actual case facts, there is absolutely no reason to believe the Debtors cannot resolve their cases under a plan of reorganization. Quite the contrary, the company's primary dilemma (management) is readily fixable, and the process of repairing historic rifts with retail customers can begin promptly. The Second-Lien Lenders respectfully submit that the "quick sale" process proposed by the Debtors is akin to haphazardly hacking off a limb, instead

of curing the wound with medical attention and care.[2] It likely will lead to a remarkable over-satisfaction of first-lien debt, is otherwise inconsistent with applicable law, is a lazy approach to Chapter 11, and should not be approved absent a full offering of proof that this is actually in the estates' best interests (as opposed to the easiest way to get through a bankruptcy and to collect a "success" fee).

6. Anticipating the obvious, the Second-Lien Lenders readily note that a process was run prior to Chapter 11 to refinance the first-lien debt, and that process did not conclude successfully pre-petition. But, here too, more facts need to be brought to the Court's attention. That process: (a) was run in an overly-compressed time frame (about three weeks), with an impending debt forbearance deadline (and thus bankruptcy) lurking in the background; (b) was reliant on management projections that, to be diplomatic, required explanation and deeper analysis; (c) did produce substantial interest, enabling Goldman Sachs to "circle" approximately $225 million at the time of the bankruptcy filing; (d) is thus not yet finished; and (e) intended for a full "out-of-court" refinancing, as opposed to the partial refinancing (meaning secured lender "cram-down") strategies that became available once the Debtors filed for Chapter 11 relief. See, e.g., In re DBSD North America, Inc., 419 B.R. 179 (Bankr. S.D.N.Y. 2009) (secured lender cram-down plan confirmed); In re TCI 2 Holdings, LLC, 428 B.R. 117 (Bankr. D.N.J.) (same).

7. Indeed, much more work needs to be done before the Court can conclude (at the hearing currently scheduled for September 28, 2010) that a sale is the appropriate end to this Chapter 11 case. But, sadly, the Official Committee of Unsecured Creditors (the "Official Committee") is not well positioned to ferret out the answer. It is comprised of trade creditors and a pension representative, all of whom receive 100% payment under the Debtors' proposed

---

[2] The Second-Lien Lenders view the quick sale proposal as one that governs or controls the provisions or content of a plan of reorganization by essentially disabling the proposal of any form of a plan of reorganization.

"sale" to the first-lien lenders.  Thus, the Official Committee cannot reasonably be expected to serve as an effective case counter-balance or "adversary" for the Debtors; its members are economically motivated to quickly accede to the proposal.

8. The Second-Lien Lenders respectfully submit that a "dual-track" process eventually should be adopted by this Court – one that enables the Second-Lien Lenders to prosecute its own plan of reorganization at the same time the Debtors run their proposed sale process.  Thus, if the Court will not confirm such alternative plan of reorganization, then the case may default to the sale, and "the keys being thrown" to the first-lien lenders.  The Second-Lien Lenders object to the DIP Motion because it incorporates terms and "case controls" that effectively prohibit the Second-Lien Lenders from proposing an alternative plan of reorganization while the Debtors pursue their sale process.

9. The Second-Lien Lenders also object to the Lazard Application to the extent that it proposes a rich compensation structure for Lazard Middle Market LLC ("Lazard"), payable for doing only a fraction of the work normally envisioned for investment bankers advising large Chapter 11 debtors-in-possession.  If Lazard works with the Second-Lien Lenders towards an alternative plan of reorganization and starts assisting in the refinancing effort (something it did not do pre-petition), it should receive the compensation structure proposed.  If, however, it intends only to provide some weak evidentiary back-up for the first-lien lenders to take the business, a $3.5 million "success" fee (plus some monthlies) seems awfully rich.

## BACKGROUND

10. On July 28, 2010, the Debtors filed with this Court voluntary petitions for Chapter 11 relief.  The Debtors continue to operate their business as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

11. On August 5, 2010, the United States Trustee appointed the Official Committee in these Chapter 11 cases. The Official Committee is comprised of: (i) trade creditors, all of whom are slated to receive 100% payment under the Debtors' proposed "sale" to the first-lien lenders; and (ii) the PBGC, another creditor with a claim "assumed" by the proposed sale transaction. On the date of its formation, the Official Committee retained counsel. But, to the best of the Second-Lien Lenders' knowledge, it has not retained a financial advisor.

**ARGUMENT**

**I.    The DIP Motion Should Not Be Approved.**

12. In order to obtain approval of post-petition financing, a debtor bears the burden of proving that: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) the financing is in the best interests of the estate and its creditors; (c) the transaction is necessary to preserve the assets of the estate, and is necessary, essential and appropriate for the continued operation of the debtor's business; (d) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender; and (e) the financing was negotiated in good faith and at arms' length by the debtor, on the one hand, and the lender, on the other. See In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (proposed financing should be beneficial and reasonable); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (court should focus on terms of proposed financing to ascertain whether they are reasonable).

13. A court should deny approval of post-petition financing if it is a product of lender overreaching. See In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of

6

desperation, has compromised the rights of unsecured creditors."); Aqua Assocs., 123 B.R. at 195-96 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); Ames Dep't Stores, 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); In re Mid-State Raceway, Inc., 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.").

14. Of particular concern is the situation where provisions of the post-petition financing cede too much control over the bankruptcy case's outcome to the post-petition lender. For example, in In re Tenney Village Co., 104 B.R. 562 (Bankr. D.N.H. 1989), the debtor sought approval of post-petition financing that provided the lender with undue control over the debtor's business operations and rendered it an event of default if the court confirmed a plan of reorganization over the lender's objection. See id. at 568. The court denied the debtor's motion, characterizing the proposed financing facility as one that "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt." Id. Stated differently by another court, post-petition financing is not consistent with the requirements of the Bankruptcy Code where it would "skew the conduct of the bankruptcy case" and "destroy the adversary process." See Ames Dep't Stores, 115 B.R. at 38.

15. Here, the Debtors cannot carry their burden of demonstrating that the proposed post-petition financing (offered by the first-lien lenders) is fair, reasonable and adequate. The financing is simply a mechanism to ensure that the first-lien lenders are in control and will be the

primary beneficiaries of these Chapter 11 cases. The preposterously aggressive milestones and the too-short maturity date set forth in the proposed credit agreement "pervert the reorganizational process" by leaving the Debtors (and all other parties-in-interest, including especially the Second-Lien Lenders) with little option but to accept the sale process mandated by the credit agreement – a sale process that inures only to the benefit of the first-lien lenders. The proposed financing utterly hamstrings the Debtors and renders them unable to exercise their fiduciary duty to restructure in a manner that maximizes value for all creditors (or even to explore any potential value-maximizing restructuring alternatives). Likewise, the fact that the proposed post-petition financing credit agreement provides for an "Event of Default" if at any time the Debtors' exclusive period to file a plan of reorganization is terminated unduly chills any possibility that value-accretive restructuring alternatives may come to fruition. Such a blatant evisceration of the restructuring process by means of post-petition financing should not be countenanced by this Court, especially under the facts of this case.

## II. The Compensation Structure Proposed In The Lazard Application Should Not Be Approved.

16. In order to approve the retention of professional services, the Court must be satisfied that the employment is necessary and in the best interest of the debtors and their estates, the creditors, and other parties of interest. See In re Helig-Meyers Co., Case No. 00-34533, 2000 Bankr. LEXIS 1957, at *2 (Bankr. E.D. Va. Nov. 14, 2000). That is especially true in connection with a debtor's proposed retention of a financial advisor charged with assisting the debtor carrying out its fiduciary obligations. See In re Allegheny Intern., Inc., 100 B.R. 244, 246 (Bankr. W.D. Pa. 1989) (noting that a debtor and its financial advisors/investment bankers are fiduciaries).

17.  The proponent of the application bears the burden of establishing that the terms of employment are reasonable under the circumstances.  See In re Thermadyne Holdings Corp., 283 B.R. 749, 756 (8th Cir. BAP 2002).

18.  By the Lazard Application, the Debtors seek this Court's authorization to retain Lazard pursuant to Bankruptcy Code Section 328.  Section 328(a) authorizes the employment of professional persons on any "reasonable" terms and conditions, but provides further as follows:

> Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a)

19.  Once a professional is engaged under Bankruptcy Code Section 328(a), the Court is thereafter substantially limited in its ability to revisit compensation terms, regardless of whether circumstances subsequently revealed render such compensation inappropriate.  See In re Federal Mogul-Global, Inc., 348 F.3d 390, 397 (3d Cir. 2003) (subsequent developments must have been incapable of being foreseen); In re NorthWestern Corp., 344 B.R. 40, 43 (D. Del. 2006) (same); In re Argose, Inc., 372 B.R. 705, 710 (Bankr. D. Del. 2007) (a sale of assets at a low price could have been foreseen as "[t]he improvident test under section 328 is foresight-driven, not hindsight-determinative"); see also In re Barron, 325 F.3d 690, 693 (5th Cir. 2003) (the legal standard to be "whether developments, which made the approved fee plan improvident, had been incapable of anticipation at the time the award was approved").

20.  Consequently, this Court must act as "gatekeeper" in evaluating an application under Section 328, and there must be a sufficiently strong record – with "evidence, not conclusory statements" – in order for the proponent to satisfy its burden.  In re Energy Partners,

9

Ltd., 409 B.R. 211, 225-26 (Bankr. S.D. Tex. 2009); In re High Voltage Eng'g Corp., 311 B.R. 320, 333 (Bankr. D. Mass. 2004). A bankruptcy court is not compelled to accept the professional's employment under Section 328 merely because the application cites that statutory provision. See Zolfo, Cooper & Co., v. Sunbeam-Oster Co., 50 F.3d 253, 261 (3d Cir. 1995) (court need not approve or reject an application as presented but may approve an application with modified terms that the Court finds necessary to render the proposed employment reasonable). As Judge Sontchi recently noted in In re Visteon Corp., Case No. 09-11786 (CSS), it would be inappropriate to provide Bankruptcy Code Section 328 approval of a compensation structure without having a "high level of comfort" that it can make a "studied, prudent judgment" that such terms "make any sense." See Hearing Transcript, 92:18-21, June 19, 2009 (attached hereto as Exhibit A).

21. Under the circumstances present here, this Court should deny the Lazard Application. Among other compensation provisions, the Debtors propose to pay Lazard a $3.5 million "success" fee, virtually without regard to the level of services provided by Lazard, the value generated by such services, or the overall results achieved in the Debtors' cases. The Lazard Application does not propose any metrics by which any case outcome should be measured. In effect, Lazard would be paid a substantial fee merely as a consequence of running a perfunctory sale process to "paper-up" the first-lien credit bid – a path of least resistance and non-value-maximizing.

22. It does not appear from anything in the Debtors' submissions that Lazard has done, or will do, anything that would justify the large success fee contemplated by the terms set forth in the Lazard Application. Likewise, it is premature for the Court to approve in advance the various other proposed compensation terms of the Lazard retention. Accordingly, the Court

should decline to approve the compensation terms of Debtors' retention of Lazard under Section 328(a). Instead, this Court should reduce the compensation terms (in particular, any success fee). In the event that the Court does approve the retention on the terms proposed, it should do so pursuant to Bankruptcy Code Section 327 on the condition that the reasonableness of all compensation to Lazard shall be subject to full review under Bankruptcy Code Section 330 after Lazard submits its final fee applications and justifies its entitlement to such fees.

23. As mentioned above, the Second-Lien Lenders are willing to accept the proposed compensation terms provided that Lazard works towards an alternative plan of reorganization (as might be generally expected of a financial advisor under the circumstances) and helps with the refinancing effort (something it did not do pre-petition). That would be, after all, consistent with Lazard's fiduciary obligations and what would ordinarily expect a debtor's financial advisor to do in a case of this size.

## CONCLUSION

**WHEREFORE,** for the reasons discussed herein, the Second-Lien Lenders respectfully request that this Court deny the DIP Motion and the Lazard Application in its present form, and grant the Second-Lien Lenders such other and further relief as is just and appropriate.

Dated: August 19, 2010  
       Wilmington, Delaware

BROWN RUDNICK LLP

By:   /s/ Robert J. Stark  
Robert J. Stark  
Andrew Dash  
Seven Times Square  
New York, NY 10036  
(212) 209-4800 (telephone)  
(212) 209-4801 (facsimile)

Steven D. Pohl  
One Financial Center  
Boston, MA 02111  
(617) 856-8200 (telephone)  
(617) 856-8201 (facsimile)

*Counsel for the Second-Lien Lenders*